| | | |
|---|---|---|
| NEXT PAYMENT SOLUTIONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **No. 17 C 8829** |
| v. | ) | |
| | ) | **Chief Judge Rubén Castillo** |
| CLEARESULT CONSULTING, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

NEXT Payment Solutions, Inc. ("Plaintiff") filed this action against CLEAResult Consulting, Inc. ("Defendant") alleging violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq.*, and the Lanham Act, 15 U.S.C. § 1125(a). (R. 36, Am. Compl. ¶¶ 194-205, 250-60.) Plaintiff also asserts several state-law claims against Defendant. (*Id.* ¶¶ 206-49.) Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant moves to dismiss the amended complaint in its entirety for failure to state a claim. (R. 45, Second Mot. to Dismiss.) Also pending before the Court are two motions to compel. First, there is Plaintiff's motion to compel Defendant to re-designate thousands of documents from "attorney's eyes only" to "confidential" so that Plaintiff's chief executive officer ("CEO") may assist Plaintiff's counsel in reviewing those documents. (R. 102, Pl.'s Mot. to Compel at 6.) Second, there is Defendant's motion to compel supplemental interrogatory responses. (R. 104, Def.'s Mot. to Compel.) For the reasons stated below, Defendant's motion to dismiss is granted in part and denied in part, Plaintiff's motion to compel is granted, and Defendant's motion to compel is granted in part and denied in part.

# BACKGROUND

Plaintiff is an Illinois software development corporation with its principal place of business in Illinois. (R. 36, Am. Compl. ¶ 27.) Defendant is a Texas corporation with its principal place of business in Texas. (*Id.* ¶ 28; R. 30, Answer ¶ 6.) Defendant provides energy efficiency services for organizations exploring ways to reduce energy costs. (R. 36, Am. Compl. ¶¶ 12, 18, 28, 35-36.) Defendant contracted with Plaintiff to use Plaintiff's existing software and have Plaintiff develop other software tools that would aid Defendant's business. (*Id.* ¶¶ 2, 4.)

Plaintiff's "cloud-based"[1] software program, which it refers to as the "Next System," processes digital rebates and customer rewards. (*Id.* ¶¶ 9-10.) Plaintiff licenses the Next System to companies, and those companies in turn provide Plaintiff with their rules for a specific customer rebate or reward program that they intend to offer their customers. (*Id.* ¶ 10.) Plaintiff then adapts its software so that the software carries out the company's desired customer rebate or reward program. (*Id.*) Through Plaintiff's software program, a company's customers can input information related to a rebate or reward that is then automatically processed by the Next System. (*Id.*) This software enables companies to reduce the number of employees needed to process data and carry out administrative tasks related to a customer rebate or reward program. (*Id.*)

The Next System also consists of "back end" software that is used only by the software administrator instead of the end-user customers. (*Id.* ¶¶ 9, 21, 101.) Plaintiff refers to this "back end" software as the "Next System Back End." (*Id.* ¶ 101.) The Next System Back End is only accessible with secure login credentials, and it is protected by a "firewall and other state of the

---

[1] A "cloud-based" software program is a software program available on a server that can be accessed remotely via the Internet. *See Riley v. California*, 134 S. Ct. 2473, 2491 (2014) ("Cloud computing is the capacity of Internet-connected devices to display data stored on remote servers rather than on the device itself.").

art protections." (*Id.*) Plaintiff alleges that it protected its software and the source code for that software by maintaining it on a "separate secure server that was protected by [firewalls], . . . regularly monitored," and only capable of being accessed by two of Plaintiff's employees. (*Id.* ¶ 9.) Plaintiff alleges that it has invested significant amounts of money into developing and improving the Next System, and that it has taken other measures to keep secret the source code and logic of the Next System, such as requiring its employees and independent contractors to execute confidentiality agreements. (*Id.* ¶¶ 13-14.)

In October 2014, the parties entered into a Master Services Agreement ("MSA") that granted Defendant a license to use Plaintiff's software for "digital rebate portal processing," "point of sale," and "reward fulfillment services." (R. 36-1, MSA at 1.) The MSA required Plaintiff to perform services for Defendant related to processing digital rebates and fulfilling rebate payments. (*Id.*) The MSA also contemplates that Plaintiff will "provide those duties set forth and defined in a Scope of Work" ("SOW") document, "in the form of Exhibit A" to the MSA. (*Id.*) Exhibit A to the MSA, however—instead of providing the format for an SOW—appears to be a document that sets forth additional terms and conditions of the MSA. (R. 42, Ex. A to MSA.) The MSA provides that "[t]his Agreement and all SOWs issued hereunder contain the entire Agreement between the parties with respect to the matters covered herein." (R. 36-1, MSA at 7.)

The MSA required Defendant to pay Plaintiff an annual license fee and other revenue as provided for in Exhibit B to the MSA. (R. 36-1, MSA at 2.) In the event that Defendant

terminated the agreement "without cause"[2] or for any other reason than Plaintiff's breach of the MSA, Defendant agreed to pay Plaintiff an early cancellation fee of $300,000, which the MSA refers to as a "kill fee." (*Id.* at 2, 6.) The MSA went into effect on April 1, 2014, and provided that its duration or "Term" was from April 1, 2014, until April 1, 2016, "unless the Parties agree in writing to extend the Term[.]" (*Id.* at 2.) The MSA also provided, however, that "[a]ll obligations incurred under this Agreement *shall survive the Term until satisfied.*" (*Id.* at 1 (emphasis added).)

Plaintiff alleges that the parties then executed several SOWs "pursuant to the terms of the MSA." (R. 36, Am. Compl. ¶¶ 18, 34.) Plaintiff claims that in 2014, it began developing a scheduling software tool for Defendant to use with a company named Consumer Energy, a potential customer of Defendant at that time. (*Id.* ¶ 35.) Plaintiff alleges that in February 2015, Defendant agreed to pay Plaintiff for its use of the scheduling tool, which Plaintiff ultimately branded as the "FAST scheduling wizard." (*Id.* ¶¶ 47-49.) Defendant then allegedly memorialized the parties' agreement related to the FAST scheduling wizard in an SOW that was "in the form prescribed by [Exhibit] A to the MSA." (*Id.* ¶¶ 49-50.)

Plaintiff claims that in August 2016, Defendant approved six more SOWs in "the form prescribed by" Exhibit A to the MSA, and that these SOWs extended Defendant's license for the FAST scheduling wizard to other projects and customers of Defendant. (*Id.* ¶¶ 54-57, 60-64, 67-70, 73-76, 79-82.) Then, in November and December 2016, Defendant allegedly approved two more SOWs that extended the FAST scheduling wizard license to two more of Defendant's

---

[2] The MSA provides that Defendant may terminate the MSA "for cause" if Plaintiff "(1) fails to perform any of its responsibilities set forth in the pursuant [sic] SOWs, or fails to make sufficient progress in its work as to endanger, in the reasonable judgment of [Defendant], complete and timely performance; (2) breaches any of its warranties under this Agreement; (3) fails to comply with any material provision of this Agreement; or (4) violates any provision of this Agreement that specifically authorizes [Defendant] to terminate for cause." (R. 36-1, MSA at 5.)

projects. (*Id.* ¶¶ 85-88, 91-93.) Plaintiff claims that it also provided Defendant with software support services for the projects and customers that were the subject of each SOW, and that it expected Defendant to pay licensing fees for the services and intellectual property rights provided under the SOWs. (*Id.* ¶¶ 98, 102.)

In September 2016, Defendant allegedly requested that one of its employees with login credentials to the Next System Back End provide access to Defendant's senior executives, even though those executives were not given login credentials by Plaintiff. (*Id.* ¶ 151.) Plaintiff claims that Defendant then tasked its employees with identifying key components of Plaintiff's software so that Defendant could incorporate those components into other software that Defendant owned, thereby obviating Defendant's need for Plaintiff's software. (*Id.* ¶¶ 25, 153-56, 160-64.) Plaintiff alleges that none of Defendant's employees who worked in Texas, Oregon, California, New York, or Georgia were provided login credentials to access the Next System Back End. (*Id.* ¶¶ 23-24, 164.) Employees of Defendant from these locations, however, allegedly logged into Plaintiff's servers over 34,000 times between September 2016 and November 2017. (*Id.* ¶¶ 24, 116, 160, 165-74.) Plaintiff alleges that this was part of Defendant's effort to replace the Next System with its own software by accessing Plaintiff's confidential information without authorization. (*Id.*)

Plaintiff avers that in November 2017, Defendant informed Plaintiff that it had achieved a software solution that eliminated the need for Plaintiff's software. (*Id.* ¶ 125.) Defendant, therefore, allegedly informed Plaintiff that it "had terminated each of the . . . SOWs . . . as of October 31, 2017[.]" (*Id.* ¶¶ 125, 161.) Shortly thereafter, Defendant allegedly refused to pay Plaintiff for work performed pursuant to the SOWs. (*Id.* ¶¶ 117-32.) Plaintiff claims that Defendant paid Plaintiff licensing fees under the SOWs until Defendant terminated its

relationship with Plaintiff in November 2017. (*Id.* ¶ 178.) Plaintiff also alleges that Defendant induced Plaintiff to develop other software tools that Defendant had no intent to pay for or use, and that Defendant represented that the parties would execute a new MSA to cover the development of these software tools. (*Id.* ¶¶ 175-77, 179-93.)

