**PUBLIC VERSION (REDACTED)**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NEXT Payment Solutions, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | Case No.1:17-cv-08829 |
| | ) | |
| vs. | ) | Honorable Ruben Castillo |
| | ) | presiding |
| CLEAResult Consulting, Inc., | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) | |

<u>**SECOND AMENDED COMPLAINT**</u>

**INTRODUCTION**

**Jurisdiction Venue and Parties**

1.      From at least as early as September 2016 until November 2017, Defendant, CLEAResult Consulting, Inc. ("CCI") engaged in a massive scheme to defraud NEXT Payment Solutions, Inc. ("NEXT") of its trade secrets in software called the NEXT FAST Tool.

2.      NEXT is a small Illinois software development corporation, formed in 2011, and located at 707 Skokie Blvd., Ste. 600, Northbrook, IL 60662. NEXT brings this suit for misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. §§ 1832 and 1836, and under the Illinois Trade Secrets Act, 765 ILCS 1065; for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; and for breach of contract, unjust enrichment, promissory estoppel, and common law fraud.

3.      CCI is a multi-million dollar Texas corporation with its principle place of business at 301 Westbank Drive, Building A, Suite 300, Austin, TX 78746. According to its website, CCI is a service business that offers energy programs and demand-side management strategies. According

**PUBLIC VERSION (REDACTED)**

to its website, www.clearesult.com, CCI is "the single largest provider of energy solutions in North America." According to owler.com, CCI's revenues were estimated at $ 210 million in 2014 and thereby exceeded NEXT's revenues by a factor of 200%.

4.     This Court has subject matter jurisdiction of the federal trade secret claim under 18 U.S.C. §1836(c), and of the Computer Fraud and Abuse Act claim under 18 U.S.C. § 1030 (a) (5), both under 28 U.S.C. § 1331.  This Court has supplemental pendent jurisdiction of the breach of contract, promissory estoppel, unjust enrichment, common law fraud and Illinois trade secrets claims because they arise out of the same acts and occurrences as the federal claims. This Court also has jurisdiction over the breach of contract, promissory estoppel, unjust enrichment, common law fraud and Illinois trade secrets claims under 28 U.S.C. §1332(a)(1) because, as is alleged in paragraphs 1 and 2 above, the parties are citizens of different states and the matter in controversy exceeds $75,000.

5.     This Court has personal jurisdiction over Defendant CLEAResult Consulting, Inc. ("CCI") because it is registered to do business in the State of Illinois and has an agent for service of process, CT Corporation System, located at 208 South LaSalle St, Suite 814, Chicago IL 60604 according to the records of the Illinois Secretary of State.

6.     Venue is proper in this District under 28 U.S.C. §1391(c)(2).

**Introduction**

7.     NEXT began development of its proprietary software platform in 2011 (the NEXT System), which was initially licensed to businesses to automate the workflow for processing of rebates for rebate programs.  NEXT protected the NEXT System from the beginning with non-disclosure agreements, confidentiality agreements, restrictive access agreements, secure servers and state of the art software protection tools. The NEXT System was and is a cloud-based software platform available on servers controlled by NEXT, which can be accessed remotely via the Internet and used by NEXT's customers who have login credentials for purposes authorized by NEXT and

agreed to by its licensees. The NEXT System is housed in Rackspace servers and is subject to state-of-the-art security protection. The NEXT System can be accessed only by entities which have been licensed by NEXT to use the NEXT System, only by using login credentials authorized by NEXT and agreed to by its licensees, and only for the purpose of using the NEXT System to automate workflow for programs such as scheduling utility services and management of rebate programs.

8.      Initially, the NEXT System was used to provide a digital rebate portal processing system, a point of sale system and reward and fulfillment services. When a NEXT client wanted to use the NEXT system to aid in the processing of a rebate program, for example, NEXT would license the client to use the NEXT System. The client would provide the rules for the rebate program. NEXT would adapt its rules software to the defined data to be provided by the client's customers and to the defined reward and/or fulfillment the customer wanted achieved. The client's customers input data to a front-end graphical user interface (GUI), the data would be automatically processed by the NEXT system according to NEXT's client's specifications, and produced the results—the fulfillment or reward being offered by the client. NEXT also enabled the client to significantly reduced the costs needed to process the data, determine customer eligibility for the client's service, be it a rebate, an appointment or some other client service. NEXT licensed the NEXT System to several companies including Office Depot, BNI, Spirit Incentives, Anytime Fitness, and Sears for its use in managing rebates. As part of that program, NEXT also provided support services.

9.      In 2013, CCI became interested in using the NEXT System to automate workflow for processing rebates. NEXT and CCI negotiated a Master Services Agreement ("MSA") (Ex. 1), effective as of April 1, 2014. Under the MSA, NEXT granted an exclusive license to CCI to use Next's digital rebate portal processing system, point of sale system and reward fulfillment services for all uses in utility businesses that CCI serviced.

**PUBLIC VERSION (REDACTED)**

10. Paragraph 6 of the MSA granted CCI access to NEXT's confidential information and trade secrets, which included the NEXT System; permitted CCI to use the NEXT System only for the purpose of servicing CCI's customers; and provided that CCI's obligations of confidentiality extended beyond the termination of the agreement. The MSA required CCI to pay NEXT for development of any additional software that NEXT would create under the MSA. (Ex. B to Ex. 1)

11. In late 2014, CCI requested that NEXT assist CCI with a pitch to a potential utility customer, Consumers Energy, who demanded that CCI have an an automated scheduling tool with a calendar feature that would enable its utility customers to schedule their own appointments online, and which would also provide other important features. In order to win the Consumers Energy business, CCI asked NEXT to design a new scheduling tool. NEXT designed a scheduling tool, demonstrated it in two meetings to Consumers Energy, and because Consumers Energy liked the tool, CCI was able to win the Consumers Energy business in 2015.

12. NEXT spent a significant number of development hours developing the scheduling tool for Consumers Energy. Under Ex. B to the MSA, to own the Tool CCI was obligated to compensate NEXT at $125 per hour for its development of the scheduling tool. CCI refused to pay NEXT for its development costs. CCI eventually agreed (1) that NEXT would own the scheduling tool and that CCI would license it and pay NEXT a monthly licensing fee. Over time, NEXT added features to the scheduling tool and eventually named it the "FAST Tool."

13. The FAST Tool was based on the NEXT System, incorporating and using many of its features. The NEXT System, including the NEXT FAST Tool, contains confidential information and trade secrets owned by NEXT.

14. NEXT granted CCI rights to use the NEXT System, effective April 1, 2014, as part of paragraph 6 of the MSA, which required CCI to restrict NEXT's confidential information to employees who "(i) have a need to access such Confidential Information solely for the purpose of

fulfilling the obligations under this Agreement, and (ii) have been advised of the obligations of confidentiality and are under obligations of confidentiality substantially similar to those set out in this section." Under this provision of the MSA, NEXT provided CCI with the ability to issue login credentials to employees restricted to and for the sole purpose of using the FAST Tool to service CCI's utility customers.

15. Beginning in 2015, CCI began searching for ways to replicate the FAST Tool to avoid paying license fees to NEXT. Sometime in 2016, CCI began negotiations to acquire Green Team Energy Services LLC ("Green Team"), a software development company that owned software called DSMTracker or "DSMT."

16. CCI completed its acquisition of Green Team in January 2017. At the time of the acquisition, Green Team's DSMTracker did not include the design elements, architecture, features or functionality of the FAST Tool that were required by CCI's utility customers including in particular Consumers Energy. Thus, the DSMTracker was not deployed as the scheduling solution to replace the NEXT FAST Tool at the time CCI acquired it.

17. Beginning sometime in 2016, CCI embarked on a scheme to defraud NEXT of its trade secrets in the FAST Tool. The scheme was called Project Renaissance. A key part of Project Renaissance was determining the design elements, architecture, features and functionality of the FAST Tool, which included the following steps, among others:

    a. In violation of its confidentiality obligations, CCI made unauthorized use of login credentials of the FAST Tool for the purpose of "scoping" the features of the FAST Tool. During "homework" assignments, CCI employees misused their login credentials to list the features and functionality of the FAST Tool, which included at least 190 screen shots of various functions of the FAST Tool;

**PUBLIC VERSION (REDACTED)**

b.  In further violation of its confidentiality obligations, CCI misused its login credentials to hold WebEx meetings in which it provided detailed demonstrations of the FAST Tool and its features and functionality to Green Team software designers and developers, which meetings were recorded for future viewing by anyone in violation of the parties' confidentiality agreements;

c.  In further violation of its confidentiality obligations, CCI provided login credentials to employees and agents—some of them business analysts and DSMTracker software developers—who were not entitled to such login credentials under the MSA. Such employees and agents used login credentials to determine the design elements, architecture features and functionality of the FAST Tool for the purpose of creating the same architecture in Green Team's DSMT;

d.  CCI's employees and agents, including but not limited to its software developers, passed the unauthorized login credentials to software developers located in India and Georgia, who used them to log in to the FAST Tool in order to determine its design elements, architecture, components, functionality and features;

e.  In total, CCI made unauthorized logins or used unauthorized login credentials over 45,000 times to determine the architecture, components, functionality and features of the FAST Tool for the unauthorized purpose of replicating them in DSMTracker.

18.  In order to lull NEXT into believing that CCI intended to do increasing amounts of business with NEXT when CCI knew that it was going to replace the NEXT Fast Tool with an updated version of DSMTracker, CCI repeatedly enlisted NEXT to win new business and promised NEXT that the parties would enter into a broader master agreement to generate new business and cover all of the additional business CCI had then obtained using the NEXT FAST Tool. CCI made

those promises well knowing it was not going to keep them and for the express purpose of defrauding NEXT of its intellectual property to win new business.

19.     Also, as part of its scheme to defraud and efforts to conceal its scheme to steal NEXT's trade secrets, CCI lulled NEXT into believing that CCI would continue doing business with it, repeatedly requested that NEXT develop new software tools for CCI's customers, well knowing that it was not going to launch the newly developed software while it was doing business with NEXT and did not intend to pay NEXT for its development costs, or enable NEXT to recover its development costs by earning licensing and other fees.

20.     Relying on CCI's false promise that the parties would enter into a broader MSA, NEXT invested over $350,000 to develop software to satisfy CCI's requests.

21.     On October 31, 2017, after successfully stealing NEXT's trade secrets and developing the DSM software with NEXT's trade secrets, CCI migrated CCI's customers' from NEXT's system to the DSM system and, without warning to NEXT, abruptly terminated its agreements with NEXT, went into competition with NEXT, and refused to pay NEXT over $950,000 worth of invoices for NEXT license fees and services NEXT had rendered.

