UNITED STATES DISTRICT
COURT NORTHERN DISTRICT OF
ILLINOIS EASTERN DIVISION

NEXT Payment Solutions, Inc.,

        Plaintiff,

    v.

CLEAResult Consulting, Inc.,

        Defendant.

Case No. 17 CV 8829

**PLAINTIFF'S RESPONSE TO
DEFENDANT'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS
<u>IN SUPPORT OF ITS AMENDED MOTION FOR SUMMARY JUDGMENT</u>**

**FILED UNDER SEAL**

1

Pursuant to F. R. Civ. P. 56 and Local Rule 56.1(b)(3), Plaintiff NEXT Payment Solutions, Inc. ("NEXT"), through its attorneys, responds to Defendant CLEAResult Consulting Inc's ("CCI") statement of undisputed material facts pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(a)(3).

## I.     PARTIES, VENUE, AND JURISDICTION

1.     Defendant CLEAResult Consulting Inc. ("CLEAResult") is a Texas corporation with its principal place of business in Texas. CLEAResult implements residential energy efficiency programs for utilities, among other things.

Support: Def.'s Answer to First Amended Compl. ("Answer") (Dkt. No. 147) ¶ 28; Decl. of Timothy John Mahler in Support of Def.'s Opp'n to Pl.'s Mot. for TRO ("Mahler Decl.") (Dkt. No. 58) ¶¶ 1–2.

**NEXT Response:**   NEXT Payment Solutions, Inc. ("NEXT") does not dispute SUF ¶ 1. NEXT does not concede the admissibility of the entirety of the Mahler Declaration. NEXT disputes that CLEAResult ("CCI")'s Unverified Answer filed in Response to NEXT's Verified First Amended Complaint ("VAC") is sufficient to establish a fact for purposes of Summary Judgment. *See Ford v. Wilson,* 90 F.3d 245 (7th Cir. 1996) (holding that verified pleadings are to be treated as "affidavits" for purposes of Rule 56 (e)).

2.     Plaintiff NEXT Payment Solutions, Inc. ("NEXT") is an Illinois corporation with its principal place of business in Illinois. NEXT was a CLEAResult vendor, providing software development services and exclusive licensing rights for a rebate incentive processing portal.

Support: Verified First Amended Compl. ("VAC") (Dkt. No. 36) ¶ 27; Mahler Decl. ¶ 7.

**NEXT Response:**  Admit. NEXT does not concede that this is a complete statement of relevant material facts about NEXT for purposes of CCI's summary judgment motion. (See SAF ¶¶ [1]1).

3.     Jurisdiction exists pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332(a)(1).

Support: VAC ¶ 29; Answer ¶ 29.

**NEXT Response:**  Admit. NEXT disputes that CLEAResult ("CCI")'s Unverified Answer filed

---

[1] NEXT's Rule 56.1 (b)(3)(C) Statements of Additional Fact requiring denial of summary judgment are referenced as "SAF ¶___"

in Response to NEXT's Verified First Amended Complaint ("VAC") is sufficient to establish a fact for purposes of Summary Judgment. *See Ford v. Wilson,* 90 F.3d 245 (7th Cir. 1996), *supra.*

4.      Venue is appropriate in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(c)(2).

Support: VAC ¶ 31; Answer ¶ 31.

**NEXT Response:**  Admit. NEXT disputes that CLEAResult ("CCI')'s Unverified Answer filed in Response to NEXT's Verified First Amended Complaint ("VAC") is sufficient to establish a fact for purposes of Summary Judgment. *See Ford v. Wilson,* 90 F.3d 245 (7th Cir. 1996), *supra.*

## II.  THE NEXT SYSTEM

5.      In the summer of 2011, Matt Peterson reached out to Robert Strong (his brother-in-law) with a business plan about "workflow automation software" for NEXT.

Support: Ex. 1, 8/1/18 Deposition of Matthew Peterson ("Peterson Dep.") at 91:13-92:8.[1]

**NEXT Response:**  Disputed that SUF ¶ 5 completely and accurately recites Peterson's testimony. Specifically, in 2011, Peterson reached out to Strong to find a developer and had a compilation of discussions with Strong and developer Ryan Rodriguez about what he envisioned about the workflow automation software he wanted to build. (Tr. 92:1-7).

6.   NEXT entered a written proposal with Robert Strong and Ryan Rodriguez to "deliver the NEXT System" to NEXT. That proposal did not include a confidentiality provision. Ryan Rodriguez worked as an independent contractor.

Support: Ex. 1, Peterson Dep. at 99:2-8, 101:6-23, 135:3-6, 136:9-20, 156:18-157:2.

**NEXT Response:**  Disputed. On July 18, 2011, Ryan Rodriguez executed a document titled Agreement With Contract Programmer ("Agreement") with NEXT (SAF ¶ 3; PE E, Peterson Dep. Tr. 99:2-100:7 (NEXT had an agreement with Rodriguez); PE H, Decl. of Staszak ¶ 20 & Ex. 7 thereto (NXT00142847)). That form was provided to NEXT by Robert Strong. (*Id.*) (PE I, Strong Decl. ¶¶ 7-11 & Ex. 1 thereto). That Agreement contains a paragraph titled "Protection of Proprietary Materials" §

3

7, and requires that Rodriguez not disclose information or data constituting "trade secrets" of NEXT, including scientific or technical information, design, process, procedure, formula, or improvement relating to the development, design, construction and operation concerning the certain software being developed. (*Id.*) The Agreement also provided that as to any work performed by Rodriguez was owned exclusively by NEXT. (§ 6.01). (*See also* SAF ¶ 3 (PE E, Peterson Dep. Tr. 136:21-137:2 (all work performed by Rodriguez was owned by NEXT)).

### III. MASTER SERVICES AGREEMENT

7.     In October 2014, the parties executed a Master Services Agreement ("MSA") with an effective date of April 1, 2014. The MSA states: "The effective date of this Agreement ('Term') is April 1, 2014 and continues in effect until April 1, 2016, unless the Parties agree in writing to extend the Term, or unless this Agreement is earlier terminated in accordance with Section 12 Termination provision herein."

> Support: VAC ¶ 4; Answer ¶ 4; Ex. 11, ¶ 2; Ex. 1, Peterson Dep. at 175:15-176:19; Ex. 5, at 4 (mistakenly referring to October 6, 2016, instead of October 6, 2014).

**NEXT Response:**  Admit that § 2 of the MSA states the information recited. Deny that SUF ¶ 7 is a complete recitation of the relevant and material provisions to the instant litigation. Pursuant to FRE 106, NEXT incorporates the entirety of the MSA, Ex. 1 to the VAC, without reciting the full contents here. To the extent applicable to NEXT's arguments in opposition to summary judgment, NEXT recites those provisions of the MSA that are applicable.

8.     The MSA provides in relevant part as follows:

> This Agreement shall remain in force for the duration of the period specified below, unless extended in accordance with this Agreement ("Term"). All obligations incurred under this Agreement shall survive the Term until satisfied.
>
> * * *
>
> WHEREAS, NEXT is engaged in the business of providing CLEAResult exclusive licensing rights ("Exclusive Rights") of NEXT's digital rebate portal processing system, point of sale systems and reward fulfillment services. NEXT grants CLEAResult the Exclusive Rights to all uses in the United States and Canada related to the water, gas, electric and Telecom utility businesses as well as the energy efficient product supply chain such

as manufacturers, retailers, distributors. The Parties may agree to extend the scope of uses to the Exclusive Rights by signed agreement or signed SOW.

## 1. Scope of Services

CLEARresult [sic] hereby contracts for, and NEXT hereby agrees to provide, the services as required for the performance of those duties set forth and defined in a Scope of Work, in the form of Exhibit A attached hereto ("SOW"), and be bound by and subject to the terms and conditions contained in this Agreement.

From time to time, the Parties may agree to contract for additional services, where CLEAResult enters into an agreement with a third-party ("Client") using the Exclusive Rights. Such additional services shall be memorialized as a SOW and signed by both Parties. SOWs will follow a standardized template and include the business unit and division, an associated SOW number and define the Client and program names, data requirements, terms and conditions, reward choices, communication requirements, and Client or partner cascading legal language, as needed. In addition, the SOWs will provide Client instructions for any authorization requirements for delivery of services.

## 2. Term of Agreement

The effective date of this Agreement ("Term") is April 1, 2014 and continues in effect until April 1, 2016, unless the Parties agree in writing to extend the Term, or unless this Agreement is earlier terminated in accordance with Section 12 Termination provision herein.

* * *

## 6. Confidentiality

In this Agreement, "Confidential Information" means all documents, software, reports, data, records, forms and other materials obtained by one party (the "Receiving Party") from the other party (the "Disclosing Party"): (i) that have been marked as confidential; (ii) whose confidential nature has been made known by the Disclosing Party to the Receiving Party; or (iii) that due to their character and nature, a reasonable person under like circumstances would treat as confidential. Notwithstanding the foregoing, Confidential Information does not include information which: (i) is already known to the Receiving Party at the time of disclosure by the Disclosing Party; (ii) is or becomes publicly known through no wrongful act of the Receiving Party; (iii) is independently developed by the Receiving Party without benefit of the Disclosing Party's Confidential Information; (iv) is received by the Receiving Party from a third party without restriction and without a breach of an obligation of confidentiality; or (v) is lawfully required to be disclosed to any governmental agency or is otherwise

5

required to be disclosed by law; provided, however, that the Receiving Party shall notify the Disclosing Party, as soon as reasonably practical, of any order or request to disclose Confidential Information, or that such an order is being sought, or request has been made, so that the Disclosing Party may have an opportunity to take appropriate action to maintain confidential handling of such information. The Receiving Party shall only disclose Confidential Information to its employees and contractors who (i) have a need to access such Confidential Information solely for the purpose of fulfilling the obligations under this Agreement, and (ii) have been advised of the obligations of confidentiality and are under obligations of confidentiality substantially similar to those set out in this section. The Receiving Party shall not otherwise use or disclose to any person, firm or entity any Confidential Information of the Disclosing Party without the Disclosing Party's express, prior written permission. Each party shall exercise at least the same level of care to protect the other's Confidential Information as it exercises to protect its own Confidential Information of a similar nature, but in no event less than reasonable care. Upon termination of this Agreement, Receiving Party shall, upon Disclosing Party's request, return to Disclosing Party or destroy any documents, equipment, or other materials made available to Receiving Party in connection with the performance of the Services. The nondisclosure requirements of this section will survive for a period of three years following disclosure of the Confidential Information to the Receiving Party, except for trade secrets, which will remain subject to the nondisclosure requirements until no longer protected by law.

\* \* \*

## 10. Limitation of Liability

Neither party shall be liable to the other party for any consequential, indirect, exemplary, special, incidental or punitive damages including, without limitation, lost profits, even if such damages are foreseeable or the damaged party has been advised of the possibility of such damages and regardless of whether any such damages deemed to result from the failure or inadequacy of any exclusive or other remedy, and, in no event shall either party's liability to the other party exceed the total amount of payments made under this Agreement.

\* \* \*

## 12. Termination and Kill Fee

In the event CLEAResult terminates this Agreement (i) without cause, or (ii) for any reason other than NEXT's breach of this Agreement, CLEAResult agrees to pay an early cancellation fee ("Kill Fee") equal to one calendar year of licensing fees for the Exclusive Rights, as stipulated in Section 3 of this Agreement. This Kill Fee is not a penalty, but rather a

6

genuine estimate of loss NEXT will suffer.

## 15. Rights in Data

NEXT shall, upon completion of all work performed under the SOW or earlier as directed by CLEAResult, submit to CLEAResult any and all information initially developed in the course of performance of the SOW and specified in the SOW. In addition, NEXT shall, upon completion of all work performed under the SOWs, or earlier as directed by CLEAResult, deliver to CLEAResult all materials furnished to NEXT by CLEAResult including all copies thereof.

NEXT and CLEAResult agree that unless otherwise expressly agreed to in the terms of the SOW or a written signed agreement between the Parties, CLEAResult shall be the owner of all right, title, and interest (including all copyrights, patent rights, and all other applicable proprietary and intellectual property rights), in and to any and all works (including deliverables, analyses, databases, documentation, reports, or other works of authorship ("Works")) specifically and uniquely developed, authorized, created, or reduced to practice, in whole or in part, by NEXT for CLEAResult in the course of providing the services pursuant to this Agreement or in the SOW incorporated by reference herein, from the time of creation and at all times thereafter. Notwithstanding the foregoing, NEXT and CLEAResult both acknowledge that NEXT may currently possess certain know-how, templates, works, proprietary material, and/or methods ("Pre-Existing Materials"), and that such Pre-Existing Materials may be used in the execution of services contemplated by this Agreement and SOWs. For such Pre-Existing Materials, NEXT hereby grants CLEAResult a non-exclusive, non-transferable and royalty free license, allowing CLEAResult to use such Pre-Existing Materials in connection with the Works. At all times, NEXT shall retain all right, title, and interest in the Pre-Existing Materials and the right to future use of improvements in Pre-Existing Materials developed while servicing CLEAResult.

\* \* \*

## 17. Entire Agreement

This Agreement and all SOWs issued hereunder contain the entire Agreement between the parties with respect to the matters covered herein. This Agreement cannot be modified except in writing signed by both parties.

\* \* \*

## 22. Governing Law

This Agreement shall be governed by and construed in accordance with the

laws of the state of Texas, exclusive of its conflict of law rules, except for questions regarding the status of NEXT's relationship as an independent contractor, which shall be governed by the law of the state where NEXT resides.

**Exhibit A**

\* \* \*

NEXT will document and confirm all received SOWs and the parties will agree to any SOWs that become part of this Agreement.

Support: Ex. 11.

