UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NEXT Payment Solutions, Inc.,        )
                                   )
           Plaintiff,          )     Case No.  1:17-cv-08829
                                   )
vs.                             )     Honorable Ruben Castillo
                                   )
CLEAResult Consulting, Inc.,       )     Magistrate Judge Young B. Kim
                                 )
           Defendant.        )

## NEXT'S LOCAL RULE 56.1 (b) (3) (C) STATEMENT OF ADDITIONAL FACTS THAT REQUIRE DENIAL OF CCI'S MOTION FOR SUMMARY JUDGMENT

## FILED UNDER SEAL

NEXT Payment Systems, Inc. ("NEXT") by and through its attorneys, and pursuant to Local Rule 56.1 (b)(3)(C) hereby submits its Statement of Additional Facts that Require Denial of CCI's Motion for Summary Judgment as follows.

### NEXT OWNS AND DEVELOPED THE NEXT SYSTEM AND FAST TOOL

1.      NEXT Payment Solutions, Inc. ("NEXT") was incorporated as an Illinois corporation on August 18, 2011. (PE H, Decl. Staszak ¶ 2 & Ex. 1).[1] Jill Staszak, ██% owner of NEXT is President and Matt Peterson, her husband, is ██ owner and Secretary and Chief Executive Officer. (*Id.* ¶ 4).

2.      At the time of incorporation, NEXT was in discussions with Office Depot concerning Office Depot's request that NEXT design and build a rebate processing system. (PE G, Peterson 3rd Decl. ¶ 3.) Peterson designed the software architecture, defined the client's specifications for the features, functionalities, rules engine and workflow processing requirements and wrote the algorithms to be used in software system codes. Hereinafter, the NEXT software is referred to as the "NEXT System." (*Id.* ¶ 3).

3.      Ryan Rodriguez was contracted to and wrote code for the NEXT Rebate System under Peterson's direction and specifications pursuant to a July 18, 2011 Agreement With Contractor Programmer providing that all development was the property of NEXT's and setting forth Rodriguez's Confidentiality requirements. (PE E, Peterson Dep. Tr. 99:2-100:7 (NEXT had an agreement with Rodriguez); PE H, Decl. Staszak ¶ 20 & Ex. 7 (NXT00142847). The Agreement also provided that any work performed by Rodriguez was owned exclusively by NEXT. (§ 6.01). (PE E, Peterson Dep. Tr. 136:21-137:2 (all work performed by Rodriguez was owned by NEXT)).

---

[1] NEXT's Exhibits in Support of their Statements of Additional Fact designated as "SAF ____" are designated as "PE ___".

4.      In or about January 2014, NEXT and Anytime Fitness entered into an Agreement whereby NEXT was to process a rebate program that provided new members a free tanning session. (PE U, Ruchty Decl. ¶¶ 6-9) In addition, NEXT provided Anytime Fitness with the ability to have the members book their tanning appointments online at franchise locations closest to the member and track redemptions of the rebate. (PE G, Peterson Decl. ¶ 4).

5.   In addition to writing the eligibility rules to Anytime Fitness' specifications for redeeming the tanning program, Peterson designed NEXT's online scheduling program, wrote the logic sequence and created the rules engine to be added through a new module to the Back End of NEXT's System. Independent contractor Ryan Rodriguez wrote code under the supervision and direction of Matt Peterson to execute Peterson's solution. (PE G, Peterson 3rd Decl. ¶ 5).

6.   As of April 1, 2014, NEXT had invested over $1 million dollars in the NEXT System. (PE F, NEXT Rule 30 (b)(6) (Peterson) Tr. 254:9-255:8 & Dep. Ex. 47); PE G, Peterson 3rd Decl. ¶ 6).

7.   On or about April 9, 2014, Brian Simmons on behalf of CCI orally agreed to pay NEXT an annual subscription of REDACTED FINANCIAL in order to have an exclusive license to the NEXT System. (PE G, Peterson 3rd Decl. ¶ 7 & PE G (60) (NXT00063921)). The REDACTED FINANCIAL monthly installments. (*Id.*). At the time of this agreement, CCI was using the NEXT System solutions for online rebate processing and monitoring of point of sale transaction.   (*Id.*)

8. This oral agreement was memorialized in the Master Services Agreement (MSA) executed by CCI on or about October 2, 2014 and by NEXT on or about October 6, 2014 and made effective as of April 1, 2014. (SUF ¶ 7; VAC Ex. 1[2] & CRE 11[3]; PE G, Peterson 3rd Decl. ¶ 8.)

9. On June 1, 2014, NEXT entered into an Agreement with Contractor Programmer with developer Priyanka Shah, providing that all development was the property of NEXT's and setting forth Rodriguez's Confidentiality requirements. (PE H, Decl. of Staszak ¶ 21 & Ex. 8 thereto; PE I, Decl. of Strong ¶ ¶ 7-11 & Ex. 1; PE G, Peterson 3rd Decl. ¶ 9.)

10. On or about June 11, 2014, Tim Mahler, emailed Matt Peterson asking whether NEXT could provide an online scheduling tool. (PE G, Peterson 3rd Decl. ¶ 10; PE G (58) (NXT 00076523)). NEXT provided CCI with the description and capabilities of its online scheduling tool in connection with CCI's presentation to Consumers Energy for its Home Energy Analysis ("HEA") program. (*Id.* ¶ 10 (PE G (30) (NXT00116906); G (31) (NXT0071732); G (32) (NXT00100171-72); G (33) (NXT00101217-00101220)).

11. On or about August 11, 2014, NEXT provided a power point for CCI's HEA Booking Application. (*Id.* ¶ 11 (PE G (34) (NXT00082302-05)).

12. Also, in August, CCI employees servicing its Consumers Energy accounts, Jane Nelson, Christine Nelson and Brenda Laukert met with Matt Peterson in CCI's East Lansing MI office. (PE D, Excerpts of Jane Nelson Dep. Tr. 10:15-11:16). Peterson was introduced to them as someone who could build a scheduling system for our [CCI'S] Field Services Programs. (*Id.* at Tr. 14:14-21). The purpose of the meeting was to define the requirements for a scheduling system.

---

[2] References to the Verified Amended Complaint are denoted as "VAC."
[3] CCI's Exhibits in support of its summary judgment motion are referred to as "CRE _____" NEXT provides certain relevant excerpts that are not included in CCI's SUF, but incorporates the MSA by reference as if fully set forth herein.

(*Id.* Tr.13:6-7). The meeting lasted for three days to assist CCI in building "the scheduling system of our [CCI's CE programs] dreams." (*Id.* Tr.15:6-15; PE B, Johns Dep. Tr. 89:13-92:10 ("I told them to design and build the scheduling tool of their dreams. I told them, literally I used the words, shoot for the moon")).

13.     During the three days, CCI's employees "talked with Matt about the current limitations of the scheduling system we were using and what the problems were with that, and he made suggestions and made notes on the whiteboard, took pictures." (*Id.* Nelson Tr. 16:6-11). The outcome of the meetings was a list of requirements that NEXT and CCI had agreed upon. (*Id.* Tr. 17:13-15).

