UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NEXT PAYMENT SOLUTIONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 17 C 8829 |
| v. | ) | |
| | ) | Chief Judge Rubén Castillo |
| CLEARESULT CONSULTING, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Next Payment Solutions, Inc. ("Plaintiff") brings this trade secret misappropriation and breach of contract action against CLEAResult Consulting, Inc. ("Defendant") related to software that Plaintiff developed. (R. 36, Am. Compl. ¶¶ 194-260.) Defendant moves for summary judgment on all of Plaintiff's claims pursuant to Federal Rule of Civil Procedure 56. (R. 190, Am. Mot. for Summ. J. at 1; R. 191, Mem. at 30.) Also before the Court are motions filed by both parties to strike or exclude evidence. (R. 221, Pl.'s Mot. to Strike at 4; R. 225, Def.'s Mot. to Strike at 1; R. 230, Mot. to Exclude Expert at 1.) Finally, Plaintiff asks the Court for an order compelling Defendant to compensate Plaintiff's experts for the time they spent preparing for and attending depositions. (R. 271, Mot. at 11.)

For the reasons stated below, Defendant's amended motion for summary judgment (R. 190) is granted in part and denied in part. As for the evidentiary motions, (R. 221; R. 225; R. 230), they are all denied except for Defendant's request that Plaintiff produce metadata and correspondence related to nondisclosure agreements that were revealed to Defendant after the close of discovery. Finally, the Court grants in part and denies in part Plaintiff's motion to compel payment of Plaintiff's experts, (R. 271).

# RELEVANT FACTS

The following facts are undisputed unless otherwise stated. Defendant is a Texas corporation that implements programs for utility companies to increase homeowners' energy efficiency. (R. 245-1, Pl.'s Resp. to Def.'s Facts ¶ 1; R. 243-5, Nelson Dep. Tr. at 8-9.[1]) Defendant engaged Plaintiff, an Illinois software development company, to develop an online portal for processing rebates. (R. 245-1, Pl.'s Resp. to Def.'s Facts ¶ 2.) Matt Peterson ("Peterson") is Plaintiff's Chief Executive Officer, (R. 245-11, Peterson Decl. at 1), and Jill Staszak ("Staszak") is the majority shareholder of Plaintiff. (R. 245-16, Staszak Decl. at 1.) Defendant's key employees that Peterson interacted with include: Defendant's Chief Technology Officer David McCann ("McCann"); Tom Diffley ("Diffley"), Director of Incentive Processing; Paul Johns ("Johns"), Senior Manager of Field Services and the Portfolio Director for Consumers Energy; and Tim Mahler ("Mahler"), Vice President. (*See, e.g.*, R. 245-11, Peterson Decl. at 2-7; R. 245-5 at 18, Feb. 27, 2015, Johns Email; R. 245-5 at 27-28, May 13, 2015, Diffley Email; R. 245-5 at 30, Aug. 14, 2015, Johns Email; R. 243-11 at 71-72, Sept. 10, 2015, Mahler Email.)

The primary software platform that Plaintiff offers is its "Next System," which is a software program that allows a business to process customer rebates or carry out a customer reward program online. (R. 198-1, Peterson Dep. Tr. at 155-56.) Plaintiff created a customized version of the Next System for Defendant so that Defendant could offer an online rebate-processing program to its utility company clients. (*Id.* at 206-07.) The Next System includes a

---

[1] Where the Court cites or discusses portions of a document filed under seal, it is because the Court has determined that those portions of the document were improperly filed under seal. *See In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010) ("Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality.").

"Next System Back End," which Plaintiff describes as the part of the Next System that has the Next System's source code, data encryption, web application, and parts of the Next System that can only be accessed with a valid log-in and password. (*Id.* at 142-47.)

## I.  The Master Services Agreement

On October 6, 2014, Plaintiff and Defendant entered into a Master Services Agreement ("MSA").[2] (R. 248, Def.'s Resp. to Pl.'s Facts ¶ 22; R. 245-1, Pl.'s Resp. to Def.'s Facts ¶ 7.) Though the MSA was signed in October 2016, the parties agreed that its effective date was April 1, 2014. (R. 245-1, Pl.'s Resp. to Def.'s Facts ¶ 7; R. 36-1, MSA at 1.)

Under the MSA, Plaintiff grants Defendant exclusive licensing rights to its "digital rebate portal processing system, point of sale systems[,] and reward fulfillment services" for "all uses in the United States and Canada related to the water, gas, electric[,] and Telecom utility business[.]" (R. 245-1, Pl.'s Resp. to Def.'s Facts ¶ 8.) It further provides that the parties "may agree to extend the scope of uses to the Exclusive Rights by signed agreement or signed" Scope of Work, which the MSA also refers to as an "SOW." (*Id.*)

With respect to SOWs, the MSA provides that Plaintiff agrees to carry out "the services required for the performance of those duties set forth and defined in [an SOW], in the form of Exhibit A attached hereto . . . and be bound by and subject the terms and conditions contained in this Agreement." (*Id.*) The MSA specifies that "[f]rom time to time, the Parties may agree to contract for additional services," which "shall be memorialized as a[n] SOW and signed by both

---

[2] As discussed in further detail below, Texas law applies to the MSA, and although Plaintiff argues that the MSA was the result of prior negotiations between the parties, the prior negotiations are irrelevant because the MSA gives no effect to such negotiations, (*see* R. 36-1, MSA at 7 (providing that the MSA is the entire agreement between the parties)). *See Adam Techs. Int'l S.A. de C.V. v. Sutherland Glob. Servs. Inc.*, No. 3:10-CV-01172-P, 2010 WL 11470723, at *3 (N.D. Tex. Oct. 18, 2010) ("The Court finds that because the parties contracted for the MSA to supersede any previous negotiations relating to the outsourcing relationship the MSA must govern this dispute."), *modified on reconsideration*, No. 3:10-CV-01172-P, 2011 WL 13137724 (N.D. Tex. May 26, 2011).

Parties." (*Id.*) With respect to the format of SOWs, the MSA provides that they will "follow a standardized template and include the business unit and division, an associated SOW number and define the Client and program names, data requirements, terms and conditions, reward choices, communication requirements, and Client or partner cascading legal language, as needed." (*Id.*) The MSA provides that SOWs will also "provide Client instructions for any authorization requirements for delivery of services." (*Id.*)

As to its duration, the MSA provides that it "shall remain in force for the duration of the period specified [herein], unless extended in accordance with this Agreement[.]" (*Id.*) This specified period is from "April 1, 2014 . . . until April 1, 2016, unless the Parties agree in writing to extend the Term[.]" (*Id.*) The MSA also provides, however, that "[a]ll obligations incurred under this Agreement shall survive the Term until satisfied," and that the MSA and all SOWs issued under the MSA "contain the entire Agreement between the parties with respect to the matters covered" in the MSA. (*Id.*) The MSA states that it "cannot be modified except in writing signed by both parties." (*Id.*)

If Defendant terminated the MSA before its expiration "without cause" or "for any reason other than [Plaintiff's] breach of [the MSA]," Defendant agreed to pay Plaintiff "an early cancellation fee ('Kill Fee') equal to one calendar year of licensing fees[.]" (*Id.*) The MSA, however, contains a limitation of liability clause, which provides that "[n]either party shall be liable to the other party for any consequential, indirect, exemplary, special, incidental[,] or punitive damages including, without limitation, lost profits, even if such damages are foreseeable or the damaged party has been advised of the possibility of such damages and regardless of whether any such damages are deemed to result from the failure or inadequacy of any exclusive

or other remedy, and, in no event shall either party's liability to the other party exceed the total amount of payments made under this Agreement." (*Id.*)

The MSA also has nondisclosure provisions, which specify that any party receiving confidential information from the other shall only disclose confidential information to "employees and contractors who (i) have a need to access such Confidential Information solely for the purpose of fulfilling the obligations under this Agreement, and (ii) have been advised of the obligations of confidentiality and are under obligations of confidentiality[.]" (*Id.*) Otherwise, the MSA provides that any party receiving confidential information "shall not . . . use or disclose to any person, firm[,] or entity any Confidential Information . . . without the Disclosing Party's express, prior written permission." (*Id.*) The MSA requires each party to "exercise at least the same level of care to protect the other's Confidential Information as it exercises to protect its own Confidential Information of a similar nature, but in no event less than reasonable care." (*Id.*) The MSA's nondisclosure provisions survive "for a period of three years following disclosure of the Confidential Information to the Receiving Party, except for trade secrets, which . . . remain subject to the nondisclosure requirements until no longer protected by law." (*Id.*)

## II.    SOWs

The parties dispute whether any SOWs were issued pursuant to the MSA prior to the MSA's expiration date of April 1, 2016. (R. 245, Resp. at 20-23; R. 247, Reply at 18-19.) Defendant argues that no SOWs were issued before the MSA expired, and Plaintiff, on the other hand, argues that a "Consumers Energy SOW" was executed in August 2015, which is approximately eight months before the MSA's expiration date. (R. 245, Resp. at 20-23; R. 247, Reply at 18-19.)

Consumers Energy is a public utility that worked with Defendant to improve its customers' home energy efficiency. (*See* R. 243-5, Nelson Dep. Tr. at 7-10; R. 198-1, Peterson Dep. Tr. at 181.) In his description of Plaintiff's software development for Defendant related to Defendant's dealings with Consumers Energy, Peterson states that it started off as a "pure spec[ulative] deal for us" where if Consumers Energy "bought" Plaintiff's software, Plaintiff would "add the license to the Statement of Work." (R. 198-1. Peterson Dep. Tr. at 228.) Plaintiff was trying to help Defendant "win the business" by demonstrating to Consumers Energy a "booking solution" software that "was a variant of [Plaintiff's] rebate program." (*Id.*) This software would allow Consumers Energy's customers to schedule an appointment through an online portal to have a technician audit their home energy use and identify areas where energy efficiency could be improved. (R. 243-5, Nelson Dep Tr. at 18-19; R. 198-3 at 8-13, Aug. 11, 2014, Presentation; R. 198-3 at 42-45, Sept. 10, 2014, Email Chain.) There was no signed SOW covering this work for Consumers Energy; rather, Peterson stated that "there's an e-mail string most likely with . . . Johns . . . where . . . Johns has said yes, build [the booking solution]." (R. 198-1, Peterson Dep. Tr. at 229-30.)

On August 28, 2014, Peterson sent a Consumers Energy SOW by email to Defendant's representatives. (R. 245-10 at 18, Aug. 28, 2014, Email.) The email states "[a]ttached is the SOW (statement of work) for this program." (*Id.*) The attachment is an SOW for "an online booking tool supporting self service . . . and call center agents to book appointments[.]" (R. 245-10 at 19, Aug. 28, 2014, SOW.) On the same day the parties executed the MSA, October 6, 2014, Peterson sent to Defendant a document titled "Statement of Work #1 CLEAResult – Booking Tool." (R. 248, Def.'s Resp. to Pl.'s Facts ¶ 22.) Like the SOW Peterson emailed on August 28, 2014, the October 6 SOW was for "an online booking tool supporting self service . . .

and call center agents to book appointments" for Consumers Energy. (R. 245-10 at 35, SOW #1.) Defendant did not respond to this SOW. (*See id.*; R. 248, Def.'s Resp. to Pl.'s Facts ¶ 22.)

As late as February 10, 2015, Peterson noted in an email to Defendant's representatives that the Consumers Energy "Scheduling Wizard is not covered in [the parties'] Licensing agreement, except by verbal contract—which I see as binding[.]" (R. 243-6 at 27, Feb. 10, 2015, Peterson Email.) On February 20, 2015, Peterson emailed Johns the versions of the unsigned Consumers Energy SOWs from August and October 2014, referring to them as "MOUs," and Peterson stated that without "an MOU for the Booking tool, [Plaintiff's] only Billing mechanism is per hourly billing[.]" (R. 243-6 at 31, Feb. 20, 2015, Peterson Email.) Peterson then offered to Defendant different payment options for the Consumers Energy booking tool, which included: "1) No MOU Bill hourly[;] 2) Add [Consumers Energy] Scheduling Wizard as a 'Program' (MOU) and agree to any pricing . . . to support this as a stand alone [amount] per month . . . ; [and] [Plaintiff's] Plan," which was "to add a Scheduling Wizard 'Product' to the Licensing agreement[.]" (*Id.*)

On February 27, 2015, Peterson sent another email to Johns inquiring about the status of the Consumers Energy SOW. (R. 245-5 at 18-19, Feb. 27, 2015, Peterson Email.) In the email, Peterson asks Johns "[h]ave you decided how you would like to operate going forward with respect to contract support of the Scheduling Wizard?" (*Id.*) Peterson again offered several pricing options for the software, which included an arrangement whereby Plaintiff would bill Defendant by the hour, a negotiated contract setting forth a fixed number of hours for software development, and a customized "Scheduling Wizard pricing program" devised by Plaintiff. (*Id.*) Johns forwarded this email to his superior, Diffley, and stated in the email that he had "been

totally and expressly noncommittal in [his] communications with [Peterson]." (R. 245-5 at 18,

Feb. 27, 2015, Johns Email.)

On August 4, 2015, Peterson emailed Diffley, Johns, and Mahler stating that as of July

2015, Plaintiff had exhausted all its software development hours under the parties' contract.

(R. 245-5 at 25, Peterson Aug. 4, 2015, Email.) Peterson then stated that, with respect to the

"booking tool" for the Consumer Energy project, "[i]t is my position that [it] will continue to be

provided under the umbrella of the original Licensing Agreement[.]" (*Id.* at 26.) Peterson further

stated that Plaintiff was "not looking to mark-up or create any other revenue stream, just cover

the costs related to supporting this New Product not covered in the original Licensing

agreement." (*Id.*) He added that Plaintiff would "continue to provide support and development

for the Booking Tool with the assumption that [the parties] are going to secure an Addendum

Agreement covering the Booking Tool shortly" and that if this was not agreeable, Plaintiff would

"immediately stop all technical work for the Booking Tool until [Defendant] provide[d] direct

approval[.]" (*Id.*)

Diffley responded that "[a]ll matters related to the referenced booking tool are handled by

Tim Mahler and Paul Johns[.]" (R. 245-5 at 25, Aug. 4, 2015, Diffley Email.) He also asked

Peterson how much additional money Plaintiff wanted Defendant to pay for this software. (*Id.*)

In an effort to "bring clarity to [the parties'] working relationship," Peterson responded that

"[p]er your direction, [Plaintiff] has engaged with [Mahler and Johns] to add the Scheduling

Tool to the current Licensing Agreement. But this has not been completed yet[.]" (R. 245-5 at

22, Peterson Aug. 4, 2015, Email.) Peterson then stated that "[b]efore any more support is

provided for the Scheduling Tool, it must be authorized by you or we need an addendum in

place[.]" (*Id.*) He further noted that "[w]e were asked to develop the . . . Scheduling Tool with no

promises of it being used—we did it on spec" and that "[i]t turned out to be a good solution for Consumers [Energy] and [Defendant,] and now we are working . . . to determine the Scheduling Tool addendum agreement terms moving forward for the additional services/software not included in the original Contract." (*Id.* at 24.)