## PROCEDURAL HISTORY

On December 7, 2017, Plaintiff filed its initial complaint in this case, and the case was assigned to U.S. District Judge Samuel Der-Yeghiayan. (R. 1, Compl.) On January 3, 2018, Defendant moved to dismiss the complaint for failure to state a claim. (R. 13, First Mot. to Dismiss.) Shortly thereafter, on January 5, 2018, Plaintiff filed a motion for preliminary injunction and expedited discovery. (R. 18, Mot.) On January 19, 2018, the case was reassigned to this Court following Judge Der-Yeghiayan's retirement. (R. 28, Order.)

On January 29, 2018, Defendant filed an answer to the complaint, and the next day, the Court dismissed the complaint without prejudice in a minute order. (R. 30, Answer; R. 31, Min. Entry.) On March 1, 2018, Plaintiff filed its amended complaint, which is the operative pleading in this case. (R. 36, Am. Compl.) The amended complaint asserts seven counts against Defendant: violation of the DTSA (Count I); breach of the SOWs that Plaintiff and Defendant allegedly entered into (Count II); breach of the MSA (Count III); unjust enrichment (Count IV); promissory estoppel (Count V); fraud (Count VI); and common law unfair competition as well as unfair competition in violation of the Lanham Act (Count VII).[3] (*Id.* ¶¶ 194-260.)

On March 30, 2018, Defendant filed its present motion to dismiss. (R. 45, Second Mot. to Dismiss.) Defendant argues that Plaintiff fails to state a claim for breach of the MSA because the

---

[3] The amended complaint mistakenly labels both Plaintiff's fraud and unfair competition claims as "Count VI," so the Court will refer to the unfair competition claim as Count VII given that it is pleaded after Plaintiff's fraud claim. (R. 36, Am. Compl. ¶¶ 243-260.)

MSA expired months before any alleged breach occurred. (R. 47, Mem. at 5-6.) Defendant contends that the Court should also dismiss Plaintiff's breach of contract claim related to the SOWs because Plaintiff does not allege that Defendant failed to perform any act required by the SOWs. (*Id.* at 6-7.) In Defendant's view, Plaintiff's DTSA claim is also subject to dismissal because Plaintiff fails to allege any information that qualifies as a trade secret, and because Defendant's alleged reverse engineering of Plaintiff's software does not constitute misappropriation of Plaintiff's trade secrets. (*Id.* at 7-10.)

Next, Defendant argues that Plaintiff cannot simultaneously maintain an unjust enrichment claim and a breach of contract claim, because an unjust enrichment claim fails as a matter of law where an express contract governs the parties' relationship. (*Id.* at 10-11.) Defendant contends that Plaintiff's promissory estoppel claim likewise fails because promissory estoppel only applies if the parties lack an express agreement. (*Id.* at 11.) Defendant maintains that Plaintiff's promissory estoppel claim fails for the additional reason that the amended complaint does not allege that Defendant promised to pay for any services after the MSA's expiration. (*Id.* at 11-12.)

Defendant argues that Plaintiff's fraud claim should be dismissed because Plaintiff fails to plead fraud with sufficient particularity and does not allege any act or omission attributable to Defendant that is actionable under a theory of fraud. (*Id.* at 12-13.) Finally, Defendant argues that the Court should dismiss Plaintiff's unfair competition claims because the parties are not competitors and because Plaintiff fails to sufficiently plead that Defendant was passing off Plaintiff's software as its own. (*Id.* at 14-15.)

Plaintiff opposes the motion to dismiss and argues that the MSA did not expire because the parties executed SOWs that expressly extended the MSA's term. (R. 69, Resp. at 2.) Plaintiff

also maintains that the MSA's extension can be implied from the parties' conduct before and after the date Defendant claims that the MSA expired. (*Id.* at 4.) As to its breach of contract claim related to the SOWs, Plaintiff contends that it alleges the existence of such agreements and the parties' obligations under such agreements in sufficient detail to survive Defendant's motion to dismiss. (*Id.* at 4-6.)

With respect to its DTSA claim, Plaintiff maintains that it pleads enough facts for its software to qualify as a trade secret and that Defendant misappropriated the software by using improper means to obtain it. (*Id.* at 6-11.) Plaintiff argues that its unjust enrichment and promissory estoppel claims survive dismissal because they can be alleged in the alternative alongside breach of contract claims. (*Id.* at 11-12.) Plaintiff also contends that the amended complaint sets forth enough factual content to state a claim for promissory estoppel and fraud, and that the amended complaint pleads fraud with sufficient particularity. (*Id.* at 12-14.) Finally, Plaintiff argues that it alleges a competitive injury and enough facts regarding Defendant's misleading conduct to state a common law unfair competition claim as well as a claim under the Lanham Act. (*Id.* at 14-15.)

After Defendant filed its motion to dismiss, Plaintiff filed an amended motion for a temporary restraining order on April 6, 2018. (R. 49, Mot.) On July 13, 2018, Plaintiff filed a motion to compel Defendant to re-designate documents marked for "attorney's eyes only" as "confidential," so that Plaintiff's CEO can assist Plaintiff's counsel in reviewing those documents. (R. 102, Pl.'s Mot. to Compel.) On the same day, Defendant filed a motion to compel responses to interrogatory numbers 10, 15, 16, 18, and 21 that it propounded on Plaintiff. (R. 104, Def.'s Mot. to Compel.) On July 18, 2018, the Court denied Plaintiff's amended motion for a temporary restraining order without prejudice and allowed further briefing on Defendant's

motion to compel. (R. 117, Min. Entry.) Defendant's motion to compel is now fully briefed and ripe for resolution. (*See* R. 122, Reply.)

## LEGAL STANDARD

A complaint must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "A motion to dismiss pursuant to Rule 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 825 (7th Cir. 2015) (citation and internal alteration omitted). "Although detailed factual allegations are unnecessary, the complaint must have 'enough facts to state a claim to relief that is plausible on its face.'" *Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. "To rise above the speculative level of plausibility, the complaint must make more than threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Oakland Police & Fire Ret. Sys. v. Mayer Brown, LLP*, 861 F.3d 644, 649 (7th Cir. 2017) (citation, internal alteration, and internal quotation marks omitted). In deciding a motion to dismiss, however, the Court accepts the factual allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff. *Tobey v. Chibucos*, 890 F.3d 634, 645 (7th Cir. 2018).

A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes. FED. R. CIV. P. 10(c). So are documents attached to the complaint, documents that

are critical to the complaint and referred to in it, and information that is subject to proper judicial notice. *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

## ANALYSIS

### I.     Choice of Law

As a preliminary matter, the Court considers which state's substantive law to apply to Plaintiff's state-law claims. The parties do not offer much discussion regarding the substantive law that governs Plaintiff's state-law claims beyond identifying a choice of law provision in the MSA that selects the substantive law of Texas as controlling. (R. 47, Mem. at 5 n.3; R. 69, Resp. at 2 n.1.) At the same time, however, the parties cite to both Illinois and Texas law in their briefs without raising any choice-of-law argument. (*E.g.* R. 47, Mem. at 5 n.3, 10-15; R. 69, Resp. at 2 n.1, 11-15.) Accordingly, the Court addresses as a threshold issue whether it must apply the substantive law of Illinois or Texas to Plaintiff's state-law claims.

First, the Court must determine which state's choice of law rules apply. *See Berger v. AXA Network LLC*, 459 F.3d 804, 809 (7th Cir. 2006) (analyzing first the applicable choice of law rules). When a federal court sits in diversity or exercises supplemental jurisdiction over state-law claims, it generally applies the choice-of-law rules of the state in which it sits. *In re Jafari*, 569 F.3d 644, 648 (7th Cir. 2009); *see also McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014) ("Federal courts hearing state law claims under diversity or supplemental jurisdiction apply the forum state's choice of law rules to select the applicable state substantive law."). Here, the Court has both supplemental and diversity jurisdiction over

Plaintiff's state-law claims.[4] Accordingly, the Court will apply Illinois' choice of law rules. *See In re Jafari*, 569 F.3d at 648; *McCoy*, 760 F.3d at 684.