22.     As the result of the acts summarized above, and described in detail below, CCI violated the Defend Trade Secrets Act and Illinois Trade Secrets Act by misappropriating NEXT's trade secrets in its FAST Tool, in violation of 18 U.S.C. §§1832 and 1836 and 765 ILCS 1065; violated the Consumer Fraud and Abuse Act by its unauthorized use and misuse of login credentials in violation of 18 U.S.C. § 1030; breached its obligations under the MSA by (a) failing to pay invoices for services rendered, including a fee for termination of the agreement and (b) by violating the confidentiality provisions of the MSA; was unjustly enriched by its wrongful acts because it was able to retain millions of dollars of business that it obtained only because it was able to provide the NEXT

**PUBLIC VERSION (REDACTED)**

FAST Tool; is estopped from denying the promises it made to NEXT; and is liable to NEXT for damages NEXT suffered as the result of CCI's fraudulent scheme.

**FACTS COMMON TO ALL COUNTS**

**THE MASTER SERVICES AGREEMENT AND OTHER CONTRACTS BETWEEN THE PARTIES**

**The Master Services Agreement ("MSA")**

23.     In 2013, NEXT licensed the NEXT System to CCI for its use in an incentive rebate program that CCI had set up for its customer, Entergy, an electric utility company, to incentivize customers to purchase energy-efficient power strips.  Thereafter, NEXT licensed the NEXT System to enable CCI to more efficiently administer an incentive rebate program for its customer Amgen. NEXT also provided administrative support services to CCI for both of its customers.  Using the NEXT System, CCI was able to reduce substantially the costs to CCI in its management of its utility customers' redemption programs.

24.     The NEXT System was defined as "Pre-Existing Materials" under the paragraph 15 of the MSA.  As of that time, NEXT had invested over $ 1 million to develop, create and improve its NEXT System.

25.     On or about October 2, 2014, NEXT and CCI entered into a written Master Services Agreement ("MSA"). (Ex. 1, CR0391069-80.) The MSA had an effective date of April 1, 2014 and provided that it "shall remain in force for the duration of the period specified below, unless extended in accordance with this Agreement."  (Ex. 1, MSA, Preamble.) The MSA provided it "continues in effect until April 1, 2016, unless the Parties agree in writing to extend the Term, or unless this Agreement is earlier terminated in accordance with Section 12 Termination provision herein."  (Ex. 1, MSA, ¶ 2.)

26.     Paragraph 1 of the MSA, entitled "Scope of Services" provided

8

**PUBLIC VERSION (REDACTED)**

> CLEAResult hereby contracts for, and NEXT hereby agrees to provide, the services as required for the performance of those duties set forth and defined in a Scope of Work, in the form of Exhibit A attached hereto ("SOW") and be bound by and subject to the terms and conditions contained in this Agreement.

(Ex. 1, MSA, ¶ 1.)  Paragraph 1 further provided,

> From time to time, the Parties may agree to contract for additional services, where CLEAResult enters into an agreement with a third-party ("Client") using the Exclusive Rights.  Such additional services shall be memorialized as a SOW and signed by both parties.  SOWs will follow a standardized template, and include the business unit and division, an associated SOW number and define the Client and program names, data requirements, terms and conditions, reward choices, communication requirements and Client or partner cascading legal language, as needed.  In addition, the SOWs will provide Client instructions for any authorization requirements for delivery of services.

(*Id.*)

27.     CCI agreed to pay NEXT an annual licensing fee of $300,000 for the Exclusive Rights in monthly installments of $25,000 and to pay other compensation itemized in Exhibit B to the MSA. (Ex. 1, ¶ 3; Ex. B to the MSA is being filed **Under Seal**.)

28.     Beginning in 2015 and continuing thereafter through 2017, NEXT  provided scheduling tool services to CCI under the following SOWs and agreements: the 2015 Consumers Energy Home Energy Audit Programs Scheduling Wizard SOW # 1 and License (Ex. 2 hereto), the 2016 Consumers Energy Recycling FAST SOW # 15 and License (Ex. 3 hereto), the 2016 Dominion Ohio SOW # 12 and License (Ex. 4 hereto), the 2016 AEP FAST SOW # 14 and License (Ex. 5 hereto), the 2016 DTE Fast SOW # 13 and License (Ex. 6 hereto), the 2016 Vectren Agreement (Ex. 7 hereto), the  Iowa Recycling Center ("IRC") (MidAmerican) FAST SOW # 18 and License (Ex. 8 hereto), and the Columbus Gas FAST SOW# 21 and License (Ex. 9 hereto) (collectively, the "CCI SOWs and Licenses").

**PUBLIC VERSION (REDACTED)**

29.     Pursuant to the terms of the MSA, CCI and NEXT executed SOWs, each SOW constituting a separate, enforceable agreement, which incorporated the terms of the MSA. (Exs. 2-9.)

### Next's Development of The Fast Scheduling Wizard

30.     In 2014, at the request of CCI, NEXT began development of a scheduling tool for purposes of helping CCI win business from Consumers Energy, a potential customer of CCI.  (CR-0129531 - CR-0129536; CR-0129407 - CR-0129409; CR-0022463-66; CR-0023962.)

31.     CCI requested that NEXT develop a demo of a customer-facing redemption site for Consumers Energy which would enable its customers to schedule home-energy audit appointments and which included back-end administrative tools which CCI personnel would use to manage the Consumers Energy Program.

32.     In response to CCI's request, NEXT developed the demo at its own expense under the terms of the MSA.

33.     After developing the demo, NEXT's CEO, Matt Peterson, attended the presentation meeting between CCI and Consumers Energy, which took place on or about August 21, 2014.  CCI touted NEXT as the developer of "Web-based scheduling tool." (CR-0383656-837 at CR-0383658, CR-0383696.) During the meeting, Mr. Peterson was introduced by CCI as the owner of the tool being demonstrated. *Id.* Mr. Peterson demonstrated the self-booking tool that a customer would use and the back-end administrative tools that CCI personnel would use.  (CR-0383751.)

34.     Following the August 21, 2014, CCI informed NEXT that Consumers Energy wanted a second demonstration of a more developed tool at CCI's Lansing, Michigan offices.  In September 2014, CCI requested that NEXT create a working tool for purposes of the second demonstration for Consumers Energy.

**PUBLIC VERSION (REDACTED)**

35.     The second meeting with Consumers Energy occurred on or about September 15, 2014, and included Mr. Peterson and representatives of Consumers Energy and CCI.  By the time of the meeting, NEXT had created a working tool that included all of the functions requested by Consumers Energy for purposes of the meeting. This tool was demonstrated to Consumers Energy's satisfaction at the meeting.

36.     By the time of the second meeting with Consumers Energy, NEXT had expended 288 hours to develop the demonstration and working tools essential to win the Consumers Energy business for CCI.

37.     On or about October 6, 2014, and pursuant to Ex. B of the MSA, NEXT submitted SOW #1 to CCI, which set forth the development costs incurred by NEXT to date at the $125/hour rate provided in Ex. B of the MSA, and which estimated the development costs for completion of the process. (Ex. 2 **Under Seal**) As of October 6, 2014, NEXT had invested 288 hours at a cost of $36,000 to develop the tools that had been shown to Consumers Energy.  At that time, NEXT estimated that it would require an additional 100 hours and $12,500 in expense to complete and deploy the tool with the functionality that CCI had specified at that point.

38.     CCI did not respond to SOW # 1 or agree to pay the development costs to NEXT, even though CCI was required to do so under the terms of Exhibit B of the MSA.

39.     In October 2014, Paul Johns of CCI informed Mr. Peterson that CCI had obtained the Consumers Energy business. Over the next several months, CCI requested that NEXT provide additional functionality to the tools for Consumers Energy.  NEXT engaged in development work and created tools with the functionality that CCI had requested, with the expectation that NEXT would be fairly compensated for that development work under the terms of Exhibit B of the MSA, which required CCI to pay $125 for each hour of development work.

40.     In total, NEXT invested over 1,900 hours of development work to develop the scheduling tool, often referred to as a scheduling wizard, and later referred to as the FAST Tool.

41.     Although the MSA, under which the scheduling and inventory management tools were developed, provided for CCI to pay the development costs for the scheduling tool, CCI determined that it would license and not own the software.

42.     At least as early as January 2015, CCI began plans to develop in-house the solutions provided by NEXT. In furtherance of that goal, CCI convened meetings to determine the viability of developing NEXT functionality in house.

43.     Despite CCI's plan, and without informing NEXT, Tom Diffley, then Incentive Processing Director, requested NEXT provide a demo of its rebate processing tool indicating that he, Diffley, had an interest in learning more about NEXT's capabilities.

44.     On or about February 20, 2015, after a number of conversations between CCI and NEXT about payment for the development costs for the Consumer's Energy work performed by NEXT, NEXT gave CCI two options: (1) pay for the development of the tools for Consumers Energy at a cost of $125 per hour, in which case, CCI would own the tool and the rights to the tools; or, (2) pay a monthly licensing fee for each customer of CCI, in which case, NEXT would own the tools and the rights to the tools. CCI chose to pay licensing fees, and for NEXT to own the tools and the rights to the tools. (CR-0447260-268.)

45.     The FAST scheduling wizard, created by NEXT, ultimately resulted from the work done on the tools created by NEXT for Consumers Energy, and from other developmental work done by NEXT, subsequent to February 20, 2015.

46.     During the period of January 2015 through and including end of 2015, CCI invited NEXT to participate in CCI's pitch to several Requests for Proposal ("RFPs") including SMUD, NEEA, Georgia Power, OG & E and PG&E for NEXT's rebate processing tool.

47.     CCI benefited from its contracts with Consumers Energy. CCI used NEXT's scheduling tool to drive scheduling of approximately 16,000 home energy assessments in 2015. (CR-0127884). As of July, 2015, Tim Mahler reported that CCI was relying on NEXT's scheduling tool to drive scheduling of 24,000 home visits and reported $9 million dollars in Net Service Revenue annually from Consumers Energy. (NXT00050681).

48.     On or about August 14, 2015, Paul Johns, Portfolio Director of Consumers Energy for CCI, sent an email to Matt Peterson, CEO of NEXT, agreeing to pricing terms for home energy audit services NEXT was to provide to Consumers Energy.  (CR-0023304-08.) On or about August 14, 2015, Paul Johns confirmed to NEXT that CCI would license the NEXT FAST Tool at $ 10,000 per month. (NXT00050849).

49.     Thus, beginning in 2015 and continuing thereafter through 2017, NEXT  provided scheduling tool services to CCI under the following SOWs and agreements: the 2015 Consumers Energy Home Energy Audit Programs Scheduling Wizard SOW # 1 and License (Ex. 2 hereto), the 2016 Consumers Energy Recycling FAST SOW # 15 and License (Ex. 3 hereto), the 2016 Dominion Ohio SOW # 12 and License (Ex. 4 hereto), the 2016 AEP FAST SOW # 14 and License (Ex. 5 hereto), the 2016 DTE Fast SOW # 13 and License (Ex. 6 hereto), the 2016 Vectren Agreement (Ex. 7 hereto), the  Iowa Recycling Center ("IRC") (MidAmerican) FAST SOW # 18 and License (Ex. 8 hereto), and the Columbus Gas FAST SOW# 21 and License (Ex. 9 hereto) (collectively, the "CCI SOWs and Licenses").