**NEXT Response:**      Admit that the MSA states the information recited, except that the "Governing Law" appears in § 21 of the MSA, not 22 as listed. Disputed that SUF ¶ 8 is a complete recitation of the relevant and material provisions to the instant litigation. Pursuant to FRE 106, NEXT incorporates the entirety of the MSA, Ex. 1 to the VAC, without reciting the full contents here. Specifically missing from CCI's recitation are the 1st specifying that "All obligations incurred under this Agreement shall survive the Term until satisfied"), 3rd relating to CCI's obligation to compensate NEXT a minimum of [Redacted Financial] installments for a license to the FAST System), 4th and 5th paragraphs on p. 1 of the MSA, § § 3 -5, 7-9, 11-12 (Termination and Kill Fee), 13-14, 16 (providing for injunctive relief), 18-20. To the extent applicable to NEXT's arguments in opposition to summary judgment, NEXT recites those provisions of the MSA that are applicable.

### IV. NEXT'S DEVELOPMENT OF FAST TOOL

9.      Prior to entering the MSA with CLEAResult, the NEXT System did not include a booking tool (later named the FAST Tool) for scheduling customer appointments. The FAST Tool is a web-based software application that enables utility customers to schedule appointments through a public site and for CLEAResult customer service representatives to schedule appointments through an internal web application (what NEXT refers to as the "backend").

Support: Ex. 1, Peterson Dep. at 206:23-207:6; Ex. 19 at CR-0009452; Ex. 6.

**NEXT Response:**  Disputed that the FAST System did not have a scheduling tool at the time the parties entered into the MSA because NEXT created a scheduling feature for its customer Anytime

8

Fitness on or before October 2013, which deployed in January 2014. (PE U, Decl. of Ruchty ¶¶ 6-9).

Further, in June, August and September, 2014, NEXT demonstrated working software including a self-scheduling and appointment management program on the NEXT System, in connection with CCI's attempt to win Consumers Energy request ████ program, which required that CCI offer an online self-scheduling tool that CCI did not have. (SAF ¶ ¶ 10-20). Disputed that the deposition reference or CRE 19[2] and 6 support a conclusion that NEXT did not have a scheduling tool at the time it entered into the MSA. Specifically, in CRE 19 (Peterson Dep. 8/1/18 Ex. 21), Peterson states in an email dated 2/10/15

> …I was asked by Tim Hardesty, Tim Mahler and Tim Celovsky a) if we could support a self booking portal (yes if we have the appointment inventory) and could we build it for demo to Consumers Energy. We said yes and did. Then we were introduced Jane and Matt to solve the system upgrade for google calendars.

(CR-0009452). CRE 6 is NEXT's Verified Second Revised Response to CCI's Second Set of Interrogatory No. 21 asking NEXT to describe its trade secrets. CCI does not point to a particular page of the 10 page response on which it relies. However, nothing in those Responses state that NEXT did not have a scheduling tool prior to entering into the MSA.

10.     NEXT's independent contractors wrote all of the code for the FAST Tool. Support: Ex. 2, 8/2/18 Deposition of Matthew Peterson ("Peterson Dep. II") at 141:2-8.

**NEXT Response:** Admit.

11**.**     NEXT did not produce any signed agreements providing that NEXT, rather than the independent contractors owned the source code they created for the FAST Tool.

Support: Ex. 1, Peterson Dep. at 63:4-64:6, 99:4-14, 101:6-23, 135:7-136:8, 137:16-139:1; Armstrong Decl. ¶ 4.

**NEXT Response:** Disputed. See SAF ¶¶ 3, 9 in which it is clear that NEXT's two primary coders, Ryan Rodriguez and Priyanka Shah, signed Contractor Agreements giving any ownership rights to NEXT. Also, all other coders/developers signed NDAs making clear that the Confidential

---

[2] CLEAResult Exhibits submitted in support of Summary Judgment are referenced as "CRE ___"

Information that belonged to NEXT and that they were required to return to or leave with NEXT at their departure included software source or object code. SAF ¶ 60.

12. NEXT launched the first version of the FAST Tool in January 2015.

Support: Ex. 6 at 10.

**NEXT Response:** Disputed. NEXT first launched the FAST Tool it built and demonstrated between June and September 2014 for the Consumers Energy HEA program. In December 2014, NEXT launched the FAST Tool which CCI used to service Consumers Energy's HN program, a new and different program than HEA. (SAF ¶ 23.)

13. NEXT developed the FAST Tool at CLEAResult's request.

Support: Ex. 7 at 13; Ex. 1, Peterson Dep. at 208:17-209:15.

**NEXT Response:** Admit that in June 2014 CCI asked NEXT if it could produce an online self-scheduling tool that CCI required to win its bid to service Consumers Energy HEA program. At the end of June, NEXT showed CCI a working solution. Thereafter, CCI asked NEXT to attend its sales presentation to Consumers Energy and NEXT modified the solution for that presentation. In October CCI asked NEXT to launch the CE HN program, which launched in December 2014. In March 2015, NEXT launched the CE HEA program. (SAF ¶ 23).

14. NEXT developed the FAST Tool in consultation with CLEAResult based on CLEAResult's feedback, requests, and approval.

Support: Ex. 16; Ex. 18; Ex. 19; Ex. 3, 7/31/18 Deposition of Kelly Jensen ("Jensen Dep.") at 28:2-11, 35:1-36:1, 46:11-19, 50:12-16, 55:10-12, 58:24-59:11, 85:18-20, 90:23-91:3.

**NEXT Response:** Admit that NEXT consulted with CCI regarding Consumers Energy's requirements and CCI preferences for the online self-scheduling booking tool it was required to have to win Consumers Energy ███ program business. (SAF ¶¶ 9-18). Dispute that the FAST Tool was developed solely based on CCI's feedback, requests and approval. (*Id.*)

15. NEXT contends it used at least 320 development hours under the MSA to develop the FAST Tool.

<u>Support</u>: Ex. 42; Ex. 2, Peterson Dep. II at 28:7-29:6, 30:6-13; Ex. 18; Ex. 43; Ex. 21; Ex. 17 at NXT00045315.

**NEXT Response:**  Admit that as of October 2014 NEXT had used 320 hours of the available hours of development time that had accumulated at the rate of 120 hours/month under the parties' exclusive license agreement that was the subject of the MSA.  (SAF ¶ 22).

16.     Peterson told CLEAResult "you guys designed [the FAST Tool] and guided us to your needs."

<u>Support</u>: Ex. 41.

**NEXT Response:**  Admit that Ex. 41 has that phrase in it. Dispute that the phrase means   that CCI designed and built the software that became the FAST Tool that was used to meet the needs of Consumers Energy and CCI's service being delivered to Consumers Energy. (SAF ¶¶ 10-18).

17.     Peterson refers to the FAST Tool as "your Scheduling Wizard" and "your baby . . . honestly a result of your teams input and direction."

<u>Support</u>: Ex. 20; Ex. 44.

**NEXT Response:**  Disputed.  Ex. 20 does not support the statement, but instead is an email from Matt Peterson to Paul Johns requesting payment by CCI for the FAST Tool per the SOWs attached thereto, which detailed the work NEXT had done to develop the FAST Tool, its features, and the work NEXT expected to do in the future for additional features requested by CCI. Also disputed because SUF ¶ 17 does not completely and accurately recite the full text of Ex. 44. Pursuant to FRE 106, the following statements from Ex. 44 provide context to CCI's out-of-context quotation. On 3/28/15, Matt Peterson sent an email to Jane Nelson, stating "System is available and fully functioning. Here if you need any support."  Ex. 44 at NXT00047397.  In response, on the same day, Jane Nelson emailed Matt Peterson telling him,

Awesome-thanks! I just assigned FT appts for a bunch of ▇ on 4/1- will run through it with all of them in about 30 minutes. Scheduling tool is way ahead of Open Field tool btw-nice job!!!.

11

Ex. 44 at NXT00047396. In response, also on the same day, Matt Peterson stated:

> It is your baby-and honestly a result of your teams input and directions-I think you guys did a pretty darn good job of describing the required operations and that is what you see in the programming. I think it is a beautiful baby too. You checked out the assigned FT's and were able to login? Want to confirm.

*Id.*

18.     The Landing Page and Customer Self-Scheduling pages of the FAST Tool are public facing.

Support: Ex. 1, Peterson Dep. at 214:5-215:20; Ex. 3, Jensen Dep. at 76:14-16.

**NEXT Response:** Admit that the "landing page" and the "customer online self-scheduling portal" are public facing. Dispute that Peterson Dep. 214:5-215:20 refers to a public facing page. The cited Peterson testimony refers to Peterson Dep Ex. 13, a PowerPoint (Tr. 209:16-23). Dispute that the slide on page 2 called Consumers Energy ▮▮▮▮ Booking Application, which was a subject of the cited Peterson deposition testimony, is public facing. Admit that slide page 3 of Peterson Dep. Ex. 13 labeled "Landing Page" and discussed at Tr. 215:2-17 is public facing. (*Id.*) Dispute the remainder of SUF ¶ 18 and dispute that the cited deposition transcripts support the assertion that multiple "Customer Self-Scheduling pages of the FAST Tool are public facing."

19.     The NEXT Back End consists of (a) a processing engine, (b) rules software, and (c) administrative modules. No administrative user, including CLEAResult, had access to the processing engine or rules software.

Support: Ex. 5 at 4, 9.

**NEXT Response:** Admit that the information recited appears in the first paragraph in response to CCI Interrogatory No. 2 on page 4 and in one sentence in response to Interrogatory No. 6 under "Technical Controls" on page 9. Dispute that SUF ¶ 19 is a complete recitation of NEXT's response to Interrogatory No. 2 or 9. Pursuant to FRE 106, NEXT incorporates herein as if fully set forth its complete response to Interrogatory Nos. 2 and 6. Further, NEXT notes that while no user had access to its source code for the NEXT System or FAST Tool, administrative users had access to the Appointment

12

Management module which allows them the ability to control data inputs by the FAST unique algorithm to calculate appointment inventory and to view and access calculated results. Providing a developer administrative access would expose him/her to the algorithm through trial and error. (SAF ¶ 5).

20.     NEXT has no evidence that CLEAResult accessed the source code for the FAST Tool, or stole NEXT's source code for the FAST Tool or NEXT System.

Support: Ex. 8 at 2-3; VAC ¶ 104.

**NEXT Response:** Admit.

### V.     NEXT'S PURPORTED CONFIDENTIALITY MEASURES

21.     NEXT produced nondisclosure agreements ("NDAs") with the following independent contractors who worked on developing the NEXT System: Michael Silao, dated August 25, 2014; Richard Cheung, dated October 28, 2014; Ryan Rodriguez, dated July 18, 2016; Cherry Mae Aran, dated June 27, 2016; and Brandon Osborne, dated January 2, 2017. Those NDAs provide, in relevant part:

> **3. Confidential Information.** The term "Confidential Information" as used in this Agreement shall mean any data. information, or knowledge disclosed by the Company to the Employee/Contractor and not generally known to the public, including but not limited to:
>
> * * *
>
> g. The Company's history, entity structure, accounts, or goodwill; the Company's copyrights, trademarks, trade secrets, patents. trade names, moral rights, or any other tangible or intangible rights, whether registered or unregistered;
>
> * * *
>
> **3. Obligation to Maintain Confidentiality.** With respect to Confidential Information:
>
> * * *
>
> f. [The obligation not to disclose Confidential Information shall survive the termination of this Agreement, and at no time will the Employee/Contractor be permitted to disclose Confidential Information, except to the extent that such Confidential Information is excluded from the obligations of confidentiality under this Agreement pursuant to Paragraph 2 above.] [The obligation not to disclose Confidential Information shall remain in effect until five years following the Employee/Contractor's termination of employment by the Company, except to the extent that such Confidential Information is excluded from the obligations of confidentiality under this Agreement pursuant to Paragraph 2 above.]

Support: Ex. 9; Ex. 10.

**NEXT Response:** Admit that NEXT produced NDA's with the developers and independent contractors Michael Silao, Richard Cheung, Ryan Rodriguez, Mae Aran, and Brandon Osborne bearing the dates identified in SUF ¶ 21. Dispute that this is a complete list of NEXT's agreements with developers which required them to maintain the confidentiality of NEXT's trade secrets, software, source code and other Confidential Information. Pursuant to FRE 106, NEXT states that it also had NDAs with developers Mark Cates (NXT00138930) and Yolan Yubat (NXT00061982). In addition, NEXT had Agreements With Contractor Programmers with Ryan Rodriguez dated 7/18/11 (NXT00142847) and Priyanka Shah dated 6/1/14 (NXT00142795) which contained confidentiality provisions). (SAF ¶¶ 3, 9).

NEXT admits that these agreements contained Confidentiality provisions but disputes that the recitation in SUF ¶ 21 accurately and completely recite these provisions. Pursuant to FRE, NEXT relies on the complete NDAs with these individuals which speak for themselves and as if fully set forth herein. *See* SAF ¶¶ 3, 9, 60) Specifically, the Confidentiality Agreements included in Ex. 9 that pertain to developers (which does not include the first Agreement with Aritola who was not a developer) defined Confidential Information in paragraphs 1 (a) - 1 (k), not simply (g) recited by CCI. For example and not included in CCI's recitation, paragraph 1 (d) required the developers to maintain the Confidentiality of schematics, designs, software source or object code, compressed and uncompressed binaries, inventions, patents or patent applications or illustrations; paragraph ( e) required the developers to maintain "existing or contemplated designs, models or platforms, formulas, research, notes or analytical data" confidential; and paragraph (h) required that they keep confidential NEXT's technical systems, processes, methods, algorithms, computational schemas, know-how, or trade secrets.