14.     At the time of these meetings, CCI knew they had a new program for Consumers Entegy that they had bid on and expected to have the outcome of that bidding by August. (*Id.* at Tr. 18:2-11). "What Matt was building for us was a scheduling system that would allow customers of the utility [CCI] to self-schedule or schedule their own appointments without having to talk to a Call Center person. So we call that online self-scheduling." "This was new to us, but it was a requirement for our client". (*Id.* Tr. 18:12-23). It was "a requirement for us to win the bid for the Home Energy Analysis Program." (*Id.* Tr. 19:10-12).

15.     After the three day meeting in August, CCI and NEXT agreed to communicate back and forth via email and phone for the most part after that. (PE D, Nelson Tr. 17:18-20).

16.     On August 14, 2014, Jane Nelson emailed Matt Peterson advising that per Paul Johns' request, she had "documented below additional fields and functionality we'd like to see for the scheduling tool." (PE G, Peterson 3rd Decl. ¶ 12; PE G (36) (CR-0014072-74)). Nelson noted that the changes were "not critical for the oral presentations to the client on 8/20" which was the first priority. Whatever could be incorporated by 8/20 would assist the team in presenting "the

scheduling tool as a solution for multiple programs." (*Id.* CR-0014072-73). Nelson requested that the scheduling tool provide the ability for CCI's "internal scheduling team and call center reps to use the tool as well as customers coming through the website." (*Id.* CR-0014073).

17. Between June and September 2014, based on the requirements Peterson gathered, Matt Peterson designed NEXT's FAST Tool, with online scheduling. (PE G, Peterson 3rd Decl. ¶ 13.)

18. On August 20, 2014, Matt Peterson, CEO of NEXT, and CCI met face to face with Consumers Energy. At the meeting, Peterson presented NEXT's software with the scheduling solution. (PE G, Peterson's 3rd Decl. ¶ 14).

19. On August 28, 2014, NEXT prepared and submitted an SOW memorializing the parties' agreement as to CCI's request that NEXT expand its booking tool to provide customer self scheduling and call center scheduling for Consumers Energy Helping Neighbors Program ("HN"). (PE E, Peterson Dep. Ex. 16 (CRE 15), SOW # 1 (CR-000624).

20. On or about September 15, 2014, Matt Peterson went to CCI's East Lansing MI office at which several Consumers Energy representatives were present. (PE G, Peterson 3rd Decl. ¶ 15). The purpose of this meeting was as a follow up to the August 2014 meeting for Consumers Energy to view a live demonstration of the scheduling tool's functionality. (*Id.*)

21. On October 2, 2014, CCI executed a Masters Services Agreement ("MSA") between CCI and NEXT, which provided that it would be effective April 1, 2014. (Ex. 1 to Verified Amended Complaint ("VAC") (CR-0014565-76) (CRE 11)). CCI drafted the agreement. (PE G, Peterson's 3rd Decl. ¶ 16). In addition to the provisions recited in CCI's SUF ¶ 8, it provided:

> All obligations incurred under this Agreement shall survive the Term until satisfied.

(Introduction to Agreement). The agreement also provided that:

> Notwithstanding the foregoing, NEXT and CLEAResult both acknowledge that NEXT may currently possess certain know-how, templates, works, proprietary material, and/or methods ("Pre-Existing Materials"), and that such Pre-Existing Materials may be used in the execution of services contemplated by this Agreement and SOWs. For such Pre-Existing Materials, NEXT hereby grants CLEAResult a non-exclusive, non-transferable and royalty free license, allowing CLEAResult to use such Pre-Existing Materials in connection with the Works. At all times, NEXT shall retain all right, title, and interest in the Pre-Existing Materials and the right to future use of improvements in Pre-Existing Materials developed while servicing CLEAResult.

(*Id.* § 15).

> The parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, it is agreed that the parties shall be entitled to injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of the United States or any state having jurisdiction, this being in addition to any other remedy to which they are entitled at law or in equity.

(*Id.* § 16).

22.     NEXT executed the MSA on October 6, 2014. (CRE 11 at 8.)  On that same date, NEXT submitted Statement of Work # 1 Booking Tool in which NEXT specified the required Features and Functions for the Booking Tool NEXT had developed for Consumers Energy and documented the Development Hours. (PE E, Peterson Dep. Ex. 22 (CR-0022198-206)). CCI did not respond to this SOW. Peterson Decl. ¶ 16.

23.     On or about December 22, 2014, NEXT launched its Scheduling Tool which automated scheduling of appointments for Consumers Energy's Income Qualified (HN) program customers. NEXT's Scheduling Tool replaced CCI's manual scheduling of appointments and use of google for scheduling. (PE G, Peterson Decl. ¶ 17). On March 6, 2015, NEXT rolled out its online scheduling tool for Consumers Energy HEA program. (PE G, Peterson 3rd Decl. ¶ 18, PE G (74) (NXT00097592)).

24.     Peterson sent Johns an email attaching the SOW submitted on August 29 and October 6, 2014, with development hours, and a summary of the Scheduling Wizard (Tool) Project to date. (PE E, Peterson Dep. Ex. 22 (CR-0022204)). On February 27, 2015, Mr. Peterson sent an email to Paul Johns inquiring about the status of the Scheduling Tool SOW. (PE B, Johns Dep. Ex. 5.) CCI did not respond to either email.  (PE G, Peterson 3rd Decl. ¶ 16.)

25.     On July 13, 2015, NEXT published the Booking Tool Manual for CCI, a document it marked as Confidential. ((PE G, Peterson 3rd Decl. ¶ 19, PE G (42) (NXT00036016-43))

26.     On August 4, 2015, Tom Diffley advised Matt Peterson by email, "All matters relating to the booking tool are handled by Tim Mahler and Paul Johns.  (PE B, Johns Dep. Tr. 122:11-124:20 & Johns Dep. Ex. 8 (at NXT00050773); In or about August 14, 2015, after negotiations, CCI determined it would not purchase NEXT's scheduling tool being used by Consumers Energy HN, HEA and HEA #2 programs and, instead, would license it for the Consumers Energy programs for REDACTED FINANCIAL per month. (PE B, Johns Dep. Tr. 126:15-130:12 & Johns Dep. Ex. 9 (NXT00050849)).