Peterson also noted that Defendant "purchased a software license" and that "per the original contract there [are] no defined development hours." (*Id.* at 21.) Thus, Peterson's understanding of the MSA was that Defendant did not "'purchase development hours" and instead Defendant is "billed at the . . . rate defined by" the Pricing Schedule attached as Exhibit B to the parties' contract. (*Id.*) Therefore, in Peterson view, "[w]ithout an addendum to the contract, [Defendant] has not technically licensed the Scheduling Tool software." (*Id.*) Peterson also testified that as of August 4, 2015, the Consumers Energy "scheduling tool" had not been added to the MSA, and that Plaintiff was billing Defendant by the hour for its development of that tool. (R. 243-7, Peterson Dep. Tr. at 13.)

On August 28, 2015, Peterson emailed Johns a "draft" version of a Consumers Energy SOW, which according to Peterson, pulled "together the various ones [the parties] ha[d] proposed in the past and consolidated." (R. 245-1, Pl.'s Resp. to Def.'s Facts ¶ 52; R. 243-6 at 40, Aug. 28, 2015, Peterson Email.) Peterson asked Johns to "make sure your interests are captured" in the draft SOW and "if I missed anything[,] let's get it included." (R. 243-6 at 40, Aug. 28, 2015, Peterson Email.)

The parties dispute whether, after these email exchanges, Defendant, through Johns, agreed in an email that it would license Plaintiff's scheduling software for a monthly fee and whether Defendant then started paying Plaintiff a monthly fee for the scheduling tool. (R. 248, Def.'s Resp. to Pl.'s Facts ¶¶ 26, 37-38.) According to Plaintiff, Defendant did agree to license

the scheduling tool pursuant to the terms of the most recent unsigned draft of the Consumers Energy SOW and other emails; thus, Plaintiff started billing Defendant for the Consumers Energy scheduling tool on August 18, 2015. (R. 248, Def.'s Resp. to Pl.'s Facts ¶¶ 26, 37-38; R. 243-7, Peterson Dep. Tr. at 18-20.) The parties, however, do not dispute that to the extent the parties entered into an agreement regarding the Consumers Energy project, it was described as a "new agreement." (R. 248, Def.'s Resp. to Pl.'s Facts ¶ 44.) Additionally, Peterson, in March 2016 and well after the date Plaintiff argues it started billing Defendant for the Consumers Energy scheduling tool, sent an email to McCann stating that the "MSA will expire April 1" and could "be extended with mutual agreement in writing." (R. 198-5, Peterson March 1, 2016, Email.) In this same email, Peterson referred to the parties' arrangement for the Consumers Energy project as a "gentleman's agreement." (*Id.*)

Peterson's understanding of the back and forth email discussions with Defendant's employees about the Consumers Energy SOW was that the "MSA had a term on it," but "we were told that it's business as usual" and "were also awarded new business, new contracts, and everything was continuing as it had before." (R. 198-1, Peterson Dep. Tr. at 183.) "[Plaintiff] continued to provide services, we sent invoices[,] and we were paid up until the time [Defendant terminated the parties' relationship] on November 1," 2017. (*Id.*) This was based on Peterson's understanding that in his experience with Defendant, "you could have a verbal agreement and wait six to eight months to get a final[,] signed agreement in writing." (*Id.* at 184.)

### III.  The FAST Tool and the End of the Parties' Relationship

Plaintiff presents evidence showing that, starting in February 2016, the parties ended their business relationship related to Plaintiff's online rebate processing portal and instead continued doing business together with utility companies by providing those companies home energy \

audit services using Plaintiff's "FAST Tool."[3] (R. 245-11, Peterson Decl. at 6.) While the focus of the parties' relationship at this time was the FAST Tool, evidence shows that Plaintiff performed other miscellaneous software development work for Defendant, and the parties dispute whether Defendant paid for this work, which included security upgrades, "auto routing" upgrades, a data exchange software program, and a software application that could be used on mobile devices. (*Id.* at 7-8; R. 248, Def.'s Resp. to Pl.'s Facts ¶ 52.)

According to Plaintiff, the FAST Tool is the same as the software tool developed for the Consumers Energy project, (R. 245-1, Pl.'s Resp. to Def.'s Facts ¶¶ 9, 12)—a software program that allows homeowners to book an appointment for a home energy audit analyzing how the homeowner can make his or her home energy use more efficient. (*See* R. 245-11, Peterson Decl. at 2-3; R. 243-9 at 53-81, Training Manual; R. 200, Pl.'s Interrog. Resps. at 3-8.) The parties dispute the nature of their contractual relationship governing the development and licensing of the FAST Tool, specifically whether it was subject to the terms and conditions of the MSA or was governed by a separate, standalone agreement independent of the MSA. (R. 248, Def.'s Resp. to Pl.'s Facts ¶¶ 17-51; R. 245-1, Pl.'s Resp. to Def.'s Facts ¶¶ 52-68.)

Plaintiff hired independent contractors to write all the software code for the FAST Tool. (R. 245-1, Pl.'s Resp. to Def.'s Facts ¶ 10.) The parties dispute whether the rights to the FAST Tool were transferred from those independent contractors to Plaintiff. (R. 245-11, Peterson Decl. at 2; R. 245-1, Pl.'s Resp. to Def.'s Facts ¶¶ 6, 10-11.) The FAST tool was developed in consultation with Defendant so that Plaintiff could develop a software program that satisfied the requirements of Defendant's utility company clients. (R. 245-1, Pl.'s Resp. to Def.'s Facts ¶ 14.)

---

[3] The word "FAST" is used as an acronym for "Field Automation Support Tools." (*See, e.g.*, R. 198-3 at 152-94, Screenshot.)

The parties also dispute whether Plaintiff took reasonable measure to protect the secrecy of the FAST Tool's proprietary features. Defendant presents evidence showing that Plaintiff did not require parties with access to the FAST Tool to execute nondisclosure agreements, and that it did not designate materials related to the FAST Tool as "confidential." (R. 245-1, Pl.'s Resp. to Def.'s Facts ¶¶ 22-29, 31-32, 40-43, 48-51.) Defendant also comes forward with evidence showing that Plaintiff's passwords protecting its software were rudimentary and easy to decipher, and that Plaintiff made a video demonstration of the FAST Tool available to the public on the Internet. (*Id.* ¶¶ 30, 44-47.) Plaintiff, on the other hand, presents evidence showing that its proprietary and secret information, including source code, was stored on secured servers and was protected by a password and log-in credentials. (R. 245-11, Peterson Decl. at 9; R. 243-7, Peterson Dep. Tr. at 194-98.) Plaintiff also points to evidence showing that it required software developers and other third parties to sign nondisclosure agreements before they were given access to the FAST Tool. (R. 245-16, Staszak Decl. at 5; R. 245-11, Peterson Decl. at 9-12.)

Prior to November 2017, Defendant initiated an effort to replace Plaintiff's FAST Tool with its own software solution, "DSMTracker." (R. 245-11, Peterson Decl. at 14-16; R. 245-4, Johns Dep. Tr. at 167-72; R. 243-18, Emerson Dep. Tr. at 237-42; R. 243-16, Dep. Tr. at 142-65.) The parties dispute whether DSMTracker had all the functions that were available on the FAST Tool before Defendant transitioned to DSMTracker. (R. 245-11, Peterson Decl. at 12-13; R. 245-1, Pl.'s Resp. to Def.'s Facts ¶¶ 78-79; R. 243-19, Weitner Dep. Tr. at 9-12; R. 243-5, Nelson Dep Tr. at 170-73, 190-93.) The parties also present conflicting evidence as to whether Defendant, without authorization, logged into the Next System Back End, took Plaintiff's confidential information related to the FAST Tool, and used that information to adapt DSMTracker so that it had all of the FAST Tool's functions. (R. 248, Def.'s Resp. to Pl.'s Facts

¶¶ 78-88; R. 245-11, Peterson Decl. at 14-16.) The parties, however, agree that there is no evidence that Defendant accessed or "stole" the source code for the FAST Tool. (R. 245-1, Pl.'s Resp. to Def.'s Facts ¶ 20.) After Defendant finalized its transition from Plaintiff's FAST Tool to DSMTracker, Peterson received an email from Mahler on November 1, 2017, stating that all of Defendant's programs using the FAST Tool had been replaced by DSMTracker. (R. 198-1, Peterson Dep. Tr. at 185-86; R. 198-5 at 94, Mahler Nov. 1, 2017, Email.)

Defendant, therefore, terminated its business relationship with Plaintiff, (R. 198-1, Peterson Dep. Tr. at 185-86; R. 198-5, Mahler Nov. 1, 2017, Email), and, shortly thereafter, Plaintiff sent Defendant invoices No. 413 and 421, which charged Defendant for its use of the FAST Tool in November and December 2017. (R. 248, Def.'s Resp. to Pl.'s Facts ¶ 56; R. 245-16, Staszak Decl. at 3.) Plaintiff also sent Defendant invoice No. 422, which billed Defendant for the "kill fee" that is described in the MSA. (R. 248, Def.'s Resp. to Pl.'s Facts ¶ 57; R. 245-16, Staszak Decl. at 3-4.)

## PROCEDURAL HISTORY

Plaintiff filed this lawsuit on December 7, 2017. (R. 1, Compl.) On March 1, 2018, Plaintiff filed a seven-count amended complaint, which is the operative complaint. (R. 36, Am. Compl.) On July 31, 2018, the Court granted in part a motion to dismiss the amended complaint, which disposed of Plaintiff's unfair competition claims and a fraud claim. (R. 125, Order at 24-26.) What remains of the amended complaint are counts for: misappropriation of trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1832 and 1836 (Count I); breach of the SOWs and MSA (Counts II and III); unjust enrichment (Count IV); and promissory estoppel (Count V). (R. 36, Am. Compl. ¶¶ 194-269.) The amended complaint was styled as a verified amended complaint because Peterson verified that the facts alleged in the amended

complaint are true and correct under penalty of perjury. (R. 36, Am. Compl.; R. 37, Peterson Decl.) Along with its amended complaint, Plaintiff filed a motion for a temporary restraining order ("TRO"). (R. 49, Mot. for TRO.) The Court denied Plaintiff's motion for a TRO, (R. 117, Min. Entry; R. 123, Tr. at 3-4), and instead—consistent with Plaintiff's requests—advanced this case on an expedited basis. (R. 65, Min. Entry; R. 88, Min. Entry; R. 152, Order at 4-5.)

With discovery completed, (*see* R. 151, Min. Entry), Defendant now moves for summary judgment on all of the remaining counts in the amended complaint.[4] (R. 190, Am. Mot. for Summ. J.; R. 191, Mem. at 30.) Defendant argues that Plaintiff's DTSA claim fails because Plaintiff cannot identify with specificity the trade secrets that Defendant allegedly misappropriated. (*Id.* at 6-11.) Defendant also asserts that Plaintiff's DTSA claim cannot proceed to trial because it is undisputed that Plaintiff publicly disseminated the FAST Tool on the Internet, and because Plaintiff failed to reasonably protect the FAST Tool's secrecy. (*Id.* at 11-16.) Finally, Defendant argues that summary judgment is proper on Plaintiff's DTSA claim because Plaintiff does not own the FAST Tool and because the FAST Tool's features and functions were readily ascertainable to Defendant through general industry knowledge. (*Id.* at 16-20.)

Defendant argues that the Court should grant summary judgment on Plaintiff's breach of contract and unjust claims because Defendant paid all amounts owed to Plaintiff under the parties' contract until the contract expired. (*Id.* at 20-27.) Defendant maintains that summary judgment is also warranted as to Plaintiff's promissory estoppel claim because Plaintiff fails to provide any evidence that can support the elements of a promissory estoppel claim. (*Id.* at

---

[4] Defendant filed a motion for summary judgment on September 14, 2018, (R. 154, Mot. for Summ. J.), but that motion was withdrawn after the Court granted Defendant leave to file an amended motion for summary judgment. (R. 186, Min. Entry.) The amended motion for summary judgment that Defendant filed on October 23, 2018, (R. 190), is the latest and operative motion for summary judgment.

27-28.) In the alternative, Defendant argues that its liability must be capped at $742,188 because a limitation of liability provision in the parties' contract limits Defendant's monetary liability to that amount. (*Id.* at 28-30.)

In response, Plaintiff argues that the existence of a trade secret is a question of fact, and therefore the Court cannot grant summary judgment on Plaintiff's DTSA claim. (R. 245, Resp. at 4-5.) Plaintiff contends that, in any event, it has sufficiently identified the trade secrets at issue that were misappropriated. (*Id.* at 5-9.) Plaintiff further maintains that it reasonably protected the secrecy of its FAST Tool because Plaintiff did not disclose any information about its FAST Tool through the Internet that would allow a party to reverse-engineer the FAST Tool. (*Id.* at 9-11.) Plaintiff also argues that there are other disputed issues of fact that preclude this Court from finding, as a matter of law, that Plaintiff failed to reasonably protect the FAST Tool's secrecy. (*Id.* at 11-14.) Additionally, in Plaintiff's view, there are factual disputes as to whether the FAST Tool was readily ascertainable through industry knowledge and whether Plaintiff owned the FAST Tool. (*Id.* at 14-18.)

Plaintiff argues that summary judgment is not proper on its breach of contract claims because there is conflicting evidence as to the precise terms of the parties' contract. (*Id.* at 18-26.) With respect to its unjust enrichment claim, Plaintiff argues that the Court should deny summary judgment if the Court finds that the parties lacked an enforceable contract covering development and licensing of the FAST Tool. (*Id.* at 26-27.) Finally, Plaintiff argues that it provides enough evidence to proceed to trial on its promissory estoppel claim, and that the parties' contract does not limit Defendant's monetary liability. (*Id.* at 27-30.)

Both parties also move to strike portions of the record. Specifically, Defendant moves to strike: several exhibits that it claims Plaintiff failed to produce before the close of discovery;

evidence that Defendant asserts is opinion testimony; other evidence that Defendant claims is inadmissible hearsay, lacking in foundation, or otherwise not admissible under the Federal Rules of Evidence; and several exhibits and deposition excerpts that Plaintiff failed to cite in its Local Rule 56.1 statement of facts. (R. 225, Def.'s Mot. to Strike at 1; R. 228, Mem. at 1, 15.) Defendant also moves to exclude certain opinions of Plaintiff's expert, Ricardo Valerdi ("Valerdi"), that Plaintiff relies on to defeat summary judgment. (R. 230, Mot. to Exclude Expert at 1; R. 231, Mem. at 1-2, 15.) Plaintiff moves to strike paragraphs 44-46 of Defendant's Local Rule 56.1 statement, which deal with Plaintiff's claimed failure to keep secret its FAST Tool by posting a video demonstrating the FAST Tool's features on the Internet. (R. 221, Pl.'s Mot. to Strike at 1-4.) Plaintiff argues that these statements are not properly supported by admissible evidence and should be stricken. (*Id.*)

Finally, Plaintiff moves to compel Defendant to compensate Plaintiff's experts pursuant to Federal Rule of Civil Procedure 26(b)(4)(E)(i). (R. 271, Mot. at 11.) Defendant opposes this motion, arguing that it is premature and should not be considered until after trial, and that Plaintiff's requested expert fees are unreasonable. (R. 278, Resp. at 1.) This motion, the motion for summary judgment, and the motions to strike are fully briefed and ripe for the Court's consideration. (*See* R. 283, Reply; R. 247, Reply; R. 220, Min. Order.)