The MSA has a choice of law provision that selects the substantive law of Texas to govern the MSA, (R. 36-1, MSA at 8), and the parties do not dispute that Texas law therefore governs the MSA. (R. 47, Mem. at 5 n.3; R. 69, Resp. at 2 n.1.) "Illinois courts generally adhere to a contract's choice of law provisions," and because there is no compelling reason to dishonor the MSA's choice of law provision, the Court will apply Texas law to Plaintiff's breach of contract claim related to the MSA. *Sound of Music Co. v. Minn. Mining & Mfg. Co.*, 477 F.3d 910, 915 (7th Cir. 2007); *see also La. Firefighters' Ret. Sys. v. N. Tr. Invs., N.A.*, 312 F.R.D. 501, 508 (N.D. Ill. 2015) (explaining that Illinois enforces choice-of-law provisions unless "(1) the chosen State has no substantial relationship to the parties or the transaction or (2) application of the chosen law would be contrary to a fundamental public policy of a State with a materially greater interest in the issue in dispute." (citation and internal quotation marks omitted)).

The MSA provides that SOWs issued under the MSA form part of the agreement comprising the MSA, (R. 36-1, MSA at 7), and because Plaintiff alleges that the SOWs were executed pursuant to the MSA, extended the MSA's term, and incorporated all of the MSA's provisions including the Texas choice of law provision, (R. 36, Am. Compl. ¶¶ 34, 207, 211;

---

[4] The Court has supplemental jurisdiction over Plaintiff's state-law claims because they are so related to Plaintiff's claims under federal law that they form part of the same controversy. *See* 28 U.S.C. § 1367(a). The Court also has diversity jurisdiction over the state-law claims, which exists "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs" and is between citizens of different states. 28 U.S.C. § 1332(a). Here, the amount in controversy exceeds $75,000. (R. 36, Am. Compl. ¶¶ 7-8.) As for the parties' citizenship, both are corporations, and for purposes of diversity jurisdiction, a corporation is a citizen of both the state it is incorporated in and the state where it has its principal place of business. *Dexia Credit Local v. Rogan*, 629 F.3d 612, 620 (7th Cir. 2010). Plaintiff is an Illinois corporation with its principal place of business in Illinois, and Defendant is a Texas corporation with its principal place of business in Texas. (R. 36, Am. Compl. ¶¶ 27-28; R. 30, Answer ¶ 6.) Thus, the parties are diverse because Plaintiff is a citizen only of Illinois and Defendant is a citizen only of Texas. *See Dexia Credit Local*, 629 F.3d at 620. The Court, therefore, finds that the requirements of diversity jurisdiction are satisfied as to all of Plaintiff's state-law claims. *See id.*

R. 69, Resp. at 2), the Court will apply Texas law to Plaintiff's claim for breach of the SOWs.[5]

*See Sound of Music Co.*, 477 F.3d at 915; *La. Firefighters' Ret. Sys.*, 312 F.R.D. at 508.

With respect to Plaintiff's remaining state law-claims, which are not based on the contract, the parties cite law from both Texas and Illinois without contending that one or the other state's law controls or that the Court's choice of law would be outcome-determinative.[6] "[A] choice-of-law determination is required only when the [party seeking a choice-of-law determination] has established an actual conflict between state laws." *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 729 (7th Cir. 2014) (citation omitted). Such a conflict exists only if applying one state's law as opposed to another's would make a difference in the outcome. *MiMedx Grp., Inc. v. Fox*, No. 16 CV 11715, 2017 WL 3278913, at *2 (N.D. Ill. Aug. 2, 2017). "If no party raises a choice of law issue to the district court, the federal court may simply apply the forum state's substantive law." *Selective Ins. Co. of S.C. v. Target Corp.*, 845 F.3d 263, 266 (7th Cir. 2016) (citation and internal quotation marks omitted), *as amended* (Jan. 25, 2017); *Wehrs v. Benson York Grp., Inc.*, No. 07 C 3312, 2008 WL 753916, at *2 (N.D. Ill. Mar. 18, 2008) (noting that "[w]here the parties fail to raise a choice of law issue, the question is one of procedure: whether the court will address an issue that the parties have chosen not to address," and that "[t]he operative rule is that when neither party raises a conflict of law issue . . . , the federal court simply applies the law of the state in which the federal court sits" (citation

---

[5] Given that Plaintiff analyzes this claim exclusively under Texas law and Defendant raises no objection to Plaintiff's reliance on Texas law, the Court would be free to simply apply Texas law without further inquiry. *See Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) (ruling that courts "honor reasonable choice-of-law stipulations in contract cases . . . [and] do not worry about conflict of laws unless the parties disagree on which state's law applies" (citations omitted)).

[6] For example, with respect to Plaintiff's unjust enrichment claims, Defendant cites both Texas and Illinois law, and Plaintiff relies primarily on Texas law. (*Compare* R. 47, Mem. at 10-11, *with* R. 69, Resp. at 11-12.) In its discussion regarding Plaintiff's common law unfair competition claim, Defendant cites both Texas and Illinois cases, while Plaintiff only cites Illinois cases. (*Compare* R. 47, Mem. at 14, *with* R. 69, Resp. at 14-15.)

omitted)). Because neither party establishes or even raises a conflict between Illinois and Texas law as to Plaintiff's remaining state-law claims, no choice of law determination is required. The Court will apply Illinois law to those claims because Illinois bears a substantial relationship to this dispute. *See MiMedx Grp., Inc.*, 2017 WL 3278913, at *2; *McDavid Knee Guard, Inc. v. Nike USA, Inc.*, No. 08 CV 6584, 2010 WL 3000178, at *4 n.3 (N.D. Ill. July 28, 2010) (assuming, for purposes of the motion before the court, that Illinois law applied because neither party identified which state's substantive law applied to the parties' agreements).

## II. Breach of Contract (Counts II and III)

### A. The MSA (Count III)

Defendant argues that Plaintiff fails to state a claim for breach of the MSA. (R. 47, Mem. at 5-6.) "In Texas, the essential elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009) (citation, alteration, and internal quotation marks omitted) (applying Texas law); *see also Schlumberger Ltd. v. Rutherford*, 472 S.W.3d 881, 892 (Tex. App. 2015) (reciting the same elements). Plaintiff alleges all four elements by pleading that the parties entered into the MSA, that Plaintiff performed its duties under the MSA, that Defendant breached the MSA by cancelling it early and failing to pay the kill fee, and that Plaintiff was damaged as a result. (R. 36, Am. Compl. ¶¶ 213-22.) Out of the four elements, Defendant challenges Plaintiff's allegations related to the existence of a valid contract. (R. 47, Mem. at 5-6.) Specifically, Defendant argues that the MSA expired before Defendant terminated its relationship with Plaintiff in November 2017, and Defendant therefore had no obligation to pay the MSA's kill fee. (*Id.*)

Under Texas law, "[t]he goal of contract interpretation is to ascertain the parties' true intent as expressed by the plain language they used." *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017). "The role of the courts is not to protect parties from their own agreements, but to enforce contracts that parties enter into freely and voluntarily." *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 810-11 (Tex. 2012). To that end, contract terms are given "their plain and ordinary meaning unless the instrument indicates the parties intended a different meaning." *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009). In discerning the parties' intent, the Court "must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless," and "all the provisions must be considered with reference to the whole instrument." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *see also El Paso Field Servs., L.P.*, 389 S.W.3d at 805. If the "contract's language can be given a certain or definite legal meaning or interpretation, then the contract is not ambiguous," and the Court "will construe it as a matter of law." *El Paso Field Servs., L.P.*, 389 S.W.3d at 806. "But, if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue on the parties' intent." *Id.* (citation and internal quotation marks omitted). However, "[a]n ambiguity does not arise simply because the parties offer conflicting interpretations." *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003).

The MSA provides that it "shall remain in force" for a defined "Term," which the MSA defines as April 1, 2014, until April 1, 2016, "unless the Parties agree in writing to extend the Term, or unless [the] Agreement is earlier terminated[.]" (R. 36-1, MSA at 1, 2.) The MSA also provides, however, that "[a]ll obligations incurred under this Agreement *shall survive the Term*

*until satisfied.*" (*Id.* at 1 (emphasis added).) With respect to the parties' rights and obligations under the MSA, the MSA requires Plaintiff to provide "the services required for the performance of those duties set forth and defined in a Scope of Work, in the form of Exhibit A attached to [the MSA] ("SOW")[.]" (*Id.*) The MSA provides that "[t]his Agreement and all SOWs issued hereunder contain the entire Agreement between the parties[.]" (*Id.* at 7.)