**PUBLIC VERSION (REDACTED)**

**CCI Entered into SOW's With NEXT, Each of Which Incorporated the Terms Of The MSA**

**The 2015 Consumers Energy SOW**

50.     On or about August, 28, 2015, NEXT sent a SOW for Consumers Energy (the "2015 Consumers Energy SOW" (Ex. 2)) to Mr. Johns via email, which memorialized the pricing terms and other matters to which NEXT and CCI had agreed. (NXT00050902-10.)

51.     The 2015 Consumers Energy SOW was in the form prescribed by Ex. A to the MSA.

52.     Following CCI's approval of the 2015 Consumers Energy SOW, NEXT performed work prescribed by that SOW, invoiced CCI monthly for such work, and CCI regularly paid invoices for such work albeit late but usually within about 60 days of receipt of each invoice.

53.     Under Texas law, the 2015 Consumers Energy SOW was an enforceable, written contract, which incorporated all of the terms and conditions of the MSA.

54.     In the alternative, the 2015 Consumers Energy SOW was an implied agreement between CCI and NEXT, which incorporated all of the terms and conditions of the MSA.

**The 2016 Consumers Energy FAST SOW and License**

55.     On or about July 15, 2016, via email, NEXT submitted a SOW to CCI via email for a FAST license and NEXT services to support a Consumers Energy recycling program (the "Consumers Energy FAST SOW and License.") (Ex. 3; NXT00053656, NXT00053663-64.)

56.     The 2016 Consumers Energy FAST SOW and License was in the form prescribed by Ex. A to the MSA.

57.     On or about August 18, 2016, CCI, per an email from Tim Mahler to Matt Peterson, agreed to pay $5,000 for setup and $500 per month as a licensing fee for the first 10 users, and then $50 per license per month per additional user for the 2016 Consumers Energy FAST SOW and License.  This email constituted approval by CCI of the Consumers Energy FAST SOW.  (See CR-0133386; CR-024203; NXT00109098-99.)

58.     Following CCI's August 18, 2016 approval of the 2016 Consumers Energy FAST SOW and License, NEXT performed work prescribed by that SOW, invoiced CCI monthly for such work, and CCI regularly paid invoices for such work albeit late but usually within about 60 days of receipt of each invoice.

59.     Under Texas law, the 2016 Consumers Energy FAST SOW and License was an enforceable contract, which incorporated all of the terms and conditions of the MSA.

60.     In the alternative, the Consumers Energy FAST SOW and License was an implied agreement between CCI and NEXT, which incorporated all of the terms and conditions of the MSA.

**The Dominium Ohio FAST SOW and License**

61.     On or about July 11, 2016, via email, NEXT submitted a SOW to CCI via email for a FAST License and NEXT services to support a "Dominion Ohio" (sic) home audit program and to provide a FAST scheduling wizard (hereinafter, the "Ohio Dominion FAST SOW and License" (Ex. 4)). (NXT00053656, NXT00053661-62.)

62.     The Dominion Ohio FAST SOW and License was in the form prescribed by Ex. A to the MSA.

63.     On or about July 14, 2016, Christopher Barden, operations manager of CCI, informed Matt Peterson by email that CCI had approved the Ohio Dominion SOW.  (NXT00053610.)

64.     On or about August 18, 2016, CCI, per an email from Tim Mahler to Matt Peterson, agreed to pay $5,000 for setup and $500 per month as a licensing fee for the first 10 users, and then $50 per license per month per additional user for the Dominion Ohio FAST SOW and License.

65.     Following CCI's approval of the Dominion Ohio FAST SOW, NEXT performed work prescribed by that SOW, invoiced CCI monthly for such work, and CCI regularly paid invoices for such work albeit late but usually within about 60 days of receipt of each invoice.

15

**PUBLIC VERSION (REDACTED)**

66. Under Texas law, the Dominion Ohio FAST SOW and License was an enforceable contract, which incorporated all of the terms and conditions of the MSA.

67. In the alternative, the Dominion Ohio FAST SOW and License was an implied agreement between CCI and NEXT, which incorporated all of the terms and conditions of the MSA.

**The AEP FAST SOW and License**

68. On or about July 15, 2016, via email, NEXT submitted a SOW to CCI via email for a FAST License and NEXT services to support an AEP home audit program and to provide a FAST scheduling wizard (hereinafter, the "AEP FAST SOW and License" (Ex. 5)). (NXT00053656, NXT00053659-60.)

69. The AEP FAST SOW and License was in the form prescribed by Ex. A to the MSA.

70. On or about August 18, 2016, CCI, per an email from Tim Mahler to Matt Peterson, agreed to pay $5,000 for setup and $500 per month as a licensing fee for the first 10 users, and then $50 per license per month per additional user for the AEP FAST SOW. This email constituted CCI's approval of the AEP FAST SOW.

71. Following CCI's August 18, 2016 approval of the AEP FAST SOW, NEXT performed work prescribed by that SOW, invoiced CCI monthly for such work, and CCI regularly paid invoices for such work albeit late but usually within about 60 days of receipt of each invoice.

72. Under Texas law, the AEP FAST SOW and License was an enforceable contract, which incorporated all of the terms and conditions of the MSA.

73. In the alternative, the AEP FAST SOW and License was an implied agreement between CCI and NEXT, which incorporated all of the terms and conditions of the MSA.

**The DTE FAST SOW and License**

74. On or about July 15, 2016, via email, NEXT submitted a SOW to CCI via email for a FAST License and NEXT services to support a DTE home audit program and to provide a FAST

16

scheduling wizard (hereinafter, the "DTE FAST SOW and License" (Ex. 6)). (NXT00053656, NXT00053657-58.)

75.     The DTE FAST SOW and License was in the form prescribed by Ex. A to the MSA.

76.     Prior to July 11, 2016, Paul Johns informed NEXT's CEO, Matt Peterson that CCI wanted to implement the NEXT FAST Tool for DTE and AEP, which Mr. Peterson confirmed in an email dated July 11, 2016. (NXT00088166; NXT00053340-41.)

77.     On or about August 18, 2016, CCI, per an email from Tim Mahler to Matt Peterson, agreed to pay $5,000 for setup and $500 per month as a licensing fee for the first 10 users, and then $50 per license per month per additional user for the DTE FAST SOW and License. This email constituted CCI's approval of the DTE FAST SOW.

78.     Following CCI's August 18, 2016 approval of the DTE FAST SOW, NEXT performed work prescribed by that SOW, invoiced CCI monthly for such work, and CCI regularly paid invoices for such work albeit it late but usually within about 60 days of receipt of each invoice.

79.     Under Texas law, the DTE FAST SOW and License was an enforceable contract, which incorporated all of the terms and conditions of the MSA.

80.     In the alternative, the DTE FAST SOW and License was an implied agreement between CCI and NEXT, which incorporated all of the terms and conditions of the MSA.

**The Vectren Agreement**

81.     On or about July 26, 2016, Tim Mahler of CCI telephoned Matt Peterson of NEXT and requested that NEXT provide a home audit program and FAST license and services to CCI's customer, Vectren (hereinafter, the "Vectren Program" (Ex. 7)).

82.     On or about August 3, 2016, Katie Alspaugh, Program Manager of CCI sent an email to Matt Peterson, introducing herself as the Program Manager for the Vectren Home Energy

**PUBLIC VERSION (REDACTED)**

Assessment Program and Income Qualified Program, and stated "we are in need of launching the FAST product to support the HEA and IQW programs by 9/1/16."

83.     On or about August 18, 2016, CCI, per an email from Tim Mahler to Matt Peterson, agreed to pay $5,000 for setup and $500 per month as a licensing fee for the first 10 users, and then $50 per license per month per additional user for the Vectren Program.

84.     Following CCI's August 18, 2016 approval of the Vectren Program, NEXT performed work requested by CCI, invoiced CCI monthly for such work, and CCI regularly paid invoices for such work albeit late but usually within about 60 days of receipt of each invoice.

85.     Under Texas law, the work NEXT performed for Vectren was pursuant to a written agreement comprising at least the following emails: Email dated July 26, 2016 from Tim Mahler to Matt Peterson providing instructions on the lead contact CCI person for the Vectren Program; August 3, 2016 email from Matt Peterson to Katie Alspaugh setting forth details of the Vectren Program; and August 18, 2016 email from Tim Mahler to Matt Peterson regarding pricing for the Vectren Program.  Under Texas Law, by course of dealing, the written agreement for the Vectren Program was an enforceable contract, which incorporated all of the terms and conditions of the MSA.

86.     In the alternative, the Vectren Program was an implied agreement between CCI and NEXT, which incorporated all of the terms and conditions of the MSA.

**MidAmerican (Iowa Recycling Center) FAST SOW and License**

87.     CCI requested that NEXT provide a FAST license and NEXT services for a recycling program for the Iowa Recycling Center (a CCI facility), which supported three utilities that CCI serviced, including MidAmerican Power, Alliant and PTP.  On or about November 16, 2016, Larry Brown, Senior Director of CCI, informed Matt Peterson via email that "[w]e would like to move forward with your system. I've asked Calvin [Ehlts, Program Manager] to work with you on pricing so that we can lock this down. I agree that time is critical here. We do want to be able to launch Jan

18

**PUBLIC VERSION (REDACTED)**

1. Calvin [Ehlts, Program Manager] should be reaching out to you shortly. I've also copied Michelle Quinn on this email. Michelle is our regional operations manager and is integral in making sure that systems provide us and our clients what we need."

88.　On or about November 17, 2016, via email, NEXT submitted a SOW to CCI entitled "MidAmerican – FAST License" to provide home audit services and a FAST scheduling wizard for the Iowa Recycling Center ("the Iowa Recycling Center FAST SOW and License" (Ex. 8)), memorializing NEXT's acceptance of the proposal made in Mr. Brown's November 16, 2017 email.

89.　The Iowa Recycling Center FAST SOW and License was in the form prescribed by Ex. A to the MSA.

90.　The Iowa Recycling Center FAST SOW and License was priced in accordance with the August 18, 2016 email from Tim Mahler to Matt Peterson, agreed to pay $5,000 for setup and $500 per month as a licensing fee for the first 10 users, and then $50 per license per month per additional user.

91.　NEXT performed work prescribed by the Iowa Recycling Center FAST SOW, invoiced CCI monthly for such work, and CCI regularly paid invoices for such work albeit late but usually within about 60 days of receipt of each invoice.

92.　Under Texas law, the Iowa Recycling Center FAST SOW and License was an enforceable contract, which incorporated all of the terms and conditions of the MSA.

93.　In the alternative, the Iowa Recycling Center FAST SOW and License was an implied agreement between CCI and NEXT, which incorporated all of the terms and conditions of the MSA.

**The Columbus Gas FAST SOW and License**

94.　On or about November 21, 2016, via email, NEXT submitted a SOW to CCI via email for a FAST License and NEXT services to support a Columbus Gas home audit program and to

19

**PUBLIC VERSION (REDACTED)**

provide a FAST scheduling wizard (hereinafter, the "Columbus Gas FAST SOW and License" (Ex. 9)).