Further, the Obligation to Maintain Confidentiality has paragraphs 3 (a) –(f), not simply (f) recited by CCI. Pursuant to FRE 106, the agreements provide that the developer will retain the

Confidential Information in strict confidence and will not grant unauthorized access to it in paragraph (a); that it will remain the sole and exclusive property of NEXT, will not be disclosed to other employees or contractors of NEXT, unless they have a need to know and agree to be bound by the NDA in paragraph (b); won't export or re expert any data downloaded in paragraph (c); and will upon termination of the Agreement ensure that all Confidential information is returned to the company within 24 hours in paragraph ( e).

22.    NEXT did not have an NDA with Ryan Rodriguez, who worked on the NEXT System in 2011, until July 2016.

Support: Ex. 9 at NXT00012677.

**NEXT Response:**  Disputed to the extent that CCI uses the initials "NDA" to be synonymous with  having an agreement with Rodriguez requiring that he maintain confidential NEXT's trade secrets (*see* SUFR ¶ 21[3] *supra* and SAF ¶ 3 reflecting that NEXT had an Agreement With Contractor Programmer dated 7/14/11 which imposed non-disclosure and confidentiality requirements); admit that NEXT did not have a document labelled "NDA" with Rodriguez until July 2016.

23.    NEXT does not have NDAs or other confidentiality agreements with the following persons who had access to the NEXT System: Curt Matson (Technology support); Jill Staszak (COO and president); Matt Peterson (CEO); or Robert Strong (CTO).

Support: Ex. 1, Peterson Dep. at 84:2-86:1, 101:24-102:7, 102:20-103:11.

**NEXT Response:**  Admit that none of the individuals listed signed NDAs. However, Peterson and Staszak, as stockholders and officers of a closely held corporation, had fiduciary duties to maintain the confidentiality of the FAST SYSTEM and FAST Tool trade secrets. Disputed that either Matson or Strong accessed the Back End of the NEXT FAST Tool in the performance of their duties at NEXT. (*See* SAF ¶ 1, 61).

24.    NEXT contracted with Kelly Jensen as an independent contractor, who had access to the NEXT System and the FAST Tool. NEXT did not have an NDA or other confidentiality agreement

---

[3] References to NEXT's Response to CCI's Rule 56. 1 (a) Statements of Undisputed Fact are denoted as "SUFR ___"

with Mr. Jensen.

Support: Ex. 1, Peterson Dep. at 112:5-13, 114:9-21; Ex. 13; Ex. 3, Jensen Dep. at 26:22-25, 51:4-18, 56:11-12.

NEXT Response:  Deny that NEXT did not have an NDA with Jensen. Jensen testified that he had an employment agreement with NEXT, but could not remember whether it included a non-disclosure agreement. (PE N, Jensen Dep. Tr. 9:12-24, 11:2-23).  Dispute that Jensen had access to the NEXT SYSTEM or the FAST Tool. Pursuant to FRE 106, Mr. Jensen had access to a test environment.  (PE E, Peterson Dep. Tr. 108:15-109:13, Tr. 111:3-112:13)).

25.   NEXT contracted with Priyanka Shah as an independent contractor, who had access to the NEXT System and FAST Tool. NEXT did not have an NDA or other confidentiality agreement with Ms. Shah.

Support: Ex. 1, Peterson Dep. at 114:22-115:6, 116:12-19; Ex. 14.

NEXT Response:  Admit that NEXT contracted with Priyanka Shah as a developer of the NEXT FAST Tool. Dispute that NEXT did not have a confidentiality agreement with Shah. NEXT had an Agreement With Contractor Programmer with Shah dated 6/1/14 which contained confidentiality provisions. (SAF ¶ 9; PE E, Peterson Dep Tr. 114:22-117:12 (stating that he believed NEXT had a confidentiality agreement with Shah); SUFR ¶ 21, *supra*).

26.       NEXT contracted with Sergy Popov as an independent contractor, who had access to the NEXT System. NEXT did not have an NDA or other confidentiality agreement with Mr. Popov.

Support: Ex. 1, Peterson Dep. at 118:22-119:9.

NEXT Response:  Admit that Popov worked for NEXT as an independent contractor and did not have an NDA with NEXT. Disputed that Popov had access to the Back End of the NEXT System. Pursuant to FRE 106, NEXT notes that he worked on the public facing app interfaces. (*Id.* at 118:22-119:7).

27.       NEXT contracted with Brenda Arritola as an adviser. NEXT did not have a signed NDA or other confidentiality agreement with Ms. Arritola.

Support: Ex. 1, Peterson Dep. at 124:2-125:9; Ex. 9 at NXT00037081-83.

**NEXT Response:** Admit that NEXT contracted with Arritola to be a financial advisor to NEXT. Pursuant to FRE 106, see SAF ¶ 61, PE E Peterson Dep. Tr. 77:17-18. Admit that the NDA with Arritola and NEXT included in Peterson Dep. Ex. 9 (NXT00037081-83 is not signed. Pursuant to FRE 106, Arritola did not have access to the Back End of the NEXT System. (SAF ¶ 61).

28.     NEXT disclosed its first draft of the FAST Tool to Robert Strong, Ryan Rodriguez, Priyanka Shah, Kelly Jensen, and Jill Staszak without an NDA in place.

Support: Ex. 13.

**NEXT Response:** Disputed that Ex. 13 (Peterson Dep. Ex. 14) constitutes the "first draft of the FAST Tool". The content of the document makes clear that exhibit 13 is a description of what the FAST Tool will do (e.g. "replace google calendar as the primary appointment scheduling tool used by CLEAResult.") The document does not reflect programming, the source code, the rules or processing engine of the Back End of the FAST Tool software.)

Disputed that Ryan Rodriguez and Priyanka Shah did not have signed agreements requiring that they maintain the confidentiality of their development work and the NEXT System in place as of the date of this document-8/25/14. Rodriguez as of 7/18/11 and Shah as of 6/1/14 both were bound by Confidentiality provisions in Agreements With Contractor Programmer they signed with NEXT.  (SAF ¶ 3, 9). Admit that Jill Staszak did not have an NDA in place; dispute that she did not have confidentiality obligations to NEXT as a shareholder and officer/director of a closely held corporation (see *Hagshenas v. Gaylor*d, 199 Ill. App. 3d 60 (2d Dist. 1990); *Rexford Rand Corp. v. Ancel,* 58 F.3d 1215 (7th Cir. 1995);  (SAF ¶ 1). Admit that Strong and Jensen did not have NDA's in place; dispute that they had access to the Back End of the NEXT FAST System. (SAF ¶ 61).

29.     NEXT did not mark the user manual for the FAST Tool as confidential which included screenshots of the backend of the tool.

Support: Ex. 3, Jensen Dep. at 63:18-64:14; Ex. 27.

**NEXT Response:** Dispute that the cited reference to Jensen's deposition transcript and Ex. 27 (Ex. 8 to Jensen's Dep) reflect that the Exhibit was shared outside of NEXT. Pursuant to FRE 106, the deposition transcript reflects that Jensen shared it with Jill (Staszak) and Matt (Peterson) shareholders, owners and officer/directors of NEXT. (PE M, Jensen Dep. Tr. 62:23-63)). The final version of the booking tool with screen shots and provided to CCI in or about July 2015 not only contains a "confidentiality" stamp but was produced after the parties executed the MSA in October 2014, effective April 1, 2014. (SAF ¶ 25).

30. NEXT used simple four-digit passwords to access the FAST Tool based on the user's phone number or a basic "1234" with a common username of "admin."

Support: Ex. 36; Ex. 39.

**NEXT Response:** Dispute that the exhibits cited support SUF ¶ 30. Ex. 36 (NXT00060696-97) is an email to Honeywell, not CCI, and does not relate to the FAST Tool but rather a mobile app for Honeywell. NEXT had an NDA with Honeywell. (SAF ¶ 62Ex. 36 does not contain FAST Tool login credentials but, rather, credentials to enable a Honeywell employee to test the mobile app. (PE G, Peterson Decl. ¶ 50).

Ex. 39 addresses logins for CCI Field Techs using the Mobile App for Consumers Energy. PE G, Peterson Decl. ¶ 50). Field Techs working for CCI and servicing the Consumers Energy ██████ ████████████████████████████████ were provided login credentials by CCI employee Jane Nelson, not NEXT, which the email makes clear when Jane references her obligation to update her own account and the individual users accounts. (*Id.*). Dispute that NEXT used simple four digit passwords to access the NEXT FAST Tool. Rather, at the time a CCI employee registered new users, the NEXT FAST Tool generated an initial password based on the last four digits of the user's phone number which was to be changed after the user received their login credentials. The password "1234" with a common username of "admin" in Ex. 39 was for a test by a Honeywell employee of the mobile

18

app Honeywell was using and not a mobile app of the FAST Tool. (*Id.*)

CRE 28 (Exhibit 43 to Peterson's Deposition) is the list of 798 users of the FAST Tool granted login credentials and passwords by CCI administrators, such as Jane Nelson, who issued login credentials. CCI requested this process for login and passwords for security purposes. (PE G, Peterson Decl. ¶ 50; PE F, NEXT Rule 30 (b) (6) (Peterson) Dep. Tr. 143:7-21; Tr. 150:6-18; Tr. 192:8-15 & Dep. Ex. 43 (CRE 28 (NXT00028975)).

Note that Ex. 36 references the security upgrade CCI requested that NEXT develop, had NEXT install on December 5, 2016 and then ordered NEXT revert back to the prior version and which CCI did not pay for and which development costs NEXT is seeking in this litigation in the amount of ████ ████████████████.) (SAF ¶ 52, PE G, Peterson Decl. ¶ 37). Among other things, the security upgrade required all CCI employees to change their passwords to be at least 8 characters long, to include upper and lower case letters and numbers. (*Id.*)

31.     NEXT did not mark its internal communications regarding the FAST Tool as confidential or indicate that they contained trade secrets and should be treated as confidential at the time of the communications.

Support: Ex. 13; Ex. 14; Ex. 16.

**NEXT Response:** Admit that NEXT did not mark Ex. 13 (Peterson Dep. Ex. 14), Ex. 14 (Peterson Dep. Ex. 15) or Ex. 16 (Peterson Dep. Ex. 17) as confidential. Dispute that these exhibits contain trade secrets. (PE G, Peterson Decl. ¶ 47)

32.     NEXT did not mark communications with CLEAResult regarding the FAST Tool as confidential or indicate that they contained trade secrets and should be treated as confidential at the time of the communications.

Support: Ex. 12; Ex. 19.

**NEXT Response:** Admit that Ex. 12 (Peterson Dep. Ex. 13), an email between Peterson, Jensen and Staszak for NEXT and Tim Mahler, David Hart, Cindy Schweitzer, and Ryan Fantino of CCI contains NEXT's initial slides for August 20, 2014 presentation to Consumers Energy of the FAST Tool and not marked confidential. The screen grabs are all public and customer facing and do not constitute

19

trade secrets.   (PE G, Peterson Decl. ¶ 47)

Ex. 19 (Peterson Dep. Ex. 21) is an email chain started by Tom Diffley of CCI on February 10, 2015, after NEXT and CCI have entered into the MSA, to CCI employee Jane Nelson seeking information about NEXT and the NEXT FAST Tool.  (CR-0009454). It does not contain trade secrets. Jane Nelson emails Peterson to ask if she should answer the questions Diffley is asking her about NEXT and the NEXT FAST Tool. Peterson permits her to respond and requests that she send the contract (SOW) to Diffley so he knows what NEXT charges. The last email (page 1 of the chain) is Peterson recapping the updates to the FAST modules NEXT is going to be making to support the Consumers Energy HEA program that is going live in March 2015. (PE G, Peterson Decl. ¶ 47)

## II.    NEXT'S DESCRIPTION OF ITS ALLEGED TRADE SECRETS

33.  CLEAResult served on NEXT an interrogatory asking NEXT to "[i]dentify with precision and specificity each alleged trade secret that NEXT alleges CLEAResult misappropriated from NEXT. NEXT's identification should include an identification of the software architecture of the allegedly misappropriated trade secret, the software specifications for the allegedly misappropriated trade secret, the structural elements of the allegedly misappropriated trade secret, the design of the allegedly misappropriated trade secret, and, to the extent NEXT alleges that its source code was misappropriated, each file and line of code of the allegedly misappropriated trade secret."

Support: Ex. 6 at 1.

**NEXT Response:**  Admit that Ex. 6 was served on CCI on July 27, 2018. (CRE 6). Prior to that, NEXT had served its Verified Revised Responses on July 11, 2018. (PE G (27)).

34. NEXT responded by claiming that the entire "NEXT System" was a trade secret, and listing out the components of its software. Specifically, NEXT identified as "NEXT Trade Secrets" the entirety of NEXT's software for improving workflow automation for rebate processing programs (the "NEXT System"), which includes the "FAST TOOL" and the "NEXT System Back End," which is alleged to be "the backbone" of workflow automation systems developed by NEXT. NEXT further alleged that the trade secrets include the following elements: formulas, designs, prototypes, methods, techniques, processes, procedures, programs and codes in the NEXT System Back End; the FAST tool modules and the design elements and functionality of each REDACTED TRADE SECRETS

REDACTED TRADE SECRETS

Support: Ex. 6 at 2-11.