27.     Beginning in February 2016, Matt Peterson on behalf of NEXT and David McCann, Chief Technology Officer (CTO) on behalf of CCI began discussions to execute an expanded MSA. (PE G, Peterson 3rd Decl. ¶ 20, PE G (59)) (CRE 5, NEXT Answer to Interrogatory No. 1)). Those negotiations continued until Peterson was informed that McCann had left CCI. (*Id.*). NEXT continued to provide development, customizations and upgrades to its FAST Tool to CCI for use in administering its utilities' programs under the terms of the initial MSA.  (PE G, Peterson 3rd Decl. ¶ 20; PE A (1), Barden 7/17/18 Dep. Tr. 179:3-184 & Dep. 23 (CR-0445349)). Per Barden Dep. Ex. 23, a March 1, 2017 PowerPoint presentation of Mahler, p. 3, "Original MSA for 'digital' processing services & redemption . . . Expired at the end of 4/2016 . . . *Transitioned* to a Month-

to-Month basis 4/16 y prior CTO . . .." *Id.* McCann was the "prior CTO" referred to in Barden Dep. Ex. 23. (Peterson Decl. ¶ 20). Consistent with Mahler's description, Peterson testified that "…our understanding was that the SOWs were bound by the MSA and we were billing from a month-to-month basis." (PE F (Rule 30 (b)(6) (Peterson) Dep.Tr. 70:10-12 & Dep. Ex. 28 (CRE 24))

28. On February 29, 2016, McCann and Peterson conducted a detailed conversation about NEXT via a web conference. At the conclusion of the call, McCann promised to represent NEXT's value during his upcoming executive retreat approximately March 7-11, 2016. McCann and Peterson discussed in detail the contract terms, timing, current customers supported and future areas on which CCI and NEXT could work together. McCann promised to provide direction on the expiring agreement. McCann told NEXT he was the point of contact. The conversations were memorialized in a March 1, 2016 email. (PE G, Peterson 3rd Decl. ¶ 21)

29. On or about April 14, 2016, CCI requested that NEXT support CCI's bid to administer ███████████████████████████ which CCI won with NEXT's assistance. (PE G, Peterson 3rd Decl. ¶ 22; PE B, Johns Dep. Tr. 130:15- 134; 136:15- 138:5 & Dep. Exs. 10, 11, 13 (NXT00075210-11; NXT00109096-97; NXT00073691-92)). The program was implemented in July 2016 after NEXT obtained ████████ requirements for the program and customized the FAST Tool to meet those requirements. (*Id.* Johns Dep. Tr. 136:13-138:5)

30. On July 15, 2016, SOWs memorializing the parties' agreement for ████████ ███████████████████████ were emailed to CLEAResult. (PE F, Peterson Dep. Ex. 27; PE G, Peterson 3rd Decl. ¶ 23; PE G (48); SUFR ¶ 61). On July 26, 2016, NEXT and

CCI memorialized the terms of the NEXT's support of the ▮▮▮▮ program with the FAST Tool. (PE G (49), Peterson 3rd Decl. ¶ 23 & SUF ¶ 61)).

31.     On or about August 8, 2016, CCI agreed to pay ▮▮▮▮ for NEXT's set up fee for development, account management, set up of customized rules for the ▮▮▮▮ ▮▮▮▮ program and portal and ▮▮▮▮ per month for the 1st 10 CCI users and ▮▮▮▮ ▮▮▮▮ per CCI user for each CCI user ▮▮▮▮. (PE G, Peterson 3rd Decl. ¶ 24; PE G (50) (CR-0024203)).

32.     On November 17, 2016, NEXT forwarded the SOW memorializing the terms of the parties' agreement pertaining to the use of the FAST Tool for the ▮▮▮▮ ▮▮▮▮ to CLEAResult. (PE G (54) & SUF ¶ 61)). On November 21, 2016, NEXT forwarded a SOW memorializing the terms of the parties' agreement for NEXT to service the ▮▮▮▮ with the FAST Tool to CLEAResult. (PE G, Peterson 3rd Decl. ¶ 25 & PE G (55) & SUF ¶ 61)).

33.     NEXT developed the FAST Tool and required modules, rules, eligibility and workflow over more than a two year period including four months of Beta testing to provide the features and functionality required by eight utilities – ▮▮▮▮ ▮▮▮▮ -for which CCI administered 13 cost efficiency programs. (PE B, Johns Tr. 167:20-168:5 & Dep. Ex. 26).

**THE AGREED LICENSING FEE AND SERVICES NEXT PERFORMED**

34.   Beginning with NEXT's Invoice dated April 15, 2014 (NXT00028976) and continuing through the September 5, 2017 Invoice, CCI paid NEXT an annual REDACTED FINANCIAL ▮▮▮▮ for the NEXT System. (PE H, Staszak Decl. ¶ 7-9; PE H (2)-H (5) (Summary Charts of CCI's Payments on NEXT Invoices for 2014-2017)).

35.     By February 24, 2015, NEXT's scheduling tool was being used by CCI to drive scheduling [REDACTED FINANCIAL] home energy audits in 2015. (PE G, Peterson 3rd Decl. ¶ 26; PE G (40) (CR-0127884-85)).

36.     On February 27, 2015, Johns forwarded Peterson's February 20 email to Tim Mahler and Tom Diffley. (PE B, Johns Dep. Tr. 106:4-108:17 & Ex. 5 (CR-0165637-39)).   On August 14, 2015, CCI (Paul Johns) informed NEXT (Peterson) that CCI had decided to license the FAST Tool for [REDACTED FINANCIAL] per month for the Consumers Energy's [REDACTED] programs. (PE B, Johns Dep. Tr. 126:15-16, Tr. 129:16-130:12 & Johns Dep. Ex. 9(NXT0005849-54)).

37.     On August 18, 2015, NEXT invoiced CCI [REDACTED FINANCIAL] for its license of the Scheduling Tool for Consumers' Energy's programs. (PE H, Staszak Decl. ¶ 7-9; PE H (3) (w) (NXT00020428 (Invoice 267)) (Summary Charts of CCI's Payments on NEXT Invoices for 2015)), which CCI paid on September 16, 2017 (PE H (3) NXT00142830). On August 28, 2015, NEXT forwarded the SOW reflecting CCI's agreement to license the FAST Tool for Consumers Energy [REDACTED] Programs for $10,000 per month and to pay $0.10 per text message to the customers of Consumers Energy. (PE F, NEXT 30 (B) (6) Peterson Dep. Tr. Tr. 18:9-20:3 & Peterson Dep. Ex. 24 (NXT00050902-10)).

38.     Beginning in August 2015 and continuing through its payment on the September 5, 2017 Invoice, CCI paid NEXT an additional [REDACTED FINANCIAL] for a license to NEXT's FAST tool solution for online and customer service scheduling for Consumers Energy HEA/HN Programs along with payment of REDACTED FINANCIAL. (PE E, Peterson Dep. Ex. 24 (NEXT 00050902-10, including Scheduling SOW # 1 (NXT00050909-10; PE H (2) –(5), Summary Charts of  2014-2017 Invoices)).

39. In an email dated February 5, 2016, Tom Diffley of CCI requested that NEXT disable certain of NEXT's portals servicing rebate programs. (PE G, Peterson 3rd Decl. ¶ 27 & PE G (44) (NXT00064255-56)). In that email, Diffley makes clear that the request was to exclude any sites NEXT had in place related to the scheduling tool. However, one of the sites Diffley identified to be disabled was the ██████████████████████████████████████ which was the portal used by CCI's employees servicing Consumers Energy programs. (*Id.*)

40. In a telephone conversation on February 8, 2016, David McCann, Chief Technology Officer for CCI, told Peterson that CCI was discontinuing the rebate program only, that CCI's relationship with NEXT would continue as it related to the scheduling tool and the Consumers Energy programs, that McCann was NEXT's new point of contact, and all invoices should be directed to his attention. (PE G, Peterson 3rd Decl. ¶ 28; PE G (59) (NXT00052308)). McCann indicated he would follow up about any revisions to be made to the parties' agreement going forward. (*Id.*)

41. On February 8, NEXT forwarded to McCann NEXT Invoices that had not been paid. (PE G, Peterson 3rd Decl. ¶ 29; PE G (59) (NXT00052308-12)). CCI subsequently paid the Invoices in 2016. PE H (3) & (4), Summary Charts for 2015 2016 Invoices.