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotation omitted). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 610 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In deciding whether a dispute exists, the Court must "consider all of the evidence in the record in the light most favorable to the non-moving party[] and . . . draw all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018) (quotation omitted).

Under Rule 56, the movant has the initial burden of establishing that a trial is not necessary. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). "That burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* (quotation omitted). If the movant carries this burden, the nonmovant "must make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (quotation omitted). The nonmovant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in [his or her] favor." *Id.* (quotation omitted). "Inferences supported only by speculation or conjecture will not suffice," and neither "will the mere scintilla of evidence." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). In addition, not all factual disputes will preclude the entry of summary judgment but only disputes of material fact—"irrelevant or unnecessary factual disputes do not preclude summary judgment." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (internal quotation omitted). "[T]he substantive law will identify which facts are material." *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (quotation omitted).

In deciding a summary judgment motion, the Court cannot weigh conflicting evidence, assess the credibility of the witnesses, or determine the ultimate truth of the matter, as these are functions of the jury. *Anderson*, 477 U.S. at 255; *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011). Instead, the Court's function is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (quoting *Anderson*, 477 U.S. at 249).

## ANALYSIS

### I.  Motions to Strike and Exclude Evidence

As a preliminary matter, the parties move to strike each other's proffered evidence. Defendant moves to strike: exhibits that Plaintiff failed to timely produce in discovery; portions of Peterson's and Staszak's declarations; deposition exhibits not cited in Plaintiff's Local Rule 56.1 statement of material facts; and "numerous exhibits and deposition excerpts that are inadmissible because they contain hearsay, lack foundation, or are otherwise inadmissible[.]" (R. 225, Def.'s Mot. to Strike at 1; R. 228, Mem. at 1.) Defendant also asks this Court to exclude certain opinions of Plaintiff's expert witness, Valerdi. (R. 230, Mot. to Exclude Expert at 1.) Plaintiff moves to strike paragraphs 44 through 46 of Defendant's Local Rule 56.1 statement of material facts. (R. 221, Pl.'s Mot. to Strike at 4.) The Court addresses each motion in turn.

#### A.  Defendant's Motions

##### 1.  Motion to Strike Plaintiff's Summary Judgment Exhibits

Defendant's first motion asks the Court to strike a variety of documents that Plaintiff submits in opposition to Defendant's motion for summary judgment, starting with nondisclosure agreements between Plaintiff and third parties that Plaintiff did not produce before the close of discovery. (R. 228, Mem. at 3-5.) Plaintiff does not dispute that it failed to produce these

agreements; rather, it argues that its failure to produce them was substantially justified or harmless. (R. 264, Resp. at 5-11.)

Under the Federal Rules, a party may not rely on documents to oppose summary judgment if they were not produced in discovery, "unless the failure [to produce] was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). Whether Plaintiff's failure to produce the agreements is substantially justified or harmless, "is entrusted to the broad discretion of the district court," with the following factors guiding the Court's analysis: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

Weighing the above factors, the Court concludes that Plaintiff's failure to produce the nondisclosure agreements between Plaintiff and third parties is substantially justified and harmless. These agreements pose little prejudicial effect or surprise to Defendant on summary judgment because Peterson testified at a deposition that Plaintiff required third parties to sign nondisclosure agreements, and Peterson specifically referenced two of these agreements in his deposition. (R. 198-1, Peterson Dep. Tr. at 64, 84-86, 99-102, 114-17.) Plaintiff submits evidence showing that this error was due to the parties' agreement regarding search terms they devised to gather and produce electronically-stored information, and not because of any bad faith or gamesmanship. (R. 264-5, Armstrong June 2, 2018, Email at 1.) Indeed, the parties do not dispute that these search terms yielded tens of thousands of documents produced in discovery. (*See id.*, R. 125, Order at 34-37.) The Court also finds that the tardy production of these nondisclosure agreements will cause little or no disruption to the trial, given that the trial date for

this case has been vacated and has yet to be rescheduled. (R. 151, Min. Entry.) Weighing the above factors that guide the Court's analysis, the Court denies Defendant's motion to strike the nondisclosure agreements that were produced after the discovery deadline. *See World Kitchen, LLC v. Am. Ceramic Soc'y*, No. 12-CV-8626, 2015 WL 7568369, at *2-3 (N.D. Ill. Nov. 24, 2015) (denying request to exclude evidence where there was little prejudice and any burden caused by late disclosure could be cured); *Berman v. Stryker Corp.*, No. 11 C 1309, 2013 WL 5348324, at *2 (N.D. Ill. Sept. 24, 2013) (declining to exclude evidence produced after deadline where there was "little surprise," "no prejudice," and "no basis for inferring willfulness"). The Court, however, grants Defendant's request that Plaintiff produce full metadata for the nondisclosure agreements and any correspondence related to these documents. (R. 228, Mem. at 5.) Plaintiff shall produce this information within 14 days of the date of this order.

Next, Defendant argues that the Court should strike portions of Peterson's and Staszak's declarations because they are improper opinion evidence and not based on personal knowledge. (*Id.*) Defendant argues that Peterson has no personal knowledge of the functionality of Defendant's software and that Staszak has no personal knowledge of Defendant's employees logging into the Next System Back End, and that they both obtained such knowledge from documents that Defendant produced in discovery. (*Compare id.* at 6-7, *with* R. 245-1, Peterson Decl. at 12-14, *and* R. 245-16, Staszak Decl. at 3.) Defendant, however, overlooks a critical rule regarding evidence used on summary judgment—that Plaintiff's cited materials are objectionable only if they "cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2). Thus, Plaintiff's evidence need not be admissible in form, but must be admissible in content. *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016). Even if Peterson and Staszak have no personal knowledge of the facts in the challenged portions of their

declarations, Defendant has failed to show how the documents that provide the basis of their knowledge cannot be otherwise presented in an admissible form at trial through a witness who does have personal knowledge. *See* FED. R. CIV. P. 56(c)(2); *see, e.g., Rao v. Gondi*, No. 14 C 66, 2017 WL 2445131, at *3 (N.D. Ill. June 5, 2017) (denying motion to strike documents that were not authenticated because "the challenged documents were produced by Defendants or their agents during discovery and are likely to be authenticated at trial"). Accordingly, the Court denies Defendant's motion to strike portions of Peterson's and Staszak's declarations.[5]

Defendant then moves to strike a variety of exhibits that fall into one of the following categories: (1) documents that Plaintiff created for this litigation; (2) emails, spreadsheets, unsigned agreements, and other documents that were produced in discovery that Defendant argues are hearsay or lack foundation; and (3) deposition testimony that Defendant argues is impermissible opinion evidence, hearsay, lacks foundation, or not based on personal knowledge. (R. 228, Mem. at 8-13.) As to the first category of evidence, the Court denies Defendant's motion to strike these documents because the Court does not need to consider those documents to resolve the motion for summary judgment. *See DRL Enters., Inc. v. N. Atl. Operating Co., Inc.*, 301 F. Supp. 3d 824, 832 n.6 (N.D. Ill. 2018) (declining to exclude evidence at the summary judgment stage because the contents of the evidence did not change the outcome); *Flores v. Lackage*, 938 F. Supp. 2d 759, 779 n.14 (N.D. Ill. 2013) ("The Court need not resolve these threshold issues, because even assuming that [the plaintiff's] documents . . . are admissible

---

[5] Defendant also objects to conclusory assertions that Staszak makes in her declaration based on the documents that Defendant produced. (*See* R. 228, Mem. at 7; R. 245-16, Staszak Decl. at 4.) Because these are conclusory assertions and not assertions of fact, the Court does not consider them in its analysis of Defendant's motion for summary judgment. *See Daugherty v. Page*, 906 F.3d 606, 611 (7th Cir. 2018) ("[C]onclusory assertions . . . cannot create a genuine issue of material fact, particularly without any evidence about what . . . defendant may have done or not done.").

(thus giving him the benefit of the doubt), he cannot show that there is a genuine issue of material fact regarding [the defendant's] municipal liability, as explained in the text.").

With respect to the second and third categories of evidence that are objected to as hearsay or lacking in foundation, Defendant again overlooks that Plaintiff's cited materials are objectionable only if they cannot be presented in a form that would be admissible at trial. FED. R. CIV. P. 56(c)(2); *Wheatley*, 826 F.3d at 420. For example, Defendant repeatedly objects to documents as hearsay, such as an email from Peterson to an employee of Defendant, (R. 228, Mem. at 10), but it is clear that the content of these emails can be admitted at trial through Peterson who has personal knowledge of the contents of his own email. *See* FED. R. EVID. 602 (providing that witness may testify about matters he or she has personal knowledge), 801(c) (providing that hearsay applies to out-of-court statements of witnesses not testifying at trial). Defendant's motion lacks any argument that these categories of evidence cannot be presented in a form that would be admissible at trial, and therefore the Court finds that Defendant fails to carry its burden to show that such evidence is inadmissible for any purpose. *See Boyce v. Wexford Health Sources, Inc.*, No. 15 C 7580, 2017 WL 1436963, at *3 (N.D. Ill. Apr. 24, 2017) (declining to strike evidence because, among other reasons, the party moving to strike did not suggest that the cited exhibits were inadmissible in any form), *appeal dismissed*, No. 17-2271, 2017 WL 6501490 (7th Cir. Aug. 23, 2017); *Minn. Life Ins. Co. v. Kagan*, 847 F. Supp. 2d 1088, 1093 (N.D. Ill. 2012) ("[A]bsent any arguments that . . . documents and other business records cannot be presented in a form that would be admissible in evidence at trial, the Court declines to

strike [the defendant's] facts that rely on these documents." (quotation omitted)), *aff'd*, 724 F.3d

843 (7th Cir. 2013).[6]

Finally, Defendant moves to strike evidence that Plaintiff never cited to in its Local Rule

56.1 statement. (R. 228, Mem. at 14-15.) This request is denied because Rule 56 provides that

"[t]he court need consider only the cited materials, *but it may consider other materials in the*

*record.*" Fed. R. Civ. P. 56(c)(3) (emphasis added). In sum, Defendant's motion to strike is

denied with the caveat that Plaintiff must produce to Defendant the metadata for the

nondisclosure agreements it failed to timely produce as well as any correspondence relating to

those nondisclosure agreements.

### 2.    Motion to Exclude Certain Opinions of Valerdi

Defendant also asks the Court to exclude parts of Valerdi's opinions that identify

Plaintiff's trade secrets and discuss whether Plaintiff revealed any trade secrets by posting videos

of the FAST Tool on the Internet. (R. 231, Mem. at 4-15.) The Court denies the motion to

exclude because the Court can resolve Defendant's motion for summary judgment without

relying on Valerdi's opinions. *See DRL Enters., Inc.*, 301 F. Supp. 3d at 832; *Flores*, 938 F.

Supp. 2d at 779 n.14. More specifically, while Valerdi offers his opinion identifying Plaintiff's

trade secrets, whether Plaintiff has delineated its trade secrets with enough specificity to survive

summary judgment can be determined by facts in the record and applicable law without

consideration of Valerdi's opinion. *See Composite Marine Propellers, Inc. v. Van Der Woude*,

---

[6] In addition to the hearsay and lack of foundation objections, Defendant also argues that the deposition of testimony of Christopher Barden is improper lay opinion, because he is not qualified as an expert to opine on the meaning of the parties' contract. This argument is rejected because Barden may testify to his own personal understanding of Defendant's contract with Plaintiff based on his experience working for Defendant, which is not based on scientific, technical, or other specialized knowledge. *See United States v. Joy*, 192 F.3d 761, 767 (7th Cir. 1999) ("[P]ersonal knowledge includes opinions and inferences grounded in observations or other first-hand experiences.").

962 F.2d 1263, 1266 (7th Cir. 1992) ("The plaintiff must show concrete secrets."). As for Valerdi's opinion as to whether videos posted on the Internet revealed Plaintiff's trade secrets, the Court again finds that Valerdi's opinions are unnecessary because this issue is too factual for resolution on summary judgment. *See Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 725 (7th Cir. 2003) ("Whether the measures taken by a trade secret owner are sufficient . . . ordinarily is a question of fact for the jury."); *Peerless Indus., Inc. v. Crimson AV LLC*, No. 11 C 1768, 2015 WL 1275908, at *13 (N.D. Ill. Mar. 17, 2015) (denying summary judgment because there was evidence that the defendant gained business advantages it did not have until it gained access to the plaintiff's confidential information, because plaintiffs in trade secret cases must oftentimes "construct a web of perhaps ambiguous circumstantial evidence" to convince a jury). Accordingly, Defendant's motion to exclude parts of Valerdi's opinions is denied.[7]

**B.    Plaintiff's Motion**

Plaintiff asks the Court to strike paragraphs 44 through 46 of Defendant's statement of facts because they are based on the declaration of Peter Uhlenhake ("Uhlenhake"), a paralegal at the law firm representing Defendant, who, according to Plaintiff, lacks personal knowledge of the matters set forth in his declaration and impermissibly offers opinion testimony as to whether videos posted on the Internet revealed Plaintiff's trade secrets. (R. 221, Pl.'s Mot. to Strike at 1-4.) Uhlenhake states that he personally viewed the videos that are the subject of his declaration, (R. 193, Uhlenhake Decl. at 1), and he may testify as to relevant matters that he personally witnessed. *See* FED. R. EVID. 402, 602. Uhlenhake is not offering opinion testimony,

---

[7] The Court's denial of this motion at this stage is without prejudice to a more developed motion to exclude Valerdi from testifying at trial. Unlike the summary judgment stage, the focus at trial is no longer whether Valerdi's testimony is necessary to create a triable issue. *See* FED. R. CIV. P. 56(a).

but testimony of what he observed based on his personal knowledge and inferences about the software he saw in the videos. *See United States v. Proano*, 912 F.3d 431, 441 (7th Cir. 2019) ("Personal knowledge can include reasonable inferences drawn from a witness's observations and firsthand experiences."); *cf. United States v. York*, 572 F.3d 415, 420 (7th Cir. 2009) ("[O]pinions or inferences, drawn from facts outside the witness's first-hand knowledge of the case, are admissible only as expert testimony."). The Court, therefore denies Plaintiff's motion to strike.

## II.    Breach of the MSA

Turning to the merits, the Court first addresses Plaintiff's breach of contract claims because Plaintiff's other claims depend in part on the scope and provisions of the parties' contract.[8] (*See* R. 197, Mem. at 18-20, 27-30; R. 45, Resp. at 16-17, 26-30.) Plaintiff claims that Defendant breached the MSA in two different ways: (A) by failing to pay the MSA's early cancellation fee or "kill fee"; and (B) by breaching the nondisclosure provisions in the MSA that protect Plaintiff's confidential information and trade secrets. (R. 245, Resp. at 23-25.)

### A.    Failure to Pay the "Kill Fee"

Defendant argues that the MSA expired before Defendant terminated Plaintiff, and therefore the kill fee for early termination was not triggered. (R. 191, Mem. at 5-6, 22-25.) Plaintiff, on the other hand, argues that the parties issued an SOW pursuant to the MSA before the MSA's expiration that extended the MSA's term and kept the MSA's kill fee provision in effect at the time Defendant terminated Plaintiff. (R. 245, Resp. at 21-23.)