A plain reading of the MSA demonstrates that the parties intended for the MSA's rights and obligations to include all SOWs issued under it, and that any obligations incurred pursuant to such SOWs survive the MSA's expiration date of April 1, 2016, if any SOW obligations are still pending. (*Id.* at 1-2, 7.) Thus, the MSA remains in effect after April 1, 2016, if an SOW was issued pursuant to the MSA before April 1, 2016, and not fully performed by April 1, 2016. *See Galderma Labs., L.P. v. Aquent, Inc.*, No. CIV.A. 4:06-CV-822-Y, 2009 WL 498113, at *9-10 (N.D. Tex. Feb. 27, 2009) (construing language in a master agreement providing that the "Master Agreement and such Work Order shall collectively . . . constitute the entire agreement for a Project" to mean that the master agreement "will be supplemented by the related work order and that these two documents will be read together as constituting the entire agreement"). If the Court were to accept the Defendant's interpretation of the MSA as expiring, without exception, on April 1, 2016, the Court would render meaningless the MSA's language providing that pending contractual obligations survive the MSA's term "until satisfied." Because the Court must construe the MSA in a manner so as not to render its provisions meaningless, the Court

finds that the MSA expired when the parties satisfied all SOWs issued under the MSA that were not fully performed as of April 1, 2016.[7] *See J.M. Davidson, Inc.*, 128 S.W.3d at 229.

With this interpretation in mind, the Court now addresses whether Plaintiff has alleged any pending obligations in an SOW that extended the MSA's term beyond April 1, 2016. Plaintiff alleges that: there was an SOW issued pursuant to the MSA before April 1, 2016; Plaintiff's services under that SOW continued beyond April 1, 2016; and Defendant failed to pay for those services in November 2017. (R. 36, Am. Compl. ¶¶ 35-53, 118-20.) The Court, therefore, finds that Plaintiff has plausibly alleged an obligation under the MSA to pay for Plaintiff's SOW services that were not yet satisfied by April 1, 2016, and continued until Defendant's alleged breach in November 2017. (*Id.*) As a result, the Court cannot find, as a matter of law, that the MSA expired before any breach occurred.

Defendant argues that the SOWs in question relate to a different subject matter than the MSA and are not in the format required by Exhibit A to the MSA, which appears to be an argument that the SOWs were not issued pursuant to the MSA such that they can survive the MSA's term. (R. 71, Reply at 2-3.) The Court, however, rejects Defendant's argument that the SOWs cover a different subject matter than the MSA, because the MSA broadly refers to Plaintiff's duties and contemplates that the SOWs will provide further detail about the services and software tools that Plaintiff must provide. (R. 36-1, MSA at 1-2, 7.) Consistent with the

---

[7] The Court recognizes that this interpretation is not necessarily in line with Plaintiff's interpretation of the MSA in its response brief, (*see* R. 69, Resp. at 3-4); however, the Court may interpret the MSA based on its plain language even if the parties' interpretation of the MSA is incorrect. *CMS Partners, Ltd. v. Plumrose USA, Inc.*, 101 S.W.3d 730, 733 (Tex. App. 2003) (observing that, for purposes of interpreting a contract, "[i]n determining the parties' intentions, intent must be taken from the agreement itself, not from the parties' present interpretation."). As Defendant correctly points out, "[w]here an exhibit and the complaint conflict, the exhibit typically controls." *Forrest v. Universal Sav. Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007) (citation omitted). "A court is not bound by the party's characterization of an exhibit and may independently examine and form its own opinions about the document." *Id.*

MSA's intent, the SOWs at issue here merely provide additional detail regarding Plaintiff's obligations. (R. 42 at 7-29, SOWs.)

As for Defendant's argument that the SOWs are not in the format required by the MSA, Defendant merely points out an ambiguity between language in the MSA requiring SOWs to be in the format set forth in Exhibit A, and Exhibit A to the MSA itself, which does not appear to provide a format for the SOWs. (*Compare* R. 36-1, MSA at 1-2, *with* R. 42, Ex. A to MSA at 9.) The Court, however, cannot resolve this ambiguity and construe as a matter of law the required format for the SOWs on a motion to dismiss. *See El Paso Field Servs., L.P.*, 389 S.W.3d at 806. Plaintiff alleges that an SOW was issued pursuant to the MSA and not fully performed by April 1, 2016, (R. 36, Am. Compl. ¶¶ 34, 43-50, 118-20), and Defendant fails to advance any persuasive argument that the MSA's provisions are so clear that they contradict and defeat Plaintiff's allegations as a matter of law.[8] *See El Paso Field Servs., L.P.*, 389 S.W.3d at 806.

Defendant also argues that the SOWs cannot extend the MSA's term because they were contracts entered into after the MSA, and therefore the SOWs can only extend the MSA's term if they incorporate the MSA by reference by "plainly refer[ring]" to the MSA. (R. 47, Mem. at 5-6.) This argument misses the mark because the plain language of the MSA does not contemplate the SOWs as being separate contracts entered into after the MSA's effective date, but rather the MSA unambiguously provides that "[t]his Agreement and all SOWs issued hereunder contain the entire Agreement between the parties[.]" (R. 36-1, MSA at 7.) This provision, when read together with the MSA's provision stating that all pending obligations survive the MSA's term,

---

[8] Defendant alludes to the SOWs being "unsigned," but Plaintiff alleges that all SOWs were duly executed and in the format required by Exhibit A to the MSA. (*See* R. 36, Am. Compl. ¶¶ 49-50, 54-57, 60-64, 67-70, 73-76, 79-82, 85-88, 91-93.) Given the above-referenced conflict between language in the MSA referencing Exhibit A and Exhibit A itself, the Court cannot determine as a matter of law whether the lack of a signature fails to comply with the contractually-required format for SOWs.

leads to the conclusion that the MSA expired only when the parties satisfied all outstanding

SOWs issued pursuant to the MSA. (*See* R. 36-1, MSA at 1-2, 7.) Accordingly, the Court denies

Defendant's motion as to Plaintiff's claim for breach of the MSA.

### B.   SOWs (Count II)

Next, Defendant argues that Plaintiff fails to sufficiently allege an obligation under the

SOWs that Defendant failed to perform. (R. 47, Mem. at 6-7.) The Court notes that Plaintiff has

alleged both SOWs that were issued prior to the MSA's expiration date of April 1, 2016, and

SOWs issued after that date. (R. 36, Am. Compl. ¶¶ 49-51, 54-57, 60-64, 67-70, 73-76, 79-

82, 85-88, 91-93.) The Court declines to dismiss Plaintiff's breach of contract claim related to

the SOWs issued before the MSA's expiration date because the amended complaint plausibly

alleges that those SOWs are part of the MSA, and Plaintiff has sufficiently alleged a breach of

the MSA. (R. 36, Am. Compl. ¶¶ 34, 43-50, 118-20; R. 36-1, MSA at 7.)

Additionally, for all the SOWs—including any SOWs entered into after the MSA's

term—Plaintiff alleges enough facts to plead that each SOW is a standalone, enforceable

agreement that Defendant breached. Plaintiff alleges that the parties mutually assented to the

SOWs, and that the SOWs are supported by consideration. (*See* R. 36, Am. Compl. ¶¶ 49-51, 54-

57, 60-64, 67-70, 73-76, 79-82, 85-88, 91-93.) This pleads all the elements of a valid,

enforceable contract. *See Coleman v. Reich*, 417 S.W.3d 488, 491 (Tex. App. 2013) ("It is well-

settled that a binding contract must have an offer and an acceptance, and the offer must be

accepted in strict compliance with its terms." (citation omitted)). Plaintiff also alleges that it

performed services for Defendant under the SOWs that Defendant failed to pay for, and the

SOWs clearly contemplate payment in return for Plaintiff's services and use of Plaintiff's

software. (R. 42 at 7-29, SOWs.) The amended complaint and its exhibits, therefore, adequately

plead all elements of a breach of contract claim—a valid contract, performance by Plaintiff,

breach of the contract by Defendant, and damages sustained by Plaintiff. *See Mullins*, 564 F.3d at 418. As a result, the Court denies Defendant's motion to dismiss Plaintiff's breach of contract claim related to the SOWs.