95.     The Columbus Gas FAST SOW was in the form prescribed by Ex. A to the MSA.

96.     On or about December 21, 2016, CCI, per an email from Tim Mahler to Matt Peterson, approved the Columbus Gas FAST SOW.  (NXT00056826-27.)

97.     Under Texas law, the Columbus Gas FAST SOW was an enforceable contract, which incorporated all of the terms and conditions of the MSA.

98.     In the alternative, the Iowa Recycling Center FAST SOW and License was an implied agreement between CCI and NEXT, which incorporated all of the terms and conditions of the MSA.

**Services Provided by NEXT Under the Approved CCI SOWs and Licenses**

99.     NEXT licensed software and provided services to CCI under the following SOWs and agreements:  the 2015 Consumers Energy SOW and License, the 2016 Consumers Energy FAST SOW and License, the Ohio Dominion SOW and License, the AEP FAST SOW and License, the DTE Fast SOW and License, the Vectren Agreement, The Iowa Recycling Center FAST SOW and License, and the Columbus Gas FAST SOW and License (collectively, the "CCI SOWs and Licenses").

100.     Under the CCI SOWs and Licenses, NEXT provided licensed software tools that enabled CCI to manage programs for its customers.  For each of CCI's customers, NEXT developed and created validation rules, public submission sites, and communication and graphics unique to each of CCI's customers.

101.     Under the  SOWs, CCI was able to administer programs for public utilities largely in the Midwest for Consumers Energy, a public utility providing natural gas and electricity to over 6 million of Michigan's residents and an appliance recycling program; Ohio Dominion, one the nation's largest producers and transporters of energy and natural gas storage and its rebate and home

energy assessment program designed to identify high utility usage; Iowa Recycling Center appliance recycling and rebate program; Vectren Corporation, a Fortune 1000 energy holding which through its utilities distributes natural gas in Indiana and Ohio, rebate program for commercial customers' installation of energy efficient natural gas equipment; Columbia Gas of Ohio, a natural gas supplier, rebate program for installation of energy efficient equipment and other improvements; DTE Energy, a Detroit Michigan based electric utility company, residential energy and efficiency utility rebate program; and an appliance recycling rebate program for American Electric Power (AEP), a retail electricity and natural gas provider. Under the CCI SOWs and Licenses, NEXT supported all of the administrative access and control of software that resided on secure servers controlled, owned, managed, and administered by NEXT, which were necessary to automate the processes for CCI's customers. NEXT maintained server access, data security, document management and technical support.

102. Among other things, NEXT provided access to a FAST online booking tool automation system for programs, including supporting a self-service website added to a utility website or linked customers self-scheduling application. Key to the self-scheduling FAST online tool, was the back-end administration support modules developed by NEXT, requiring a login name and password, and that included workflow, rules and eligibility within features, functionality and components within modules called client dashboard, operational dashboard, schedule appointment, dispatch center, appointment confirmation, tech assignment, map route, contractor assignment, contractor invoice review, supervisor follow up, lead management, appointment validation, eligibility queue, appointment manager, field tech roster, upload territory, administrative history, manage users, status updater, operational tickets, contractor administrator lead management, contractor administrator dispatch center, contractor administrator schedule appointment, contractor

**PUBLIC VERSION (REDACTED)**

administrator contractor invoice tracker, Field Tech dashboard, Field Tech Assignment, returned pdf, Field Tech mobile app-standard and field tech mobile app -recycling and customized report creation.

103.    Under the CCI SOWs and Licenses, NEXT provided a FAST license to CCI.  As part of services NEXT provided in conjunction with the FAST License for each of CCI's energy customers, NEXT set up program(s), rules, data fields, and terms & conditions, specific to each customer.  The license included access to the "front end" of the NEXT System, which was available to consumers who had accounts with CCI's energy customers.

104.    Another part of the FAST License was restricted secure access to administrative modules that were part of the secure "back end" of the NEXT System (the "NEXT System Back End"), which was accessible only through secure login credentials, and which was protected by a firewall and other state of the art protections. The CCI employees granted restricted access to the NEXT System Back End were administrative users, call agents, and field technicians, who supported day to day operations for CCI's customers. The NEXT System Back End also included the following features to add/edit/cancel appointments, go back view. Under granular security provided pursuant to the On-Demand Data Security Policy, NEXT and CCI were able to isolate program access to only those who absolutely need it and to provide login credentials to maintain data integrity.

105.    NEXT reasonably relied on CCI's approval of the CCI SOWs and Licenses, and provided the licenses and services described in the CCI SOWs and Licenses for CCI, with the expectation that CCI would pay the license fees and service fees to which CCI had agreed.

106.    Under the Network Access Policy, user accounts were required to be password protected, must be for individuals only. Account sharing and group accounts were expressly prohibited. Administrator or "root" access was prohibited except where it was necessary to the performance of a person's job function. Individuals requiring access to confidential data were required to have an individual, distinct account. When an employee no longer worked for a company,

such as CCI, the account was to be disabled. A company such as CCI was to report activities such as illegal activities or theft of NEXT's property, physical and intellectual.

107.    CCI had agreed that it would receive a license for the software NEXT developed for the first Consumers Energy SOW, and NEXT would bill CCI $25,000 per month, which would cover 120 hours per month of development programming included in the monthly license fee. In exchange, NEXT waived all developmental programming expenses it had invoiced to CCI as of May 13, 2015. CCI requested that NEXT send all invoices to Tom Diffley. (CR-0137936-38.)

### NEXT's Trade Secrets—Pre-Existing Materials Under the MSA

108.    Paragraph 15 of the MSA recognized that "NEXT may currently possess certain know-how, templates, works, proprietary material, and/or methods ("Pre-Existing Materials") and that such Pre-Existing Materials may be used in the execution of services contemplated by this Agreement and SOWs. For such Pre-Existing Materials, NEXT hereby grants CLEAResult a non-exclusive, non-transferable and royalty free license, allowing CLEAResult to use such Pre-Existing materials in connection with the Works. At all times, NEXT shall retain all right, title and interest in the Pre-Existing Materials developed while servicing CLEAResult." (Ex. 1 MSA ¶ 15.)

109.    As of April 1, 2014, the source code, design elements, logic and architecture of the NEXT System, constituted "Pre-Existing Materials" under paragraph 15 of the MSA and was a trade secret of NEXT. NEXT had taken reasonable steps to keep it secret, by obligating employees and outside contractors to enter into non-disclosure and confidentiality agreements, and (b) by maintaining the NEXT System on a secure server. NEXT had derived independent economic value from the NEXT System because it was not known to or readily ascertainable through proper means.

110.    The back end of the NEXT System (the "NEXT System Back End") embodies highly confidential and extremely valuable trade secrets of NEXT. As used herein, "NEXT System Back

**PUBLIC VERSION (REDACTED)**

End" includes the FAST Tool and its predecessors, as of the date(s) the FAST Tool and earlier versions of software that became the FAST Tool were created.

111.    The NEXT System Back End includes a processing engine, rules software and administrative modules. Formulas, designs, prototypes, methods, techniques, processes, procedures, programs, codes that NEXT had created, including for the NEXT System FAST Tool, were incorporated into the NEXT System Back End.

112.    As of April 1, 2014, the NEXT System Back End as it then existed constituted "Pre-Existing Materials" under paragraph 15 of the MSA.

113.    The NEXT System Back End was the backbone of the FAST Tool and of each of the customized systems NEXT developed for each of CCI's utility customers using the FAST Tool. CCI's utility customers did not have access to the NEXT System Back End.

114.    NEXT's trade secrets included the FAST TOOL modules and their unique combination in the NEXT FAST TOOL design elements including its architecture. Among the FAST TOOL modules are, mobile apps and self scheduling portals, including but not limited to: the client dashboard, operational dashboard, schedule appointment, dispatch center, appointment confirmation, tech assignment, map route, contractor assignment, contractor invoice review, supervisor follow up, appliance inventory, lead management, appointment validation, quality assurance, eligibility queue, appointment management, field tech roster, upload territory, administrative history, manage users, status updator, operational ticket, lead management, "Contractor" dispatch center, "Contractor" schedule appointment, contractor invoice tracker, FT Dashboard, Tech Assignment, Returned PDF, App-Standard, App-Recycling, Self Scheduling website, program rules & eligibility, data & report compilation production. The design elements of the NEXT System, including the NEXT System FAST TOOL's architecture, were built into the rules and eligibility source code, including the code customized for each CCI Utility customer's program(s) and that determine data collected, used and

**PUBLIC VERSION (REDACTED)**

produced and reported by the executable code, including zip code lists (Territories), user registration, dashboards, export reports, status updator, and API data exchange. The modules and executable code functions and features are described in detail in the expert reports of Dr. Ricardo Valerdi and in NEXT's Verified Second Revised Confidential Answer to CCI's Interrogatory 21. As used below, the term "NEXT's Trade Secrets" or "NEXT Trade Secrets" refers to the trade secrets of NEXT that are described in the the expert reports of Dr. Valerdi and in NEXT's Verified Second Revised Confidential Answer to CCI's Interrogatory 21.

**CCI's Scheme to Defraud NEXT of Its Intellectual Property and Trade Secrets**

115.    As to each of the CCI SOWs and Licenses, CCI agreed to be bound by the terms and conditions of the MSA, which included confidentiality provisions in paragraph 6. (Ex. 1 ¶ 1).

116.    Paragraph 15 of the MSA, which was incorporated into each of the CCI SOWs and Licenses, recognized that "NEXT may currently possess certain know-how, templates, works, proprietary material, and/or methods ("Pre-Existing Materials") and that such Pre-Existing Materials may be used in the execution of services contemplated by this Agreement and SOWs. For such Pre-Existing Materials, NEXT hereby grants CLEAResult a non-exclusive, non-transferable and royalty free license, allowing CLEAResult to use such Pre-Existing materials in connection with the Works. At all times, NEXT shall retain all right, title and interest in the Pre-Existing Materials developed while servicing CLEAResult." (Ex. 1 ¶ 15.)

117.    Paragraph 6 of the MSA, which was incorporated into each of the CCI SOWs and Licenses, provided that "Confidential Information" means all documents, software, reports, data, records forms and other materials obtained by one party (the "Receiving Party") from the other party (the "Disclosing Party"): . . . (ii) whose confidential nature has been made known by the Disclosing party to the Receiving Party; or (iii) that due to their character and nature, a reasonable person under like circumstances would treat as confidential."  (Ex. 1 ¶ 6.)

118.    Paragraph 6 of the MSA, which was incorporated into each of the CCI SOWs and Licenses, provided that CCI, as the "Receiving Party," "shall only disclose Confidential Information to its employees and contractors who (i) have a need to access such Confidential Information solely for the purpose of fulfilling the obligations under this Agreement, and (ii) have been advised of the obligations of confidentiality and are under obligations of confidentiality substantially similar to those set out in this section."  Paragraph 6 of the MSA also provided that the Receiving Party "shall not otherwise use or disclose to any person, firm or entity any Confidential Information of the Disclosing Party without the Disclosing Party's express, prior written permission." (Ex. 1 ¶ 6.)