**NEXT Response:** Dispute that SUF ¶ 34 completely and accurately recites NEXT's 10 page response to interrogatory 21 Ex. 6 (Plaintiff NEXT Payment Solutions, Inc.'s Verified Second Revised Confidential Answers to CLEAResult Consulting Inc.'s Second Set of Interrogatories). Pursuant to FRE 106, NEXT incorporates herein by reference as if fully set forth its entire 10 page response to Interrogatory 21 in Ex. 6, which speaks for itself. NEXT specifically notes that CCI omits the fact that NEXT's response incorporates by reference as if fully set forth therein the July 16, 2018 Expert Report of Ricardo Valerdi. (Ex. 6 at 8.) CCI has designated the July 16, 2018 Valerdi Expert Report as Ex. 57 to its motion. CCI does not include the fact that the Valerdi expert report is 34 pages long, excluding attachments. Page 13 of that Report further described NEXT's trade secrets as including:



REDACTED TRADE SECRETS

35. On July 13, 2018, CLEAResult moved to compel a detailed description of NEXT's trade secrets. NEXT opposed the motion. In its opposition, NEXT identified its trade secrets as the "NEXT System," defined as "software for automating company workflow," and which includes the NEXT System Backend and NEXT System FAST Tool; the "specific modules that are combined to create the system"; the "functions" of each module; and the Executable Type/Grouping which "identified the unique architecture of the NEXT System."

Support: Ex. 6; Dkt. No. 104; Dkt. No 105; Dkt. No. 113 at 2-5; Dkt. No. 121.

**NEXT Response:** Disputed that Ex. 6, NEXT's Verified **Second** Revised Confidential Answers were the subject of CCI's Motion to Compel because those Second Revised Responses were filed on July 27, 2018. (CRE 6) (emphasis supplied.) Admit that CCI moved to compel a further response to its Interrogatory No. 21 on July 13, 2018 (Dkt. 104), which motion was directed at NEXT's revised confidential answers served on July 11 (PE G (27), NEXT Payment Solutions, Inc's Verified Revised Confidential Answers to CLEAResult Consulting Inc.'s Second Set of Interrogatories ("July 11 Response")). Pursuant to FRE 106, NEXT adds that on 7/31/2018, this Court denied CCI's motion to compel NEXT to supplement its July 11 Response to CCI's Interrogatory No. 21 noting that the July 11 Response:

> consists of approximately 10 pages and details the elements of its software that are trade secrets at issue in this case. (citation omitted) The parties have also produced tens of thousands of documents and taken depositions, and the Court finds that a further response to interrogatory No. 21 is unnecessary Considering the relevance of any such further elaboration, the potential for further elaboration to duplicate discovery already provided, and the vast amount of discovery already exchanged in this case. (citation omitted)

(Dkt. 125 at pp. 34-35). Pursuant to FRE 106, NEXT notes that Dr. Valerdi served his initial expert report on July 16 per this Court's order, after CCI filed its Motion to Compel. (CRE 57). Also after CCI's motion to compel was filed, on July 27, 2018, NEXT served CRE Ex. 6, NEXT's **Second** Revised Responses incorporating by reference Dr. Valerdi's July 16 report. (CRE 6). On August 1 and 2, 2018, CCI deposed Matt Peterson in his individual capacity (8/1/18) and as NEXT's Rule 30 (b) (6) witness (8/2/18). CCI questioned Peterson on NEXT's trade secrets at length. (PE E, 8/1/18 Peterson Dep. Tr. 14214-16, 21-Tr. 143:8-144:146:21; Tr. 150:11-159:2; Tr. 206:12-22; Tr. 265:10-24); 8/2/18 Rule 30

(b) (6) (Peterson) Dep. Tr. 179:4-234:10 & Ex. 44; Tr. 260:9-16). Also, pursuant to FRE 106, CCI

deposed Richardo Valerdi for an entire day on September 25, 2018 and discussed NEXT's trade secrets

(PE J, Valerdi Dep. Tr. 28:21-29:6, 29:21-30:6, Tr. 47:17-21, Tr. 108:3-12; Tr. 129:3-15; Tr. 174:12-

21; Tr. 177:7-24; Tr. 187:18-188:1, 9-Tr. 189:8, Tr. 190:6-24, Tr. 192:11-16, Tr. 192:5-193:18, Tr.

194:2-10, Tr. 195:19, Tr. 196:16-Tr. 197:16, Tr. 203:2-Tr. 204:1, Tr. 211:23-Tr. 215:13, Tr. 216:9-Tr.

217:12, Tr. 218:6-Tr. 219:13, Tr. 219:19-22, Tr. 220:19-221:4, Tr. 221:16-222:1, Tr. 222:15-20, Tr.

230:20-232:17, Tr. 233:19-24, Tr. 234:8-235:5, Tr. 236:12-21, Tr. 237:5-10, Tr. 237:15-238, Tr. 239:10-

12, Tr. 240:23-2243:4)).  Thus, CCI has been given explanations of NEXT's trade secrets in addition to

the explanation provided in CRE 6.

36.  Peterson testified that the "back end is part of our trade secrets." He further testified that the "NEXT FAST Solution" and the "modules on the FAST" are NEXT's trade secrets, as are "any of the compiled compilation of the data using our algorithms to produce reports that were exportable" as well as the source code and logic of the NEXT System. He also testified that the backend "relies" on the NEXT System. He further testified that the graphics of the screen shot for the Client Dashboard module, including whether it was "[b]lue versus white versus green," is "considered a trade secret."

Support: Ex. 1, Peterson Dep. at 142:13-155:12, 156:18-157:6; Ex. 2, Peterson Dep. II at 200:11-200:24, 260:9-261:5.

**NEXT Response:**  Admit that Peterson testified as referenced above. Dispute that the

characterizations of Peterson's testimony are accurate. Further, pursuant to FRE 106, CCI's recitation is

incomplete. Peterson testified for two days and the excerpts of his testimony regarding NEXT's trade

secrets is, pursuant to FRE 106, set forth in the excerpts of Peterson's testimony & Dep. Ex. 44 identified

in SUFR ¶ 35 *supra.*

37.  Dr. Valerdi is an expert retained by NEXT to opine on "what the trade secrets were or are." In the Opening Report of Dr. Ricardo Valerdi Regarding Theft of Trade Secrets, Dr. Valerdi wrote that the "trade secrets developed by NEXT, as defined in NEXT's revised confidential answer to second set of interrogatories (Interrogatory No. #21), can be described as design elements of FAST Tools." He gave a list of what these elements "include" that corresponds with the statements in NEXT's response to Interrogatory No. 21. In the Supplement to Expert Report of Dr. Ricardo Valerdi Regarding Theft of Trade Secrets, Dr. Valerdi provides a list of "FAST Component[s]" that he asserts are "NEXT Trade Secrets." All of the modules listed in NEXT's response to Interrogatory No. 21 are in Dr. Valerdi's list of components.

Support: Ex. 56, 9/25/18 Deposition of Ricardo Valerdi ("Valerdi Dep.") at 47:9-47:21; Ex. 57 at 13; Ex. 58 at 5-6; Ex. 6.

**NEXT Response:** Admit that Valerdi testified about NEXT's trade secrets. Dispute that SUF ¶ 37 accurately and completely recite Valerdi's testimony regarding NEXT's trade secrets. Pursuant to FRE 106, NEXT incorporates by reference as if fully set forth herein the excerpts of Valerdi's testimony identified in SUFR ¶ 35 *supra.*

38.  NEXT's Verified Second Revised Confidential Answers to CLEAResult Consulting Inc.'s Second Set of Interrogatories, which contains NEXT's response to Interrogatory No. 21, was marked as Exhibit 4 during the deposition of Dr. Valerdi. Dr. Valerdi testified that the modules list in NEXT's response, such as "Client Dashboard, Operational Dashboard, Schedule Appointment, et cetera . . . are high level characterizations of what the FAST Tool does[.]" Dr. Valerdi also testified that the first full paragraph of NEXT's interrogatory response "doesn't describe the trade secrets, per se. It mentions the types of trade secrets." Asked what the "types of trade secrets" are, Dr. Valerdi stated: "from this text, I don't—I can't tell what they are specifically trying to describe[.]"

Support: Ex. 56, Valerdi Dep. at 175:2-175:13, 184:3-185:4, 185:19-188:1; Ex. 6.

**NEXT Response:** Admit that SUF ¶ 38 identifies one excerpt from Dr. Valerdi's deposition testimony when asked by CCI's counsel to address paragraph 1 of NEXT's 10-page Second Revised Answer to Interrogatory No. 21. Dispute that CCI's recitation is a complete set of excerpts of Dr. Valerdi's testimony concerning NEXT's trade secrets. Pursuant to FRE 106, NEXT incorporates by reference as if fully set forth herein the excerpts of Valerdi's testimony identified in PRSUF ¶ 35 *supra.* Valerdi was asked several questions by CCI about NEXT's Response to Interrogatory No. 21 (*see e.g.* PE J, Valerdi Dep. Tr. 175:03-177:24; 182:15-188:07) but was not asked to address the entirety of the contents of that Interrogatory and the trade secrets identified in it.

39.  When asked how the "application architecture of the FAST Tool differ[s] from the architecture of any other workflow system," Dr. Valerdi testified in part: "The application architecture is how the specific software is designed to meet customer requirements." When asked what the user experience that he referred to as a trade secret is, Dr. Valerdi stated that "it's the result of the architect or designer of the product making decisions" about where menus go and the "visual response" that is provided to users. When asked what about the user experience in the FAST Tool is unique, Dr. Valerdi testified in part: "I think the relevant issue here is that what Matt was developing, Matt and whoever worked with him to build the NEXT Fast Tool, was something that was specific to the utility industry. So put yourself in the shoes of dispatcher, who needs to perform certain tasks. And if you are a designer

of a tool to enable that dispatcher to perform their job, you're going to have to provide them with something that is exactly in support and nothing else, nothing more, nothing less, but exactly in support of that workflow."

Support: Ex. 56, Valerdi Dep. at 196:16-197:16, 203:2-204:1, 208:1-209:5; Ex. 57 at 13.

**NEXT Response:** Admit that SUF ¶ 39 identifies a string of quotes from Dr. Valerdi's deposition concerning architecture, albeit not all of his testimony. Pursuant to FRE 106, NEXT incorporates by reference as if fully set forth herein the excerpts of Valerdi's testimony identified in SUFR ¶ 35 *supra*. Dr. Valerdi provided substantial testimony concerning the architecture of the NEXT SYSTEM and FAST Tool. (PE J, Valerdi Dep. Tr. 9:18, 16:21, 19:17-19, 20:17, 25:06-15, 36::05, 38:15, 45:03-19, 187:19, 197:03-198, 202:15-23, 221:24, 225:01, 232: 11).

## VI. NEXT'S DISCLOSURE OF ITS NEXT SYSTEM OR FAST TOOL

40. NEXT provided access to the backend of the FAST Tool to 798 users, including 720 CLEAResult administrators or call agents, and 48 third parties, including field technicians and other third party contractors.

Support: Ex. 3, Jensen Dep. at 76:4-13; Ex. 2, Peterson Dep. II at 148:17-149:13; Ex. 28.

**NEXT Response:** Disputed. Neither of the cited references support SUF ¶ 40. See (PE G, Peterrson Decl. ¶ 50 which makes note that NEXT granted user access to CCI's administrators of the eight utilities the FAST Tool serviced. Those CCI administrators created user credentials for most of the 798 users listed on Ex. 28.

41. NEXT provided a live demo of its NEXT System to Anytime Fitness in 2014 without a confidentiality agreement.

Support: Ex. 1, Peterson Dep. at 162:5-11, 162:19-163:13; Ex. 29.

**NEXT Response:** Admit that NEXT provided a live demo to Anytime Fitness. Pursuant to FRE 106, NEXT states that it had a confidentiality and NDA dated 1/27/14 with Anytime Fitness at the time of the demonstration. (SAF ¶ 62).

42. NEXT provided access to its NEXT System to Sears in 2014 with only a one-way confidentiality agreement protecting Sears' confidential information.

25

Support: Ex. 30.

**NEXT Response:**  Disputed. NEXT had a "two way" confidentiality agreement with Sears

dated 5/19/12. (SAF ¶ 62).

43.  NEXT provided login credentials to the FAST Tool for CLEAResult's customers. NEXT did not object to Duke Energy or Consumers Energy viewing screenshots of the NEXT System without a confidentiality agreement.

Support: Ex. 40; Ex. 35.

**NEXT Response:** Disputed that Exs. 40 and 35 support SUF ¶ 43. Dispute that Ex. 40 contains

screen shots of the FAST Tool. Ex. 40 relates to rebates and the rebate approval cue. Ex. 35 relates to

Consumers Energy's and obtaining access to "client facing" data. (SAF ¶ 47). NEXT had Security

Policies in place per the requirements of CCI to protect its customer data on NEXT's system. (*Id.* PE G

(1) & (2) (NXT00094389; CR-0409325). Client facing information were reports generated from the

client's data related to the program being served.

44.    NEXT posted 21 videos on vimeo.com which show over 73 minutes of demonstrations of the FAST Tool, with some videos dating back to December 8, 2016. The video demonstration remained publicly available on vimeo.com until at least June 25, 2018. The videos were not password-protected, could be viewed or copied by the public, and can be found by a simple internet search.

Support: Ex. 34; Declaration of Peter Uhlenhake in support of defendant's amended motion for summary judgment ("Uhlenhake Decl.").