42. On April 14, 2016, Paul Johns notified NEXT of "confidential information"; to wit: that CCI is looking to take on a project that would require scheduling roughly ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ ( PE B, Johns Dep. Tr. 130:15-132:1 & Dep. Ex. 10) (NXT00075210-11)), which CCI won on or about May 11, 2016 after a demonstration by NEXT. (PE B, Johns Tr. 132:13-134:14 & Dep. Ex. 11 (NXT00109096-97)). On July 5, 2016, Peterson emailed Paul Johns at CCI to schedule time to get the specifications for the Consumers

Energy ███████████ and Johns set 7/20 for that meeting. (PE B, Johns Dep. Tr. 136:13-138:5 & Dep. Ex. 13 (NXT00073691-92)).

43.   On July 8, 2016, Paul Johns informed Peterson that CCI wanted to move forward with the NEXT FAST Tool for customers of ███████ which Peterson memorialized in an email dated July 11, 2016. (PE G, Peterson 3rd Decl. ¶ 30; PE B, Johns Dep. Ex. 14 (NXT00088166)). On July 11, 2016, Chris Barden at CCI notified NEXT that Tim Mahler had approved proceeding forward with NEXT to build a custom portal to manage ████████ programs per NEXT's quote.  (PE G, Peterson 3rd Decl. ¶ 30; PE G (48) (NXT00053611-13))

44.   On July 14, 2016, Tim Mahler responded to a May 12, 2016 email from CCI Sr. Financial Analyst █████████ to Mahler and Dave McCann seeking confirmation that "per Tom Diffley, the 2 of you made a new agreement with NextPay for scheduling services or something like that. Is this true? If so, which of you has budget to pay for it? We need to get the dollars moved where they belong (where they were budgeted) since we have 0 budget past March in admin." (PE B, Johns Dep. Tr. 140:1-143:9 & Dep Ex. 15 (CR-0130850); see also PE A (1), Barden 7/17/18 Dep. Tr. 179:3-184:25 & Ex. 23 (CR-0445349-40 & Attachments) (confirming that NEXT and CCI had a month to month agreement regarding the FAST Tool). Mahler directs ████████, in Finance to provide █████ with a forecast for NEXT Payment Solutions for the following programs: ██████████████████████████████████████████ ██████████████ and for services consisting of "online scheduling-self scheduling portal; field service resource management; route optimization; w/o management; etc." (*Id.* CR-0130848-50) Paul Johns then agrees to collect the information. (*Id.*) On July 15, 2016, NEXT (Peterson) forwarded the SOWs for ████████████████████████. (PE G, Peterson 3rd Decl. ¶ 31; PE G (48) (NXT00053656-64); SUF ¶ 61).

45.  On July 17, 2016, after Paul Johns notified NEXT that the meeting to work out details on Consumers Energy ███████████ was going forward in East Lansing on July 20, NEXT emailed Michael Nelson to provide him with NEXT's implementation check list and Email text contact guide. (PE G, Peterson 3rd Decl. ¶ 32; PE G (47) (NXT00064878; NXT00062764-67; NXT00108862-77; NXT00064625-26)) On July 18, 2016, NEXT invoiced CCI for the set up fees for ████████████████████████ which was paid by CCI on September 26, 2016. (PE H, Staszak Decl. ¶¶ 6-9; PE H (4) (Invoice 311 (NXT00020457); Payment (NXT00034647) (Summary Charts of CCI's Payments on NEXT Invoices for 2014-2017)).

46.  On or about July 26, 2016, Tim Mahler advised NEXT that CCI wanted it to launch the FAST Tool on a new account, ████. Mahler requested that this implementation happen quickly. (PE G, Peterson 3rd Decl. ¶ 33). Pursuant to this communication, NEXT forwarded NEXT's implementation checklist to CCI on July 26. (*Id.* & PE G (49) (NXT00075496-97, NXT00062379-82, NXT00119851-52).

47.  On August 18, 2016, CCI (Tim Mahler) confirmed that the pricing strategy for new customers ██████████████████████████████████ consisted of a REDACTED FINANCIAL ████████████████████████████████████████ . (PE G, Peterson Decl. ¶ 34; PE G (50) (CR-0024203)).

48.  On September 1, 2016, NEXT invoiced CCI for the second half of the set up fees for ████████████████████████, the set up fees for ████, and the monthly 10 user fees for ████████████████, which invoice was paid by CCI on October 24, 2016. (PE H, Staszak Decl. ¶ ¶ 6-9; PE H (4) (2016 Summary Chart of Invoices, Invoice 318 (NXT00020459; NXT00034645)).

49.    On November 16, 2016, CCI contacted NEXT by email stating "We would like to move forward with your system. . . ███████████████ gave her approval also. . . We do want to be able to launch Jan. 1 …." (PE G, Peterson Decl.  ¶ 35; PE G (53) (NXT00103978)). NEXT responded providing the SOW for ██████████████ (*Id.*  PE G (54) (NXT00055982-85).

50.    On November 21, 2016, NEXT forwarded a SOW for CCI's client █████████ ████ which was approved by CCI on December 21, 2016. (PE G, Peterson 3rd Decl.  ¶ 36; PE G (55) (NXT00056048-50); PE G (56) (NXT00056826-27)). In an invoice dated December 1, 2016, NEXT billed ████████████████████████ which CCI paid on January 23, 2017.  (PE H, Staszak Decl. ¶¶ 6-9; PE H (4), H (4) (q), (2016 Summary Chart of Invoices, Invoice 334 (NXT00020462; NXT00029016)).

51.    In addition to paying NEXT invoices related to Consumers Energy ██████████ ████ CCI paid NEXT for the services it provided to its programs with ██████████████ ████████████████████████████████████████████ from the inception of these services through October 2017. (PE H, Staszak Decl. ¶¶ 6-9; PE H (4) & H (5) (2016 and 2017 Summary Charts of NEXT Invoices and CCI's payments.)

## CCI FAILURE TO PAY FOR WORK DONE BY NEXT

52.    CCI owes NEXT ████████ for development work it requested NEXT perform but refused to pay for. Specifically,

- On 7/26/16 CCI requested that NEXT develop certain security upgrades which NEXT developed at a cost of ████████ and installed and then uninstalled at CCI's direction (PE G, Peterson 3rd Decl. ¶ 37 & PE G 65 (a), G 65 (b) (NXT00112471; NXT00065948));

- On or about 2/17/17 CCI requested that NEXT provide auto routing upgrades, NEXT

developed the upgrades for ███████ but CCI refused to test and deploy the upgraded auto routing (PE G, Peterson 3rd Decl. ¶ 37 & PE G 65 (c), G 65 (d) (NXT00060655; CR-0025158);

- On or about 2/28/17 CCI requested that NEXT code API's for ██████ data exchange, which NEXT completed expending ████████ develop but which CCI refused to test and deploy (PE G, Peterson 3rd Decl. ¶ 37 & PE G 65 (c)(NXT00060655));

- On 6/27/17, NEXT deployed a Mobile App upgrade for Consumers Energy ████████ the costs of the development for which were not recouped because CCI terminated NEXT before the costs could be recovered by licensing fees. (PE G, Peterson 3rd Decl. ¶ 37 & PE G 65 (c) (NXT00060655; NXT00062413)).