---

[8] For example, the parties dispute whether Plaintiff owns the alleged trade secret at issue pursuant to the MSA. (R. 197, Mem. at 18-20; R. 245, Resp. at 16-17.) The parties also dispute whether the existence of an express contract and the terms of their contract preclude Plaintiff's claims for unjust enrichment and promissory estoppel or, in the alternative, limit Defendant's liability in this case to $742,188. (R. 197, Mem. at 27-30; R. 245, Resp. at 26-30.)

The MSA provides that it "shall remain in force" for a defined "Term," which the MSA defines as April 1, 2014, until April 1, 2016, "unless the Parties agree in writing to extend the Term, or unless [the] Agreement is earlier terminated[.]" (R. 36-1, MSA at 1, 2.) The MSA also provides, however, that "[a]ll obligations incurred under this Agreement *shall survive the Term until satisfied.*" (*Id.* at 1 (emphasis added).) The Court has construed these provisions to mean that the MSA remains in effect after April 1, 2016, if an SOW was issued pursuant to the MSA before April 1, 2016, and not fully performed by April 1, 2016.[9] (R. 125, Order at 14-16.) Plaintiff argues that a "Consumers Energy SOW" was executed under the MSA in August 2015 that extended the MSA's term past the date that Defendant terminated Plaintiff. (R. 245, Resp. at 20-21; R. 247, Reply at 19.) The Court, however, rejects Plaintiff's argument because there is no evidence that the Consumers Energy SOW was issued pursuant to the MSA.

---

[9] Defendant asks that the Court reconsider this interpretation, but the Court declines to do so. Defendant reasons that the MSA's term must end for obligations to "survive" the term. (R. 191, Mem. at 24-25.) This argument does not say much, if anything at all—following Defendant's logic, even if the MSA's term must end for obligations under the MSA to "survive," those surviving obligations still exist and are to be enforced as part of the original MSA with all of the MSA's other provisions. *See City of Houston v. Williams*, 353 S.W.3d 128, 145 (Tex. 2011) ("[W]e look to the entire agreement, giving effect to all its provisions."); *see also Litton Bus. Sys., Inc. v. N.L.R.B.*, 501 U.S. 190, 206 (1991) ("[A]n expired contract has by its own terms released all its parties from their respective contractual obligations, *except obligations already fixed under the contract but as yet unsatisfied.*" (emphasis added)). Defendant argues that the Court's interpretation would lead to unintended consequences such as a continuing obligation to pay licensing fees until the MSA's nondisclosure provisions expire, but the MSA provides that "[a]ll obligations incurred under this Agreement shall survive the Term until satisfied." (R. 36-1, MSA at 1.) This envisions that some obligations under the parties' agreement—such as paying licensing fees—might be satisfied and no longer survive the MSA's term, while other obligations—such as maintaining confidentiality—are unsatisfied and do survive the MSA's term. Whether breach of either obligation triggers the "kill fee" depends on whether Defendant "terminate[d]" the MSA without cause or for any other reason than Plaintiff's breach. (*Id.* at 6.) Thus, the Court's interpretation allows confidentiality obligations to persist without a continuing obligation to pay licensing fees or a kill fee.

Under Texas law,[10] "[t]he goal of contract interpretation is to ascertain the parties' true intent as expressed by the plain language they used." *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017). To that end, contract terms are given "their plain and ordinary meaning unless the instrument indicates the parties intended a different meaning." *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009). If the "contract's language can be given a certain or definite legal meaning or interpretation, then the contract is not ambiguous," and the Court "will construe it as a matter of law." *El Paso Field Servs., L.P.*, 389 S.W.3d at 806. "But, if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue on the parties' intent." *Id.* (internal quotation omitted).

The plain language of the MSA provides that Defendant is granted "exclusive licensing rights" to Plaintiff's "digital rebate portal processing system, point of sale systems[,] and reward fulfillment services," and that the parties "may agree to extend the scope of uses to the [licensing rights] by signed agreement or signed SOW." (R. 245-1, Pl.'s Resp. to Def.'s Facts ¶ 8.) The MSA also provides that additional services not specified in the contract must be "memorialized as a[n] SOW and signed by both parties." (*Id.*) The MSA requires a "standardized template" for SOWs that must "include the business unit and division, an associated SOW number and define the Client and program names, data requirements, terms and conditions, reward choices,

---

[10] In its order on the motion to dismiss, the Court ruled that Texas law applies to Plaintiff's contract claims arising under the MSA, and that Illinois law applies to the remaining state-law claims because the parties did not raise a choice-of-law issue related to those claims. (R. 125, Order at 11-13.) The parties do not raise any choice of law issues in their summary judgment briefs. (*See generally*, R. 191, Mem. (putting forward no argument on choice of law); R. 245, Resp. (same).) The Court, therefore, adheres to its prior choice of law decision and will apply Texas law to Plaintiff's claim for breach of the MSA and Illinois law for Plaintiff's other state-law claims. *See Sound of Music Co. v. Minn. Mining & Mfg. Co.*, 477 F.3d 910, 915 (7th Cir. 2007) ("Illinois courts generally adhere to a contract's choice of law provisions[.]"); *Selective Ins. Co. of S.C. v. Target Corp.*, 845 F.3d 263, 266 (7th Cir. 2016) ("If no party raises a choice of law issue to the district court, the federal court may simply apply the forum state's substantive law." (quotation omitted)), *as amended* (Jan. 25, 2017).

communication requirements, and Client or partner cascading legal language, as needed." (*Id.*)
The MSA also provides that it "cannot be modified except in writing signed by both parties."
(*Id.*) Because the MSA does not cover the Consumers Energy scheduling tool, the MSA's plain
language requires the parties to execute a signed SOW or other writing signed by both parties to
have the development or licensing of the Consumer Energy scheduling tool be an obligation
arising under the MSA that could have extended the MSA's term. *See Dynegy Midstream Servs.,
Ltd. P'ship*, 294 S.W.3d at 168; *El Paso Field Servs., L.P.*, 389 S.W.3d at 806.

Plaintiff, however, does not present any evidence of a signed SOW for the scheduling
tool and only points to unsigned SOWs. (R. 245, Resp. at 21; R. 248, Def.'s Resp. to Pl.'s Facts
¶ 24.) Relying on the Texas Uniform Electronic Transactions Act ("TUETA"), TEX. BUS. &
COM. CODE ANN. §§ 322.003, 322.007, Plaintiff argues that although the Consumers Energy
SOWs were unsigned, "the body of email correspondence between [Plaintiff] and [Defendant]"
regarding the Consumers Energy scheduling tool "constitutes a signature under Texas Law."
(R. 245, Resp. at 21-22.) The Court disagrees.

TUETA provides that "[a] contract may not be denied legal effect or enforceability solely
because an electronic record was used in its formation." TEX. BUS. & COM. CODE ANN.
§ 322.007(b). Thus, "[i]f a law requires a signature, an electronic signature satisfies the law." *Id.*
§ 322.007(d). TUETA defines an electronic signature as "an electronic sound, symbol, or process
attached to or logically associated with a record and executed or adopted by a person with the
intent to sign the record." *Id.* § 322.002(8). TUETA's provisions, however, only apply to
"transactions between parties each of which has agreed to conduct transactions by electronic
means." *Id.* § 322.005(b). "Whether the parties agree to conduct a transaction by electronic

means is determined from the context and surrounding circumstances, including the parties' conduct." *Id.*

Plaintiff presents no evidence from which a reasonable fact finder could conclude that the parties' email conversations are "an electronic sound, symbol, or process attached to or logically associated" with the unsigned Consumers Energy SOWs, nor does Plaintiff put forward any evidence showing that the parties intended to execute SOWs by a series of email conversations. Instead, the email communications that Plaintiff references indisputably show that the parties did not intend the Consumers Energy scheduling tool to be part of the MSA.

The parties do not dispute that Peterson sent Defendant's representatives an email attaching the Consumers energy scheduling tool and that he sent Defendant's representatives, including Johns, an email on February 27, 2015, that inquired about the parties' relationship related to the Consumers Energy scheduling tool. (R. 248, Def.'s Resp. to Pl.'s Facts ¶ 24.) In the email, Peterson states "[h]ave you decided how you would like to operate going forward with respect to contract support of the Scheduling Wizard?" (R. 245-5 at 18-19, Feb. 27, 2015, Peterson Email.) Johns forwarded this email to Diffley and noted that there was no agreement on the SOW by commenting to Diffley that he had "been totally and expressly noncommittal in [his] communications with [Peterson]." (R. 245-5 at 18, February 27, 2015, Johns Email.)

Peterson again emailed Defendant's representatives seeking clarity as to the MSA on August 4, 2015, stating that with respect to the scheduling tool for the Consumer Energy project, "[i]t is my position that [it] will continue to be provided under the umbrella of the original Licensing Agreement pursuant to [the] Booking tool being added to the Licensing Agreement." (R. 245-5 at 26, Peterson Aug. 4, 2015, Email.) In the same email, Peterson referred to this software tool as a "New Product not covered in the original Licensing agreement," and that he

would "continue to provide support and development . . . with the assumption that [the parties] are going to secure an Addendum Agreement covering" the scheduling tool. (*Id.*) Peterson clarified in a later email that "[p]er [Diffley's] direction, [Plaintiff] has engaged with [Mahler and Johns] to add the Scheduling Tool to the current Licensing Agreement. But this has not been completed yet[.]" (R. 245-5 at 22, Peterson Aug. 4, 2015, Email.) He further noted that "[w]e were asked to develop the . . . Scheduling Tool with no promises of it being used—we did it on spec," and that "[i]t turned out to be a good solution for Consumers and [Defendant] and now we are working . . . to determine the Scheduling Tool addendum agreement terms moving forward for the additional services/software not included in the original Contract." (*Id.* at 24.) Based on these discussions, no reasonable jury could infer an agreement to the terms of the unsigned SOWs, or that any of Defendant's representatives intended the parties' email conversations to constitute a "signature" or acceptance of the Consumers Energy SOWs.

Plaintiff references an August 14, 2015, email conversation between Peterson and Johns that Plaintiff claims is part of the "electronic signature" to the Consumers Energy SOW, but in that conversation, Peterson asked for an "update/direction" on the Consumers Energy project and Johns responded that the two should "talk next week about details and duration." (R. 248, Def.'s Resp. to Pl.'s Facts ¶ 26; R. 245-5 at 30, Johns August 14, 2015, Email.) Plaintiff points to Johns' testimony in which Johns acknowledges that he was given permission to pay a monthly licensing fee for the Consumers Energy tool, but nowhere in Johns' email discussions or in his testimony did he state that this licensing fee would be paid pursuant to the MSA or that the parties would operate under the terms of the unsigned Consumer Energy SOWs. (R. 245-5 at 30, Johns Aug. 14, 2015, Email; R. 243-4, Johns Dep. Tr. at 126-30.) Instead, Plaintiff does not dispute that the parties referred to the agreement covering the Consumers Energy scheduling tool

as a "gentleman's agreement" and a "new agreement with [Plaintiff] for scheduling services."
(R. 245-1, Pl.'s Resp. to Def.'s Facts ¶ 59.)

The Court concludes that the Consumers Energy SOW was not issued pursuant to the MSA and that TUETA does not apply here because no reasonable jury could conclude that the parties agreed to execute SOWs by a series of emails such as the emails Plaintiff relies upon. *See* TEX. BUS. & COM. CODE ANN. § 322.005(b). The MSA provides that SOWs are to be in writing, signed, and that they "will follow a standardized template and include the business unit and division, an associated SOW number and define the Client and program names, data requirements, terms and conditions, reward choices, communication requirements, and Client or partner cascading legal language, as needed." (R. 36-1, MSA at 2.) The MSA indisputably bars an SOW from being executed by a series of emails without this contractually-required information, and therefore the Court rejects Plaintiff's argument that the Consumers Energy SOW was executed through a series of emails pursuant to TUETA. *See El Paso Field Servs., L.P.*, 389 S.W.3d at 806 (explaining that where a contract's language is unambiguous, a court may construe the contract as a matter of law); *see also Celmer v. McGarry*, 412 S.W.3d 691, 701 (Tex. App. 2013) (reversing jury verdict in part and ruling that where the defendant explicitly requested a writing to memorialize the parties' agreement rather than agreeing to conduct transactions by electronic means, "the evidence as a whole [did] not rise to a level that would enable reasonable and fair-minded people to differ in their conclusions regarding whether [the defendant] agreed to conduct transactions by electronic means"); *2001 Trinity Fund, LLC v. Carrizo Oil & Gas, Inc.*, 393 S.W.3d 442, 452-53 (Tex. App. 2012) (finding that there was no issue of fact as to whether the parties entered into an agreement through a series of emails where

"the negotiations, alleged offers, and alleged acceptances in the case under review are in writing and the language of these writings is unambiguous").

Even if the parties had agreed to allow the execution of an SOW through a series of emails without the contractually-required information for SOWs described above, the Court concludes that no reasonable jury could find that the parties' emails qualify as a "signature" under TUETA. As noted above, an electronic signature is "an electronic sound, symbol or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record." TEX. BUS. & COM. CODE ANN. § 322.002(8). There is no evidence that the August 14, 2015, email in which Johns acknowledges that he was given permission to pay a monthly licensing fee for the Consumers Energy scheduling tool makes any reference to or is logically associated to the unsigned Consumer Energy SOWs that Peterson sent to Defendant's representatives. (R. 245-5 at 30, Johns August 14, 2015, Email; R. 243-4, Johns Dep. Tr. at 126-30.) Rather, it is undisputed that the parties understood that the agreement related to the Consumers Energy scheduling tool was a "new agreement." (R. 245-1, Pl.'s Resp. to Def.'s Facts ¶ 59.) The Court therefore finds, as a matter of law, that the Consumers Energy SOW was not issued pursuant to the MSA such that it could have extended the MSA's term. *See Cunningham v. Zurich Am. Ins. Co.*, 352 S.W.3d 519, 530 (Tex. App. 2011) (affirming summary judgment that the parties did not enter into a settlement agreement by email because there was no "marking executed or adopted by [the defendant's counsel] with the intent to sign" and the plaintiff failed to direct the court "to any other place in the record raising a fact issue about" the intention of Defendant's counsel to sign the settlement agreement); *cf. Stanley D. Bujnoch, Life Estate v. Copano Energy, LLC*, No. 13-15-00621-CV, 2017 WL 6616741, at *5 (Tex. App. Dec. 28, 2017) (finding party not entitled to summary judgment based on argument that no agreement

existed because "a fact issue exist[ed] regarding whether [a party to the contract] evinced an intent to sign").