Defendant argues that Plaintiff's allegations of breach are directed to terms in the MSA that were not incorporated into the SOWs. (R. 47, Mem. at 6-7.) The Court, however, declines at this stage of the litigation to construe the terms of each SOW to the extent they are considered agreements independent of the MSA. The SOWs contain terms that appear to be blank or state "TBD," and the alleged circumstances surrounding the SOWs would lead to a conclusion that the SOWs are not fully integrated contracts. (*E.g.* R. 42 at 13-19, SOWs.) "A fully integrated written agreement is a final and complete expression of all the terms agreed upon by the parties," whereas "[a] partially integrated agreement is a final and complete expression of all the terms addressed in that written agreement, but is not a final and complete expression of all the terms the parties have agreed upon." *Morgan Bldgs. & Spas, Inc. v. Humane Soc'y of Se. Tex.*, 249 S.W.3d 480, 486 (Tex. App. 2008). "If . . . the contract contains missing material terms, that contract is not fully integrated." *Probado Techs. Corp. v. Smartnet, Inc.*, No. CIV.A. C-09-349, 2010 WL 2232831, at *5 (S.D. Tex. June 2, 2010); *see also Sanders v. Future Com, Ltd.*, No. 02-15-00077-CV, 2017 WL 2180706, at *4 (Tex. App. May 18, 2017) ("A court considers the surrounding circumstances in determining whether, and to what degree, an agreement is integrated."). Construing a contract that is not fully integrated requires the Court to consider evidence outside the written agreement to "explain or supplement terms," a task this Court cannot undertake on a motion to dismiss. *See Probado Techs. Corp.*, 2010 WL 2232831, at *5; *Cypress Engine Accessories, LLC v. HDMS Ltd. Co.*, No. CV H-15-2227, 2017 WL 1710569, at *5 (S.D. Tex. May 3, 2017) (considering extrinsic evidence on summary judgment to construe

the terms and conditions of the parties' agreement). The Court, therefore, will not dismiss Plaintiff's claim for breach of the SOWs.

## III.    Unjust Enrichment (Count IV) and Promissory Estoppel (Count V)

Defendant argues that Plaintiff cannot bring claims for unjust enrichment or promissory estoppel related to the SOWs because those claims are displaced by the breach of contract claims covering the same subject matter. (R. 47, Mem. at 10-12.) In response, Plaintiff contends that it can plead unjust enrichment and promissory estoppel in the alternative to its breach of contract claims. (R. 69, Resp. at 11-13.)

"To state a claim for unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Gagnon v. Schickel*, 983 N.E.2d 1044, 1052 (Ill. App. Ct. 2012). Unjust enrichment is a "quasi-contractual equitable remed[y]" that is available when "no actual agreement between the parties occurred, but a duty is imposed to prevent injustice." *Byram v. Danner*, No. 4-17-0058, 2018 WL 1831819, at *14 (Ill. App. Ct. Apr. 13, 2018). Generally, there can be no claim for unjust enrichment where there is an express contract between the parties. *Stark Excavating, Inc. v. Carter Constr. Servs., Inc.*, 967 N.E.2d 465, 474 (Ill. App. Ct. 2012). If, however, no contract covers the benefit that the plaintiff conferred to the defendant, then recovery under a theory of unjust enrichment is possible. *Id.* Thus, a plaintiff may plead a claim for unjust enrichment in the alternative in the event no enforceable contract is found to exist. *See Reid v. Unilever U.S., Inc.*, 964 F. Supp. 2d 893, 923 (N.D. Ill. 2013) ("A party may plead a claim for unjust enrichment in the alternative where the existence of a valid contract is questioned." (citation and internal alteration omitted)); *Prudential Ins. Co. of Am. v. Clark Consulting, Inc.*, 548 F. Supp. 2d 619, 624 (N.D. Ill. 2008) ("[I]f this Court determines in subsequent proceedings that an enforceable

contract exists between the parties, then [the plaintiff's] unjust enrichment claim cannot stand. At this stage, however, [the plaintiff] has properly alleged the unjust enrichment claim as an alternative to its breach of contract claim.").

Plaintiff alleges that it conferred a benefit to Defendant by providing services and the use of its software, and that Defendant unjustly retained those benefits without paying Plaintiff, to Plaintiff's detriment. (R. 36, Am. Compl. ¶¶ 117-32, 224-35.) Plaintiff also alleges that Defendant's failure to pay plaintiff "violates the fundamental principles of justice, equity, and good conscience." (*Id.* ¶ 231.) These allegations are sufficient to state a claim for unjust enrichment. *See Reid*, 964 F. Supp. 2d at 924 (ruling that plaintiff stated an unjust enrichment claim with allegations that plaintiff did not receive a refund for a product that did not perform as advertised and that the defendant's failure to issue a refund was unjust and inequitable).

The Court also concludes that Plaintiff's unjust enrichment claim is not subject to dismissal simply because Plaintiff alleges the existence of a contract covering the same subject matter as its unjust enrichment claim. The Court has not yet determined whether the SOWs are enforceable contracts or part of an enforceable contract, and therefore, it is premature to dismiss Plaintiff's alternative unjust enrichment claim. *See Footprint Acquisition LLC v. Skal Beverages E., Inc.*, No. 15 C 5013, 2016 WL 147898, at *2 (N.D. Ill. Jan. 13, 2016) (denying motion to dismiss where the plaintiff "expressly pled the unjust enrichment claim in the alternative to the breach of contract claim"). Because Plaintiff alleges that Defendant is liable pursuant to a theory of "implied agreement" for failing to pay for services rendered pursuant to the SOWs in the event the SOWs are not enforceable contracts, (R. 36, Am. Compl. ¶¶ 53, 59, 66, 72, 78, 84, 90, 95), Plaintiff has adequately pleaded its unjust enrichment claim in the alternative. *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013) ("A plaintiff may plead as follows: (1) there is

an express contract, and the defendant is liable for breach of it; and (2) if there is *not* an express contract, then the defendant is liable for unjustly enriching himself at my expense." (emphasis in original)). Accordingly, Defendant's motion to dismiss Plaintiff's unjust enrichment claim is denied.

Turning to Plaintiff's promissory estoppel claim, the Court finds that Plaintiff pleads all the elements of a promissory estoppel claim under Illinois law. To state a claim for promissory estoppel, Plaintiff must allege that: "(1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 566 (7th Cir. 2012) (applying Illinois law); *Salaita v. Kennedy*, 118 F. Supp. 3d 1068, 1080 (N.D. Ill. 2015) (reciting the same elements). Plaintiff plausibly alleges that Defendant unambiguously promised to pay Plaintiff for its services and use of Plaintiff's software on the projects described in each SOW and that Plaintiff, in reliance on Defendant's promise of compensation, performed work for Defendant that Defendant did not pay for. (R. 36, Am. Compl ¶¶ 35-132, 236-42.) These allegations are enough to state a claim for promissory estoppel. *See Wigod*, 673 F.3d at 566; *Salaita*, 118 F. Supp. 3d at 1080.

Defendant's argument that Plaintiff cannot simultaneously plead a claim for promissory estoppel and breach of contract is unpersuasive for the same reason this argument was rejected as to Plaintiff's unjust enrichment claim. "[B]reach of contract and promissory estoppel claims can be pled in the alternative," however, "once a court finds that there was an enforceable contract[,] . . . then a party cannot recover under promissory estoppel." *Boswell v. City of Chicago*, 69 N.E.3d 379, 385 (Ill. App. Ct. 2016), *appeal denied*, 80 N.E.3d 1 (Ill. 2017). The Court has not yet decided whether the SOWs are enforceable contracts beyond concluding that Plaintiff

plausibly alleges that the SOWs are enforceable contracts. Thus, it is premature to dismiss Plaintiff's promissory estoppel claim, and the Court denies Defendant's motion as to this claim. *See id.*

## IV.    Fraud (Count VI)

Defendant argues that the Court should dismiss Plaintiff's fraud claim because Plaintiff fails to plead its claim with the particularity required by Federal Rule of Civil Procedure 9(b), and because Plaintiff fails to plead a cognizable fraud claim. (R. 47, Mem. at 12-13.) Rule 9(b) imposes a heightened pleading standard for fraud claims in federal court, and provides that "[i]n alleging fraud . . . a party must state with particularity the circumstances constituting the fraud[.]" FED. R. CIV. P. 9(b). To satisfy Rule 9(b)'s particularity requirement, "a plaintiff ordinarily must describe the 'who, what, when, where, and how' of the fraud[.]" *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011) (citation omitted). This includes "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016) (citation omitted).