119.    Paragraph 6 of the MSA further provided, "The nondisclosure requirements of this section will survive for a period of three years following disclosure of the Confidential Information to the Receiving Party, except for trade secrets, which will remain subject to the nondisclosure requirements until no longer protected by law." (Ex. 1 ¶ 6.)

120.    Each of CCI's employees who had access to the modules of the NEXT System Back End was under the obligation, pursuant to the terms of paragraph 6 of the MSA, "solely for the purpose of fulfilling the obligations under this Agreement."  (Ex. 1, ¶ 6.)

121.    CCI was obligated under paragraph 6 of the MSA to advise each employee who had access to the NEXT System Back End of "the obligations of confidentiality" under paragraph 6 of the MSA. (Ex. 1, ¶ 6.)

122.    Each of CCI's employees who had access to the NEXT System Back End was under an obligation under paragraph 6 of the MSA not to "use or disclose to any person, firm or entity any Confidential Information of the Disclosing Party [NEXT] without the Disclosing Party's express, prior written permission."  (Ex. 1, ¶6.)

123.    The NEXT System Back End embodies highly confidential and extremely valuable trade secrets of NEXT.  The NEXT System Back End includes a processing engine, rules software,

and administrative modules, the source code of which is maintained in a secure location accessible only to two NEXT employees who are under non-disclosure agreements. Access to the NEXT System Back End was limited by NEXT to persons who were under obligations of confidentiality to NEXT and who promised not to disclose confidential information regarding the NEXT System Back End to third parties.

124.    The NEXT System Back End was the backbone of workflow automation systems NEXT developed for CCI's customers in various states of the United States.  CCI's customers did not have access to the NEXT System Back End under the terms of paragraph 6 of the MSA.

125.    The NEXT System Back End embodies trade secrets of NEXT.  NEXT employees and any outside contractors who have worked on the NEXT System have signed non-disclosure agreements obligating them not to disclose the NEXT System Back End to others.  Similarly, NEXT has required its clients to sign non-disclosure agreements.  NEXT has not disclosed the NEXT System Back End to anyone in the absence of an obligation not to disclose the NEXT System to others.

126.    NEXT has taken reasonable measures to keep the NEXT System Back End secret. Among other things, NEXT restricted access to the NEXT System Back End to employees and third parties who were under obligations to keep the NEXT System Back End confidential and not to disclose the NEXT System Back End to third parties or to use the NEXT System Back End for purposes that were not licensed by NEXT.  NEXT provided access only to persons under such confidentiality obligations and required each such person to have log-in credentials.

127.    CCI knew that the NEXT System Back End embodied trade secrets of NEXT because CCI acknowledged in the MSA that NEXT had confidential information; CCI undertook under paragraph 6 of the MSA to maintain such information in confidence; CCI licensed access to the NEXT System Back End;  CCI was provided log-in credentials only for employees of CCI who were identified as needing  access the NEXT System Back End for purposes under the CCI SOWs and

**PUBLIC VERSION (REDACTED)**

Licenses; and CCI agreed to NEXT's Network Security and On Demand policies requiring confidentiality and restricted access.

128.    The NEXT Trade Secrets, including the source code, the architecture, rules, workflow, logic, modules, features and functionality underlying the NEXT System Back End, derives independent economic value from not being generally known to and not being readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information.  First, NEXT invested over $ 2.5 million to develop the NEXT System Back End through February 2018.   Second, employees and contractors of NEXT and third parties granted access to the NEXT System Back End were obligated to execute a non-disclosure agreement. Third, paragraph 6 of the MSA itself reflected that NEXT owned trade secrets and obliged CCI not to use the NEXT System Back End for any purpose other than for business purposes in fulfilling their obligations to CCI's utility customers as required under the agreements.   Fourth, CCI did not identify any other software that had the functionality of the NEXT System Back End. Fifth,  the DSM Tracker software it purchased did not have the features and functionality of the NEXT FAST Tool. Sixth, the DSMT software CCI purchased did not have the features, functionality, architecture, rules or workflow required to meet the requirements of CCI's utility customers at the time it was purchased. Seventh, CCI resorted to misappropriation of the NEXT System Back End by misusing log-in credentials and violated the confidentiality agreements in place for the purpose of studying, investigating, documenting, demonstrating and reverse engineering the NEXT System Back End and in order to replicate NEXT's functionality  in the DSM Tracker software, which CCI had purchased by virtue of its acquisition of Green Team.

129.    Pursuant to the terms of the CCI SOWs and Licenses, which incorporated the terms of the MSA, NEXT customized the NEXT System and granted CCI licenses to enable CCI to manage programs for eight of its Midwest utility customers and their 13 programs.  Under the terms of the

CCI SOWs and Licenses, which incorporated paragraph 6 of the MSA, NEXT provided certain CCI employees restricted access to its FAST Tool for use in programs supporting CCI's utility customers for whom CCI was licensed to use the FAST Tool, including supporting self-service (customers self-booking) and CCI call center agents to book appointments. NEXT provided back end administration support modules that included reporting, appointment scheduling and to monitor status of scheduled appointments, Field Technician Support and customer notification. NEXT provided data integration, audit and customized report creation.

130. In addition to the Confidentiality Agreement in the MSA, CCI agreed to isolate program access to only those who absolutely needed it (NXT000641117) and who agreed to Next Payment Solutions Network Access and Authentication Policy providing that users would be granted the least amount of network access required to perform his or her job function, would be granted access only if he or she accepts the Acceptable Use Policy, and that access to the network would be granted in accordance with the Acceptable Use Policy. (NXT00046496, 00056119).

131. Under the Network Access and Authentication Policy, accounts were required to be implemented in standard fashion and utilized consistently across the organization including: 1) accounts were to be created using a standard format (i.e. first name-lastname, or first initial-lastname, etc.); 2) accounts must be password protected); 3) accounts must be for individuals only. Account sharing and group accounts were specifically prohibited; 4) user accounts must not be given administrator or 'root' access unless it is necessary to perform his or her job function; 5) when guests had a legitimate business need for access to the corporate network, and a reasonable need is demonstrated, temporary guest access was allowed but only if it was severely restricted to only those resources the guest needed at the time and disabled when the guest's work is completed; 6) individuals requiring access to confidential data must have an individual, distinct account subject to additional monitoring or auditing.

132.    The services provided by NEXT resided on NEXT servers.  NEXT maintained server access, data security, document management and technical support.

**CCI's Misuse of Its Login Credentials to NEXT's Back End in Breach of Its Confidentiality Obligations In the MSA, SOWs and Licenses in Furtherance of Its Scheme to Defraud NEXT of Its Intellectual Property And To Misappropriate NEXT's Trade Secrets By Improper Means.**

133.    In reliance on the Confidentiality Provisions of the MSA and agreed upon security protocols and policies, NEXT provided login credentials to certain confidential features of the NEXT System to select CCI employees

134.    Paragraph 6 of the MSA provided that CCI, as the "Receiving Party," "shall only disclose Confidential Information to its employees and contractors who (i) have a need to access such Confidential Information solely for the purpose of fulfilling the obligations under this Agreement, and (ii) have been advised of the obligations of confidentiality and are under obligations of confidentiality substantially similar to those set out in this section."  (*Id.* ¶ 6.)

135.    Paragraph 6 of the MSA also provided that the Receiving Party "shall not otherwise use or disclose to any person, firm or entity any Confidential Information of the Disclosing Party without the Disclosing Party's express, prior written permission." (*Id.*)

136.    NEXT limited access to the NEXT System Back End to persons who were under an obligation of confidentiality to NEXT, who had a restriction and requirement to access these applications for the sole purpose of  servicing the specific CCI 8 utility customers and their 13 programs to which the CCI employee was assigned, and who promised not to provide their user access to any other person or group.

137.    Under the terms of the MSA, certain CCI employees had access to the NEXT System Back End for the sole purpose of fulfilling the job functions under the MSA and SOWs. NEXT provided each such CCI employee with confidential login credentials, including IDs and passwords

**PUBLIC VERSION (REDACTED)**

that would enable such employee to access the NEXT System Back End modules for purposes of performing their job functions for the utility clients of CCI.

138.    Each of CCI's employees who was granted login credentials to the NEXT System Back End was under the obligation, pursuant to the terms of paragraph 6 of the MSA, to access the administrative modules of the NEXT System Back End "solely for the purpose of fulfilling the obligations under this Agreement" and  not to "use or disclose to any person, firm or entity any Confidential Information of the Disclosing Party [NEXT] without the Disclosing Party's express, prior written permission."  (Ex. 1, ¶ 6.)

139.    Between  roughly  September  2016  and  November  2017,  in  violation  of  its confidentiality  and  restricted  access  agreements,  CCI  misused   login  credentials  or  made unauthorized use of login credentials to access NEXT's back end in over 45,000 sessions for the purpose of obtaining information about the architecture, components, features and functionality of the NEXT FAST Tool.

140.    During some of those sessions, CCI provided live demonstrations of the NEXT FAST Tool to persons who were not authorized to access the FAST Tool. CCI recorded some of those demonstrations and made them available at any time to persons not authorized to access the FAST Tool, including the business analysts of Project Renaissance, the instructional design team of the DSMT software and the developers of DSMT.

141.    CCI recorded screen shots of the modules on the back end of the FAST Tool that comprise NEXT's trade secrets and made those screen shots available to persons not authorized to access the back end of the FAST Tool and who were using those screen shots to develop the DSMT software.

142.    Ultimately, the live demonstrations, recordings,  screen shots and unauthorized login credentials were made available to software developers, some of them located in India, who used the

**PUBLIC VERSION (REDACTED)**

information to defraud NEXT of its trade secrets and to replicate the NEXT FAST Tool in Green Team's DSMTracker software. By doing so, CCI  exceeded  the authorizations NEXT granted for use of login credentials,  violated agreements restricting access to the trade secrets and components of back end of the NEXT FAST Tool.

143.    CCI breached its obligations of confidentiality and restricted access to the NEXT System Back End. CCI misappropriated NEXT's trade secrets under 18 U.S.C. §§ 1832 and 1836 of the DTSA, violated the Computer Fraud and Abuse Act under 18 U.SC. § 1030 prohibiting intentional access to a protected information on a computer without authorization, and furthered its scheme to defraud NEXT of its intellectual property and trade secrets when  CCI employees misused their login credentials as is alleged herein to obtain information about the architecture, components, workflow, modules, features, functionalities, components, rules and eligibility criteria of the NEXT FAST Tool for development of the  DSMTracker software.

144.