**NEXT Response:**  Disputed. SUF ¶ 44 is conclusory and is not supported by fact. The

declaration makes clear that Mr. Uhlenhake's personal knowledge does not support the conclusion that

all 21 videos were on the Vimeo site since December 8, 2016 and until at least June 25, 2018.  The

declaration states that, on June 25, 2018, Mr. Uhlenake, a Holland & Knight paralegal, downloaded 21

videos from Vimeo. (Dkt, 193, Uhlenhake Decl. ¶¶ 2, 3). There is no evidence that he or any other agent

of CCI visited the Vimeo video cite prior to June 25, 2018, or at any time during CCI's theft of NEXT's

trade secrets. Dispute that there are73 minutes of video reflecting the FAST Tool, or that Mr. Uhlenahke has personal knowledge of and is qualified to testify to NEXT's trade secrets, as he has not been identified as an expert. Pursuant to FRE 106, NEXT states that its expert Dr. Valerdi addressed the Vimeo Videos in his September 18, 2018 Expert Rebuttal Report, which CCI has not included as an exhibit and he testified at length about the Vimeo videos which testimony CCI has also ignored. (*See* SAF ¶ 69). Specifically, Dr. Valerdi's Rebuttal Report states that only about 24 minutes of video content relate to the FAST Tool. (*Id.* & PE. J, Valerdi Dep. & Ex. 3 (9/18/18 Rebuttal Report) thereto, p. 5 § 5 paragraph 4. He stated further that the videos provide a passive inspection and do not allow the viewer to interact with the features or understand the underlying rules or architecture of the software, making it impossible to "fully reflect" the trade secrets . . . ." (§ 5, pp. 5-6, para. 5. *See also,* PE J, Valerdi Dep. Tr. 98:8-15; Tr. 106:4-107:2 (It is not possible to reverse engineer the NEXT FAST Tool by watching the Vimeo videos "because of the duration of the videos. They are ranging from one to four minutes. So it's—not enough time to describe some of these things in the necessary detail. Also, the ability to interact with some of the functionalities is not possible, because you're a passive viewer. And if you want to really understand how something works, you really need to be able to use it, enter some inputs, and see how those inputs provide outputs. . . .")

    45. Vimeo.com includes the following Terms of Service:

> LICENSE TO VIMEO: As between you and Vimeo, you own the video content ("videos") that you submit to the Vimeo Service. By submitting a video, you grant Vimeo and its affiliates a limited, worldwide, non-exclusive, royalty-free license and right to copy, transmit, distribute, publicly perform and display (through all media now known or hereafter created), and make derivative works from your video for the purpose of (i) displaying the video within the Vimeo Service; (ii) displaying the video on third party websites and applications through a video embed or Vimeo's API subject to your video privacy choices; (iii) allowing other users to play, download, and embed on third party websites the video, subject to your video privacy choices; (iv) promoting the Vimeo Service, provided that you have made the video publicly available; and (v) archiving or preserving the video for disputes, legal proceedings, or investigations.

    * * *

27

LICENSE TO OTHER USERS: You further grant all users of the Vimeo Service permission to view your videos for their personal, non-commercial purposes. This includes the right to copy and make derivative works from the videos solely to the extent necessary to view the videos. The foregoing licenses are in addition to any license you may decide to grant (e.g., a Creative Commons license).

DURATION OF LICENSES: The above licenses will continue unless and until you remove your videos from the Vimeo Service, in which case the licenses will terminate within a commercially reasonable period of time. Notwithstanding the foregoing, the license for legal archival/preservation purposes will continue indefinitely. Please note that removed videos may be cached in search engine indices after removal and that Vimeo has no control over such caching.

Support: Ex. 47.

**NEXT Response:** Dispute that SUF ¶45 completely recites the terms of a license for the Vimeo website. Dispute that, and move to strike, Uhlenhake's Declaration (Dkt. 193) provides a sufficient foundation for the admissibility of this document pursuant to FRE 901 (a), he does not assert that he has personal knowledge of the information in his declaration, and does not establish a basis for an exception to the hearsay rule. FRE 801. Pursuant to FRE 106, NEXT states that the document speaks for itself and incorporates by reference all of the terms and conditions set forth in that agreement. Dispute the relevance of Ex. 47 and the foundation for its admission that is not provided in the motion.

46. The video demonstration of the FAST Tool on vimeo.com showed: (1) IESO Redemption; (2) Quality Review Module; (3) Administrative History Module; (4) Dispatch Center Module; (5) Lead Management Module; (6) Schedule Appointment Module; (7) Status Updater Module; (8) Appointment Dashboard; (9) Access Instructions for IRC Monthly Check Export Report; (10) workflow automation using the Northwest Energy Efficiency Alliance portal; (11) backend architecture for the NEXT System and FAST Tool, including the NEXT mobile app, on-demand rebate center, Operational Dashboard, Claims Central, Customer Center, and Report Management; (12) backend authentication for a tech logging in to Honeywell's Lyric system to obtain Thermastat credit; (13) customer portal showing a customer obtaining an instant rebate; (14) mobile app for drivers who collect items for recycling; (15) Administrative Portal for Midstream; (16) Retailer Portal for the Midstream Tool; (17) Midstream Tool; (18) PayPal customer experience.

Support: Uhlenhake Decl., Ex. 2.

**NEXT Response:** Disputed and Move to Strike SUF ¶ 46. Uhlenhake has not been proffered as an expert in this case and has not otherwise been shown to be qualified to testify about the FAST Tool

and its trade secrets. Consequently, pursuant to Fed. R. Civ. P. 37 (c), the Defendant is barred from using him as a witness (or any other witness not disclosed pursuant to Rule 26 (a) (2)) to supply evidence in support of summary judgment as it would not be admissible at trial as required under FRCP 56. *Tribble v. Evangelides,* 670 F.3d 753, 758 (7th Cir. 2012), citing *Musser v. Gentiva Health Serv's,* 356 F.3d 751, 758 (7th Cir. 2004). The statements and opinions contained in the SUF would also be inadmissible under Rule 701, which allows lay opinion, because Uhlenhake fails at least two of the three requirements of Rule 701. To be admissible under Rule 701, lay testimony is limited to "opinions or inferences which are (a) rationally based on the perception of the witness, . . . and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed.R.Evid. 701. Here, as noted, the opinion falls within the scope of Rule 702, and therefore fail the tests of Rule 701. Further, CCI has not offered evidence laying a foundation to show that Uhlenhake has personal knowledge of the FAST Tool to render his opinions and statements admissible under Rule 701.

To be relevant, evidence must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Red. R. Evid. 401. Without any foundation suggesting he has the relevant expertise in the area of trade secrets his opinions about the matter lack the personal knowledge that is required and is simply irrelevant and is nothing more than a subjective by a biased witness and, thus, is irrelevant.

NEXT notes that Dr. Valerdi, who has been proffered as a witness and who did offer opinions on the Vimeo videos makes clear that only 24 minutes of the Vimeo videos relate to the FAST Tool. See SUFR ¶ 44 and SAF ¶ 69.

47. Dr. Valerdi testified he has not "examined" whether the posting of the videos "violate[d] the trade secret qualification." Dr. Valerdi also concedes that he has not determined whether any of NEXT's alleged trade secrets are readily ascertainable.

Support: Ex. 56, Valerdi Dep. at 127:5-127:15, 133:14-133:23.

**NEXT Response:** Disputed. Dr. Valerdi testified that in his Rebuttal report to CCI expert

Shamos' report, he focused on whether the trade secrets were "fully reflected" as CCI's Expert, Dr.

Shamos, had claimed in his expert report. Dr. Valerdi found they were not. Pursuant to FRE 106, NEXT

states that the entirety of Dr. Valerdi's September 18, 2018 Expert Rebuttal Report addressing the Vimeo

Videos should be considered by the Court in addition to Dr. Valerdi's extensive testimony at his

deposition relating to the Vimeo Videos. (SAF ¶ 69; SUFR *Supra* ¶ 35.)

48.  Screenshots from the FAST Tool were marked as Exhibit 44 during the deposition of Matt
Peterson. NEXT confirmed that those screenshots came from administrative access to the FAST Tool
and constitute its alleged trade secrets.

> Support: Ex. 26; Ex. 2, Peterson Dep. II at 194:5-11, 197:20-199:2, 199:7-21, 200:11-
> 201:12, 201:19-205:23, 206:16-209:22, 210:10-214:8, 215:12-219:2, 219:21-221:14,
> 223:16-225:15.

**NEXT Response:**  Admit that Ex 26 (Ex. 44 to Peterson's Deposition) contains screen shots

produced in discovery by NEXT at the request of CCI. Dispute that the screenshots all came from users

with Administrative Access. (PE G, Peterson Decl. ¶ 47 & PE  G (570 thereto). Rather, the screenshots

come from access that could be obtained by Field Tech users, Public Users, NEXT's CEO,

Administrative users, Call Agent users. (*Id.* identifying who had access to the screen shots in Peterson

Dep. Ex. 44).

49.  NEXT took screenshots of its FAST Tool and posted them to Screencast without a login or
password.

> Support: Ex. 3, Jensen Dep. at 36:10-24, 42:15-44:6.

**NEXT Response:**  Dispute that SUF ¶ 49 is an accurate characterization or complete statement

of Jensen's testimony. Jensen testified that Screencast snapshots were not to his knowledge public and

that it was on his computer and when you send it, it's for the user that you send it to. (Dep. Tr. 43: 15-

24). Pursuant to FRE 106, the name of the software that NEXT used to transmit screenshots was Snagit,

and NEXT purchased licenses to Snagit and it was installed on Peterson's Staszak's, Jensen's and

Rodriguez's laptop. To install the software the license number had to be entered. The public did not have

access to NEXT's Snagit account.  (SAF ¶ 63).

50.  NEXT provided access to Honeywell (a third party) to demo the FAST Tool with a password of "1234," and provided screenshots of the mobile app without marking the information as confidential.

Support: Ex. 36; Ex. 48.

**NEXT Response:**  Disputed. CCI mischaracterizes Ex. 36. See SUFR ¶ 30. Ex. 48 (Ex. 2 to

Staszak Dep.) contains screenshots updates related to the Honeywell Mobile App. (*Id.*).  NEXT had a

Confidentiality Agreement in place with Honeywell dated 6/1/16 at the time these screenshots were

shared. (SAF ¶ 62 & PE G (23), thereto (Honeywell Confidentiality Agreement).

51.  On July 16, 2018, NEXT publicly filed its response to CLEAResult's Interrogatory No. 21 which sought the identity of "each alleged trade secret that NEXT alleges CLEAResult misappropriated from NEXT." NEXT moved to file that information under seal on September 17, 2018, only after CLEAResult filed a motion for summary judgment relying in part of NEXT's failure to file under seal the identification of its alleged trade secrets.

Support: Exhibit 4 to Pl.'s Mem. in Opp'n to Mot. to Compel (Dkt. No. 113-4); Pl.'s Mot. for Leave to File Under Seal (Dkt. No. 165).

**NEXT Response:**  Admit that NEXT filed its "Confidential Verified Revised Response to CCI's

Interrogatory No. 21 served on July 11, 2018 in response to CCI's Motion to Compel and, upon learning

it was not filed Under Seal, moved immediately upon learning that it was not filed Under Seal to seal it.

(Dkt. 165).  Dispute that this filing is in anyway relevant to CCI's theft of NEXT's trade secrets which

occurred in 2017. Further, note Valerdi Expert Opinion, (PE J, Valerdi Dep. Tr. 98:8-15; Tr. 106:4-

107:2 (It is not possible to reverse engineer the NEXT FAST Tool by watching the Vimeo videos

"because of the duration of the videos. They are ranging from one to four minutes. So it's—not enough

time to describe some of these things in the necessary detail. Also, the ability to interact with some of

the functionalities is not possible, because you're a passive viewer. And if you want to really understand

how something works, you really need to be able to use it, enter some inputs, and see how those inputs

provide outputs. . . .")

### VIII.        SOWS EMAILED TO CLEARESULT

52.  Prior to April 1, 2016, SOW 1 is the only SOW that NEXT sent to CLEAResult.

> Support: Ex. 15; Ex. 17; Ex. 22; VAC Ex. 7; VAC ¶¶ 54, 60, 67, 73, 86, 91.

**NEXT Response:**  Admit that NEXT sent SOW # 1 to CCI on multiple occasions—8/28/14, 10/6/14 and 8/28/15-all prior to April 1, 2016.

53.  The first iteration of SOW 1 was drafted by Matt Peterson and emailed to CLEAResult by Mr. Peterson on August 28, 2014. Mr. Peterson testified that the August 2014 version of SOW 1 was not drafted to have a signature line because if CLEAResult "accepted it" the SOW would be "embed [ded]" in the MSA, which was still in the process of being finalized, and CLEAResult would not be charged anything extra. Mr. Peterson's position is that CLEAResult did "accept" this version of SOW 1.

> Support: Ex. 15; Ex. 1, Peterson Dep. at 227:6-231:17.

**NEXT Response:**  Disputed that SUF ¶ 53 fully and accurately recites Peterson's deposition testimony. Peterson testified that the work represented in SOW #1 was done on spec and "if accepted" would be included in the original license and was accepted. (PE E, Peterson Dep. Tr. 229:1-6). The August SOW # 1 was for Consumers Energy ██ program. (SAF ¶ 19).

54.  The second iteration of SOW 1, emailed by Mr. Peterson to CLEAResult on October 6, 2014, was never agreed to.

> Support: Ex. 17; Ex. 1, Peterson Dep. at 241:2-241:12; 274:6-275:19.

**NEXT Response:**  Dispute that the SOW 1 sent on October 6, 2014 was an iteration of SOW 1 and that a SOW for the scheduling tool was never agreed to. See SUFR ¶ 53. Pursuant to FRE 106, the October SOW was for General Booking Tool and requested approval for an additional 100 hours of development time. (*Id.*) CRE 17 (Peterson Dep Ex. 19)).

55. The third iteration of SOW 1 was emailed to Paul Johns of CLEAResult by Matt Peterson on August 28, 2015. Mr. Peterson's cover email described it as a "draft SOW."

> Support: Ex. 22.

**NEXT Response:**  Dispute that the SOW 1 sent to Paul Johns as Ex. 22 was the same as the

SOW # 1 sent on 8/24/14 and the SOW sent on October 6, 2014 and dispute that Ex. 22 supports this

assertion or the characterization of the SOW as the "third iteration".