53.     Without any advance notice to NEXT that CCI was replacing NEXT, CCI, by email dated November 1, 2017 at 6:46 p.m., CCI stated that "on October 31, 2017, CLEAResult did cut over from NEXT's FAST System to our DSMTracker/Salesforce solution—it was a successful migration and now all program scheduling and work order management—████████████

████████████████████████████████████████████████████████

██████████████████████████ are managed by CLEAResult's DSMTracker solution." (CRE 37 (NXT00061313)).

54.     At the time that NEXT received the termination notice, CCI had booked appointments for November and December for customers of ████████████████

████████████████████████████████████████████████████████

██████████████████████. (PE G, Peterson 3rd Decl. ¶ 39 & PE G (66) (NXT00061923, FAST Full DB exports 6-14-2018-on Zip Drive).

55.     CCI also continued to access NEXT's modules and trade secrets on its Back End through and including at least November 17, 2017.  (PE G, Peterson 3rd Decl. ¶ 40 & PE G (67) (NXT00061922, NEXT Audit Logs on Zip Drive)).

56.     NEXT billed CCI for its use of NEXT's FAST Tool in November (PE H (5) (j), Invoice 413) and December ((PE (5) (k), Invoice 421) which CCI has refused to pay. (PE H, Staszak Decl. ¶¶ 12, 13).

57.     On November 2, 2017, NEXT billed CCI REDACTED F NANC AL. (PE H, Staszak Decl. ¶¶ 14-16 & PE H (5) (l), Invoice 422). This Invoice bills CLEAResult:

(a) REDACTED F NANC AL  for the additional users per month over the first 10 it assigned to use the NEXT FAST Tool to service CLEAResult's utility customers per the parties' agreement (PE G (50) (CR-0024203)).  CLEAResult did not pay this Invoice when it was due and has refused to pay this Invoice despite NEXT's demand that it do so. To arrive at the additional users over 10 per month for each utility, NEXT reviewed the log CLEAResult created in the NEXT FAST System of registered users for the FAST System by the portal used by the utility/program (PE F, NEXT 30 (b) (6) Dep. Ex. 43 (NXT00028975) NEXT Registered Users)) to arrive at the total number of registered users per utility per month, subtracted 10 users per month already paid by CLEAResult, and then multiplied the balance by the number of months the program was active.

(b) REDAC ED FINANCIAL  for the Termination and Kill Fee provided for under § 12 of the Master Services Agreement, Ex. 1 to the Verified Amended Complaint and CLEAResult Exhibit 11 to Summary Judgment, which CCI has refused to pay.  (PE H, Staszak Decl. ¶¶ 14-16 & PE H (5) (l)). The Kill Fee is comprised of the REDAC ED F NANC AL CLEAResult paid NEXT for its exclusive licensing rights to the FAST System, plus the yearly licensing fees

17

CLEAResult paid NEXT for its use of the FAST Tool to service its utility customers

REDACTED FINANCIAL

Paragraph 12 of the MSA negotiated by the parties provided that CCI could only after "ten (10) days written notice to NEXT, terminate this Agreement for all tasks not then performed, whether or not NEXT is then in breach of default . . . ." Paragraph 12 provided further that where, as here, the MSA was terminated for any reason other than NEXT's breach, then "CLEAResult agrees to pay an early cancellation fee ("Kill Fee") equal to one calendar year of licensing fees for the Exclusive Rights, as stipulated in Section 3 of this Agreement. The Kill Fee is not a penalty, but rather a genuine estimate of loss NEXT will suffer." (CRE 11 (Peterson Dep. Ex. 12 ¶ 12 (CR-0014570)). CCI agreed to this Kill Fee in order to protect NEXT's investment and hard costs in supporting CCI and the costs that would be incurred in NEXT's wind down of its CCI business, including the costs incurred by NEXT in continuing to protect customer data of the utilities in NEXT's custody. (PE G, Peterson 3rd Decl. ¶ 41).

**NEXT'S USED REASONABLE MEASURES TO PROTECT ITS TRADE SECRETS**

### Source Code Controls

58.     NEXT's compiled source code containing the trade secrets of the FAST Tool was loaded on servers NEXT Payment Solutions licensed from Rackspace. Rackspace servers are protected by locked down and secure environments with restricted access to authorized personnel only who could gain access to the server room and NEXT's servers. Rackspace controls for security of its servers met the SOC 16 requirements for security. (PE G, Peterson 3rd Decl. ¶ 42; PE G (7) & (8) (NXT00141669; NXT00141660; NXT00141760)).

18

59.     Matt Peterson and Ryan Rodriguez were the only two individuals who had access to NEXT's servers housing the complied source code for the FAST Tool. (PE G, Peterson 3rd Decl. ¶ 43) Matt Peterson and Rodriguez had passwords to gain access to NEXT Payment Solutions server on Rackspace cloud. (PE G, Peterson 3rd Decl. ¶ 43). Also, as noted in SAF ¶ 3, Rodriguez signed an Agreement with Contractor Programmer dated July 18, 2011

### NEXT Controlled Its Trade Secrets With Confidentiality and Non-Disclosure Agreements

60.     NEXT required that its programmers/developers, in addition to Ryan Rodriguez and Priyanka Shah, who had access to the Back End of the NEXT FAST TOOL and trade secrets to execute confidentiality and non-disclosure agreements. (PE E, Peterson 8/1/18 Dep. Tr. 114:22-117:12; PE G, Peterson Decl. ¶ 44 & Ex. (3)). Rodriguez and Shah's agreement, in a section called "Protection of Proprietary Materials" § 7, that they not disclose information or data constituting "trade secrets" of NEXT, including scientific or technical information, design, process, procedure, formula, or improvement relating to the development, design, construction and operation concerning the certain software being developed. (PE H (7); PE H (8)). The other programmers also agreed to maintain the confidentiality of NEXT's information and agreed to return all information to NEXT at the time they left. (See e.g. CRE 9 (NXT00037082 ¶6); CRE 10 (NXT00029902 ¶ 6); PE G (4) & (5)).

61.     NEXT did not require its contractors who did not have access to its trade secrets or the Back End of the FAST Tool to execute NDAs. (PE G, Peterson Decl. ¶ 45). This includes Curt Matson, who was not a programmer, did not have access to the Back End and generated leads for NEXT (PE E, Peterson 8/1/18 Dep. Tr. 84:11-85:3, 86:2-8); Robert Strong, who was a business advisor to NEXT and did not have access to NEXT's Back End (*Id.* at Tr. 66:8-16, Tr. 67:2-13; 23-68:4); Kelly Jensen, who assisted NEXT with account management but did not give live

demonstrations reflecting NEXT's trade secrets (*Id.* Tr. 108:15-109:13, Tr. 111:3-112:13); Sergey Popov, who wrote public interfaces for NEXT's mobile app (*Id.* Tr. 118:22-119:7); and Brenda Arritola, who was an accountant and finance person (*Id.* Tr. 77:16-21).