Plaintiff's claim for breach of the MSA is based on Defendant's termination of Plaintiff in November 2017 without paying the MSA's kill fee. (R. 36, Am. Compl. ¶¶ 213-22; R. 248, Def.'s Resp. to Pl.'s Facts ¶¶ 53, 56-57.) Defendant, however, has shown there is no evidence to support Plaintiff's argument that the MSA was extended beyond April 1, 2016; therefore, Plaintiff must come forward with evidence that would allow it to establish that the MSA was in effect beyond April 1, 2016, such that Defendant could have breached the MSA by terminating Plaintiff too soon. *See Sterk*, 770 F.3d at 627. Because Plaintiff fails to come forward with any evidence that the Consumers Energy SOW extended the MSA's term or any evidence that any other SOW or writing extended the MSA's term beyond April 1, 2016, there is no dispute that the MSA expired before any breach could have occurred. *See Craft v. John H. Harland Co.*, No. CIV.A. 305CV2421-D, 2007 WL 2325590, at *5 (N.D. Tex. Aug. 14, 2007) (applying Texas law and finding that defendant did not breach contractual obligation because it had expired); *Mangione v. Gov't Pers. Mut. Life Ins. Co.*, No. 04-01-00655-CV, 2002 WL 1677457, at *3 (Tex. App. July 24, 2002) (affirming summary judgment on breach of contract claim where contractual provision expired before any breach occurred). Accordingly, the Court grants summary judgment in Defendant's favor on Plaintiff's count for breach of the MSA to the extent that count is premised on Plaintiff's failure to pay the MSA's kill fee.

Plaintiff argues that if no MSA existed after April 1, 2016, it "begs the question" as to what the operative terms of the parties' agreements were after April 1, 2016. (R. 245, Resp. at 19.) This argument misapprehends Defendant's burden on summary judgment, which is to show

the absence of evidence to support Plaintiff's case rather than to establish that the terms of the parties' agreements are different from what Plaintiff claims. *See Sterk*, 770 F.3d at 627.

Next, Plaintiff argues that the MSA was extended because Mahler stated in a presentation that the MSA expired in April 2016 but that the parties "[t]ransitioned" to a "[m]onth-to-[m]onth" agreement. (R. 245, Resp. at 19.) This presentation, however, explicitly states that the MSA expired in April 2016, and it does not say that the parties were operating "month-to-month" under the MSA, nor is it evidence that the MSA was extended by a writing or SOW. (R. 245-4 at 12, March 1, 2017, Presentation; R. 245-1, Pl.'s Resp. to Def.'s Facts ¶ 65.) Rather, Plaintiff claims that he merely "understood" that there were SOWs issued pursuant to the MSA that were still in effect beyond the MSA's expiration date. (R. 245-1, Pl.'s Resp. to Def.'s Facts ¶ 65.) Peterson's understanding, however, is not enough because there is no dispute that the only SOW that could have been issued pursuant to the MSA and extended the MSA's term—the Consumers Energy SOW—was not issued pursuant to the MSA for the reasons set forth above.

Additionally, the MSA provides that it expires on April 1, 2016, and that it cannot be extended unless the parties agree "in writing" to extend the MSA's term. (R. 245-1, Pl.'s Resp. to Def.'s Facts ¶ 8.) There is no dispute that the parties agreed and understood that the MSA could only be extended by a written agreement. (R. 245-1, Pl.'s Resp. to Def.'s Facts ¶ 62; R. 198-5 at 71, Peterson March 1, 2016, Email.) Giving effect to the MSA's plain language, *see Dynegy Midstream Servs., Ltd. P'ship*, 294 S.W.3d at 168, and although Mahler's statements are evidence that another contract independent of the MSA may have existed between the parties after the MSA expired, Mahler's statements and the parties' course of dealing could not have, as

a matter of law, extended the MSA.[11] *See Cardinal Database Servs., LLC v. Kleski*, No. 1:15-CV-494 RP, 2015 WL 5062293, at *3 (W.D. Tex. Aug. 27, 2015) (explaining that "[u]nder Texas law, when parties initially operate under an express contract, but continue to operate in essentially the same manner after the contract has expired, the rights of the parties are determined under implied contract principles," but that the "resulting contractual relationship stems from a new, implied contract, not an extension of the old, expired contract"); *Joe N. Pratt Ins. v. Doane*, No. CIV.A. V-07-07, 2009 WL 3157337, at *11 (S.D. Tex. Sept. 25, 2009) (applying Texas law and noting that a contract cannot be modified orally if the contract is subject to the Statute of Frauds, which includes contracts that cannot be completely performed within one year from the day the contract is entered into). Even disposing of the requirement that the MSA be extended in writing, Mahler's statements in a presentation and the parties' course of dealing, which involved month-to-month invoicing, (R. 245-1, Pl.'s Resp. to Def.'s Facts ¶ 65), are simply insufficient for a reasonable jury to conclude that the parties agreed to extend the MSA. *See AMX Corp. v. Pilote Films*, No. 3:04-CV-2035-D, 2007 WL 1695120, at *4 (N.D. Tex. June 5, 2007) (granting summary judgment and finding that the parties' contract was not extended where the plaintiff only "presented evidence of the parties' conduct and course of dealing—shipping products, providing services (e.g., promoting, selling, and distributing AMX products), and issuing written invoices—not of an explicit oral agreement to extend the 1994 Agreement."), *on reconsideration in part*, No. 3:04-CV-2035-D, 2007 WL 2254943 (N.D. Tex. Aug. 7, 2007).

---

[11] Indeed, Peterson describes the extension of the MSA as an oral agreement: "[t]here was a verbal agreement and a written agreement in e-mail confirming the agreement." (R. 198-1, Peterson Dep. Tr. at 178.)

Finally, Plaintiff argues that the Court's decision on Defendant's motion to dismiss precludes a finding that the MSA expired. (R. 245, Resp. at 19-20.) The Court ruled, however, that Plaintiff had plausibly *alleged* that an SOW was issued pursuant to the MSA that extended the MSA's term. (R. 125, Order at 14-17.) The Court did not rule that Plaintiff presented enough evidence to create a triable issue of fact on that issue. (*See id.*) The purpose of a motion to dismiss "is to test the sufficiency of the allegations, not to address issues of fact or evidence." *Begeske v. Gen. Teamsters Union*, No. 09-CV-4009, 2010 WL 1541281, at *3 (N.D. Ill. Apr. 16, 2010). For the reasons stated above, Plaintiff has not come forward with sufficient evidence of an SOW or other writing that extended the MSA's term, and therefore Plaintiff cannot survive summary judgment by relying on allegations that survived a motion to dismiss. *See id.* Accordingly, the Court grants summary judgment on Plaintiff's claim that Defendant breached the MSA by failing to pay the MSA's kill fee, because the MSA had already expired when Defendant refused to pay the kill fee. *See Craft*, 2007 WL 2325590, at *5; *Mangione*, 2002 WL 1677457, at *3.

**B.     Breach of the MSA's Nondisclosure Provisions**

Plaintiff argues that its claim for breach of the MSA survives summary judgment because it has presented evidence that Defendant breached the nondisclosure provisions in the MSA, (R. 245, Resp. at 25), which, according to the MSA, "survive a period of three years following disclosure" of the confidential information to the "Receiving Party" and protect the confidentiality of trade secrets "until no longer protected by law." (R. 36-1, MSA at 3.) Defendant contends that this claim fails for the same reason Plaintiff's DTSA claim fails: Plaintiff's confidential information is not described with enough particularity, it is not secret or

confidential, it does not belong to Plaintiff, and it was readily ascertainable to Defendant through general industry knowledge. (R. 191, Mem. at 6-20, 26-27.)

The MSA provides that Defendant may not use or disclose confidential information to another person without Plaintiff's consent. (R. 36-1, MSA at 3.) Confidential information is defined in the MSA as any information "whose confidential nature has been made known" by Plaintiff to Defendant or any information, due to its "character and nature," that "a reasonable person under like circumstances would treat confidential." (*Id.*) Confidential information does not include, in relevant part, information that was already known to Defendant, became publicly known, or was independently developed by Defendant without using Plaintiff's confidential information. (*Id.*)

The Court finds that there is a triable issue as to whether Defendant breached the nondisclosure provisions in the MSA. Plaintiff presents evidence that it disclosed confidential information to Defendant while the MSA was in effect that Defendant in turn disclosed or used for unauthorized purposes. (*See* R. 248, Def.'s Resp. to Pl.'s Facts ¶¶ 25, 60-69.) First, Plaintiff presents evidence that its FAST tool was "confidential information" under the MSA, which the MSA broadly defines to include any information that a "reasonable person" would keep confidential under the circumstances. (*See* R. 36-1, MSA at 3.) Specifically, Plaintiff presents evidence showing that it required its software developers to refrain from disclosing information related to the FAST tool. (R. 245-11, Peterson Decl. ¶ 44.) Plaintiff also presents evidence showing that it restricted Defendant's full access to the FAST Tool to only those persons that needed full access to the FAST tool. (*Id.* ¶¶ 50-51.) Whether, pursuant to the MSA, the FAST Tool's "confidential nature ha[d] been made known" by Plaintiff to Defendant such that "a

reasonable person under like circumstances would" keep the FAST Tool confidential is a factual issue that the Court cannot resolve on summary judgment. (*See* R. 36-1, MSA at 3.)

The Court also finds that Plaintiff has presented enough evidence to survive summary judgment because the MSA's nondisclosure provisions broadly apply to any confidential information received while the MSA was in effect. (*See id.*) Plaintiff has presented evidence that Defendant was provided confidential information related to the FAST Tool in February 2016, before the MSA expired in April 2016. (R. 245-11, Peterson Decl. ¶ 20; R. 245-1, Pl.'s Resp. to Def.'s Facts ¶ 12.) Plaintiff has also proffered evidence showing that Defendant accessed Plaintiff's confidential information related to the FAST Tool without authorization in September 2016 through November 2017, (R. 248, Def.'s Resp. to Pl.'s Facts ¶¶ 79, 82-88; R. 245-11, Peterson Decl. ¶¶ 56-65),which is within the three-year period that Plaintiff's confidential information is protected under the MSA. (*See* R. 36-1. MSA at 3.) Based on the plain language of the MSA, which forbids Defendant's unauthorized use or disclosure of information a reasonable person would consider confidential for a period of three years after receipt of such information, the Court cannot decide as a matter of law whether Defendant breached the MSA's nondisclosure provisions. *See Ureteknologia De Mexico S.A. De C.V. v. Uretek (USA), Inc.*, No. H-16-2762, 2018 WL 4680603, at \*14 (S.D. Tex. Sept. 28, 2018) (denying summary judgment because the "testimony raise[d] a fact question whether [the defendant] breached confidentiality," and because if the "testimony prove[d] to be true and the confidentiality breach occurred after the execution of the NDA[,] [the defendant] may be responsible[.]"); *Simplified Telesys, Inc. v. Live Oak Telecom, L.L.C.*, 68 S.W.3d 688, 693-96 (Tex. App. 2000) (denying summary judgment for breach of nondisclosure provision where that provision covered "more than 'trade secrets,'" because the plaintiff presented evidence showing that the defendant used

plaintiff's information to develop a competing software program). As a result, the Court denies summary judgment as to Plaintiff's claim that Defendant breached the MSA's nondisclosure provisions.

Defendant argues that the FAST Tool is not confidential because Plaintiff posted videos of it on the Internet, (R. 191, Mem. at 12-13), but the parties dispute whether Plaintiff revealed any confidential or proprietary information about the FAST Tool by posting a video demonstration of the FAST tool on the Internet. (*See* R. 245-1, Pl.'s Resp. to Def.'s Facts ¶¶ 44-47; R. 248, Def.'s Resp. to Pl.'s Facts ¶ 69.) Similarly, though Defendant argues that Plaintiff failed to take reasonable steps to protect the confidentiality of the FAST Tool with independent contractors and third parties, (R. 191, Mem. at 14-15), Plaintiff provides evidence showing that it did not reveal proprietary and confidential information to such persons without adequate safeguards. (*See* R. 245-1, Pl.'s Resp. to Def.'s Facts ¶¶ 6, 11, 22-30; R. 248, Def.'s Resp. to Pl.'s Facts ¶¶ 3, 9, 25, 58-68.) Contrary to Defendant's assertions, (R. 191, Mem. at 16-17), Plaintiff also presents evidence showing that the FAST Tool was not readily ascertainable by Defendant or through general industry knowledge, because Defendant asked Plaintiff to build the FAST Tool and accessed Plaintiff's confidential information to reverse-engineer the FAST Tool. (R. 245-1, Pl.'s Resp. to Def.'s Facts ¶¶ 9-10, 12-14, 16, 78-79; R. 248, Def.'s Resp. to Pl.'s Facts ¶¶ 17, 27, 33, 43, 46, 70-88.) A reasonable jury, therefore, could infer that Defendant asked Plaintiff to build the FAST Tool and then attempted to copy it by using Plaintiff's secret information because the FAST Tool could not be reverse-engineered using common industry knowledge.

The Court likewise rejects Defendant's argument that the FAST Tool was not confidential because Plaintiff failed to designate materials related to the FAST Tool as

confidential. The MSA's nondisclosure provisions encompass all information that "a reasonable person under like circumstances would" consider confidential. (R. 36-1, MSA at 3.) Whether Plaintiff's software qualifies as "confidential information" under this description, is a fact-intensive inquiry that the Court cannot resolve on summary judgment. *See Quintel Tech., Ltd. v. Huawei Techs. USA, Inc.*, No. 4:15CV307, 2018 WL 271957, at *4-5 (E.D. Tex. Jan. 3, 2018) (denying summary judgment because there was a genuine issue of fact as to whether, pursuant to a nondisclosure agreement, the plaintiff "intended" that its information be kept confidential).

Finally, Defendant argues that it did not breach any duty of confidentiality owed to Plaintiff because Plaintiff comes forward with no evidence showing that it owns the FAST Tool. (R. 191, Mem. at 18-20.) The Court disagrees. Plaintiff has put forward evidence showing that it obtained the rights to the FAST Tool, (R. 245-8, Peterson Dep. Tr. at 136-37; R. 248, Def.'s Resp. to Pl.'s Facts ¶¶ 59-60), and while Defendant disputes this evidence, the Court cannot resolve this factual dispute on summary judgment. *See Anderson*, 477 U.S. at 255; *Omnicare*, 629 F.3d at 704-05. Accordingly, the Court denies Defendant's motion for summary judgment on Plaintiff's claim for breach of the MSA's nondisclosure provisions.

## III. Breach of the SOWs

Though the MSA expired in April 2016, Plaintiff claims that SOWs entered into after the MSA expired are separate, standalone agreements that Defendant breached. (R. 36, Am. Compl. ¶¶ 206-12; R. 245, Resp. at 22-23.) Defendant does not argue that summary judgment is proper on Plaintiff's claim for breach of the SOWs but instead argues that, to the extent any of the SOWs are standalone contracts, none of those contracts required Defendant to pay the MSA's kill fee. (R. 191, Mem. at 25-26.)

The Court focuses on invoices 413, 421, and 422, as those are the only invoices that Plaintiff claims were not paid pursuant to outstanding SOWs. (R. 245-1, Pl.'s Resp. to Def.'s Facts ¶¶ 69-72.) Plaintiff provides evidence that those invoices are related to Defendant's use of the FAST Tool on various projects. (*Id.* ¶ 71; R. 248, Def.'s Resp. to Pl.'s Facts ¶¶ 56-57; R. 245-16, Staszak Decl. at 2-4.). Thus, the narrow question on summary judgment is whether any SOW or enforceable agreement for the FAST Tool incorporated the kill fee provision from the MSA.