In its fraud allegations, Plaintiff generally ascribes fraudulent conduct to Defendant, a corporation, and fails to identify any person working for Defendant that made a fraudulent representation, the place of the fraudulent representation, or the method by which the misrepresentation was communicated. (R. 36, Am. Compl. ¶¶ 175-93, 244-48.) Accordingly, these allegations fall short of satisfying Rule 9(b), and the Court must dismiss Plaintiff's fraud claim. *See Rocha*, 826 F.3d at 911. Upon review of the allegations, however, Plaintiff may be able to cure its failure to plead fraud with particularity. The amended complaint raises a reasonable inference of a pattern of promises by Defendant to pay Plaintiff for further services

with no intention of keeping such promises, which supports a theory of promissory fraud if alleged with the particularity required by Rule 9(b). *See Maurice Sporting Goods, Inc. v. BB Holdings, Inc.*, No. 15-CV-11652, 2017 WL 2692124, at *4-6 (N.D. Ill. June 22, 2017) ("[W]here the plaintiff is able to allege a specific pattern of misrepresentations, including the person who made the misrepresentation and the time and place at which he did so, courts will allow promissory fraud claims to survive a motion to dismiss."). The Court, therefore, dismisses Plaintiff's fraud claim without prejudice. *See U.S. ex rel. Grenadyor v. Ukranian Vill. Pharmacy, Inc.*, 895 F. Supp. 2d 872, 880 (N.D. Ill. 2012) (dismissing fraud claim lacking the requisite particularity without prejudice because the claim could survive a motion to dismiss if it was pleaded with sufficient particularity).

## V.     Unfair Competition (Count VII)

Plaintiff brings claims for unfair competition under Illinois' common law and the Lanham Act based on the same factual allegations. (R. 36, Am. Compl. ¶¶ 250-60; R. 69, Resp. at 14-15.) Both claims involve the same elements and proofs. *KJ Korea, Inc. v. Health Korea, Inc.*, 66 F. Supp. 3d 1005, 1012 (N.D. Ill. 2014) (analyzing a Lanham Act claim and Illinois unfair competition claim under the same rubric, and collecting cases providing that such claims involve the same elements and proofs); *Desmond v. Chi. Boxed Beef Distribs., Inc.*, 921 F. Supp. 2d 872, 884 (N.D. Ill. 2013) (applying the same analysis to common law unfair competition and Lanham Act claims based on the same allegations). Thus, Plaintiff's state-law unfair competition claim rises or falls with Plaintiff's Lanham Act claim. *See KJ Korea, Inc.*, 66 F. Supp. 3d at 1012; *Desmond*, 921 F. Supp. 2d at 884.

Plaintiff alleges that Defendant violated the Lanham Act by "passing off" its software product as Plaintiff's software product, and that Defendant misled consumers into believing that Defendant was using Plaintiff's software product. (R. 36, Am. Compl. ¶¶ 250-60; R. 69, Resp. at

14-15.) "Passing off or palming off occurs when a firm puts someone else's trademark on its own (usually inferior) goods." *Bretford Mfg., Inc. v. Smith Sys. Mfg. Corp.*, 419 F.3d 576, 580 (7th Cir. 2005); *Slep-Tone Entm't Corp. v. Sellis Enters., Inc.*, 87 F. Supp. 3d 897, 904 n.3 (N.D. Ill. 2015) (noting that "passing off" occurs when the defendant "is passing off his (inferior) product as the plaintiff's" (citation omitted)).

A passing off claim under the Lanham Act fails, however, if the plaintiff does not allege that the defendant sells a tangible good that causes consumer confusion among consumers buying that tangible good. *Phx. Entm't Partners v. Rumsey*, 829 F.3d 817, 831 (7th Cir. 2016) ("[T]he problem for [the plaintiff] . . . is that the defendants are not passing off a tangible good sold in the marketplace as [plaintiff's]. . . . Consequently, the defendants' alleged conduct is not actionable as trademark infringement."). Plaintiff fails to state a viable passing off claim under the Lanham Act because it does not allege that Defendant sells any tangible good in the marketplace as Plaintiff's, but instead merely alleges that Defendant *uses* a product that is passed off as Plaintiff's. *See id.*; *cf. AVKO Educ. Research Found. Inc. v. Wave 3 Learning Inc.*, No. 15-CV-3393, 2015 WL 6123547, at *4 (N.D. Ill. Oct. 15, 2015) ("To the extent that Plaintiff alleges that Defendants create and sell copies of materials with their Sequential Spelling trademark, they have stated Lanham Act claims[.]"). Plaintiff's allegations that Defendant's customers, on "information and belief," perceive the use of Defendant's software tool as being the same as or similar to Plaintiff's, without more, is not enough to survive a motion to dismiss. *Phx. Entm't Partners*, 829 F.3d at 828-29 (ruling that the plaintiff failed to state a Lanham Act passing off claim where consumers only perceive the performance of the plaintiff's product and the alleged consumers are not "direct purchasers" of the plaintiff's product). Accordingly, the Court dismisses Plaintiff's Lanham Act and common law unfair competition claims with prejudice. *See*

*Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013) (noting that "[w]hen a complaint fails to state a claim for relief, the plaintiff should ordinarily be given an opportunity, at least upon request, to amend the complaint to correct the problem if possible," but "[l]eave to amend need not be granted . . . if it is clear that any amendment would be futile").

## VI.    DTSA (Count I)

Defendant argues that the Court should dismiss Plaintiff's DTSA claim because Plaintiff fails to allege any trade secret that is protected by the DTSA and because Defendant's alleged reverse engineering of Plaintiff's software is not actionable misappropriation under the DTSA. (R. 47, Mem. at 7-10.) To state a claim for misappropriation under the DTSA, Plaintiff must allege that "(1) there are trade secrets (2) that were misappropriated" by Defendant. *Molon Motor & Coil Corp. v. Nidec Motor Corp.*, No. 16 C 03545, 2017 WL 1954531, at *3 (N.D. Ill. May 11, 2017). "For a complaint alleging violation of the DTSA to survive a motion to dismiss under Rule 12(b)(6), a plaintiff must identify the purported trade secrets, but it may do so generally to avoid publicly disclosing the information in its court filings." *Wells Lamont Indus. Grp. LLC v. Richard Mendoza & Radians, Inc.*, No. 17 C 1136, 2017 WL 3235682, at *3 (N.D. Ill. July 31, 2017). Under the DTSA, a trade secret includes:

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3).

Plaintiff's claim pertains to software—the Next System Back End—that was allegedly the "backbone" of its software program that Plaintiff developed for Defendant. (R. 36, Am. Compl. ¶¶ 107-11.) Plaintiff also claims that it took several measures to protect this software such as requiring use of passwords and login credentials to access the software and only providing those credentials to a limited number of Defendant's employees. (*Id.* ¶¶ 112-16.) Therefore, Plaintiff alleges, its software derived economic value from not being generally known or accessible. (*See id.* ¶¶ 14, 112-16.) Plaintiff claims that Defendant directed its employees without login credentials to log into the Next System Back End without authorization and reverse-engineer Plaintiff's software for Defendant's benefit. (*Id.* ¶¶ 3, 25, 116, 159-62, 194-205.) These allegations are enough to plead a trade secret that is protected under the DTSA. *See Mission Measurement Corp. v. Blackbaud, Inc.*, 216 F. Supp. 3d 915, 922 (N.D. Ill. 2016) (denying motion to dismiss DTSA claim where "Plaintiff has sufficiently identif[ied] the trade secrets at issue, including the dates and ways it shared this information with Defendants, especially because the only relationship the parties had was collaborating on the jointly-developed software"); *see also Wells Lamont Indus. Grp. LLC*, 2017 WL 3235682, at *3 ("Because Wells Lamont has generally identified which trade secrets have been misappropriated, its allegations are sufficient to survive a motion to dismiss.").

Defendant argues that Plaintiff's software cannot qualify as a trade secret because Defendant asked Plaintiff to develop the software; thus, Plaintiff's software was "readily ascertainable through proper means" by Defendant. (R. 47, Mem. at 8-9.) This argument blends into Defendant's argument that it did not misappropriate Plaintiff's trade secrets, because "misappropriation" under the DTSA means acquisition of Plaintiff's trade secrets through "improper means" or "disclosure or use of a trade secret . . . without express or implied consent

by a person who . . . used improper means to acquire knowledge of the trade secret[.]" 18 U.S.C. § 1839(5). The DTSA provides that "improper means" include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means," but does not include "reverse engineering, independent derivation, or any other lawful means of acquisition[.]" *Id.* § 1839(6).