**PUBLIC VERSION (REDACTED)**



**PUBLIC VERSION (REDACTED)**



PUBLIC VERSION (REDACTED)

**PUBLIC VERSION (REDACTED)**



**PUBLIC VERSION (REDACTED)**



**PUBLIC VERSION (REDACTED)**



**PUBLIC VERSION (REDACTED)**



**PUBLIC VERSION (REDACTED)**



**PUBLIC VERSION (REDACTED)**



**PUBLIC VERSION (REDACTED)**



**PUBLIC VERSION (REDACTED)**



**PUBLIC VERSION (REDACTED)**

**PUBLIC VERSION (REDACTED)**

195.     Between January 16, 2017 through January 18, 2017, for the purpose of defrauding NEXT of its intellectual property and trade secrets, CCI, without authorization and in violation of the parties' confidentiality agreement, On Demand Security protocols and NEXT Payment Solution's Inc. Network Access and Authentication Policy, penetrated six separate portals to the back end of the NEXT FAST Tool at least 327 times. Each of the six separate portals corresponded to one of the 8 Midwestern utilities serviced by NEXT. During those at least 327 penetrations, CCI penetrated 18 modules included within NEXT's trade secrets.  In order to access these six portals, it was necessary for the individual or individuals accessing these six portals to have been granted restricted administrative credentials for the six utilities involved. However, to use these administrative accesses for the purpose of investigating NEXT's back end and modules exceeded the authorization granted by NEXT and was in violation of confidentiality agreements.

196.     Specifically, the 327 penetrations to six portals to the back end of NEXT's FAST Tool were from a single IP Address (12.130.50.103) located in Cambridge MA and registered to Conservation Service Group, a company located in Westborough MA and purchased by CCI in or

about August 2015. No CCI employee servicing the utilities utilizing NEXT's FAST Tool resided in Massachusetts or were employed by or a contractor for Conservation Service Group.



198.    IP address 12.130.50.103 tied to Conservation Energy in Cambridge/Westborough, MA, accessed the NEXT Back End for all Utilities using FAST.  This was the only activity identified from this IP from all data records available to NEXT during the period of September 1, 2016 through November 1, 2017.  (NXT00140509):

| IP Access - Utilities | 12.130.50.103 |
|---|---|
| 1/16/2017 | 111 |
| Columbia Gas | 11 |
| Consumers Energy | 14 |
| Consumers Energy Recycling Program | 28 |
| MidAmerican | 50 |
| VECTREN | 8 |
| 1/17/2017 | 115 |
| Consumers Energy | 26 |
| Consumers Energy Recycling Program | 13 |
| MidAmerican | 72 |
| VECTREN | 4 |
| 1/18/2017 | 101 |
| Columbia Gas | 18 |
| Consumers Energy Recycling Program | 3 |
| Dominion Ohio | 6 |
| MidAmerican | 70 |
| VECTREN | 4 |

**PUBLIC VERSION (REDACTED)**

| IP Access - Utilities | 12.130.50.103 |
|---|---|
| Grand Total | 327 |

199.    All of the functional modules on NEXT's FAST TOOL were reviewed, searched and investigated from IP address 12.130.50.103 tied to Conservation Energy in Cambridge/Westborough, MA but no Appointments were created or edited. (NXT00140509).





**PUBLIC VERSION (REDACTED)**

203.    On January 24, 2017, CCI's purchase of Green Team and DSM Tracker software was completed.

204.    █████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████

205.    On January 24, 2017, knowing that it was going to terminate NEXT, CCI required NEXT to demonstrate the FAST Tool for DTE.  (NXT00110077.)

206.    After January 24, 2017, CCI repeatedly requested NEXT expend development resources for AEP, Ohio Dominion, Columbus Gas of Ohio, Consumer's Energy Recycling, Vectren, MidAmerican/Alliant Energy/Pull the Plug and DTE, knowing that CCI intended to replace the FAST Tool with DSMTracker for each of those customers within a short time period. CCI did so

**PUBLIC VERSION (REDACTED)**

knowing that NEXT would incur up-front costs for adapting its FAST Tool for use with each of those customers, and that CCI would not service those customers with the FAST Tool for a sufficient length of time for NEXT to recover its development costs.

207.    On or about February 9, 2017, CCI issued a press release announcing that CCI had acquired Green Team.

208.    On or about February 10, 2017, Hansel Rodriguez, who was aware of Project Renaissance and of CCI's decision to terminate NEXT, sent Matt Peterson a spreadsheet that included a long list of requests for NEXT to engage in development work for which NEXT would not receive payment, either directly from CCI or to be recovered from contractual payments from CCI over a period of time.  (NXT00060655.)

209.    The customers for which CCI requested that NEXT do further development work after CCI had decided to replace NEXT's FAST Tool with DSMTracker included continuing support for Consumers Energy, and development to deploy DTE, AEP, Mid American (Iowa Recycling Center), Ohio Dominion, Columbus Gas, Consumer's Energy Recycling, Vectren, among other development projects including upgrade in security, mobile app, reclaim API. CCI engaged NEXT to design and support a solution for DTE based on the FAST system. NEXT developed solutions unique to DTE, incurring significant development expenses, which it had not recovered as of November 1, 2017.

210.

**PUBLIC VERSION (REDACTED)**





**PUBLIC VERSION (REDACTED)**



PUBLIC VERSION (REDACTED)



**PUBLIC VERSION (REDACTED)**

222.    CCI instructed its employees in the East Lansing office to conduct a "gap analysis" and prepare a matrix identifying what NEXT's system could do that should be incorporated into the DSM Tracker software.

**PUBLIC VERSION (REDACTED)**

**PUBLIC VERSION (REDACTED)**

**PUBLIC VERSION (REDACTED)**





PUBLIC VERSION (REDACTED)

**PUBLIC VERSION (REDACTED)**

244. In addition, ███████████████████████████████████████

███████████████████████████████████████████████

misused their login credentials ██████████████████████████████

approximately 131 screen shots of NEXT's FAST Tool trade secrets, modules, features and

functionality are detailed on Ex. 10 attached hereto to be used by ██████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████ the number of times these modules were accessed are as

follows:



245.

**PUBLIC VERSION (REDACTED)**

**PUBLIC VERSION (REDACTED)**



**PUBLIC VERSION (REDACTED)**



**PUBLIC VERSION (REDACTED)**

**PUBLIC VERSION (REDACTED)**



**PUBLIC VERSION (REDACTED)**



**PUBLIC VERSION (REDACTED)**



**PUBLIC VERSION (REDACTED)**



**PUBLIC VERSION (REDACTED)**



**PUBLIC VERSION (REDACTED)**



**PUBLIC VERSION (REDACTED)**



**PUBLIC VERSION (REDACTED)**



PUBLIC VERSION (REDACTED)



**PUBLIC VERSION (REDACTED)**



**PUBLIC VERSION (REDACTED)**



299.    Immediately following ████████████████████████████████████ ████████████████████████████████████ for the first time during the period of September 1, 2016 through November 1, 2017, the back end of NEXT's FAST Tool for Consumers Energy programs was penetrated from IP addresses tied to India. There were 46 such penetrations between the dates of 9/1/17 to 9/6/17 during which time 36 of the FAST Tool's modules requiring administrative credentials for access were accessed:





300.    Also, beginning in the month of August 2017, ██████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████, the back end of NEXT's FAST Tool

was penetrated from IP addresses tied to Alpharetta and Atlanta Georgia where CCI DSMT

developers ██████████████████████████ lived and worked. Specifically,

during the period of August 15 through October 5, 2017, there were 60 penetrations from these

locations into the back end of the FAST Tool's portal for Consumers Energy programs. During these

penetrations, 8 modules for Consumers Energy programs that required administrative logins to access

as follows:

**PUBLIC VERSION (REDACTED)**





301.    Additionally, NEXT's FAST Tool back end portal for Vectren programs was penetrated 64 times from IP addressed located in the Atlanta Georgia area during this same time period. The modules penetrated also required administrative login access.

302.

**PUBLIC VERSION (REDACTED)**



**PUBLIC VERSION (REDACTED)**

307.     The time between CCI's acquisition of Green until CCI's November 1 notice that it had "cutover from NEXT's FAST system to our DSMTracker/Salesforce solution" is consistent with the amount of time it would have taken a team of software engineers to reverse engineer the NEXT FAST system and adapt it to Green's DSM software.

308.     At 6:46 p.m., Central Time (NXT00061887) ("the November 1 email")), Tim Mahler, Vice President of CCI, advised NEXT that CCI had terminated the MSA as of October 31, 2017: "I do want to let you know, that on October 31st, CLEAResult did cutover from NEXT's FAST system to our DSMTracker/Salesforce solution – it was a successful migration and now all program scheduling and work order management – Consumer Energy (HN, HEA, and ARP), COH (Audit and Assessment), DEO (Audit) Vectren (HEA and IQ) and Iowa ARP programs (MI dam, Alliant, and PTP) are managed by CLEAResult's DSMTracker solution."312.   By   2017,   CCI   had   gross revenues of approximately $24 million from its Consumers Energy business.

309.    In addition to the programs for Consumers Energy, CCI relied on NEXT's tool to schedule appointments for its customers and programs, DTE, AEP, Ohio Dominion, Columbia Gas of Ohio, Consumer's Energy Recycling, Vectren, Iowa Recycling including MidAmerican, Alliant and Pull the Plug (PTP) programs through at least 2017.

310.    As a result of the CCI's contracts won with NEXT's FAST Solutions, NEXT had expenses associated with providing services and support of the day to day account management of CCI's contracts, servers to support volume and system accessibility, and the ongoing maintenance and continued development of the FAST solutions.

311. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬





**CCI'S BREACH OF THE CCI SOWs and Licenses by Failure to Pay Invoice #413**

313. On or about September 29, 2017, NEXT sent CCI invoice #413, for which payment was due on or about October 29, 2017.

314. CCI invoice #413 included NEXT license and service fees for the 2015 Consumers Energy SOW, for the 2016 Consumers Energy Recycling SOW, for the Ohio Dominion SOW, for

**PUBLIC VERSION (REDACTED)**

the Iowa Recycling Center SOW, for the Vectren Agreement, for the Columbia Gas SOW, for the DTE SOW and for the American Electric Power SOW, each of which was a written agreement between CCI and NEXT.

315.    On or about November 9, 2017, CCI advised NEXT that it disputed the amounts claimed in invoice #413 and without specifying any inaccuracy or asserting that it was not accurate.

316.    CCI's refusal to pay the amounts reflected in Invoice #413 is a breach of the 2016 Consumers Energy Recycling SOW, for the Ohio Dominion SOW, for the Iowa Recycling Center SOW, for the Vectren Agreement, for the Columbia Gas SOW, for the DTE SOW and of the American Electric Power SOW, each of which was a written agreement between CCI and NEXT.

**CCI'S BREACH OF THE CCI SOWs and Licenses by Failure to Pay Invoice #421**

317.    On or about November 1, 2017, NEXT sent CCI invoice #421, for which payment was due on or about December 1, 2017.

318.    CCI invoice #421 included NEXT license and service fees for the 2015 Consumers Energy SOW, for the 2016 Consumers Energy Recycling SOW, for the Ohio Dominion SOW, for the Iowa Recycling Center SOW, for the Vectren Agreement, for the Columbia Gas SOW, for the DTE SOW and for the American Electric Power SOW, each of which was a written agreement between CCI and NEXT.

319.    On or about November 9, 2017, CCI advised NEXT that it disputed the amounts claimed in invoice #421 and without specifying any inaccuracy or asserting that it was not accurate.