56. CLEAResult was awarded a contract for a Consumers Energy home audit program. The August 2015 draft SOW 1 relates to additional services for an agreement CLEAResult had entered into with Consumers Energy and states its purpose is for "[p]rovid[ing] an online booking tool automation for Consumer Energy home audit programs." NEXT contends that CLEAResult used the scheduling tool to drive scheduling of thousands of home visits for Consumers Energy. The August 2015 draft SOW 1 does not contain business unit and division, data requirements, communication requirements, Consumers Energy's instructions for any authorization requirements, or signature lines.

> Support: Ex. 22; Ex. 7, at 2.

**NEXT Response:** Dispute that Exs. 22 and 7 support SUF ¶ 56. Ex. 7 supports the statement

that CCI reported to NEXT that Consumers Energy ███████████████████████ in 2015

and NEXT should expect ██ that in 2017. CCI won the Consumers Energy ████ program in October

2014 and the contract was finalized in or about March 2015 when NEXT rolled it out. (SAF ¶ 23).

During that time period, NEXT was supporting Consumers Energy █████ program. (*Id.*). NEXT did

not see the RFP from 2015. However, CR-0484462, CCI's contract with Consumers Energy contains

requirements for CCI to meet.

57. It was not within Mr. Johns' purview to approve SOWs.

> Support: Ex. 4, 8/16/18 Deposition of Paul Johns ("Johns Dep.") at 115:8-115:10.

**NEXT Response:** Disputed. On August 14, 2015 (CRE 22) Paul Johns reported to NEXT that he had

succeeded in obtaining approval of NEXT's SOW for the scheduling wizard. Tom Diffley advised

Matt Peterson by email on August 4, 2015, "All matters relating to the booking tool are handled by

Tim Mahler and Paul Johns. (SAF ¶ 26).

58. Neither Mr. Johns or anyone at CLEAResult ever signed the draft SOW 1 or agreed in writing to its terms, nor did NEXT ever attempt to finalize it.

> Support: Ex. 4, Johns Dep. at 115:1-115:6; Ex. 2, Peterson Dep. II at 31:21-33:6.

**NEXT Response:** Disputed. SUF ¶ 58 states a conclusion of law not a statement of fact.

Moreover, it is incorrect. Under Texas law provides that a record or signature cannot be denied legal effect or enforceability if it is in electronic form. Tex. Bus. & Com. Code Ann. §§ 322.003 (a), 322.007 (a). *See also Tubelite v. Risicia & Sons, Inc.,* 819 S.W.2d 801, 804 (Texas 1991). CCI approved all SOWS with NEXT by email. (SAF ¶¶ 26, 30-32, 34-51) (PE E, Peterson Dep. Tr. 177:1-184:5)) and paid all invoices NEXT issued pursuant to those SOWs (*Id.* & PE  H, Staszak Decl. ¶ & Ex. 2-5) (reflecting the parties course of dealing).

59.   In March of 2016, in an email to David McCann of CLEAResult, Mr. Peterson referred to the agreement in place for Consumers Energy as a "gentleman's agreement."

Support: Ex. 31.

**NEXT Response:**  Admit that Ex. 31 mentions the words "gentleman's agreement" for "support of Consumers Energy Scheduling Program-Modify as required- . . . ." Dispute that this is a complete and accurate representation of the circumstances governing NEXT and CCI as of that date. On September 10, 2015, Tim Mahler of CCI characterized NEXT's scheduling tool as one of the "Key Technologies" that CCI was using to service Consumers Energy. (PE G (69) (CR-0182761-62.)  In May 2016, CCI characterized its arrangement with NEXT as a "new agreement with NEXT for scheduling services" (SAF ¶ 44 & PE B,  Johns Dep. Ex. 15 (CR-0130848-50)) and as a new deal. *See also* NEXT's Responses to CCI's First Set of Interrogatories No.1 (CRE 5).

60.  Beginning in July 2016, NEXT emailed a series of six SOWs to CLEAResult pertaining to use of the FAST Tool for different CLEAResult clients. NEXT and CLEAResult also exchanged emails relating to the ▮▮▮▮ program that NEXT contends are an enforceable agreement. None of these SOWs, nor the ▮▮▮▮-related emails, make any reference to the MSA, to being of any duration, or to a Kill Fee. They were never signed.

Support: Ex. 23; Exs. 3-9 to VAC; Ex. 2, Peterson Dep. II at 38:19-39:9, 48:18-48:20, 49:1-49:4, 50:9-50:11, 51:1-51:3, 52:3-52:9, 52:11-52:15, 52:16-53:12, 58:23-62:1, 63:13-63:16, 64:4-64:6, 65:15-66:3, 66:14-66:21; VAC ¶¶ 54, 60, 67, 73, 86, 91.

**NEXT Response:**  Admit that the SOWs and email exchanges are enforceable contracts. SUF ¶ 60 conclusion of law that these exchanges "were not signed" is incorrect. Under Texas law provides that a record or signature cannot be denied legal effect or enforceability if it is in electronic form. Tex. Bus.

& Com. Code Ann. §§ 322.003 (a), 322.007 (a). *See also Tubelite v. Risicia & Sons, Inc.,* 819 S.W.2d 801, 804 (Texas 1991). CCI approved all SOWS with NEXT by email. (SAF ¶¶ 26, 30-32, 34-51; PE E, Peterson Dep. Tr. 177:1-184:5)) and paid all invoices NEXT issued pursuant to those SOWs (*Id.* & PE H, Staszak Decl. ¶ & Ex. 2-5) (reflecting the parties course of dealing). Further, each SOW was in the form provided under the MSA, Ex. A as required under § 1 of the MSA. (CRE 11). As that Section states, "NEXT hereby agrees to provide, the services as required for the performance of those duties set forth and defined in a Scope of Work, in the form of Exhibit A attached hereto ("SOW"), and be bound by and subject to the terms and conditions in this Agreement." Thus, the terms of the MSA were incorporated into the terms of the SOW. To the extent that any of the SOWs entered into after April 1, 2016 are not fully integrated, the Court must consider surrounding circumstances and the parties' course of dealing (*Tubelite, a Div. of Indal, Inc.,* 819 S.W.2d at 804) to explain or supplement the terms. *Id.* at 19. Moreover, under similar circumstances, a Texas court has held that where, as here, a "blanket agreement" existed between the parties, work orders issued subsequent to the blanket agreement "automatically include[] the terms of the blanket agreement." *Granite Re Inc. v. Jay Mills Contracting Inc.*, 2015 WL 1869216 at *3 (Tex. App. April 23, 2015).

61. SOWs for Consumers Energy ███████████████████████████ were emailed to CLEAResult on July 15, 2016; the ███████ emails that NEXT claim are an enforceable agreement are from August 2016; an SOW pertaining to the █████████████████████████ SOW was sent to CLEAResult on or around November 17, 2016; and an SOW pertaining to █████████ was emailed to CLEAResult on November 21, 2016.

Support: Ex. 23; VAC Ex. 7; Ex. 33; Ex. 32; VAC ¶¶ 54, 60, 67, 73, 86, 91; Answer ¶ 86.

**NEXT Response:** Admit.

## IX. THE MSA WAS NOT EXTENDED

62. In a March 1, 2016 email to Mr. McCann of CLEAResult, Mr. Peterson wrote: "The MSA will expire April 1 [and] it can be extended with mutual agreement in writing …." Prior to April 1, 2016, the parties did not agree in writing to extend the MSA.

Support: Ex. 31; Ex. 1, Peterson Dep. at 176:20-184:16; Ex. 5, at 2-4.

**NEXT Response:** Disputed. Objection to the extent that SUF ¶ 62 states a conclusion of law. Further, each SOW was in the form provided under the MSA, Ex. A as required under § 1 of the MSA. (CRE 11). As that section of the MSA states, "NEXT hereby agrees to provide, the services as required for the performance of those duties set forth and defined in a Scope of Work, in the form of Exhibit A attached hereto ("SOW"), and be bound by and subject to the terms and conditions in this Agreement." Thus, the terms of the MSA were incorporated into the terms of the SOW. To the extent that any of the SOWs entered into after April 1, 2016 are not fully integrated, the Court must consider surrounding circumstances and the parties' course of dealing (*Tubelite, a Div. of Indal, Inc. v. Risica & Sons, Inc.,* 819 S.W.2d 801, 804 (Texas 1991)) to explain or supplement the terms. *Id.* at 19. Moreover, under similar circumstances, a Texas court has held that where, as here, a "blanket agreement" existed between the parties, work orders issued subsequent to the blanket agreement "automatically include[] the terms of the blanket agreement." *Granite Re Inc. v. Jay Mills Contracting Inc.*, 2015 WL 1869216 at *3 (Tex. App. April 23, 2015). *See* NEXT's Responses to CCI's First Set of Interrogatory No. 1 (CRE 5); See also PE B, Johns Dep. Ex. 15 (CR-0130848-50) in which CCI claimed to have a new agreement and a new deal with NEXT. (SAF ¶ 44).

63. On July 29, 2016, Mr. Peterson emailed Mr. Mahler of CLEAResult a spreadsheet he created for CLEAResult to "lay out pricing strategies." Peterson admits that the second column of the spreadsheet, labeled "CURRENT," is "consistent" with the then-current "state of the relationship" between NEXT and CLEAResult. For current "RISK MODIFIERS"/"Contract Stability" Peterson recorded on the document: "Verbal Month to Month."

Support: Ex. 24; Ex. 2, Peterson Dep. II at 68:11-69:10.

**NEXT Response:** Dispute that SUF ¶ 63 accurately recite Peterson's testimony regarding Ex. 24 (Ex. 28 to Rule 30 (b) (6) (Peterson) Dep.) Specifically, Peterson testified that "…our understanding was that the SOWs were bound by the MSA and we were billing from a month-to-month basis." (Tr. 70:10-12).

64. On January 9, 2017, Tim Mahler of CLEAResult wrote to Bob King of CLEAResult about

36

NEXT costs for 2017; for each program NEXT was supporting, he recorded under the column "renews in" "month to month."

Support: Ex. 46.

**NEXT Response:** Admit that SUF ¶ 64 summarizes CRE 46. Deny that NEXT had knowledge of this email or that the agreement was a month-to-month agreement. Deny that NEXT agreed to a month-to-month agreement. See SUFR ¶ 65 *infra*; *see also* CRE 5, NEXT's Response to CCI's Interrogatory No. 1 in which NEXT understood that McCann was negotiating a broader MSA with NEXT.

65. Peterson testified that, as of July 29, 2016, "…and we were billing from a month-to-month basis. We didn't have a stated new contract."

Support: Ex. 2, Peterson Dep. II at 69:22-70:12.

**NEXT Response:** Admit. Pursuant to FRE 106, the full statement of Peterson was "our understanding was that the SOWs were bound by the MSA and we were billing from a month-to-month basis. We didn't have a stated new contract."

66. In August or September 2016, NEXT began to provide access to the "NEXT platform" to Enbridge, a utility based in Canada, to enable Enbridge to participate in NEXT's "self-automated rebate processing solution." In or around the fall of 2016, NEXT entered into an MSA with Honeywell. Honeywell engaged NEXT in connection with an Enbridge program to self-authenticate automatically with an installed Lyric thermostat. NEXT and Honeywell also agreed to Statement of Works for rebate processing, midstream processing, and programs. Mr. Peterson's understanding is that the manufacturing division of Honeywell is the Honeywell division that has been paying for NEXT's work.

Support: Ex. 1, Peterson Dep. at 26:16-29:10, 30:22-33:23, 36:14-37:4; Ex. 5 at 19.

**NEXT Response:** Dispute that SUF ¶ 66 is a relevant or material fact. Admit that NEXT provided rebate processing to Enbridge, a utility based in Canada in the later part of 2016. Pursuant to FRE 106, NEXT had an NDA with Honeywell at the time. ((SAF ¶¶ 62, PE G, Peterson Decl. PE G (23)).

67. When asked to explain whether NEXT and CLEAResult agreed in writing to extend the MSA beyond April 1, 2016, Mr. Peterson failed to identify a single writing or any oral agreement before

April 1, 2016 that he contends extended the contract. He further admitted that in the February 2016 timeframe he spoke with Mr. McCann of CLEAResult and said "we've got this MSA that has an expiration date on it," and what Mr. McCann agreed to was "to meet with me in subsequent meetings to discuss how NEXT and [CLEAResult] can continue working together." Moreover, when asked what he believed the new term for the extended MSA was, he admitted: "So I didn't believe any term. I was waiting to understand what the term was."

Support: Ex. 1, Peterson Dep. at 176:20-184:16.