62. NEXT also required that third parties to whom NEXT provided live demonstrations of the FAST System and FAST Tool Back End reflecting the features and functionality of trade secrets execute non-disclosure and confidentiality agreements, including:



(PE G, Peterson 3rd Decl. ¶ 46 & PE H (10-(27).).

**NEXT's Further Protected Its Trade Secrets By Utilizing Licensed Communication Tools Such As Snagit**

63.     NEXT purchased a multi user license to Snagit used by its employees/contractors, to transfer by email in a protected environment screenshots of NEXT's back end and trade secrets. (PE G, Peterson 3rd Decl. ¶ 47).

**NEXT Restricted CCI Employee's Access to Its Back End and Trade Secrets**

64.     Pursuant to the MSA, CCI (the Receiving Party) was required to restrict access to NEXT's Confidential Information, including its software, reports, data, records, forms and other material only to its employees and contractors "who (i) have a need to access such Confidential Information solely for the purpose of fulfilling the obligations under this Agreement and (ii) have been advised of the obligations of confidentiality and are under obligations of confidentiality substantially similar to those set out in this section." (CRE 11, ¶ 6; Peterson 3rd Decl. ¶ 48.)

Further, CCI agreed it would "not use or disclose to any person, firm or entity any Confidential Information of NEXT (the Disclosing Party) without NEXT's express, prior written permission and was obligated to exercise the same level of care to protect NEXT's Confidential Information as it exercised to protect its own, but in no event less than reasonable care. (*Id.*)

Upon termination of the MSA, CCI was obligated to return NEXT's Confidential Information to it and the non-disclosure requirements of the Agreement survived for a period of three years following disclosure except as to trade secrets which would be subject to nondisclosure until no longer protected by law. (CRE 11 § 6). (*Id.*)

65.     CCI employee Chris Barden, also a software developer, testified that this language is inserted into contracts to protect a software developer from piracy or reverse engineering of their software. (PE A (2) Tr. 47:18-49:19).

66.     Additionally, CCI and NEXT negotiated a policy that provided the two entities would isolate program access to only those who absolutely need it. (PE G, Peterson 3rd Decl. ¶ 50 & PE G (2) (a) (NXT00064117)).

67.     NEXT Payment Solutions also issued a Network Access and Authentication Policy setting forth requirements and restrictions for access to its software by login accounts and password protections. (PE G, Peterson 3rd Decl. ¶ 51 & PE G (2) (b) (NXT00046496)).

68.     Additionally, NEXT had to meet and met the requirements of CCI's Vendor Security policies to ensure that its system would maintain the confidentiality of the CCI's utility vendor customer data. (PE G, Peterson 3rd Decl. ¶ 52 & PE G (1))

**The Vimeo Videos**

69.     Dr. Valerdi addressed the Vimeo Videos in his September 18, 2018 Expert Rebuttal Report, attached hereto as Ex. J (3), which CCI has not included as an exhibit and he testified at length about the Vimeo videos which testimony CCI has also ignored. (*See* PE J, Valerdi Dep. Tr. 8:14 & Dep Ex. 3 & K, Valerdi Decl. ¶ 3 (c)). Specifically, Dr. Valerdi's Rebuttal Report states that only about 24 minutes of video content relate to the FAST Tool. (*Id.* & PE. J, Valerdi Dep. & Ex. 3 (9/18/18 Rebuttal Report) thereto, p. 5 § 5 paragraph 4; PE K, Verification of Valerdi that his Reports Accurately Recite his Opinions). He stated further that the videos provide a passive inspection and do not allow the viewer to interact with the features or understand the underlying rules or architecture of the software, making it impossible to "fully reflect" the trade secrets . . . ." (§ 5, pp. 5-6, para. 5. *See also,* PE J, Valerdi Dep. Tr. 98:8-15; Tr. 106:4-107:2 (It is not possible to reverse engineer the NEXT FAST Tool by watching the Vimeo videos "because of the duration of the videos. They are ranging from one to four minutes. So it's—not enough time to describe some of these things in the necessary detail. Also, the ability to interact with some of the

functionalities is not possible, because you're a passive viewer. And if you want to really understand how something works, you really need to be able to use it, enter some inputs, and see how those inputs provide outputs. . ..")) 

## CCI DID NOT HAVE ANY OTHER SOFTWARE WITH THE SOLUTION PROVIDED BY NEXT'S FAST TOOL'S FEATURES AND FUNCTIONALITY

### Catalyst and EmHub

70.     Jane Nelson testified that CCI did not have an online scheduling tool that met the requirements of ████████████ as of August 2014, which is why CCI contracted with NEXT to build the scheduling system of their dreams. (PE D, Nelson Dep. Tr. 6:10-11, 14:14-21; Tr. 18:13-19; PE B, Johns Dep. Tr. 15:6) CCI contracted with NEXT throughout 2016 to provide its scheduling tool to CCI's utility customers including ████████████████████ ████████████████ . (SAF ¶¶ 42-49).

71.     Jane Nelson also testified that Catalyst was simply a "recordkeeping system". (PE D Nelson Dep. Tr. 6:10-11, 14:14-21; Tr. 18:13-19; PE B, Johns Dep. Tr. 15:6).

72.     CCI's power point ████████████████ with Catalyst dated November 8, 2016 (PE G (52)) makes clear that as of that date Catalyst intake and scheduling and trade ally management (all features of the FAST Tool) were still under development and not expected to be rolled out until January-March 2017. (NEXT's Response to SUF ¶¶ 78) (PE G, Peterson Decl. ¶ 53 (PE G (5) (CR-0096396, slide 8)). None of the Catalyst power points submitted by CCI in support of summary judgment reflect nor can they demonstrate in their static form online scheduling features provided by the FAST Tool (e.g. CRE 52-55). Further, for the scheduling tool feature reflected in CCI's power points CRE 45, 53 both show screen shots of NEXT's FAST Tool. (PE G, Peterson 3rd Decl. ¶ 53 & PE G (70) (compare CRE 45, pp. 22-23 and CRE

53, 2,3 with PE G (7) pp. 7-10 which makes clear that CCI knew the scheduling screen shots in CRE 45 and 53 were of the FAST Tool, not a tool owned by CCI).

73. CCI's claim that EmHub has the FAST Tool scheduling features and functionality is not supported by the documents they identify. CRE 55 is a 2012 PowerPoint that appears to have been last modified on May 26, 2016, but in what way it is not clear. What is clear is that a logo for Conservation Services Group (CSG) appears in the lower right hand corner and CCI did not acquire CSG until April 2015. (PE G, Peterson Decl. ¶ 54 & PE G (41)) The PowerPoint does not show a scheduling tool with the FAST Tool features and, in fact, concedes that EmHub does not have the FAST Tool features in slides 9-13 "Biggest Pain Points" in which data accuracy, account validation, absence of "other" required functionality, all features the FAST Tool had, are among the EmHub deficiencies. Indeed, as of August 2015, CCI concedes that Catalyst and CSG's EmHub did not have self scheduling and CSG was impressed with functionality of the NEXT FAST Tool. (PE G, Peterson 3rd Decl. ¶ 54 & PE G (43) (CR-0131743-45)). Finally, CRE 45 on which CCI relies is a January 13, 2016 email with a power point presentation to ██████ dated 1/13/16. But the On line Scheduling Feature CCI represents EmHub has at slides 22 and 23 are in fact screen shots of the NEXT FAST Tool. (PE G, Peterson 3rd Decl. ¶ 54 (compare PE G (7), pp. 7-10 with CRE 45, pp. 22-23).