As noted above, the FAST Tool was not issued pursuant to the MSA such that it would have incorporated the MSA's provisions, including the provision related to the kill fee. (*See also* R. 125, Order at 14-16; R. 36-1 MSA at 6.) Plaintiff does not point to a specific, executed written instrument that embodies the FAST Tool SOW or any executed licensing agreement for Defendant's use of the FAST tool. Plaintiff instead argues that "electronic communications between [Plaintiff] and [Defendant] demonstrate that the parties agreed to . . . the SOWs" and that the parties' "course of dealing" evidence an agreement between them. (R. 245, Resp. at 23.) In Plaintiff's view, this evidence demonstrates that the parties agreed that the SOWs contained the same provisions as the MSA. (*Id.*) Defendant, on the other hand, submits that there is no evidence that the parties ever consented to a kill fee provision after April 1, 2016. (R. 191, Mem. at 25-26.)

"It suffices that the conduct of the contracting parties indicates an agreement to the terms of the alleged contract," otherwise, "a party would be free to avoid his contractual liabilities by simply denying that which his course of conduct indicates."[12] *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 515 N.E.2d 61, 65 (Ill. 1987) (internal quotation omitted). Therefore, "[i]t is

---

[12] Because this claim does not arise under the MSA, the Court analyzes this claim under Illinois law for the reasons set forth in footnote 10 above.

not necessary that the parties share a subjective understanding as to the terms of the contract; the parties' conduct may indicate an agreement to the terms." *Jannusch v. Naffziger*, 883 N.E.2d 711, 716 (Ill. App. Ct. 2008). "When a contract is the subject of a summary judgment motion, the appropriateness of summary judgment will turn on the clarity of the contract terms under scrutiny." *Zubi v. Acceptance Indem. Ins. Co.*, 751 N.E.2d 69, 74 (Ill. App. Ct. 2001) (internal quotation omitted). The Court may grant summary judgment where "the terms of a contract are clear and unambiguous," but if "the terms of the alleged contract are ambiguous or capable of more than one interpretation," summary judgment "is not proper[.]" *A. Epstein & Sons Int'l, Inc. v. Eppstein Uhen Architects, Inc.*, 945 N.E.2d 18, 24 (Ill. App. Ct. 2011), *as modified on denial of reh'g* (Mar. 8, 2011); *see also Util. Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 687 (7th Cir. 2004) (observing that, under Illinois law, a contract dispute is suitable for summary judgment where the dispute involves the "interpretation of an unambiguous contract"). When there is no written instrument and the existence of contractual provisions are in dispute, a plaintiff's "own testimony as to the terms of the contract is sufficient 'evidence' to withstand summary judgment absent a legal impediment to an oral contract (such as the statute of frauds)." *Angelopoulos v. Keystone Orthopedic Specialists, S.C.*, 207 F. Supp. 3d 850, 861 (N.D. Ill. 2016). "The parties' intent in forming an oral contract and the terms of the contract are questions of fact to be determined by the trier of fact." *Szafranski v. Dunston*, 34 N.E.3d 1132, 1147 (Ill. App. Ct. 2015).

The parties present no executed, written agreements that are licensing agreements for the FAST Tool generally or for the specific projects relating to unpaid invoices. Instead, they present conflicting evidence as to what the terms of any such licensing agreements might be based on various emails and other discussions between the parties. (R. 245-1, Pl.'s Resp. to Def.'s Facts

¶¶ 60, 62-65, 67-68; R. 248, Def.'s Resp. to Pl.'s Facts ¶¶ 27, 30, 32-33, 46, 56-57.) Defendant does not dispute that the parties were operating pursuant to a "month-to-month" agreement after the MSA expired but provides little clarity as to the terms of that agreement or whether the FAST Tool was subject to that agreement. (R. 248, Def.'s Resp. to Pl.'s Facts ¶ 44.) Plaintiff, on the other hand, provides evidence showing that the parties' agreement related to the FAST Tool was intended to incorporate the MSA's terms, including the kill fee provision. Specifically, Plaintiff has come forward with evidence showing that based on Defendant's conduct, Plaintiff reasonably understood that, although the MSA had expired, the parties were operating under month-to-month licensing agreements for the FAST Tool subject to the MSA's terms. (*E.g.*, R. 245-1, Pl.'s Resp. to Def.'s Facts ¶ 68; R. 248, Def.'s Resp. to Pl.'s Facts ¶¶ 27, 44; R. 245-11, Peterson Decl. at 5-7; R. 198-1, Peterson Dep. Tr. at 183.) In these circumstances, where there are competing accounts as to the parties' intent concerning the terms of their agreement, summary judgment is not appropriate. *See A. Epstein & Sons Int'l*, 945 N.E.2d at 24-25; (denying summary judgment where the parties disagreed as to the documents that reflected the terms of their agreement); *see also Angelopoulos*, 207 F. Supp. 3d at 861. The Court, therefore denies Defendant's motion for summary judgment on Plaintiff's claim related to breach of the parties' FAST Tool licensing agreement for Defendant's failure to pay the amounts reflected in invoices 413, 421, and 422.

## IV. Limitation of Liability

The last contractual issue raised on summary judgment is whether the limitation of liability provision in the MSA is enforceable. Defendant argues that if the parties are found to have incorporated the MSA's provisions, its liability is limited pursuant to section 10 of the MSA. (R. 191, Mem. at 28-30.) This section provides that neither party "shall be liable to the

other . . . for any consequential, indirect, exemplary, special, incidental[,] or punitive damages including, without limitation, lost profits," and that "in no event shall either party's liability to the other . . . exceed the total amount of payments made under this Agreement." (R. 245-1, Pl.'s Resp. to Def.'s Facts ¶ 8.) Plaintiff, citing a bevy of older legal authority outside of Texas—the state whose substantive law governs the MSA—contends that the limitation of liability clause is not enforceable because Defendant acted in "bad faith." (R. 245, Resp. at 27-29.) Plaintiff also argues, this time relying on Texas law, that the limitation of liability clause is unenforceable "because it is not conspicuous." (R. 245, Resp. at 29-30.)

Texas courts enforce limitation of liability provisions like the one in this case, and therefore the Court finds that the MSA's limitation of liability clause is enforceable. *See Sw. Bell Tel. Co. v. FDP Corp.*, 811 S.W.2d 572, 576-77 (Tex. 1991) (enforcing limitation of liability provision in an advertising contract); *IHR Sec., LLC v. Innovative Bus. Software, Inc.*, 441 S.W.3d 474, 477-80 (Tex. App. 2014) (enforcing limitation of liability provision in software licensing agreement that capped damages at $5,000); *Head v. U.S. Inspect DFW, Inc.*, 159 S.W.3d 731, 748 (Tex. App. 2005) ("In the absence of a controlling public policy to the contrary, contracting parties can limit their liability in damages to a specified amount.").

Plaintiff argues that enforcing the limitation of liability provision would "vitiate" the MSA's provisions relating to the kill fee and injunctive relief, (R. 245, Resp. at 29), but the Court disagrees. The limitation of liability merely caps the amount of damages at the "total amount of payments" received under the MSA. (R. 245-1, Pl.'s Resp. to Def.'s Facts ¶ 8.) It is easily harmonized with the MSA's provisions regarding injunctive relief and the kill fee. The limitation of liability does not "vitiate" any right to injunctive relief, because the limitation of liability relates to *monetary relief*, not *injunctive relief.* (R. 245-1, Pl.'s Resp. to Def.'s Facts

¶ 8.) Nor does it vitiate any right to recover the entire kill fee or significant portions of it, because the kill fee amounts to one year of licensing fees and the MSA limits damages to the total amount paid under the MSA, which can be as much as two years of licensing fees (twice the amount of the kill fee) or even more had Defendant agreed to SOWs that increased the total amount of payments under the MSA. (*Id.*) Thus, the kill fee provision still has force when construed together with the limitation of liability provision. *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003) (ruling that courts must "consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless"). Additionally, the limitation of liability provides that "in no event" shall either party's liability exceed the total amount of payments under the MSA, and Texas courts without hesitation enforce limitation of liability clauses which provide that they are effective even if they conflict with provisions elsewhere in the parties' contract. *See IHR Sec., LLC*, 441 S.W.3d at 477-80; *Helmerich & Payne Int'l Drilling Co. v. Swift Energy Co.*, 180 S.W.3d 635, 643 (Tex. App. 2005) (observing that "[w]hen parties use the clause 'notwithstanding anything to the contrary contained herein' in a paragraph of their contract, they contemplate the possibility that other parts of their contract may conflict with that paragraph, and they agree that this paragraph must be given effect regardless of any contrary provisions of the contract" and collecting cases). The Court, therefore, rejects Plaintiff's argument that the limitation of liability cannot be harmonized with the rest of the MSA.

Plaintiff then argues that the limitation of liability is unenforceable because Defendant's claimed misconduct was intentional and the product of "bad faith." (R. 245, Resp. at 27-29.) While Texas and other jurisdictions, as Plaintiff points out, (*id.*), invalidate pre-injury waivers of future liability caused by intentional or reckless behavior, that is not the type of case before the

Court. *See, e.g., Armstrong v. Curves Int'l, Inc.*, No. 6:15-CV-294-RP, 2017 WL 894437, at *12 (W.D. Tex. Mar. 6, 2017) (invalidating contract provision in which the plaintiff "would effectively be waiving any claims she could ever have against [the defendant]"); *Zachry Constr. Corp. v. Port of Hous. Auth. of Harris Cty.*, 449 S.W.3d 98, 116–18 (Tex. 2014) (finding that a contract allowing "one party to intentionally injure another with impunity violates the law"). This case does not involve a complete waiver of liability or a clause allowing Defendant to injure Plaintiff "with impunity." (R. 245-1, Pl.'s Resp. to Def.'s Facts ¶ 8.) Rather, this case involves a mere limitation of damages that allows Plaintiff to recover a significant amount and be awarded injunctive relief for Defendant's breach of contract or misappropriation of trade secrets. (*See* R. 245-1, Pl.'s Resp. to Def.'s Facts ¶ 8.)

The legal principle found within Plaintiff's cases relies on an observation from a legal treatise that parties "may contract to limit liability in damages for nonperformance of promises," but that parties cannot preemptively foreclose themselves of liability for fraud or bad faith conduct, such as when a builder requires an owner to waive any liability for late completion of a building although the parties' contract provides for completion of the building by a specific date. (*See* R. 245, Resp. at 27-29 (relying on cases that reference the legal principle described in 15 CORBIN ON CONTRACTS § 85.18 (2018).) Similarly, Plaintiff relies on out-of-state cases for the general principle that parties cannot preemptively release, through exculpatory clauses or clauses that limit liability to a "nominal sum," claims for intentional misconduct. (R. 245, Resp. at 28-29 (citing *Abacus Fed. Sav. Bank v. ADT Sec. Servs., Inc.*, 967 N.E.2d 666 (N.Y. 2012) and related cases).) These cases, however, are unrelated to the limitation of liability clause in the MSA, which does not exculpate Defendant from intentional misconduct or reduce liability to a nominal sum; rather, it allows Plaintiff to bring claims against Defendant for injunctive relief and for

46

significant amounts of money, namely, "the total amount of payments made under this [MSA]," which Defendant claims is $742,188. (*See* R. 245-1, Pl.'s Resp. to Def.'s Facts ¶ 8.) This is far from a "nominal sum," or an exculpatory clause that effectively forecloses liability for intentional misconduct. Accordingly, Plaintiff's non-binding legal authorities are simply unpersuasive here.

Finally, Plaintiff argues that the limitation of liability is unenforceable because it was not "conspicuous" in the parties' agreement, and because "Texas law will not impose an exculpatory clause on the smaller party," who is Plaintiff. (R. 245, Resp. at 29.) For its argument that the limitation of liability is unenforceable because it was not "conspicuous," Plaintiff relies on *Dresser Industries, Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 507 (Tex. 1993), a case that is not analogous. That case involved contractual language that had the "effect of . . . reliev[ing] a party in advance of responsibility for its own negligence." *Dresser Indus., Inc.*, 853 S.W.2d at 507. The limitation of liability clause here does not have such an effect and instead limits the amount of monetary damages to the total amount paid under the MSA. (R. 245-1, Pl.'s Resp. to Def.'s Facts ¶ 8.)

Nor does Texas law excuse Plaintiff from the limitation of liability because it is a smaller party than Defendant. The doctrine that Plaintiff relies on applies where "one party is so disadvantaged that it is essentially forced to agree to an exculpatory provision," not in situations involving "sophisticated entities, replete with learned counsel and a familiarity" with their industry. *See Valero Energy Corp. v. M.W. Kellogg Constr. Co.*, 866 S.W.2d 252, 257 (Tex. App. 1993), *writ denied* (Apr. 20, 1994). First, as noted above, this case does not involve an exculpatory provision and instead involves a limitation on damages. (R. 245-1, Pl.'s Resp. to Def.'s Facts ¶ 8.) Second, the undisputed evidence shows that Plaintiff is a capable negotiator

and a sophisticated party having significant familiarity with the software industry. (R. 248, Def.'s Resp. to Pl.'s Facts ¶¶ 6, 12-14, 16-24, 26, 29-30, 32, 34-35, 37-38, 42-46, 48-50.) Finally, there is no evidence that Plaintiff entered into the MSA under duress or was "essentially forced to agree" to the limitation of liability in the MSA. The undisputed evidence provided by the parties instead shows that the MSA was freely negotiated. (R. 245-1, Pl.'s Resp. to Def.'s Facts ¶ 7; R. 248, Def.'s Resp. to Pl.'s Facts ¶¶ 7-8, 21-22, 57.) The Court, therefore, rejects Plaintiff's argument that the fact it is "the smaller party" relieves it from the MSA's limitation of liability. As a result, the Court finds that the MSA's limitation of liability is enforceable as a matter of law to the extent it applies to Plaintiff's claims.

## V.   DTSA

Turning to Plaintiff's DTSA claim, Defendant contends that this claim cannot proceed to trial because Plaintiff fails to sufficiently identify its trade secrets or any other protected information that Plaintiff misappropriated. (R. 191, Mem. at 6-12, 16-17.) Defendant also argues that Plaintiff's DTSA claim fails because Plaintiff did not reasonably protect the secrecy of its trade secrets, and because either Defendant or Plaintiff's software developers own Plaintiff's claimed trade secrets. (*Id.* at 13-16, 18-20.)