Plaintiff alleges that Defendant provided information about the Next System Back End to persons who were not authorized to receive that information in breach of the MSA's confidentiality provisions, which survived for three years after the MSA's expiration and indefinitely as to any trade secrets. (R. 36, Am. Compl. ¶¶ 1, 5, 199; R. 36-1, MSA at 3.) More specifically, Plaintiff alleges that it provided a limited number of Defendant's employees login credentials only for the purpose of servicing Defendant's customers. (R. 36, Am. Compl. ¶¶ 5, 21-22, 109-12, 164-74.) Defendant, however, allegedly permitted unauthorized users in its Oregon, Texas, New York, Georgia, and other offices to access the Next System Back End. (*Id.* ¶¶ 164-74.) Such allegations that a defendant abused its legitimate access to the plaintiff's confidential information are enough to plead misappropriation of trade secrets under the DTSA. *See* 18 U.S.C. § 1839(6) (providing that breach of a duty to maintain secrecy constitutes improper means); *Chamberlain Grp., Inc. v. Techtronic Indus. N. Am., Inc.*, No. 16 CV 06113, 2017 WL 4269005, at *7 (N.D. Ill. Sept. 26, 2017) (concluding that "allegations that [the defendant's employee and plaintiff's former employee] abused his legitimate access" to the plaintiff's confidential information was "sufficient at the pleading stage to plausibly allege" misappropriation). The Court, therefore, denies Defendant's motion to dismiss.

Defendant argues that it could not misappropriate Plaintiff's software because Plaintiff developed it for Defendant's use, but a factual dispute remains as to the scope of Defendant's

permitted use. Plaintiff alleges that Defendant exceeded the scope of its permission to access the Next System Back End in violation of the parties' confidentiality agreements. (R. 36, Am. Compl. ¶¶ 5, 21-22, 109-12, 164-74.) Defendant argues that there were no such confidentiality agreements, (R. 47, Mem. at 8-9), but this raises a factual dispute that the Court cannot resolve on a motion to dismiss. *Tobey*, 890 F.3d at 645. Defendant also contends that the MSA precludes any DTSA claim because it provides that Defendant is the owner of all works "specifically and uniquely developed, authorized, created, or reduced to practice, in whole or in part, by [Plaintiff] for [Defendant][.]" (R. 47, Mem. at 9.) This provision, however, is only applicable "unless otherwise expressly agreed to in the terms of the SOW or a written signed agreement between the Parties[.]" (R. 36-1, MSA at 6.) Plaintiff and Defendant expressly agreed in the MSA that that Defendant may only disclose confidential information to "its employees and contractors who (i) have a need to access [it] solely for the purpose of fulfilling the obligations under [the MSA], and (ii) have been advised of the obligations of confidentiality and are under obligations of confidentiality[.]" (*Id.* at 3). This provision, therefore, supersedes the provision cited by Defendant, and Plaintiff alleges that it implemented this confidentiality provision by only allowing a select group of Defendant's employees to access the Next System Back End. (R. 36, Am. Compl. ¶¶ 21-22.) Plaintiff also alleges that Defendant breached this provision by allowing access of confidential information to employees who were not provided access or lacked any need to access the Next System Back End. (*Id.* ¶¶ 5, 21-22, 109-12, 164-74.) The Court, therefore, is not persuaded by Defendant's argument.

Finally, Defendant argues that the amended complaint only alleges that Defendant reverse-engineered Plaintiff's software program, which is not misappropriation under the DTSA. (R. 47, Mem. at 9-10.) Defendant is correct that lawful reverse engineering does not violate the

DTSA. 18 U.S.C. § 1839(6)(B). Plaintiff, however, alleges more than reverse engineering, and alleges that Defendant allowed dissemination and use of Plaintiff's trade secrets by unauthorized persons in breach of a confidentiality agreement. (R. 36, Am. Compl. ¶¶ 5, 21-22, 109-12, 164-74.) The Court, without the benefit of a factual record, cannot say at this early stage in the litigation that Defendant lawfully reverse-engineered Plaintiff's trade secrets and obtained information about the Next System Back End by lawful means. *See* 18 U.S.C. § 1839(6) (noting that "improper means" includes "breach or inducement of a breach of a duty to maintain secrecy"); *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 730 (7th Cir. 2003) ("Reverse engineering can defeat a trade secret claim, but only if the product could have been properly acquired by others[.]"); *Edgenet, Inc. v. GS1 AISBL*, 742 F. Supp. 2d 997, 1026 (E.D. Wis. 2010) ("Under the legal definition, reverse engineering may not occur without legitimate acquisition."). Accordingly, the Court denies Defendant's motion to dismiss Plaintiff's DTSA claim.

## VII.  Motions to Compel

### A.  Plaintiff's Motion

The Court first addresses Plaintiff's motion to compel. On May 16, 2018, the Court entered the parties' stipulated confidentiality order, which limits the disclosure of any confidential information that the parties exchange in discovery. (R. 74, Confidentiality Order.) The confidentiality order allows parties to designate files produced as "confidential," which limits the parties' ability to fully disclose the information in those files but otherwise allows the parties themselves to review such files. (*Id.* at 4-5.) The confidentiality order also allows the parties to designate files for "attorney's eyes only," which does not allow the parties themselves to review files with such a designation. (*Id.* at 5-7.)

Plaintiff moves the Court to compel Defendant to re-designate as confidential 79,376 documents that Defendant designated for attorney's eyes only, so that Plaintiff's CEO can assist in reviewing the large volume of documents. (R. 102, Pl.'s Mot. to Compel at 1, 6.) Plaintiff argues that these documents are improperly designated for attorney's eyes only, and points to video demonstrations on how to use Plaintiff's software tools as examples of files improperly designated for attorney's eyes only. (*Id.* at 5-6.) Plaintiff's counsel notes that it has not reviewed all the files designated for attorney's eyes only but contends that it is impractical or impossible for counsel to timely review each document and provide a reason why each document should not be designated for attorney's eyes only. (*Id.* at 3.)

In response, Defendant argues that Plaintiff failed to comply with the procedures set forth in the confidentiality order because Plaintiff did not afford Defendant an opportunity to review any of the documents designated for attorney's eyes only and reconsider the designation or explain the basis for the designation. (R. 115, Resp. at 2-3.) Defendant argues that Plaintiff only met and conferred about a small portion of documents that were designated for attorney's eyes only and failed to confer on the remaining tens of thousands of documents. (*Id.* at 2-3.) Defendant also argues that it justifiably designated the 79,376 documents for attorney's eyes only because the confidentiality order allows such a designation for "other sensitive and confidential competitive information," in addition to source code and information related to revenues and pricing. (*Id.* at 4.) Defendant represents that "[d]ue to the expedited discovery schedule and large volume of documents, [Defendant] largely made its [attorney's eyes only] designations based on keyword searches to ensure that it captured all documents discussing its proprietary software," and that "[i]f Plaintiff identifies specific documents that truly do not contain information regarding the development [of Defendant's software], but were likely

designated as [attorney's eyes only] as part of [Defendant's] batch designation, [Defendant] will assess accordingly." (*Id.* at 6 n.3.) Defendant also represents that it "is willing to submit a sample of its [attorney's eyes only] material to the Court *in camera*" for review. (*Id.* at 6 n.4.) Defendant argues that the information withheld is "competitively sensitive and would cause harm to [Defendant] if released to a competitor like [Plaintiff]." (*Id.* at 7-8.)

Defendant's decision to "batch designate" documents as attorney's eyes only and then place the burden of individual review of those documents on Plaintiff or this Court is not supported by the confidentiality order or applicable law. The confidentiality order places the "the burden of persuasion" on the designating party to demonstrate that a particular confidentiality designation is proper. (R. 74, Confidentiality Order at 9.) The Federal Rules similarly place the burden on a party seeking to limit disclosure of confidential information to demonstrate that it will be harmed by disclosing information it believes to be confidential. *Pfizer Inc. v. Apotex Inc.*, 744 F. Supp. 2d 758, 766 (N.D. Ill. 2010). The confidentiality order also contemplates that the designating party has reviewed the documents and made a good faith determination that the document falls within one of the categories subject to an attorney's eyes only designation. (R. 74, Confidentiality Order at 2.) Simply running keyword searches, "batch designating" documents, and then placing the burden of individual review of documents on other parties is not a good faith approach.

The Court also finds that Defendant has not carried its burden to show that the documents it has designated for attorney's eyes only merit such a designation. Defendant's attorney's-eyes-only designations hinge upon Defendant's stated concern that Plaintiff is a direct competitor, but Defendant argued to the Court in its motion to dismiss that Plaintiff does not compete with Defendant. (R. 47, Mem. at 1 ("CLEAResult Consulting Inc. and NEXT are not

competitors[.]").) Defendant reasserted this argument in its reply brief. (R. 71, Reply at 14.) Aside from conclusory statements, Plaintiff offers no compelling reason why the information it designated for attorney's eyes only will cause competitive harm if disclosed to Plaintiff's CEO. The Court, therefore, rejects Defendant's assertions that the tens of thousands of documents it has "batch designated" as attorney's eyes only merit that designation.