320.    CCI's refusal to pay the amounts reflected in Invoice #421 is a breach of the 2016 Consumers Energy Recycling SOW, for the Ohio Dominion SOW, for the Iowa Recycling Center SOW, for the Vectren Agreement, for the Columbia Gas SOW, for the DTE SOW and of the American Electric Power SOW, each of which was a written agreement between CCI and NEXT.

**CCI'S BREACH OF THE CCI SOWs and Licenses by Failure to Pay Invoice #422**

321.    On or about November 2, 2017, NEXT sent CCI invoice # 422, for which payment was due on December 2, 2017.

322.    The November 2, 2017 Invoice #422 reflected user license fees that CCI owed NEXT and which were payable under the terms of the Consumers Energy Recycling SOW, the Vectren Agreement, the Columbia Gas SOW, he Ohio Dominion SOW, and the Iowa Recycling Center SOW, per the August 18, 2016 email from Tim Mahler to Matt Peterson regarding pricing.

323.    Under paragraph 1 of the MSA, each of the CCI SOWs and Licenses was "subject to the terms and conditions contained in this Agreement [the MSA]." (Ex. 1, ¶ 1.)  Under paragraph 12 of the MSA, in the event that CCI terminated the agreement, CCI agreed "to pay an early cancellation fee ("Kill Fee") equal to one calendar year of licensing fees for the Exclusive Rights, as stipulated in Section 3 of this Agreement" as "a genuine estimate of loss NEXT will suffer." (Id. ¶ 12.)

324.    CCI's cancellation of each of the then extant CCI SOWs and Licenses per the November 1 email constituted a written notice under paragraph 12 of the MSA and triggered CCI's obligation to pay the Kill Fee to NEXT pursuant to paragraph 12 of the MSA, which was incorporated in each of the CCI SOWs and Licenses. (Ex. 1, ¶¶ 1, 12.)

325.    Invoice #422 included the Kill Fee under paragraph 12 of the MSA.

326.    On or about November 7, 2017, CCI advised NEXT that it disputed the amounts claimed in invoice # 422 and without specifying any inaccuracy or asserting that it was not accurate.

327.    In total, CCI has refused to pay NEXT at least $915,024.50 for NEXT's performance under the CCI SOWs and Licenses, and for the kill fee due for CCI's termination without cause.

**PUBLIC VERSION (REDACTED)**

## COUNT I

### Violation of 18 U.S.C. §§ 1832 and 1836

### Misappropriation of Trade Secrets

328.     NEXT incorporates paragraphs 1-327 by reference.

329.     The NEXT System Back End, including the design elements and architecture of the NEXT FAST Tool, is related to a service used in interstate commerce.

330.     The NEXT System Back End, including the design elements and architecture of the NEXT FAST Tool, constitutes trade secrets owned by NEXT under 18 U.S.C. § 1839 (3).  NEXT owns the NEXT Trade Secrets (as defined above).

331.     NEXT has taken reasonable measures to keep the NEXT Trade Secrets, secret.

332.     Information about the NEXT Trade Secrets provides independent economic value to NEXT because such information is not known to and not readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

333.     CCI, without authorization, and with the intent to convert a trade secret to its own economic benefit, conveyed information about the NEXT Trade Secrets, to unauthorized persons for the purpose of creating applications that had the same functionality as the NEXT System and the NEXT FAST Tool, in violation of 18 U.S.C. §§1832 and 1836.

334.     CCI misappropriated information about the NEXT Trade Secrets, through unlawful means in order to adapt the Green DSM system to provide the same service to CCI's customers that had been provided using the NEXT System.

335.     CCI's misappropriation of the NEXT Trade Secrets was willful and malicious.

336.     NEXT has suffered and will continue to suffer irreparable injury as the result of CCI's misappropriation of the NEXT Trade Secrets.

337.     NEXT is without an adequate remedy at law.

338.   NEXT is entitled to a temporary restraining order, preliminary injunction and injunction to prevent CCI from continuing to use NEXT's trade secrets, including a temporary restraining order, preliminary injunction and injunction requiring CCI to cease using its DSMTracker/Salesforce solution for customers who had previously used solutions provided by NEXT. CCI has agreed that irreparable injury would occur in the event of any breach of any of the provisions of the MSA and that NEXT is entitled to injunctive relief to prevent breaches and to enforce specifically the terms of and provisions of the MSA. (Ex. 1 ¶ 16).

339.   NEXT is entitled to actual damages, including but not limited to lost profits and future lost profits, plus damages for unjust enrichment caused by CCI's misappropriation of NEXT trade secrets, and/or a reasonable royalty.

## COUNT II

### Breach of the CCI SOWs and Licenses

340.   NEXT incorporates paragraphs 1-339 by reference.

341.   Each of the CCI SOWs and Licenses incorporates each and every one of the terms of the MSA and is a valid and enforceable contract between NEXT and CCI.

342.   NEXT performed all of its obligations under each of the CCI SOWs and Licenses.

343.   CCI breached the CCI SOWs and Licenses, and paragraph 6 of the incorporated MSA by misappropriating NEXT's trade secrets.

344.   CCI breached the CCI SOWs and Licenses by refusing to pay for services provided by NEXT under the terms of the CCI SOWs and Licenses.

345.   CCI breached the CCI SOWs and Licenses and the incorporated MSA by refusing to pay the Kill Fee after CCI terminated its agreements with NEXT without cause.

346.   NEXT is entitled to damages in the amount of at least $950,000.00 for CCI's breach of the CCI SOWs and Licenses.

**PUBLIC VERSION (REDACTED)**

## COUNT III

### Breach of the MSA

347.     NEXT incorporates paragraphs 1-346 by reference.

348.     Under the MSA, NEXT was to provide "services as required for the performance of those duties set forth and defined in a Scope of Work, in the form of Exhibit A attached hereto ("SOW"), and be bound by and subject to the terms and conditions contained in this Agreement." (Ex. 1 ¶ 1.)

349.     The MSA provided that "SOWs will follow a standardized template and include the business unit and division, an associated SOW number and define the Client and program names, data requirements, terms and conditions, reward choices, communication requirements, and Client or partner cascading legal language, as needed. In addition, the SOWs will provide Client instructions for any authorization requirements for delivery of services."  (Ex. 1, ¶ 1.)

350.     The MSA further provided that

> From time to time, the Parties may agree to contract for additional services, where CLEAResult enters into an agreement with a third-party ("Client") using the Exclusive Rights. Such additional services shall be memorialized as a SOW and signed by both Parties. SOWs will follow a standardized template and include the business unit and division, an associated SOW number and define the Client and program names, data requirements, terms and conditions, reward choices, communication requirements, and Client or partner cascading legal language, as needed. In addition, the SOWs will provide Client instructions for any authorization requirements for delivery of service.

(*Id.*)

351.     Pursuant to paragraph 1 of the MSA, NEXT and CCI entered into each of the CCI SOWs and Licenses, each of which were in compliance with the terms of the MSA, and were "bound by and subject to the terms and conditions contained in" the MSA.  (Ex. 1, ¶ 1.)

**PUBLIC VERSION (REDACTED)**

352.   The MSA "continues in effect until April 1, 2016, unless the parties agree in writing to extend the Term."  (Ex. 1, ¶ 2.)

353.   Each of the CCI SOWs and Licenses, described in paragraphs 8-51, above, which were "bound by and subject to the terms and conditions contained in" the MSA, was a writing that continued the term of the MSA until November 1, 2017, when CCI terminated the MSA without cause.

354.   CCI had the right to terminate the MSA without cause "upon (10) ten days written notice to NEXT... for all tasks not then performed …."  (Id., ¶ 12.)  Upon such termination, CCI agreed "to pay an early cancellation fee ("Kill Fee") equal to one calendar year of licensing fees for the Exclusive Rights, as stipulated in Section 3 of this Agreement" as "a genuine estimate of loss NEXT will suffer." (Id.)

355.   CCI breached paragraph 12 of the MSA by refusing to pay the Kill Fee.

356.   NEXT is entitled to damages in the amount of at least $ 950,000.00 for CCI's breach of the MSA.

**COUNT IV**

**Unjust Enrichment**

357.   NEXT incorporates paragraphs 1-356 by reference.

358.   NEXT provided licenses and performed services for CCI in accordance with terms of the MSA and the CCI SOWs and Licenses, which CCI specifically approved.

359.   CCI benefited from the services NEXT performed and licenses NEXT provided under the CCI SOWs and Licenses.

360.   CCI has refused to pay for the services NEXT performed and licenses NEXT provided under the CCI SOWs and Licenses, in spite of the fact that CCI approved SOWs for those licenses and services.

361.    CCI misappropriated NEXT's trade secrets for the untoward purpose of adding functionality to CCI's software that did not exist before CCI's misappropriation.

362.    CCI benefited from its misappropriation of NEXT's trade secrets by adding functionality for CCI's software, which increased the value of such software, and enabled CCI to replace the services NEXT provided under the CCI SOWs and Licenses, thus saving CCI the cost of the services and licenses NEXT had provided under the CCI SOWs and Licenses.

363.    NEXT was damaged by CCI's misappropriation, by losing control over its trade secrets, and by losing revenues that rightly belonged to NEXT under the CCI SOWs and Licenses.

364.    CCI has been unjustly enriched to NEXT's detriment by the value of the services NEXT performed and licenses NEXT provided under the CCI SOWs and Licenses CCI had approved.

365.    CCI's use of the licenses and services provided by NEXT under the CCI SOWs and Licenses without paying NEXT for the value of those licenses and services violates the fundamental principles of justice, equity, and good conscience.

366.    NEXT is entitled to recover from CCI the value of the services NEXT performed and licenses NEXT provided under the CCI SOWs and Licenses that CCI had approved and per the terms provided in the MSA and any other agreement, written or oral, reached by NEXT and CCI, which resulted in NEXT providing such licenses and performing such services.

367.    CCI has been unjustly enriched by having access to NEXT trade secrets and other proprietary information, which was provided under paragraph 6 of the MSA.

368.    CCI misused NEXT's trade secrets and proprietary information to enable persons and entities with no right to have access to NEXT's trade secrets and proprietary information to create competitive systems ("the Competitive Systems") that CCI subsequently used to service CCI customers under terms of SOW's approved by CCI and under the MSA.

**PUBLIC VERSION (REDACTED)**

369.    NEXT is entitled to recover from CCI the value of the licenses provided and services performed for CCI and/or its customers by other persons or entities or by CCI using the Competitive Systems, in an amount to be proved at trial but no less than $2 million.

## COUNT V

### Promissory Estoppel

370.    NEXT incorporates paragraphs 1-369 by reference.

371.    CCI made unambiguous promises, either through words or through conduct, or both, to pay for services NEXT provided under the CCI SOWs and Licenses.

372.    CCI made unambiguous promises, either through words or through conduct, or both, to pay license fees for tools that NEXT developed at CCI's request for CCI's use in connection with the CCI SOWs and Licenses.

373.    NEXT reasonably relied on CCI's promises and conduct when it provided licenses and performed services for CCI under the CCI SOWs and Licenses, and when it developed tools that CCI had requested.