NEXT Response: Disputed. SUF ¶ 67 states conclusions not facts and is argumentative. Pursuant to FRE 106, Peterson testified that the SOWs were extending and incorporating the terms of the MSA: "our understanding was that the SOWs were bound by the MSA and we were billing from a month-to-month basis." (PE E, Peterson Dep. Tr. 70:10-12; see also NEXT Responses to CCI's First Interrogatories No. 1 (CRE 5)). Further, as CCI concedes in SUF 61, each of the SOWs governing work NEXT agreed to perform was agreed to by email, which under Texas law is sufficient to constitute separate contracts and, where as here there is a blanket agreement governing the SOWs, incorporates in and includes the terms of the MSA. Under Texas law provides that a record or signature cannot be denied legal effect or enforceability if it is in electronic form. Tex. Bus. & Com. Code Ann. §§ 322.003 (a), 322.007 (a). *See also Tubelite v. Risicia & Sons, Inc.,* 819 S.W.2d 801, 804 (Texas 1991). CCI approved all SOWS with NEXT by email. (SAF ¶¶  26, 30-32, 34-51; PE E, Peterson Dep. Tr. 177:1-184:5) and paid all invoices NEXT issued pursuant to those SOWs (*Id.* & PE  H (Staszak Decl. ¶ & Ex. 2-5) (reflecting the parties course of dealing).  Further, each SOW was in the form provided under the MSA, Ex. A as required under § 1 of the MSA. (CRE 11). As that Section states, "NEXT hereby agrees to provide, the services as required for the performance of those duties set forth and defined in a Scope of Work, in the form of Exhibit A attached hereto ("SOW"), and be bound by and subject to the terms and conditions in this Agreement." Thus, the terms of the MSA were incorporated into the terms of the SOW. To the extent that any of the SOWs entered into after April 1, 2016 are not fully integrated, the Court must consider surrounding circumstances and the parties' course of dealing (*Tubelite, a Div. of Indal, Inc.,* 819 S.W.2d at 804) to explain or supplement the terms. *Id.* at 19.  Moreover, under similar

38

circumstances, a Texas court has held that where, as here, a "blanket agreement" existed between the parties, work orders issued subsequent to the blanket agreement "automatically include[] the terms of the blanket agreement." *Granite Re Inc. v. Jay Mills Contracting Inc.*, 2015 WL 1869216 at *3 (Tex. App. April 23, 2015).

68.  In identifying in its verified interrogatory responses what "led [NEXT] to believe that NEXT and [CLEAResult] were operating under the terms of the MSA" after April 1, 2016, the only events pre-April 1, 2016 NEXT identified were: (1) a February 18, 2016 call between Mr. McCann and Mr. Peterson in which Mr. McCann allegedly said, among other things, "business is to continue as before" and he was "committed to future meetings to discuss NEXT's contract and future opportunities"; (2) a February 29, 2016 web conference between Mr. McCann and Mr. Peterson in which Mr. McCann allegedly promised to represent NEXT's value internally, the two men discussed "contract terms, timing, current customers supported and future areas" the parties could work together, Mr. McCann promised to "provide direction on the expiring agreement," and Mr. McCann assured Mr. Peterson he was NEXT's "executive sponsor and primary contact" at CLEAResult; (3) a March 29, 2016 phone call between Mr. McCann and Mr. Peterson in which Mr. McCann allegedly promised to connect Mr. Peterson to another CLEAResult employee; and (4) an alleged introduction by Mr. McCann to Sal Shukla of CLEAResult in which Mr. McCann allegedly "endorsed NEXT as a 'partner to CLEAResult.'"

Support: Ex. 5, at 2-4.

**NEXT Response:**   Dispute that SUF ¶ 68 states facts but instead states conclusions, is argumentative and is not complete. Pursuant to FRE 106, pages 2-4 of Ex. 5 relates to CCI' Interrogatory No. 1 and NEXT's Response thereto. NEXT incorporates by reference herein both the Interrogatory (No. 1) to which NEXT was responding in the items selected in ¶ 68 which asked NEXT to "State in full the Basis for your contention in paragraph 7 of the FAC that CLEAResult 'repeatedly promised a broader master agreement with NEXT,' and identify precisely what was promised, the date of each such promise, and the identity of the person who made the promise." Also pursuant to FRE 106, NEXT incorporates its complete response to Interrogatory No. 1 as if fully set forth herein.

## X.    CLEARESULT DOES NOT OWE AMOUNTS IN INVOICE 422

69.  All invoices issued by NEXT to CLEAResult before October 2017 were paid.

Support: Ex. 1, Peterson Dep. at 183:6-183:9, 186:7-186:18; Ex. 2, Peterson Dep. II at 39:1-39:5, 46:17-48:17, 48:18-48:20, 50:2-50:8, 50:9-50:11, 57:4-57:12, 62:18-63:16, 64:14-64:18, 65:15-65:20, 67:14-67:24.

**NEXT Response:** Disputed. NEXT issued Invoice No. 413 on September 29, 2017 and CCI

has refused to pay that Invoice to date. (SAF ¶ 56; PE H, Staszak Decl. ¶ 12 & Ex. H-5 (j), Invoice

413).

70. On November 1, 2017 CLEAResult informed NEXT that, effective October 31, 2017,
CLEAResult had ceased using the FAST Tool and switched to its own DSMTracker/Salesforce
solution.

    Support: Ex. 37.

**NEXT Response:** Admit that CCI sent an email on November 1 to NEXT. Dispute that SUF ¶

70 completely and accurately recites the contents of that email. Pursuant to FRE 106, NEXT incorporates

by reference as if fully set forth herein . Specifically, the relevant paragraph reads "I do want to let you

know, that on October 31st, CLEAResult did cutover from NEXT's FAST system to our

DSMTracker/Salesforce solution—it was a successful migration and now all program scheduling and

work order management— ███████████████████████████████████

████████████████████████████████████████████████████ are managed

by CLEAResult's DSMTracker solution."

71. On November 2, 2017, NEXT sent CLEAResult Invoice 422 demanding a Redacted Financial
Kill Fee and ▒▒▒▒▒▒▒Redacted Financial▒▒▒▒▒▒▒ that NEXT had never billed to CLEAResult.
Invoice 422 consists of two categories of charges. One is a "Termination and Kill Fee" that is
purportedly "Equal to 1 calendar yr in exclusive rights." The second category is retroactive billing for
"user licenses" for "Consumer Energy ███████████. NEXT arrives at these license fees by multiplying a number of users of the
▒▒▒REDACTED FINANCIAL▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒
▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒.

    Support: Ex. 49, at NXT00034633.

**NEXT Response:** Dispute the characterization of Invoice 422 which speaks for itself. Admit

that on November 2, 2017, NEXT sent Invoice No. 422 to CCI. Admit further that Invoice No. 422 had

two category of charges: charges by program for each user of the NEXT FAST system each month over

the initial 10 at the rate of $ 50 per user times the number of months the program had been in  effect.

(SAF ¶ 57 (a); E H, Staszak Decl. ¶ 14 & Ex. H (5) (l)). Additionally, the Invoice included the Kill Fee

provided for in § 12 of the MSA. (CRE 11). NEXT disputes CCI's argumentative characterization of the

calculation of the Kill Fee. Pursuant to FRE 106, NEXT incorporates by reference herein as if fully set

forth Invoice 422 in its entirety. (See SAF ¶ 57 (b)).

72. Prior to issuing Invoice 422, NEXT billed CLEAResult only ████████ a month for licenses

for "Consumer's Energy ████████████████████████████

████████████. This corresponds to the minimum monthly user fee stated on the SOWs for these
programs.

Support: Ex. 2, Peterson Dep. II at 86:21-88:15; Ex. 23; Exs. 7-9 to VAC; Ex. 49.

**NEXT Response:** Admit that pursuant to the agreement of the parties, NEXT billed monthly $

REDACTED FINANCIAL                          (other than Consumers Energy). Pursuant to FRE

106, NEXT notes that the agreement of the parties was for NEXT to bill the actual users per month over

the initial REDACTED FINANCIAL at a later date. (SAF ¶ 47; PE G (50) (CR-0024203)).

73. On November 21, 2016, Erik Tranby, an Account Manager at CLEAResult, sent Mr.
Peterson an email in which he asked: "How are user licenses charged? Per project or per user?" In his
November 21, 2016 reply, Mr. Peterson said: "We are only applying the minimum for the early
programs ██████████████████████ to evaluate the impact with respect to the Call Agents."

Support: Ex. 25.

**NEXT Response:** Dispute that SUF ¶ 73 fully and completely recites the contents of Matt

Peterson's email dated November 21, 2016 and dispute that it accurately and completely recites the

agreement of the parties concerning billing for users of the NEXT System over the initial REDACTED FINANCIAL

████████████████████████████████████████████████████

user. (SAF ¶ 47; PE G (50) (CR-0024203)) Additionally, Peterson testified as to Ex. 25 (Peterson

Dep. E. 31) that the agreement was to bill for a minimum REDACTED FINANCIAL

██████████████████. (PE F, NEXT (Peterson) Rule 30 (b) (6) Dep Tr. 91:4-6).

## XI. NEXT DOES NOT ALLEGE CLEARESULT MADE PROMISES ON WHICH IT RELIED

74. In responding to an interrogatory requesting that NEXT describe the "complete basis" for

its fraud claims, as to the alleged request to develop an auto-routing tool, NEXT claims CLEAResult requested NEXT develop it, and NEXT undertook its development reasonably relying on the request and CLEAResult's past course of conduct with NEXT, under which CLEAResult would use tools NEXT developed and pay license fees. NEXT makes no mention of any promise by CLEAResult related to the auto-routing tool.

      Support: Ex. 7, at 13.

**NEXT Response:** Dispute that NEXT's response to an Interrogatory seeking information related to its fraud claim (now dismissed) is relevant to NEXT's claim that CCI compensate it for development work CCI requested and NEXT performed. Dispute also that SU ¶ 74 completely recites NEXT's response to Interrogatory No. 23 which response began on page 7 and continued to page 17 from which CCI selects just certain paragraphs. Pursuant to FRE 106, NEXT incorporates herein by reference as if fully set forth the entirety of NEXT's response to Interrogatory No. 1 (CRE 5) and its complete response to Interrogatory No. 23 if this Court deems it relevant.

Further, as set forth in NEXT's response to interrogatory 1 of Plaintiff Next Payment Solutions, Inc.'s Answers to CLEAResult Consulting Inc." s First Set Of Interrogatories (CRE 5), served on May 29, 2018, CCI informed NEXT, among other things, that "CCI is happy with NEXT, business is to continue as before," and that CCI's requests for the auto-routing tool, the security code upgrade and the ██████████████████████, and the request for the mobile app, all led Mr. Peterson to believe that NEXT and CCI were operating under the terms of the MSA that had been executed on October 6, 2016. Thus, NEXT reasonably expected to recoup its development costs through licensing and/or other fees that were negotiated by the parties and with the reasonable expectation that CCI would use the upgrades for a period of time after the development was completed. (SAF ¶ 52).

75. In responding to an interrogatory requesting that NEXT describe the "complete basis" for its fraud claims, as to the alleged request to develop an enhanced security tool, NEXT claims CLEAResult requested NEXT perform a security code upgrade for the FAST tool and NEXT did so reasonably relying on the request and on its past course of conduct with CLEAResult, under which CLEAResult would use tools NEXT developed and pay license fees for the use of those tools. NEXT makes no mention of any promise by CLEAResult related to the enhanced security tool.

      Support: Ex. 7, at 13-14.

**NEXT Response:** Dispute that NEXT's response to an Interrogatory seeking information related to its fraud claim (now dismissed) is relevant to NEXT's claim that CCI compensate it for development work CCI requested and NEXT performed. Dispute also that SU ¶ 75 completely recites NEXT's response to Interrogatory No. 23 which response began on page 7 and continued to page 17 from which CCI selects just certain paragraphs. Pursuant to FRE 106, NEXT incorporates herein by reference as if fully set forth the entirety of NEXT's response to Interrogatory No. 23 if this Court deems it relevant.

Further, as set forth in NEXT's response to interrogatory 1 of Plaintiff Next Payment Solutions, Inc.'s Answers to CLEAResult Consulting Inc." s First Set Of Interrogatories (CRE 5), served on May 29, 2018, CCI informed NEXT, among other things, that "CCI is happy with NEXT, business is to continue as before," and that CCI's requests for the auto-routing tool, the security code upgrade and the ███████████████████, and the request for the mobile app, all led Mr. Peterson to believe that NEXT and CCI were operating under the terms of the MSA that had been executed on October 6, 2016. Thus, NEXT reasonably expected to recoup its development costs through licensing and/or other fees that were negotiated by the parties and with the reasonable expectation that CCI would use the upgrades for a period of time after the development was completed. (SAF ¶ 52).

76.     In responding to an interrogatory requesting that NEXT describe the "complete basis" for its fraud claims, as to the alleged requests by CLEAResult for a ███████████████ and to add new features to the Mobile App Re-development specs for Kiting, NEXT makes no mention of any promises made by CLEAResult.

Support: Ex. 7, at 14.

**NEXT Response:** Dispute that NEXT's response to an Interrogatory seeking information related to its fraud claim (now dismissed) is relevant to NEXT's claim that CCI compensate it for development work CCI requested and NEXT performed. Dispute also that SU ¶ 76 completely recites NEXT's response to Interrogatory No. 23 which response began on page 7 and continued to page 17 from which CCI selects just certain paragraphs. Pursuant to FRE 106, NEXT incorporates herein by

reference as if fully set forth the entirety of NEXT's response to Interrogatory No. 23 if this Court deems it relevant.

Further, as set forth in NEXT's response to interrogatory 1 of Plaintiff Next Payment Solutions, Inc.'s Answers to CLEAResult Consulting Inc." s First Set Of Interrogatories (CRE 5), served on May 29, 2018, CCI informed NEXT, among other things, that "CCI is happy with NEXT, business is to continue as before," and that CCI's requests for the auto-routing tool, the security code upgrade and the ██████████████, and the request for the mobile app, all led Mr. Peterson to believe that NEXT and CCI were operating under the terms of the MSA that had been executed on October 6, 2016. Thus, NEXT reasonably expected to recoup its development costs through licensing and/or other fees that were negotiated by the parties and with the reasonable expectation that CCI would use the upgrades for a period of time after the development was completed. (SAF ¶ 52).

77. In responding to an interrogatory requesting that NEXT describe the "complete basis" for its fraud claims, as to the alleged request to upgrade user login security, NEXT claims that there was a promise that additional Consumers Energy information would be passed to NEXT and used in the FAST solution. NEXT makes no mention of any other promise by CLEAResult.

Support: Ex. 7, at 16.