**DSMTracker**

74. DSMTracker did not have the online scheduling, inventory management or other features and functionalities of the FAST Tool at the time CCI purchased Green Team in January 2017. (PE D, Dep. Tr. (Jane Nelson) Tr. 192:1-23. (DSMTracker software "wasn't built" and "didn't exist"). NEXT's expert, Dr. Ricardo Valerdi stated that in his opinion the NEXT Tool functionality did not exist in the DSMT software as of March 2017. (PE K, Valerdi Decl. ¶ 3 (a)

(CRE 57, Valerdi's 7/16/18 Expert Report, pp. 31-32 (NEXT FAST Tool Functionality Did Not Exist in DSMTracker as of March 2017).)

75.     "Project Renaissance" was initiated to replace NEXT on January 11, 2017 (PE A (2), Barden Dep. Tr. 81:22-24, 82:1-15, 115:13-20)) From the date Project Renaissance began to the time Chris Barden, Project Manager for Project Renaissance left CCI in May 2017, he had never seen the DSMT software functioning live, nor did he have access to it. (*Id.* Tr. 110:21-25). On January 16, 2017, Tim Mahler scheduled a meeting for January 17, 2017 for the purpose of "Defining FAST Modules & Client Stratification."  (PE B, Johns Dep. Ex. 24) (CR-0383340)).

76.     CRE 50 is proffered by CCI in support of its contention that DSMT had the features and functionality of the FAST Tool is a Green Team document captioned Energy Efficiency Tracking System (CR-0000174). No affidavit is submitted to attest to the document's foundation or its admissibility under the hearsay rules exclusion. This document bears a date of January 29, 2017, which is shortly after CCI acquired the DSMTracker software PE. The document was Ex. 3 to the Weitner deposition showing the date of the Exhibit with the metadata, whereas CCI omits the date of the document proffered as CRE 50. (PE L (9/19/18 Dep of Weitner Tr. 96:19-97:6 & Ex. 3 to Deposition)) A review of the index of Ex. 50 reflects that as of that date DSMTracker did not list online self scheduling or other FAST Tool functionality in its brochure. (PE G, Peterson 3rd Decl.  ¶ 55).

77.     CRE 51 is also proffered by CCI in support of its contention that DSMTracker had the FAST Tool online scheduling features and functionality. No affidavit attesting to the documents foundation or supporting its admission under the hearsay rules is offered. The document is a Green Team document captioned Energy Efficiency Tracking System (CR-0445411). This document bears a date of January 24, 2018, one year after CCI's acquisition of

DSMTracker and after CCI has copied NEXT's features in the DSMT software, therefore, cannot serve as evidence of DSMTracker features and functionality as of January 2017. This document was document 8 to Weitner's deposition and it contains the metadata reflecting it was last revised on January 24, 2018. (PE L (9/19/18 Dep of Weitner Tr. 219:10-220:5 & Ex. 8 to Deposition) CRE 51 proffered by CCI in support of summary judgment omits the metadata. Thus, CRE 51 cannot reflect features and functionality of DSMT as of the date CCI acquired it in 2017. As Weitner testified, the January 2018 version of DSMT represented an ongoing cumulative process whereby features added to it remained in it. (PE L, Weitner Dep. Tr. 225:16-21).

## CCI'S THEFT OF NEXT'S TRADE SECRETS

78.     Dr. Valerdi, NEXT's technology expert who testified the DSMT "was a copycat effort that involved reverse engineering" (PE J, Valerdi Dep. Tr. 240:18-241:18). Valerdi Dep. Tr. 27:17-28:17 (teaches reverse engineering; *see also* PE K, Valerdi's Decl. ¶ 3 (a) authenticating his 7/16/18 Expert Report (CRE 57) and the Opinions in it, pp. 6-7 (Steps in Reverse Engineering; pp. 7-12 CCI's Efforts to Reverse Engineer the FAST Tool, pp. 16-17 CCI's Efforts and Resources Directed to Steal NEXT Trade Secrets). He testified that "this whole effort on Project Renaissance is it led to something of a tangible product . . . It was a very focused effort with guidance from CCI leadership to go out and do very specific tasks. And it was very well documented. And I think they would serve as a great case study for how to do reverse engineering. (Tr. 264:9-265:2.) Valerdi documents the similarities between the FAST Tool and DSM Tracker based on the information he knew as of 7/16/18 (CRE 57, pp. 30-33). In Dr. Valerdi's Supplemental Report submitted on 8/20/18 after he inspected the DSM Tracker software provided in a test environment only, he further detailed the FAST Tool Features, Functionalities and Components replicated in DSM Tracker. (PE K, Valerdi Decl. ¶ 3 (b) (CRE 58)). CCI did not

provide him access to all components of DSMT, (*Id.* at p. 5), but of the components he was able to inspect he found at least 14 of NEXT's Trade Secrets implemented in DSMT. He concluded: "Based on my inspect of the DSM Tracker version provided to me, it is abundantly clear that features, functionality, and components of the FAST Tool were replicated by CCI in the DSM Tracker software to arrive at their copycat tool and solution." (*Id.* p. 6) The bases for his opinion appear at pp. 6-39 of his 8/20/18 report. One of the documents to which Valerdi referred, Sean Weitner's email dated 6/6/17 (CR-0437415) and the attached spreadsheet is included as Weitner Dep. Ex. 9 with the spreadsheet on the zip drive of exhibits. (PE L, Weitner Dep. Ex. 9). In this email Weitner instructed CCI developers to perform a gap analysis on over 900 requirements derived from scoping the FAST Tool features, functionalities, components, workflow rules, eligibility, reporting, etc.

79.     NEXT's expert Dr. Valerdi opined that there are examples of repeated unauthorized access of the FAST Tool by CCI employees between at least September 2016 through November 2017 from offices in Austin TX, Portland OR, Los Angeles CA, New York NY, and Alpharetta Georgia. (PE K, ¶ 3 (a), 7/16/18 Report, (CRE 57)). It is his opinion that "The information obtained through the repeated and unauthorized access of the FAST Tool by CCI personnel and agents allowed CCI to copy the FAST Tool's design elements. (CRE 57, pp. 18-30).

80.     Additional evidence of CCI employees researching, identifying and copying NEXT FAST Tool features, functionality, components, workflow rules, eligibility into DSMT are the following:

81.     Between January 2017 and October 31, 2017, CCI worked on Project Renaissance, a project whose mission was to develop FAST Tool features and functionality in DSMTracker as follows.