In a trade secret misappropriation case, the plaintiff must "define the allegedly misappropriated secrets with sufficient specificity."[13] *Maxtech Consumer Prods., Ltd. v. Robert Bosch Tool Corp.*, 255 F. Supp. 3d 833, 853 (N.D. Ill. 2017). "It is not enough to point to broad

---

[13] For its analysis, the Court also relies on cases interpreting claims under the Illinois Trade Secrets Act ("ITSA"), 765 ILL. COMP. STAT. 1065 *et seq.*, and other states' enacted version of the Uniform Trade Secrets Act ("UTSA"), because the elements of a claim arising under those statutes are the same. *See Mickey's Linen v. Fischer*, No. 17 C 2154, 2017 WL 3970593, at *9 (N.D. Ill. Sept. 8, 2017) (noting that Illinois' statutes and the DTSA "impose[] the same requirements"); *see also Inmar, Inc. v. Vargas*, No. 18-CV-2306, 2018 WL 6716701, at *3 (N.D. Ill. Dec. 21, 2018) (comparing the ITSA and DTSA and noting that the elements for establishing a protectable trade secret are the same); *Kuryakyn Holdings, LLC v. Ciro, LLC*, 242 F. Supp. 3d 789, 797-98 (W.D. Wis. 2017) ("[T]he court's analysis will use Wisconsin's UTSA, but the analysis would apply as well to the DTSA.").

areas of technology and assert that something there must have been secret and misappropriated." *Composite Marine Propellers, Inc.*, 962 F.2d at 1266. "The plaintiff must show concrete secrets." *Id.*; *see also IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002) ("[A] plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition."); *Act II Jewelry, LLC v. Wooten*, 318 F. Supp. 3d 1073, 1089 (N.D. Ill. 2018) (finding that "a pile of documents are unlikely to meet the specificity requirements" for trade secrets). This is because without enough specificity of what information constitutes the claimed trade secret, the Court cannot properly analyze the elements of a trade secret claim, such as whether a particular piece of information "was sufficiently secret to derive economic value or whether [the plaintiff] took reasonable efforts to keep information secret[.]" *GlobalTap LLC v. Elkay Mfg. Co.*, No. 13 C 632, 2015 WL 94235, at *6 (N.D. Ill. Jan. 5, 2015).

Plaintiff's amended complaint avers that Defendant misappropriated the "NEXT System Back End," which Plaintiff vaguely alleges is comprised of "a processing engine, rules software, and administrative modules[.]" (R. 36, Am. Compl. ¶¶ 141-42, 165-74, 194-205.) Plaintiff also alleges that Defendant misappropriated the NEXT System Back End so that Defendant could adapt its DSMTracker to perform the same functions as Plaintiff's FAST Tool. (*Id.* ¶¶ 3, 200.) These allegations were enough to survive a motion to dismiss, (R. 125, Order at 26-30), but the question at the summary judgment stage is whether Plaintiff has provided enough evidence identifying a concrete trade secret to create a triable issue as to whether Defendant misappropriated that trade secret. *See* FED. R. CIV. P. 56(a); *Aspen Mktg. Servs., Inc. v. Russell*, No. 09 C 2864, 2009 WL 4674061, at *7 n.8 (N.D. Ill. Dec. 3, 2009) ("[T]o survive a motion to dismiss plaintiff is required only to provide defendants with notice as to the substance of the

49

claims, and is not required to articulate protectable trade secrets with specificity, as it would in a summary judgment proceeding." (internal quotation omitted)).

The Court grants Defendant's motion for summary judgment as to all the information that Plaintiff claims is a trade secret except for those parts of the FAST Tool that were not present in DSMTracker before Defendant transitioned from the FAST Tool to DSMTracker. Plaintiff claims that it has provided sufficient information in its revised interrogatory responses that describes the trade secret at issue in this case. (R. 245, Resp. at 5-6.) This response includes the following description of Plaintiff's trade secrets:

- Customized workflow for the utility industry to address a specific business need to perform home energy audit scheduling/administration, appliance recycling program, etc.
- The application architecture of the FAST Systems with specific system behaviors, interactions, data exchange, functions, etc.
- User experience with an optimized Graphical User Interface (GUI) for the specific tasks being performed by utility companies in certain markets, including interfaces for the administrative, call center, and field tech users
- Algorithms and rules to automate certain tasks at different levels of the process including appointment scheduling, appointment confirmation, appointment validation, appointment management, field technician dash board, field technician roster, field technician assignment, field technician dispatching, upload territory, map routes, contractor assignment, contractor invoice review, supervisor follow up, appliance inventory, lead management, quality assurance, eligibility queue, administrative history, user management, status updater, operational ticket, lead management, "Contractor" dispatch center, "Contractor" schedule appointment, "Contractor" invoice tracker, returned PDF, App-Standard, App-Recycling, Self-Scheduling website, program rules & eligibility, data & report compilation production.

(R. 243-1, Pl.'s Resp. to Def.'s Facts ¶ 34.[14]) This description is too broad and generalized,[15] and it is not evidence of a concrete secret or other information that would allow the Court or a fact finder to assess whether such information was kept secret or derives economic value. *See IDX Sys. Corp.*, 285 F.3d at 584; *see also GlobalTap LLC*, 2015 WL 94235, at *6. This broad description of business methods and software does nothing to separate genuine trade secrets from generic features that are part of every software program such as "[a]lgorithms and rules to automate certain tasks," (R. 243-1, Pl.'s Resp. to Def.'s Facts ¶ 34). *See IDX Sys. Corp.*, 285 F.3d at 583-84 (finding that the plaintiff's description of its trade secret was insufficient to create a triable issue because it did "not separate the trade secrets from the other information that goes into any software package"); *cf. Motorola, Inc. v. Lemko Corp.*, No. 08 C 5427, 2012 WL 74319, at *18 (N.D. Ill. Jan. 10, 2012) (denying summary judgment because "[a]lthough [the plaintiff] ha[d] identified a large number of items, it ha[d] referred to particular documents, files, inventions, and aspects of its technology, not simply general methods or areas of its business"). The Court, therefore, finds that Plaintiff's DTSA claim cannot proceed to trial to the extent it is based on the above broad categories of information.

Additionally, none of this information can form the basis of Plaintiff's DTSA claim for the simple reason that Plaintiff fails to come forward with any evidence showing that these broad

---

[14] This information was redacted and filed under seal, but the Court finds that it was improperly redacted because it is just a high-level, generalized description of software without revealing anything that would allow someone to reverse-engineer, copy, or misappropriate Plaintiff's confidential information. *See Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 547 (7th Cir. 2002) (denying motion to seal and finding that mere references to a confidential licensing agreement without revealing the substance of that agreement were not confidential information that could properly be filed under seal). Like the Court, Plaintiff's expert recognizes that Plaintiff's trade secret descriptions are so generalized that a person could not reverse-engineer the FAST Tool from those high-level descriptions. (R. 245, Resp. at 13-14.)

[15] Plaintiff's description of its trade secret in response to Defendant's interrogatory No. 21 is even more broad and consists of more than five pages of jargon describing all of Plaintiff's software, including aspects of its software that are unrelated to Plaintiff's DTSA claim. (R. 243-9, Pl.'s Interrog. Resps. at 1-8.)

categories of information are the information that Defendant allegedly misappropriated. *See IDX Sys. Corp.*, 285 F.3d at 584 (affirming summary judgment because the description of the plaintiff's claimed trade secrets was not accompanied by evidence that the defendants misappropriated such trade secrets or unique algorithms that "power" the plaintiff's software program); *GlobalTap LLC*, 2015 WL 94235, at *7 ("[E]ven if [the plaintiff] did establish identifiable trade secrets within the Business Plan or its list of partners, the record is devoid of evidence showing that [the defendant] ever utilized those trade secrets. To prevail at trial, [the plaintiff] would need to show that [the defendant] used its information for its own business purpose."). Instead, Plaintiff only presents evidence showing that Defendant improperly gained access to the Next System Back End to obtain information that would allow Defendant to adapt DSMTracker to have the same features as Plaintiff's FAST Tool, a very specific and concrete software tool. (R. 248, Def.'s Resp. to Pl.'s Facts ¶¶ 70-88; R. 245-11, Peterson Decl. at 14-16.) The Court, therefore, grants summary judgment in Defendant's favor on any DTSA claim based on the broad categories of information referenced above that merely describe Plaintiff's software in broad and generalized terms.[16]

The Court, however, finds that Plaintiff's DTSA claim survives summary judgment to the extent it pertains to the features of the FAST Tool that were not part of DSMTracker before Defendant transitioned from the FAST Tool to DSMTracker. Plaintiff has come forward with evidence showing that Defendant's DSMTracker did not have all of the software features that

---

[16] The Court disagrees with Plaintiff's argument that the Court has already rejected Defendant's summary judgment argument going to the merits of whether Plaintiff has sufficiently identified its trade secrets. (R. 245, Resp. at 4-5.) The decision Plaintiff references is the Court's prior decision resolving a discovery dispute between the parties, not a decision resolving any issue on the merits or weighing in on whether Plaintiff's case raises triable issues of fact. (R. 125, Order at 34-37.) That decision expressly notes that Defendant may challenge the specificity of Plaintiff's trade secret by filing "a motion for summary judgment or rebut[ting] Plaintiff's evidence at trial." (*Id.* at 35.)

Plaintiff's FAST Tool had, such as online scheduling and inventory management, and that those software features were added to DSMTracker after Defendant accessed the Next System Back End. (R. 248, Def.'s Resp. to Pl.'s Facts ¶¶ 70-88; R. 245-11, Peterson Decl. at 14-16.) The features of the FAST Tool that DSMTracker did not have, including the FAST Tool's industry tracking and inventory management features, are specific enough trade secrets to survive summary judgment. *See Do It Best Corp. v. Passport Software, Inc.*, No. 01 C 7674, 2005 WL 743083, at *13 (N.D. Ill. March 31, 2005) (denying summary judgment where the plaintiff "identif[ied] specific lines of code and specific software features for which it claims protection"); *cf. IDX Sys. Corp.*, 285 F.3d at 584. The Court and a jury would be able to analyze whether Defendant misappropriated specific features that were in the FAST Tool but missing from DSMTracker and later added to DSMTracker after Defendant accessed the Next System Back End. *See Peerless Indus., Inc.*, 2015 WL 1275908, at *13; *cf. GlobalTap LLC*, 2015 WL 94235, at *6. Unlike its broad description of the trade secrets above, Plaintiff also puts forth evidence creating a triable issue as to whether Defendant improperly accessed the Next System Back End to copy the software features from the FAST Tool so that they could be added to DSMTracker, (R. 248, Def.'s Resp. to Pl.'s Facts ¶¶ 70-88; R. 245-11, Peterson Decl. at 14-16). *Cf. IDX Sys. Corp.*, 285 F.3d at 584; *GlobalTap LLC*, 2015 WL 94235, at *7. The Court, therefore denies the motion for summary judgment as to Plaintiff's DTSA claims to the extent those claims are based on the unique features of the FAST Tool that were not part of DSMTracker until after Defendant accessed the Next System Back End.

Next, Defendant argues that Plaintiff's DTSA claim fails because the FAST Tool and its features are not secret. (R. 191, Mem. at 6, 12-16.) The DTSA provides that a protected "trade secret" is one that "(A) the owner thereof has taken reasonable measures to keep such

information secret; and (B) the information derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]" 18 U.S.C. § 1839(3)(A)-(B). In Defendant's view, Plaintiff's FAST Tool is not a protected trade secret because Plaintiff failed to take "reasonable steps" to keep it secret, and because it was readily ascertainable to Defendant by proper means. (R. 191, Mem. at 12-17.)

The Court concludes, however, that there are too many factual disputes related to these issues for Defendant to prevail on summary judgment. "Typically, what measures are reasonable in a given case is an issue for a jury." *Puroon, Inc. v. Midwest Photographic Res. Ctr., Inc.*, No. 16 C 7811, 2018 WL 5776334, at *5 (N.D. Ill. Nov. 2, 2018) (internal quotation omitted). Defendant argues that Plaintiff failed to reasonably protect its trade secrets because it did not require its independent contractors to sign nondisclosure agreements; designate information related to the FAST Tool as confidential; restrict access of the FAST Tool to Defendant's customers or other third parties; or file under seal a description of it trade secrets. (R. 191, at 13-16.) Plaintiff, however, disputes this characterization of the facts and comes forward with evidence showing that it required its independent contractors to sign nondisclosure agreements, (R. 245-11, Peterson Decl. at 9-12; R. 245-16, Staszak Decl. at 5), and that it did not reveal any unique software features of the FAST Tool to third parties or discuss those features in litigation documents. (R. 245-1, Pl.'s Resp. to Def.'s Facts ¶¶ 44-47, 51.) Accordingly, summary judgment is not appropriate. *See Act II Jewelry, LLC*, 318 F. Supp. 3d at 1090 (denying summary judgment because there was a factual dispute as to whether the plaintiff required its employees or others that had access to its trade secrets to maintain the secrecy of those trade secrets).

The Court also finds that there are triable issues of fact as to whether the FAST Tool was readily ascertainable to Defendant. Defendant argues that Plaintiff's FAST Tool was readily ascertainable because Plaintiff posted a video demonstration of the FAST Tool on the Internet, (R. 191, at 12-13, 16-17), but Plaintiff has come forward with evidence showing that the Internet demonstration did not reveal the FAST Tool's features that other software programs, like DSMTracker, lacked. (R. 243-5, Nelson Dep Tr. at 170-92, R. 245-11, Peterson Dep. Tr. at 12-13; R. 245-1, Peterson Decl. at 12-13.) Defendant also maintains that the FAST Tool is readily ascertainable because "Plaintiff has no evidence . . . that the FAST Tool functionalities are unique to NEXT, are not readily ascertainable in the industry, and did not already exist in the DSMTracker." (R. 191, Mem. at 17.) The Court disagrees. Plaintiff proffers evidence showing that the FAST Tool does have unique features that did not exist in Defendant's software and are not readily ascertainable in the software industry. (*See* R. 243-5, Nelson Dep Tr. at 170-92; R. 245-11, Peterson Dep. Tr. at 12-13; R. 245-1, Peterson Decl. at 12-13.) Defendant, therefore, fails to carry its burden to show that no genuine dispute of material fact exists as to whether Plaintiff took reasonable measures to protect its trade secrets or whether Plaintiff's trade secrets were readily ascertainable in the industry generally or through proper means. *See* 18 U.S.C. § 1839(3)(A)-(B).

Finally, Defendant contends that the DTSA claim fails because there is no dispute that either Defendant or Plaintiff's software developers own the FAST Tool. (R. 191, Mem. at 18-20.) Defendant is correct that Plaintiff must be the owner of the trade secrets that are the subject of its DTSA claim, *see* 18 U.S.C. § 1839(3)-(4), but factual disputes remain as to who owns the FAST Tool. Defendant first argues that it owns the FAST Tool pursuant to the terms of the MSA, (R. 191, Mem. at 18), but as explained above, the FAST Tool was not developed

pursuant to the MSA and there is a factual dispute as to whether the parties intended that their relationship be governed by the terms of the MSA after the MSA expired. Defendant argues that if the MSA does not apply, then the independent contractors that Plaintiff hired to develop the FAST Tool own it because Plaintiff never obtained agreements from those independent contractors transferring to Plaintiff the rights to the FAST Tool. (*Id.* at 19-20.) Plaintiff, however, presents evidence that it did obtain the rights to the FAST Tool from these independent contractors. (R. 245-1, Pl.'s Resp. to Def.'s Facts ¶¶ 6, 11.) The Court cannot resolve this dispute on summary judgment and denies summary judgment on these grounds. Accordingly, Defendant's motion for summary judgment as to the DTSA claim is granted to the extent Plaintiff seeks redress for a trade secret other than the unique features of the FAST Tool described herein. The motion for summary judgment on Plaintiff's DTSA claim, however, is denied in all other respects.