The Court also rejects Defendant's assertion that Plaintiff failed to meet and confer with Defendant, as Plaintiff details attempts to work with Defendant on the phone and by email to address the tens of thousands of documents designated for attorney's eyes only. (R. 102-1, Cohen Decl. at 2.) Defendant, however, without individually reviewing those tens of thousands of documents, took the position that all those documents were properly designated. (*Id.*) Accordingly, the Court grants Plaintiff's motion to compel and orders Defendant to, within ten days, re-designate all documents marked for attorney's eyes only as "confidential," unless such documents contain source code or information directly revealing a party's revenues or pricing. Given Defendant's failure to demonstrate any competitive harm, Defendant shall not designate files as for attorney's eyes only based on its assertion that the files contain "other sensitive and confidential competitive information." If the parties further disagree about any confidentiality designations, the parties are directed to meet and confer in *good faith* to resolve any disagreements.[9] *See* N.D. ILL. L.R. 37.2.

---

[9] The Court notes that the present motions to compel appear to be part of a larger pattern in which the parties take unreasonable discovery positions and then rely on the Court to sort out the parties' disagreements. (*See* R. 93, Min. Entry (denying motion to compel); R. 117, Min. Entry (denying motion to compel).) The Court cautions the parties against filing motions without attempting to resolve disputes in good faith, as this practice is unacceptable under the Local Rules as well as the parties' general obligation to cooperate in discovery. N.D. ILL. L.R. 37.2; *Slaven v. Great Am. Ins. Co.*, No. 11 C 7993, 2014 WL 4470723, at *2 (N.D. Ill. Sept. 11, 2014) ("Both Rule 37(a)(1) and Local Rule 37.2 require that parties confer *in good faith* over discovery squabbles before approaching the court with a motion." (emphasis in original)).

**B.      Defendant's Motion**

The Court turns to Defendant's motion to compel, which seeks to compel supplemental interrogatory responses to interrogatory numbers 10, 15, 16, 18, and 21 propounded by Defendant. (R. 104, Def.'s Mot. to Compel at 1.) With respect to Interrogatory 21, Defendant argues that Plaintiff fails to identify its trade secrets or those trade secrets that Defendant misappropriated with enough specificity, and that Defendant's response is "implausible, deficient, and internally inconsistent." (R. 105, Mem. at 3-5.) In Defendant's view, Plaintiff must identify the specific "code that warrants trade secret protection" instead of generally referring to "rules, modules, formulas, processes, programs, or codes" as the trade secrets in question. (*Id.* at 6-7.)

"The district court exercises significant discretion in ruling on a motion to compel." *United States ex rel. Lisitza v. Par Pharm. Cos.*, No. 06 C 6131, 2014 WL 222727, at *1 (N.D. Ill. Jan. 21, 2014). "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." FED. R. CIV. P. 26(b)(1).

Defendant's response to interrogatory 21 consists of approximately ten pages and details the elements of its software that are the trade secrets at issue in this case. (R. 110, Interrog. Resps. at 1-10.) The parties have also produced tens of thousands of documents and taken depositions, and the Court finds that a further response to interrogatory 21 is unnecessary considering the relevance of any such further elaboration, the potential of further elaboration to

duplicate discovery already provided, and the vast amount of discovery already exchanged in this case. *See* FED. R. CIV. P. 26(b)(1).

Defendant argues that Plaintiff implausibly describes a broad range of software as the software allegedly misappropriated, but it is not appropriate to argue the merits of a case through motions to compel. *See Hubbell Indus. Controls, Inc. v. Electro Power Sys. of Utah, Inc.*, No. 12-CV-8609, 2013 WL 5676916, at *4 (N.D. Ill. Oct. 17, 2013) (denying motion to compel interrogatory based on party's arguments going to the merits of a claim, and observing that "[a]rguments like these about the functionality or distinctiveness of Hubbell's trade dress go to the merits of Hubbell's infringement claim, not to the sufficiency of its response to Interrogatory No. 11" and that "[i]f Electro Power is unclear about specific element[s] of Hubbell's alleged trade dress, it can seek clarification during . . depositions"); *Stereo Optical Co. v. Judy*, No. 08 C 2512, 2009 WL 1360871, at *2 (N.D. Ill. May 14, 2009) ("To the extent that VAC argues that none of the documents supplied by Stereo are sufficient to support a trade secret claim, that is a matter to be determined on the merits of the case and not on a discovery motion."). If Defendant believes that Plaintiff's claims are implausible, Defendant may file a motion for summary judgment or rebut Plaintiff's evidence at trial. *See Stereo Optical Co.*, 2009 WL 1360871, at *2.

As for Plaintiff's responses to interrogatory numbers 10, 15, 16, and 18, Defendant argues that Plaintiff fails to fully respond to these interrogatories because Plaintiff does not specify in detail the documents it relied on in its answers to these interrogatories. (R. 105, Mem. at 8-9.) Defendant contends that Plaintiff invokes Rule 33(d) as to these interrogatories, which would require Plaintiff to specify in detail the documents that offer an answer to the interrogatories. (*Id.*)

Rule 33(d) provides that a party "may" respond to an interrogatory by producing business records, which the rule itself describes as the "option to produce business records." FED. R. CIV. P. 33(d). Producing or identifying business records in response to an interrogatory is an alternative to responding in narrative form but not a requirement. *Id.* Plaintiff has chosen to answer interrogatory numbers 10, 15, and 16 in narrative form, (R. 113-2, Interrog. Resps. at 12-13, 17-18), and the Court finds that Plaintiff's answers are sufficient and proportional given the large amount of discovery already undertaken in this case. *See* FED. R. CIV. P. 26(b)(1). Because Plaintiff has answered these interrogatories in narrative form, it does not need to satisfy the requirements of Rule 33(d), and Defendant's arguments are unavailing. *See* FED. R. CIV. P. 33(d). Accordingly, Defendant's motion to compel is denied as to interrogatories 10, 15, and 16.

With respect to interrogatory 18, which asks for the date, time, and location of each login by Defendant's employees to Plaintiff's FAST scheduling wizard, Plaintiff responded that it "will produce a server log" without any further response in narrative form. (R. 113-2, Interrog. Resps. at 19.) For this interrogatory, Plaintiff opted to produce business records pursuant to Rule 33(d) and is required under that rule to respond by "specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could[.]" FED. R. CIV. P. 33(d)(1). Defendant asks that Plaintiff identify these documents by their Bates numbers.[10] (R. 105, Mem. at 9; R. 122, Reply at 6-7.) The Court finds that the server log is relevant to the issues in this case, and that it is not unduly burdensome for Plaintiff to identify by Bates number the document produced that is the referenced "server log."

---

[10] A "Bates number" is a unique number affixed to each page of the documents produced in discovery that allows the parties and the Court to readily locate any reference to discovery materials. *See, e.g., United States ex rel. Proctor v. Safeway, Inc.*, No. 11-CV-3406, 2018 WL 1210965, at *3 (C.D. Ill. Mar. 8, 2018) ("Safeway must . . . place a unique Bates number on each Issue File produced. The parties and the Court must have a way to identify each document and verify its authenticity. A Bates number is an appropriate way to meet those requirements.").

*See* FED. R. CIV. P. 26(b)(1). Therefore, Defendant's motion to compel a response to interrogatory number 18 is granted as set forth herein. The Court orders Plaintiff to identify by Bates number the "server log" referenced in its response to interrogatory number 18.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss (R. 45) is GRANTED IN PART and DENIED IN PART as set forth herein, and Plaintiff's Motion to Compel (R. 102) is GRANTED as set forth herein. Defendant shall, within ten days of this order, re-designate all documents marked for attorney's eyes only as "confidential," unless such documents contain source code or information directly revealing a party's revenues or pricing. Defendant's motion to compel (R. 104) is GRANTED IN PART and DENIED IN PART as set forth herein. Plaintiff shall, within ten days of this order, identify by Bates number the "server log" referenced in its response to interrogatory number 18.

The parties shall appear for a status hearing on August 9, 2018, at 9:45 a.m. The parties are DIRECTED to reevaluate their settlement positions in light of this opinion and to exhaust all settlement possibilities prior to the status hearing.

ENTERED: _____

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: July 31, 2018**

37