374.    NEXT's reliance on CCI's unambiguous promises was expected and foreseeable by CCI.

375.    NEXT relied on CCI's promises to its detriment.

376.    NEXT is entitled to recover the value of the licenses and services it provided to CCI in reasonable reliance on CCI's unambiguous promises, as recited above.

## COUNT VI

### Common Law Fraud

377.    NEXT incorporates paragraphs 1-376 by reference.

378.    From 2015 through November 1, 2017, CCI engaged in a pattern of deception, misrepresentations, concealment, and enticements designed to mislead NEXT into believing that CCI

91

intended to continue a long-term relationship with NEXT under which NEXT would be able to recoup its costs of (a) developing additional software requested by CCI, (b) adapting its FAST Tool to assist CCI in obtaining new business, and (c) implementing the FAST Tool with new customers. Instead, when CCI made such requests, CCI intended to replace NEXT entirely and port all of the utility customers described above to a version of DSMTracker that incorporated a pirated version of the NEXT FAST Tool.

379. CCI's pattern of deception, misrepresentations, concealment, and enticements included those described in paragraphs 138-309, above.

380. NEXT relied on CCI's requests that it expend resources to (a) develop software requested by CCI, (b) adapt its FAST Tool to assist CCI in obtaining new business, and (c) implement the FAST Tool with new customers as a result of the parties' past relationship in which CCI would request that NEXT bear the up-front costs of those services with the expectation that NEXT would recoup those costs over a period of several years of revenues from license fees and service charges.

381. Based on its past course of dealing with CCI, NEXT reasonably relied on CCI's misrepresentations, which was the proximate cause of NEXT spending over $350,000 on development costs for new software tools CCI never intended to use or pay for.

382. Based on its past course of dealing with CCI, NEXT reasonably relied on CCI's misrepresentations, which was the proximate cause of NEXT spending over $500,000 to adapt the FAST Tool to help CCI obtain new business and implement the FAST Tool with new customers that CCI intended to switch over to DSMTracker shortly after or during implementation of the FAST Tool.

383. NEXT has suffered damages of over $12 million by virtue of CCI's fraud.

**PUBLIC VERSION (REDACTED)**

## COUNT VII

### Violation of the Computer Fraud and Abuse Act under 18 U.S.C. §1030

384.    NEXT incorporates paragraphs 1-383 by reference.

385.    As stated above, CCI misused login credentials without authorization and in violation of confidentiality agreements for the purpose of defrauding NEXT of its intellectual property and trade secrets.

386.    Under the confidentiality provisions of the Master Services Agreement, CCI was permitted to provide login credentials only for the purpose of servicing certain of its utility customers for which it was licensed to use the FAST Tool. ███████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███

387.    As early as January 2017, login credentials were misused to gain access to the back end of NEXT's FAST Tool for the purpose of defrauding NEXT of its trade secrets including by investigating, documenting and researching NEXT's modules.

388.    As early as March 2017 and continuing thereafter, CCI employees misused their login credentials for the purpose of gaining access to NEXT's back end and take screen shots to aid the DSMT developers in replicating NEXT's features and functionality in violation of confidentiality agreements and to defraud NEXT of its trade secrets.

389.    At least as early as August 2017, without authorization and in violation of its agreements with NEXT, CCI misused  login credentials to the NEXT back end and trade secrets to demonstrate the back end of NEXT FAST Tool its employees and contractors who were developing the DSMTracker with features, functionalities and components of NEXT's trade secrets.

390.    During August 2017,  CCI misused login credentials to defraud NEXT by providing CCI  employees and contractors developing the DSMracker software with login credentials allowing them to gain access the NEXT System Back End, including the backend of the FAST Tool explicitly so that the developers could replicate  the features and functions of the FAST Tool in the DSMTracker software as is more fully set forth in detail above.

391.    Additionally, without authorization and in violation of its agreements with NEXT, CCI digitally recorded demonstrations of NEXT's FAST Tool back end so that CCI's employees and contractors would access these videos showing NEXT's back end and trade secrets.  (CR-0014612.)

392.    NEXT conducted an extensive investigation to identify unauthorized penetrations of NEXT's back end.

393.    NEXT confirmed that there were in excess of 45,000 unauthorized penetrations of its back end between September 1, 2016 and November 2017.

394.    Those unauthorized penetrations were the result of CCI's misuse of confidential login credentials, which were restricted to select CCI employees by written and confidentiality agreements for the sole purpose of servicing CCI's customers.

**PUBLIC VERSION (REDACTED)**

395.    CCI penetrated NEXT's back end by misusing login credentials for the purpose of defrauding NEXT including by  stealing NEXT's trade secrets by reverse engineering the logic of critical software modules so that NEXT's features and functionality could be replicated in the DSM tracker software.

396.    For example, the figure below is a summary showing unauthorized logins by CCI on May 16, 2017, using login credentials issued to Dan Williams:

## Chart 8 – May 16, 2017 Logins Using Dan Williams Login Credentials



Dan Williams' Login Credentials were required to gain access to the NEXT System FAST Back End Modules. As an administrative user the people accessing NEXT System could see all modules, and by touching appointments would see first hand appointment work-flow processes and Inventory Management algorithm results.

**PUBLIC VERSION (REDACTED)**

397.    As stated above, CCI misused login credentials, without authorization and in violation of confidentiality agreements, and with the intent to defraud NEXT by converting  trade secret to its own economic benefit, conveyed information about the NEXT System Back End to unauthorized persons for the purpose of appropriating NEXT's trade secrets.  (CR-0014612.)

398.    CCI misappropriated information from the NEXT System Back End by misusing login credentials without authorization and in violation of confidentiality agreements for the purpose of defrauding NEXT including by  replicating NEXT's features and functionalities in the DSMTracker software in order to provide the same service to CCI's customers that had been provided using the NEXT System.

399.    NEXT has suffered in excess of $12 million dollars in monetary damages as the result of CCI's misuse of login credentials without authorization and in violation of confidentiality agreements to defraud NEXT by gaining access to NEXT's System Back End and subsequently misappropriating of NEXT's trade secrets including, but not limited to, lost revenue and costs associated with conducting an assessment of data breaches.

400.    NEXT is entitled to actual damages, including but not limited to lost profits, future lost profits, and costs associated with assessing the data breach, caused by CCI's unauthorized access to NEXT's misappropriation of NEXT trade secrets, and/or a reasonable royalty.

### Count VIII

### Violation of the Illinois Trade Secrets Act
### 765 ILCS 1065

401.    NEXT incorporates paragraphs 1-400 by reference.

402.    The NEXT System Back End, including the design elements and architecture of the NEXT FAST Tool, constitutes trade secrets owned by NEXT under the Illinois Trade Secrets Act, 765 ILCS 1065.  NEXT owns the NEXT Trade Secrets (as defined above).

**PUBLIC VERSION (REDACTED)**

403.    NEXT has taken reasonable measures to keep the NEXT Trade Secrets, secret.

404.    Information about the NEXT Trade Secrets provides independent economic value to NEXT because such information is not known to and not readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

405.    CCI, without authorization, and with the intent to convert a trade secret to its own economic benefit, conveyed information about the NEXT Trade Secrets to unauthorized persons for the purpose of creating applications that had the same functionality as the NEXT System, in violation of 765 ILCS 1065.

406.    CCI misappropriated information from the NEXT Trade Secrets through unlawful means in order to adapt the Green DSM system to provide the same service to CCI's customers that had been provided using the NEXT System.

407.    CCI's misappropriation of NEXT's Trade Secrets was willful and malicious.

408.    NEXT has suffered and will continue to suffer irreparable injury as the result of CCI's misappropriation of the NEXT Trade Secrets.

409.    NEXT is without an adequate remedy at law.

410.    NEXT is entitled to a temporary restraining order, preliminary injunction and injunction to prevent CCI from continuing to use NEXT's trade secrets, including a temporary restraining order, preliminary injunction and injunction requiring CCI to cease using its DSMTracker/Salesforce solution for customers who had previously used solutions provided by NEXT. CCI has agreed that irreparable injury would occur in the event of any breach of any of the provisions of the MSA and that NEXT is entitled to injunctive relief to prevent breaches and to enforce specifically the terms of and provisions of the MSA. (Ex. 1 ¶ 16).

**PUBLIC VERSION (REDACTED)**

411.    NEXT is entitled to actual damages, including but not limited to lost profits and future lost profits, plus damages for unjust enrichment caused by CCI's misappropriation of NEXT trade secrets, and/or a reasonable royalty.

**PRAYER FOR RELIEF**

WHEREFORE, NEXT prays for relief and judgment as follows:

A.  That CCI be temporarily restrained, preliminarily enjoined and finally enjoined from continuing to use the DSMTracker/Salesforce solution in place of the NEXT solution for CCI's customers;

B.  That CCI be ordered to produce expedited discovery;

C.  That NEXT be awarded damages for its actual losses, including but not limited to past and future profits, from CCI's breach of contract, unjust enrichment, misappropriation of NEXT's trade secrets, fraud and unfair competition;

D.  That the Court increase the damages for CCI's malicious and willful misappropriation of NEXT's trade secrets;

E.  Award NEXT a reasonable royalty for the life of CCI's relationships with its present and future accounts;

F.  That the Court award NEXT reasonable attorneys' fees and costs pursuant to Title 18 U.S.C. §1836(b)(3)(D);

G.  That the Court award NEXT prejudgment interest and post-judgment interest; and,

H.  That the Court award NEXT any further relief that the Court deems just and proper.

**PUBLIC VERSION (REDACTED)**

RESPECTFULLY SUBMITTED,

PLAINTIFF NEXT PAYMENT SOLUTIONS, INC.,

Dated: September 18, 2018    BY:  /s/ Susan Bogart

Susan Bogart
Law Offices of Susan Bogart
70 West Madison St., Ste. 1400
Chicago, IL 60602
Sbogart514@aol.com
sbogart@susanbogart.com
Tele: (312) 214-3271

Eric C. Cohen
Theresa Starck
Brinks Gilson & Lione
455 N. Cityfront Plaza Drive Suite 3600
Chicago, IL 60611 eccohen@brinksgilson.com
Tel: (312) 321-4200
Fax: (312) 321-4299

Attorneys for Plaintiff
NEXT Payment Solutions, Inc.

**PUBLIC VERSION (REDACTED)**

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned attorney certifies that on September 18, 2018 she caused to be served the foregoing instrument via email on counsel for defendants by ECF electronic filing at the email addresses listed below:

Anthony Fuga
Timothy Ray
Rachel Christine Agius
Tammy Tabus
Holland and Knight LLP
131 South Dearborn St.
30th Floor
Chicago, IL  60603
Anthony.fuga@hklaw.com
Timothy.ray@hklaw.com
Tammy.tabush@hklaw.com
Rachel.agius@hklaw.com

John Matthew Donohue
Shannon Armstrong
111 SW Fifth Ave.
2300 US Bancorp Tower
Portland, OR 97204
matt.donohue@hklaw.com
shannon.armstrong@hklaw.com

/s/ Susan Bogart