**NEXT Response:** Dispute that NEXT's response to an Interrogatory seeking information related to its fraud claim (now dismissed) is relevant to NEXT's claim that CCI compensate it for development work CCI requested and NEXT performed. Dispute also that SU ¶ 77 completely recites NEXT's response to Interrogatory No. 23 which response began on page 7 and continued to page 17 from which CCI selects just certain paragraphs. Pursuant to FRE 106, NEXT incorporates herein by reference as if fully set forth the entirety of NEXT's response to Interrogatory No. 23 if this Court deems it relevant.

Further, as set forth in NEXT's response to interrogatory 1 of Plaintiff Next Payment Solutions, Inc.'s Answers to CLEAResult Consulting Inc." s First Set Of Interrogatories (CRE 5), served on May 29, 2018, CCI informed NEXT, among other things, that "CCI is happy with NEXT, business is to

continue as before," and that CCI's requests for the auto-routing tool, the security code upgrade and the ███████████████████████, and the request for the mobile app, all led Mr. Peterson to believe that NEXT and CCI were operating under the terms of the MSA that had been executed on October 6, 2016. Thus, NEXT reasonably expected to recoup its development costs through licensing and/or other fees that were negotiated by the parties and with the reasonable expectation that CCI would use the upgrades for a period of time after the development was completed. (SAF ¶ 52).

## XII. CLEARESULT DID NOT USE THE NEXT TOOL TO DEVELOP DSMTRACKER

78.    CLEAResult had its own proprietary operating platforms for scheduling before the FAST Tool, including Catalyst Scheduling and Em Hub. Those platforms offered general scheduling and calendar functionality, as well as other workforce management tools.

Support: Ex. 52; Ex. 54; Ex. 55; Ex. 45.

**NEXT's Response:** Disputed. Dispute that Exs. 52, 54, 55 and 45 support the conclusion set forth in SUF 78. Pursuant to FRE 106, NEXT states that CCI's conclusory assertion as to the inferences to be drawn from the four cited exhibit is not supported by facts. In June 2014, Tim Mahler requested that NEXT build a scheduling tool with online self scheduling. (SAF ¶ 10; PE H (58) (NXT00076523)). At that time, CCI had Catalyst but clearly it did not have this scheduling function. Jane Nelson, CCI's primary administrator of the Consumers Energy account, testified that CCI did not have an online self scheduling tool. (PE D, Nelson Dep. Tr. 14: 14-21; Tr. 18:13-19). Additionally, however, Nelson testified that at that time catalyst was a "recordkeeping system" (*Id.* Tr. 6:10-11). Paul Johns, who was oversaw the Consumers Energy account and the development by NEXT of the scheduling tool, described Catalyst as a Microsoft CRM (client relations) data platform. (PE B, Johns Dep. Tr. 151:6)). It existed in 2014 at the time CCI determined to hire NEXT to build the self scheduling tool of the dreams for the CCI employees servicing Consumers Energy. Dispute that CCI has established the foundation for the admissibility of these documents. Further, as noted in SAF ¶ 29 and SUF ¶ 61, CCI contracted with NEXT to provide its FAST Tool and scheduling functionality for ██████████████████████████

45

███████████████████████████████ in mid to later 2016, contradicting CCI's contention that its software catalyst and EmHub had the FAST Tool functionality.

Ex. 52 is an email dated 5/17/16 and attaches a power point that the metadata shows was last revised on May 16, 16. (SAF ¶ 72; PE G (24)). Nothing in that powerpoint supports the conclusion that Catalyst had an online self scheduling function at that time. Moreover, ████████████ with Catalyst-Project Update dated 11/8/16 demonstrates that as of November 8, 2016 Catalyst did not have the scheduling, trade ally management or other functionality of the FAST Tool to permit CCI to service its utility clients using the FAST Tool and did not expect to have that functionality until March 2017 at the earliest. Before that happened, CCI acquired DSMTracker. (*Id.* PE G (52) (CR-0096396, p. 8)).

Ex. 54 is a 8/4/16 email regarding a PECO Demo, attached to it is a power point labeled Catalyst Demo for PECO dated 8/22/16. While the power point mentions customer self scheduling on p. 3, nothing in that document reflects an online scheduling capability and PE G (52) belies the assertion that such a capability existed within catalyst.

Ex. 55 is an email dated 5/26/16 and is labeled "Tom's Final Presentation". Attached is a powerpoint bearing a date in 2012. The metadata for that document reflects that it was last updated on 5/26/16. (SAF ¶ 73; PE G (26)) but there is no record as to what was updated. This document purports to describe EmHub but nowhere supports the assertion that it had an online self -scheduling functionality.

Ex. 45 is an email dated 1/13/16 with a "ECO CCC Slide Deck" attached. The online scheduling features being promoted in that exhibit appears on slides/ pp. 22-23 and, in fact, are copies of screenshots of NEXT's FAST Tool customer self- scheduling screen and appointment scheduling. (SAF ¶ 72).

CCI's employees testified that Mr. Peterson "built a scheduling system for our Field Services Program" (Nelson Tr. 10:15-18, 14:19-21), "What Matt was building for us was a scheduling system that would allow customers of the utility to self-schedule or schedule on their own appointments without

having to talk to a Call Center person . . . [and] this was new to us, but it was a requirement of our client."

(Nelson Tr. 18:12-19); "So we talked to Matt about the current limitations of the scheduling system we

were using and what the problems were with that, and he made suggestions and notes on the whiteboard,

took pictures." (Nelson Tr. 16:6-10) "[T]he NEXT Fast Tool solution is that [served] a specific market

need and—so that's the first indicator that there is some novelty in it" (Valerdi Tr. 190:6-24); "[T]here

was nothing available in the marketplace that already somebody could just grab off the shelf and service

these customers. So that really was another indicator for me to determine that this was a unique solution"

(Valerdi Tr. 190:12-24; Tr. 193:9-18); NEXT's trade secrets were unique and not readily ascertainable

(*Id.*) Tr. 218:11-14, 219:3-13, 19-22; Tr. 220:19-221:4, 16-24; Tr. 222:1); ". . .it has taken us over two

years to develop what we have [with NEXT] and that includes over four months of beta testing

(cumulative, as testing was done as modules were being rolled out" (Johns Tr. 167:20-168:2))


79.   In February 2017, CLEAResult acquired the DSMTracker software. DSMTracker provided a comprehensive operating platform, and included, prior to its acquisition by CLEAResult, modules for program management, trade ally management, call center management (including self-scheduling), work order management, application processing, and data tracking, reporting and analytics, among other things. All of those functionalities pre-existed CLEAResult's access to the FAST Tool. CLEAResult began the process of developing many of those functionalities before it started its relationship with NEXT.

Support: Mahler Decl. ¶¶ 11–13; Ex. 50; Ex. 51; Ex. 53.

**NEXT Response:**  Disputed. CCI acquired DSMTracker on January 24, 2017. (SAF ¶¶ 74-77).

Disputed that the documents and exhibits cited support the conclusion that DSMTracker had the

features and functionality of the NEXT's FAST Tool CCI was required to have to service 8 utilities

and 13 programs.

Ex. 50 is a Green Team document captioned Energy Efficiency Tracking System (CR-

0000174). This document bears a date of January 29, 2017, which is shortly after CCI acquired the

DSMTracker software. The document was Ex. 3 to the  Weitner deposition, except that Weitner Dep.

Ex. 3 had the metadata showing the date of the Exhibit, whereas CRE. 50 omits the metadata

reflecting the document was last modified on 1/219/17. (SAF ¶ 76; PE L (9/19/18 Dep of Weitner Tr. 96:19-97:6 & Ex. 3 to Deposition) A review of the index of Ex. 50 reflects that as of that date DSMTracker did not list online self scheduling or other FAST Tool functionality. (SAF ¶ 76, PE G, Peterson 3rd Decl. ¶ 55)

Ex. 51 is also a Green Team document captioned Energy Efficiency Tracking System (CR-0445411). This document bears a date of January 24, 2018, one year after CCI's acquisition of DSMTracker and, therefore, cannot serve as evidence of DSMTracker features and functionality as of January 2017. (SAF ¶ 77, PE L (9/19/18 Dep of Weitner Tr. 219:10-220:5 & Ex. 8 to Deposition) Ex. 51 proffered by CCI does not show the metadata reflecting that the document was last modified on 1/24/18, making clear that it does not represent the features and functionality of DSMT as of the date CCI acquired it one year prior. Weitner Dep. Ex. 8 has the metadata. 1/24/18 and by Weitner's admission contained features and functionality that had been added to DSMT. As Weitner testified, the January 2018 version of DSMT represented an ongoing cumulative process whereby features added to it remained in it. (PE L, Weitner Dep. Tr. 225:16-21). *See also,* (PE K, Valerdi Decl. ¶ 3; CRE 57, Valerdi's 7/16/18 Expert Report, pp. 31-32 (NEXT FAST Tool Functionality Did Not Exist in DSMTracker as of March 2017).

Ex. 53 which is an email dated 1/8/16 titled PECO slides for technology with attachment "Online Scheduling-PECO.pptx" does not reflect an online scheduling tool of CCI. In that Power Point, CCI represents that their "New Online Scheduling" is in the design phases. In fact, however, slides 2, 3 relating to the scheduling tool are in fact screen shots of the FAST Tool. (PE G, Peterson 3rd Decl. ¶ 53).

Pursuant to FRE 106, in addition to the above, NEXT also directs the Court's attention to the deposition testimony of Jane Nelson, in which she states that DSMTracker did not exist and had to be built (SAF ¶ 74; PE D, Nelson Dep. Tr. 192:1-23), and that she did not see a live demonstration of it

only screenshots of a phone. (*Id.* Tr. 171:10-18). CCI employees with login credentials to the Back End of the FAST Tool, whose use was restricted to servicing the utility to which they were assigned, without authorization and in violation of the MSA and NEXTS policies restricting use of login credentials, performed homework assignments where they were requested to investigate, document, and report, with screenshots, the Back End and functionality and features of the FAST Tool to provide to Business Analysts who were working with the DSMT developers. (SAF ¶ 84 & PE H, Staszak Decl. ¶¶ 17-19 & Ex. 6 thereto). NEXT has identified numerous instances in which these employees were conducting test transactions for the purpose of documenting the functionality of the NEXT FAST Tool. (*Id.*)). Additionally, during the 10 month period that CCI was investigating, documenting and copying the FAST Tool for the purpose of developing the DSMTracker software with FAST Tool features and functionality, Jane Nelson and other CCI employees with administrator login credentials, in violation of the MSA and without authorization, conducted live demonstrations that were digitally recorded of the Back End of the FAST Tool for those individuals involved in replicating NEXT's features in DSMT, including developers, demonstrations NEXT has documented. (SAF ¶ 85-87).

Additionally, in August 2017, Jane Nelson without authorization provided administrator login credentials to developers Simon Nadar, Santosh Reddy and Soham Chakraborty, who were located in and around Atlanta Georgia and field tech credentials to Business Analysts Stephanie Votta White and JoAnne Supple. (SAF ¶ 88(PE P, Nadar Dep. Tr. 25:1-18, 41:8-42:7, 88:22-89:15 & Ex. 15 (CR-0272267); CRE 28 (Registered FAST Users 297-301, 754-756). Simon Nadar oversaw developers in India. (PE P, Nadar Dep. Tr. 88:22-89:15). Immediately after receiving login credentials, the Back End of NEXT's FAST Tool was penetrated from IP addresses tied to India. (SAF ¶ 88). As NEXT's technology expert testified: CCI's development of the DSMT "was a copycat effort that involved reverse engineering" (SAF ¶ 78; PE J, Valerdi Dep. Tr. 240:18-241:18).

## XIII. CLEARESULT'S PAYMENTS TO NEXT.

80. CLEAResult paid NEXT ▓▓▓▓▓ since the April 1, 2014 effective date of the MSA to November 1, 2017. CLEAResult paid NEXT ▓▓▓▓▓ since the April 1, 2014 effective date of the MSA to April 1, 2016.

　　　　Support: Ex. 38.

　　　**NEXT Response:** Dispute that SUF ¶ 80 is relevant to any issue before this court. Admit that

the numbers of CRE 38 for the time periods listed add up to the numbers identified here. Pursuant to

FRE 106, CRE 38 does not include the amounts due and owing from CCI to NEXT for the development

work requested but not paid for and do not include payment on Invoices 413, 421 and 422 which is due.

(SAF ¶¶ 52-57).

Dated: November 20, 2018　　　　　　　　RESPECTFULLY SUBMITTED,

　　　　　　　　　　　　　　　　　　　　NEXT PAYMENT SOLUTIONS, INC.

　　　　　　　　　　　　　　　　　　　　By: /s/ Susan Bogart
　　　　　　　　　　　　　　　　　　　　　　Law Offices of Susan Bogart
　　　　　　　　　　　　　　　　　　　　　　70 West Madison St., Ste. 1400
　　　　　　　　　　　　　　　　　　　　　　Chicago, IL 60602
　　　　　　　　　　　　　　　　　　　　　　Sbogart514@aol.com
　　　　　　　　　　　　　　　　　　　　　　sbogart@susanbogart.com
　　　　　　　　　　　　　　　　　　　　　　Tele: (312) 214-3271

　　　　　　　　　　　　　　　　　　　　　　Eric C. Cohen
　　　　　　　　　　　　　　　　　　　　　　Brinks Gilson & Lione
　　　　　　　　　　　　　　　　　　　　　　455 N. Cityfront Plaza Drive, Ste 3600
　　　　　　　　　　　　　　　　　　　　　　Chicago, IL 60611
　　　　　　　　　　　　　　　　　　　　　　eccohen@brinksgilson.com
　　　　　　　　　　　　　　　　　　　　　　Tel: (312) 321-4200

　　　　　　　　　　　　　　　　　　　　　　Attorneys for Plaintiff

1