82. Without authorization from NEXT, CCI conducted a two hour demonstration on January 16, 2017 conducted by Jane Nelson of the back end of the FAST Tool for Green Team software developers to assess the "required cost and effort to deploy the necessary programs into DSMTracker." Sean Weitner and Byron Martinez participated from CCI's Westborough MA office (PE L, Tr. 152:17-153:4, Tr. 154:7-156:20). Immediately thereafter, on January 16, 2017, January 17, 2017 and January 18, 2017, the Back End of NEXT's FAST Tool was penetrated from an unauthorized IP address ███████, registered to Conservation Services Group (CSG) in Westborough MA. (PE G, Peterson Decl. ¶ 57 & PE G (61 (c)), a Summary Chart of those penetrations, PE G (61 (a)), a Summary Chart reflecting the modules penetrated and the number of times they were penetrated from that same IP address, PE G (61(b)), the results of a location search for IP address ███████. Sean Weitner, DSMT solutions architect admits to doing work in January in preparation for March scoping sessions of the features and functions of the FAST Tool used by the utilities and programs serviced by CCI. (PE L, Weitner Dep. Tr. 159:18-160:16)

83. In March 2017, without authorization from NEXT, CCI conducted at least 5 sessions in which they had CCI employees servicing the eight utilities and 13 programs CCI serviced using the FAST Tool identify the features and functionalities of the NEXT FAST Tool used by each of the eight utilities and 13 programs NEXT serviced. (PE L, Weitner Dep. Tr. 167:4-187:13; O, Supple Dep. Tr. 33-38 & Ex. 1 (Reviewing Scoping Videos CR-0047576-79; PE L, Weitner Dep. Tr. 159-187, PE R, Transcript of 3/16/17 Video CR-0447576, see e.g. Tr. 7-16 & 122-124 ("DSM Tracker in this project is simply replacing NEXST" (Tr. 9:5-6); PE Q, Emerson Dep. Tr. 169:9-21)).

84. Between March 2017 and April 2017, CCI directed its employees, without authorization from NEXT, to use their login credentials (issued for the sole purpose of servicing CCI's utility customers) to penetrate the Back End of NEXT's FAST Tool to conduct homework assignments directed at investigating, documenting and taking screen shots of NEXT's trade secrets for the purpose of assisting CCI's employees developing DSMT. (PE H, Staszak Decl. ¶ ¶ 17-19 & PE H 6 (Rule 1006 Summary Chart reflecting Homework Assignments, Modules, Features and Functionalities to be Investigated and 100s of Screen shots assigned to be taken of NEXT's back end); PE O, JoAnne Supple Dep. Tr. 142:4-152:9 & Ex. 13 (CR-0062012-27)).

85. On May 16, 2017, CCI employees without authorization from NEXT and in violation of NEXT's policy prohibiting sharing login accounts and credentials, logged into the Back End of the NEXT Fast tool from four (4) separate locations (Santa Clara CA, Englewood CO, Austin TX, and Caledonia TX) at the same time, all using Dan Williams Login credentials. (PE G, Peterson Decl. ¶ 58, PE G (64 (a) & (64 (b)). NEXT policies prohibited sharing credentials. (*Id.* G (2)(b)).

86. On June 6, 2016, Sean Weitner, DSMT Solutions Architect identified over 900 gaps between DSMT and FAST Tool and identified the FAST Tool features that had to be developed in DSMT in order for it to perform the functions the NEXT FAST Tool performed to meet the utilities requirements. (PE L, Weitner Dep. Ex. 9 & 9 (A)- on zip drive (Excel Sheet attached to CR-0437415-17).

87. In August, 2017, CCI scheduled times for its CCI employees, Jane Nelson and Alex Heinen, without NEXT's authorization, to use their login credentials issued solely for the purpose of servicing CCI utility customers, to conduct live demonstrations and training sessions of the Back End of the NEXT FAST Tool and its features and functionality for the employees and

developers building out DSMT and put these demos on the shared drive. (PE Q, Emerson Dep. 241:1-242:11 & Dep Exs. 20, 21). These demonstrations were recorded. Transcripts for certain of these demonstrations are attached as PE S (1) (Transcript of 8/14/17 NEXT Scheduling Demo by Jane Nelson (CR-0272477) and PE S (2) (NEXT logs reflecting Nelson's penetration of NEXT's Back End and the booking Ids used by Nelson (144384, 144391) during that demonstration (PE G, Peterson Decl. ¶ 60)); PE T (1) (Transcript of 8/17/17 Demo of NEXT data, inventory, scheduling, online scheduling by Alex Heinen) and PE T (2) (NEXT logs reflecting Heinen's penetration of NEXT's Back End and the booking Ids used by him (14649, 14734, 14740, 14661, 14760, 14757, 14784) during the demonstration (PE G, Peterson Decl. ¶ 61)); and an August 28, 2017 demonstration by Jane Nelson of NEXT Logins for HEA_HN (PE P, Nadar Dep. Tr. 195-287 & Dep. Ex. 14 (A) (CR-0014612 by Jane Nelson) and PE V ( NEXT's logs reflecting Jane Nelson's Back End access and booking Id (144955) used during the August 28 demonstration (PE G, Peterson 3rd Decl. ¶ 62)).

88. On August 29, 2017, Jane Nelson, without NEXT's authorization, issued administrator login credentials to the Back End of the FAST Tool to CCI DSMT developers Simon Nadar, Soham Chakraborty and Santosh Reddy, contractor administrative logins for Business Analyst Stephanie Votta White, Field Tech login credentials for Business Analyst, JoAnne Supple, and call center logins to Erin Mason. ((PE O, Supple Dep. Ex. 15 (CR-0442456-59). Immediately thereafter, the Back End of NEXT's System was penetrated 46 times by logins from India (PE G, Peterson Decl. ¶ 63, (PE G (63(a) is a bar chart reflecting the number of penetrations from India and PE G (63(b) reflects the modules accessed during those penetrations). Additionally, logins from Alpharetta GA, where CCI's developers were located (PE P, Nadar Dep. Tr. 9:19-24, 88:22-89:15, 90:3-91:13)) increased after Nelson issued the developers administrative login credentials.

(PE G, Peterson Decl. ¶ 64 & Exs. PE G (71(a)) which reflects the penetrations to NEXT's Back End from Georgia, PE G (71(b)) which reflects the modules on the Back End that were penetrated and PE G (71 (c)) reflects the data and source for those charts.  PE G (71) (d) reflects the IP locator for the Georgia IPs penetrating NEXT's Back End. (PE G, Peterson Decl. ¶ 65).

RESPECTFULLY SUBMITTED,

PLAINTIFF NEXT PAYMENT SOLUTIONS, INC.,

BY:  /s/ Susan Bogart
     Its Attorney
     Law Offices of Susan Bogart
     70 W. Madison Street, Suite 1400
     Chicago, Illinois 60602
     Sbogart514@aol.com
     sbogart@susanbogart.com
     Tele: 312-214-3271

     Eric C. Cohen
     Brinks Gilson & Lione
     455 N. Cityfront Plaza Drive
     Suite 3600
     Chicago, IL 60611
     eccohen@brinksgilson.com
     Tel: (312) 321-4200