## VI.   Unjust Enrichment

Defendant argues that Plaintiff's unjust enrichment claim fails to the extent it is rooted in the MSA, because the existence of an express contract like the MSA precludes a claim for unjust enrichment. (R. 191, Mem. at 27.) Defendant also argues that to the extent Plaintiff's unjust enrichment claim is based on a misappropriation of trade secrets, the unjust enrichment claim must also fail because Plaintiff's trade secret claim has no merit. (*Id.*) Plaintiff's unjust enrichment claim relates to the FAST Tool, as it seeks redress for Defendant's misappropriation of trade secrets related to the FAST Tool and failure to pay Plaintiff's invoices for use of the FAST Tool. (R. 36, Compl. ¶¶ 223-35.)

While the parties agree that they were operating under a month-to-month agreement after the MSA expired, they dispute whether the FAST Tool was subject to the month-to-month

agreement or any other agreement at all. (R. 248, Def.'s Resp. to Pl.'s Facts ¶ 44.) Thus, although Illinois law bars an unjust enrichment claim where there is an express contract governing the parties' relationship, *People ex rel. Hartigan v. E & E Hauling, Inc.*, 607 N.E.2d 165, 177 (1992), there remains a dispute as to whether that is the case here. The Court also rejects Defendant's argument that the unjust enrichment claim must fail because Plaintiff's DTSA claim lacks merit. The Court has concluded above that Plaintiff's DTSA claim survives summary judgment and therefore still has merit at this stage of the litigation. Accordingly, the Court denies summary judgment on Plaintiff's unjust enrichment claim.

## VII.  Promissory Estoppel

Plaintiff's promissory estoppel claim is based on software other than the FAST Tool that Plaintiff developed for Defendant, which included security upgrades, "auto routing" upgrades, a software application available on mobile devices, and a data exchange. (R. 248, Def.'s Resp. to Pl.'s Facts ¶ 52.) To establish promissory estoppel, Plaintiff must prove that (1) Defendant made an unambiguous promise to Plaintiff, (2) Plaintiff relied on such promise, (3) Plaintiff's reliance was expected and foreseeable by Defendant, and (4) Plaintiff relied on the promise to its detriment. *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 906 N.E.2d 520, 523-24 (Ill. 2009). Defendant submits that summary judgment is warranted because Plaintiff's promissory estoppel claim is based on promises that were "supported by consideration and not gratuitous." (R. 191, Mem. at 28.) Though Defendant avoids explicitly framing it as such, this is essentially an argument that the parties had an enforceable contract, supported by consideration, for the development of these additional software programs. *See All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 869 (7th Cir. 1999) ("Promissory estoppel is meant for cases in which a promise, not being supported by consideration, would be unenforceable under conventional principles of contract law. When there is an express contract governing the relationship out of which the

promise emerged, and no issue of consideration, there is no gap in the remedial system for promissory estoppel to fill.").

The Court, however, finds that there is a genuine dispute of material fact as to whether any consideration supported Defendant's promise to pay Plaintiff for the additional software programs, because the parties dispute whether Defendant agreed to pay Plaintiff for the additional software. (R. 248, Def.'s Resp. to Pl.'s Facts ¶ 52.) Plaintiff presents evidence showing that Defendant asked Plaintiff to develop several software tools, Plaintiff developed the software, and Defendant refused to pay Plaintiff. (*Id.*; R. 245-11, Peterson Decl. at 7-8.) Defendant disputes these facts with evidence that it "intended certain tools to be developed," but that Plaintiff never completed its development and the cost of any such software development was accounted for in other payments Defendant made. (R. 248, Def.'s Resp. to Pl.'s Facts ¶ 52.) The record simply does not bear out undisputed evidence of a bargained-for exchange and enforceable contract between the parties for development of these additional software tools. With factual disputes still in play, the Court cannot grant summary judgment. *See Celotex Corp.*, 477 U.S. at 322.

Again focusing on the parties' contractual relationship, Defendant argues that Plaintiff's promissory estoppel claim fails because Defendant "paid for the billed services it agreed to pay" and there "is no evidence [Defendant] agreed to pay [Plaintiff] for items that [Plaintiff] never billed" for during the parties' relationship. (R. 191, Mem. at 28.) This argument goes to what the parties did or did not "agree" to and therefore does not address promissory estoppel, a doctrine that applies in the absence of an agreement. *See Matthews v. Chi. Transit Auth.*, 51 N.E.3d 753, 779 (Ill. 2016). ("[P]romissory estoppel is proper only in the absence of an express agreement."). Whether Defendant "agreed" to pay Plaintiff for items that Plaintiff did not submit a bill for is

irrelevant and cannot support judgment; promissory estoppel does not look at an agreement but instead looks at whether Defendant made a promise to Plaintiff that Plaintiff foreseeably relied upon to its detriment. *See Newton Tractor Sales, Inc.*, 906 N.E.2d at 523.

Similarly, Defendant's assertion that it "paid for the billed services it agreed to pay" repeats the contention that the parties had an express agreement and that Defendant paid for the additional software under an agreement covering such additional software. (R. 191, Mem. at 28.) The Court again rejects this argument because there are disputes of material fact as to whether the parties had an enforceable agreement covering the additional software and whether Defendant paid Plaintiff for this additional software. (R. 248, Def.'s Resp. to Pl.'s Facts ¶ 52.)

Defendant also argues that Plaintiff's promissory estoppel claim cannot survive summary judgment because there is no evidence that Defendant promised to "pay for things that Plaintiff claimed to have developed[.]" The Court is not persuaded. Plaintiff presents evidence showing that Defendant promised to pay Plaintiff if Plaintiff developed the additional software, it developed software in reliance on such promises, and Defendant did not pay Plaintiff for the software. (R. 248, Def.'s Resp. to Pl.'s Facts ¶ 52; R. 245-11, Peterson Decl. at 7-8.) This evidence covers all the elements of a promissory estoppel claim and is enough to survive summary judgment. *See Newton Tractor Sales, Inc.*, 906 N.E.2d at 523.

Finally, Defendant argues, without citation to the record or any legal authority, that Plaintiff's promissory estoppel claim fails because there is no evidence that Plaintiff justifiably relied on Defendant's promises or that Plaintiff's reliance on Defendant's promises was foreseeable. (R. 191, Mem. at 28.) These perfunctory and undeveloped arguments are waived. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by

pertinent authority, are waived[.]"). Notwithstanding, the Court finds that Plaintiff does present evidence creating a triable issue as to whether Plaintiff justifiably relied on Defendant's promises and whether Plaintiff's reliance was foreseeable, (R. 248, Def.'s Resp. to Pl.'s Facts ¶ 52; R. 245-11, Peterson Decl. at 7-8). *See Ricco v. Sw. Surgery Ctr., LLC*, 73 F. Supp. 3d 961, 973 (N.D. Ill. 2014) ("[W]hether Plaintiff's reliance . . . was reasonable and justifiable is a question of fact for a jury."); *Triad Capital Mgmt., LLC v. Private Equity Capital Corp.*, No. 07-C-3641, 2010 WL 3023409, at *9 (N.D. Ill. July 29, 2010) (same). Accordingly, Plaintiff's promissory estoppel claim survives summary judgment.

## VIII. Compensation of Plaintiff's Experts

Finally, Plaintiff moves to compel Defendant to compensate Plaintiff's experts for time spent preparing for and attending depositions pursuant to Federal Rule of Civil Procedure 26(b)(4)(E)(i), which provides that, "[u]nless manifest injustice would result, the court must require that the party seeking discovery: pay the expert a reasonable fee for time spent in responding to discovery[.]" FED. R. CIV. P. 26(b)(4)(E)(i). Plaintiff seeks a total of $24,714.29 for Valerdi and its other expert, Jeffery Snell ("Snell"). (R. 271, Mot. at 11.) Defendant does not dispute that it must compensate Plaintiff's experts; instead Defendant argues that it is premature to compensate them and that their requested fees are unreasonable. (R. 278, Resp. at 1-3.)

Defendant's argument that it is premature to compensate Plaintiff's experts is based on its reasoning that "manifest injustice" would result in compensating Plaintiff's experts if the Court grants summary judgment or grants Defendant's motion to exclude any of Plaintiff's experts. Defendant points to no binding authority that supports its position, and its argument is weakened because the Court has not decided to grant summary judgment on all of Plaintiff's claims or exclude experts at this time. Additionally, "the timing of a party's request for this cost is not a bar to recovery under this rule." *Great Lakes Dredge & Dock Co. v. Commercial Union Assur.*

*Co.*, No. 94 C 2579, 2000 WL 1898533, at *3 (N.D. Ill. Sept. 18, 2000); *see also Chambers v. Ingram*, 858 F.2d 351, 361 (7th Cir. 1988) (finding that the timing of a request for reimbursement of expert fees is not a bar to reimbursement). The Court, therefore, rejects Defendant's argument that Plaintiff's motion is premature.

Defendant also maintains that the Court should reserve ruling on Plaintiff's motion so that the Court can assess whether manifest injustice bars recovery of fees for Plaintiff's experts. (R. 278, Resp. at 2.) "A finding of manifest injustice is rare and is granted only in extreme circumstances." *Se-Kure Controls, Inc. v. Vanguard Prod. Grp., Inc.*, 873 F. Supp. 2d 939, 957 (N.D. Ill. 2012). This case does not present such circumstances, and therefore the Court declines to delay compensation of Plaintiff's experts. *See, e.g., Fairley v. Andrews*, No. 03 C 5207, 2008 WL 961592, at *5 (N.D. Ill. Apr. 8, 2008) (no manifest injustice by requiring party to compensate expert whose opinion was partially stricken as inadmissible); *see also Research Sys. Corp. v. IPSOS Publicite*, 276 F.3d 914, 920 (7th Cir. 2002) (no abuse of discretion in trial court's rejection of manifest injustice argument where there was no evidence to support the plaintiff's theory that the defendant had disclosed experts just to impose a burden on the plaintiff to depose experts). Accordingly, the Court will not reserve its ruling on Plaintiff's motion.

Defendant's next argument is that the requested fees for Plaintiff's experts are unreasonable and that Plaintiff's experts should be compensated no more than $13,259.29. (R. 278, Resp. at 2-7.) "[C]ourts determine the reasonableness of an expert's fee by considering the following factors: (1) the expert's area of expertise; (2) the education and training required to provide the expert insight that is sought; (3) the prevailing rates of other comparably respected available experts; (4) the nature, quality, and complexity of the discovery responses provided; (5) the fee actually being charged to the party that retained the expert; (6) fees traditionally charged

by the expert on related matters; and (7) any other factor likely to be of assistance to the court in balancing the interests implicated by Rule 26." *Se-Kure Controls, Inc.*, 873 F. Supp. 2d at 955. "The party seeking reimbursement of their expert witness fees has the burden of demonstrating to the court that the expert's rate and fee are reasonable." *Id.*

First, Defendant argues that Plaintiff's experts should only be awarded fees for deposition preparation time for a number of hours that is equal to the length of their depositions. (R. 278, Resp. at 3-6.) Plaintiff, on the other hand, argues that compensation for a little less than a 3:1 ratio of deposition preparation hours to deposition hours is reasonable. (R. 271, Mot. at 7-10.) "To determine whether an expert's preparation time was reasonable, courts in this district have looked to the preparation time in relation to the deposition time, and the nature or complexity of the case, to establish a reasonable ratio of preparation time to actual deposition time for the case." *LK Nutrition, LLC v. Premier Research Labs, LP*, No. 12 CV 7905, 2015 WL 4466632, at *3 (N.D. Ill. July 21, 2015) (quotation omitted). "Courts have approved of a 1:1 ratio up to a 3:1 ratio depending on the nature of the required document review, breadth of the expert's involvement, and difficulty of the issues." *Id.* "Also relevant is how the expert spent his time and the specificity with which the expert describes that time in the invoice." *Id.*

Upon review of the invoices submitted by Plaintiff's experts, (R. 277-1, Snell Invoice; R. 277-2, Valerdi Invoice), the Court finds nothing excessive or unreasonable about the hours they spent preparing for their depositions, which included reviewing documents and expert reports submitted in this case. Additionally, this case concerns Plaintiff's trade secrets and other complex issues related to computer software. (*See* R. 36, Am. Compl. ¶¶ 194-260.) In such cases, a 3:1 ratio has been found to be reasonable. *See, e.g., Se-Kure Controls, Inc.*, 873 F. Supp. 2d at 956 (awarding fees for a 3:1 ratio of deposition preparation time to deposition length in a

patent infringement case and collecting other cases awarding similar fees in other complex cases and cases involving intellectual property). The Court, therefore, awards Plaintiff all the fees for deposition preparation time that it seeks.

Second, Defendant argues that Valerdi's fees for an inflated "weekend" rate is unreasonable. (R. 278, Resp. at 6.) The Court agrees. The above factors for determining the reasonableness of expert witness' hourly rate are generally related to the expert's area of expertise, his or her work product, and other factors relating to the market rate for the expert's services. *See Se-Kure Controls, Inc.*, 873 F. Supp. 2d at 955. An increased "weekend" rate finds no support in these factors, and Plaintiff fails to provide any compelling reason why the Court should award additional fees for work completed over the weekend. (*See* R. 283, Reply at 5-6.) The Court, therefore, will subtract $760 from the amount Defendant must pay Plaintiff, which is the amount that represents the additional fees resulting from Valerdi's increased "weekend" rate.

Finally, Defendant argues that the Court should not award Plaintiff the $2,500 it seeks for Snell's review of his own deposition testimony. (R. 278, Resp. at 7.) The Court agrees that the amount of time Snell spent reviewing his own deposition transcript for accuracy—almost the same amount of time that he spent sitting for the deposition—is excessive, and the Court will reduce this amount by half, or $1,250, which is a reasonable amount in light of the above factors related to the reasonableness of expert fees. *Se-Kure Controls, Inc.*, 873 F. Supp. 2d at 957. Thus, the Court subtracts $2,010 from the $24,714.29 that Plaintiff requests in expert fees, with this subtraction accounting for Valerdi's "weekend" rate and half of Snell's time reviewing his own deposition testimony. Defendant, therefore, must compensate Plaintiff $22,704.29 for expert witness fees.

## CONCLUSION

For the foregoing reasons, Defendant's amended motion for summary judgment (R. 190) is GRANTED in part and DENIED in part as set forth herein.

Defendant's motion to strike (R. 225) is GRANTED in part, only as to Defendant's request that Plaintiff produce full metadata for documents that were not produced before the discovery deadline as well as all correspondence related to those documents. Plaintiff shall make this production within 14 days of the date of this order. Defendant's motion to strike (R. 225) is DENIED in all other respects. Defendant's motion to exclude portions of Valerdi's testimony (R. 230) is DENIED, and Plaintiff's motion to strike (R. 221) is DENIED.

Lastly, the Court GRANTS in part and DENIES in part, as set forth herein, Plaintiff's motion to compel Defendant to pay Plaintiff's experts (R. 277). Defendant is ordered to compensate Plaintiff $22,704.29 for expert witness fees.

The parties shall  appear for a status hearing on March 13, 2019, at 9:45 a.m. for the express purpose of setting a priority trial date. The parties are DIRECTED to reevaluate their settlement positions in light of this opinion and to exhaust all settlement possibilities prior to the status hearing.

ENTERED:

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: February 27, 2019**