## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| NEXT PAYMENT SOLUTIONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:17-cv-8829 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| CLEARESULT CONSULTING, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

### MEMORANDUM OPINION AND ORDER

NEXT Payment Solutions alleges that one of its former clients, CLEAResult Consulting, stole its trade secrets. NEXT licensed software to CLEAResult to help with scheduling and appointment tracking in its energy-consulting business. But when CLEAResult later acquired other software and tailored it to its needs, NEXT cried foul, claiming that CLEAResult had misappropriated its intellectual property.

For the second time, CLEAResult moves for partial summary judgment on one issue: whether NEXT identified its alleged trade secrets with sufficient specificity. The Court has given NEXT multiple opportunities to identify its trade secrets, and each time, NEXT has come up short. Instead of offering something specific and concrete, NEXT offers broad descriptions and jargon-laden terminology. NEXT's response to the latest motion for summary judgment is no exception. After multiple attempts, it is hazy what, exactly, NEXT is claiming as its alleged trade secrets.

NEXT can't identify its trade secrets with specificity, so it can't get to a jury. For the reasons stated below, CLEAResult's motion for partial summary judgment is granted.

## Background

The motion at hand is the second summary judgment motion on the same topic, namely, whether NEXT defined the alleged trade secrets with the requisite specificity. The Court's opinion on the first summary judgment motion contains a comprehensive overview of the underlying facts. *See* Mem. Opinion and Order dated 2/27/19 (Dckt. No. 285). The opinion at hand will assume modest familiarity with the facts in the earlier opinion (but many of those facts aren't critical here).

CLEAResult supported its second summary motion with a Statement of Facts that is quite targeted. *See* CLEAResult's Rule 56.1 Statement of Facts (Dckt. No. 336). It includes 26 paragraphs, and it basically covers what has happened in this case (meaning procedural history) since the middle of 2018. *Id.* CLEAResult summarizes discovery requests and responses, motions, rulings, and so on. In the interest of telling the broader story, the facts that follow draw from CLEAResult's original Statement of Facts filed in support of the first motion for summary judgment (Dckt. No. 199), as well as CLEAResult's second Statement of Facts (Dckt. No. 336). For ease of reference, the opinion will refer to them as "Volume I" and "Volume II." *See* Pl.'s Resp. to Def.'s Statement of Facts Vol. I (Dckt. No. 245-1); Pl.'s Resp. to Def.'s Statement of Facts Vol. II (Dckt. No. 357).

Defendant CLEAResult implements residential energy efficiency programs for utilities. *See* Pl.'s Resp. to Def.'s Statement of Facts Vol. II, at ¶ 1 (Dckt. No. 357). The summary judgment materials don't explore in depth what, exactly, CLEAResult actually does. The punchline seems to be that CLEAResult helps its customers improve energy efficiency, lower consumption, and reduce energy costs. *See generally* CLEAResult, *Our Story: What We Do,* https://www.clearesult.com/about-us (last visited May 27, 2020) ("We deliver solutions that

lower load requirements for utilities, reduce energy bills for end users and minimize environmental burdens on communities.").

CLEAResult became a customer of Plaintiff NEXT Payment Solutions, a software company. NEXT provided "software development services and exclusive licensing rights for a rebate incentive processing portal." *See* Pl.'s Resp. to Def.'s Statement of Facts Vol. II, at ¶ 2 (Dckt. No. 357). NEXT basically helped CLEAResult offer an online rebate-processing program to its utility company clients. *See* Mem. Opinion and Order dated 2/27/19, at 2 (Dckt. No. 285); *see also* Pl.'s Resp. to Def.'s Statement of Facts Vol. I, at ¶ 8 (Dckt. No. 245-1) (quoting Master Services Agreement (Dckt. No. 198-2, at 32 of 43)) ("NEXT is engaged in the business of providing CLEAResult exclusive licensing rights . . . of NEXT's digital rebate portal processing system, point of sale systems and reward fulfillment services.").

The primary software platform that NEXT offers is called, aptly enough, the "NEXT System." It is a software program that allows a business to process customer rebates or carry out a customer reward program online. *See* Mem. Opinion and Order dated 2/27/19, at 2 (Dckt. No. 285) (citing testimony). NEXT created a customized version of the NEXT System for CLEAResult so that it could offer an online rebate-processing program for its clients. *Id.*

The NEXT System includes a "Next System Back End," which contains the source code, data encryption, web application, and parts of the NEXT System that can only be accessed with a valid log-in password. *Id.* at 2–3 (citing Peterson Dep., at 142–47 (Dckt. No. 198-1)). NEXT also developed an online self-scheduling tool – later referred to as the "FAST Tool" – at CLEAResult's request, based in part on CLEAResult's preferences and requests. *See* Pl.'s Resp. to Def.'s Statement of Facts Vol. I, at ¶¶ 13–14 (Dckt. No. 245-1). The FAST Tool was a "web-based software application that enables utility customers to schedule appointments through a

public site and for CLEAResult customer service representatives to schedule appointments through an internal web application (what NEXT refers to as the 'backend')." *Id.* at ¶ 9.

The parties entered into a Master Services Agreement in 2014. *Id.* at ¶ 7. By all appearances, the business relationship continued successfully for a few years. During that time, NEXT and CLEAResult apparently worked together to ensure that the FAST Tool would meet CLEAResult's needs. *See id.* at ¶ 14 ("NEXT developed the FAST Tool in consultation with CLEAResult based on CLEAResult's feedback, requests, and approval."); *id.* at ¶ 12 ("NEXT launched the first version of the FAST Tool in January 2015.").

In 2017, CLEAResult made a change that ultimately sparked this lawsuit. CLEAResult replaced NEXT's FAST Tool with different software, called the "DSMTracker." *Id.* at ¶ 79. CLEAResult acquired the DSMTracker software in early 2017. *Id.*

The parties dispute what the DSMTracker could do when CLEAResult bought it. NEXT claims that the original DSMTracker did not contain any of the FAST Tool's capabilities. *Id.* But CLEAResult argues that many of its functions – including program management, call center management, application processing, self-scheduling, and other functions – existed in the original version of the DSMTracker. *Id.* CLEAResult also says that it owned additional programs that offered scheduling and calendar functionality, even before it implemented NEXT's FAST Tool and well before it acquired the DSMTracker. *See id.* at ¶ 78. NEXT, for its part, disputes CLEAResult's rendition – as NEXT sees it, CLEAResult couldn't offer scheduling functionality until it began using the FAST Tool. *See id.*

The parties also dispute the extent to which CLEAResult accessed the NEXT System Back End, meaning the source code and the like. *See id.* at ¶ 19. Specifically, the NEXT System

Back End consists of (a) a processing engine; (b) rules software; and (c) administrative modules. *See id.*

The parties seem to agree that the CLEAResult users didn't have access to the processing engine or rules software. *See id.* The parties also agree that there is "no evidence that CLEAResult accessed the source code for the FAST Tool, or stole NEXT's source code for the FAST Tool or NEXT System." *See* Pl.'s Resp. to Def.'s Statement of Facts Vol. II, at ¶ 26 (Dckt. No. 358); *see also* Pl.'s Resp. to Def.'s Statement of Facts Vol. I, at ¶ 19 (Dckt. No. 245-1). But NEXT argues that CLEAResult's access to the administrative modules provided them access to FAST Tool's algorithms (through trial and error, at the very least). *See* Pl.'s Resp. to Def.'s Statement of Facts Vol. I, at ¶ 19 (Dckt. No. 245-1). The parties agree that CLEAResult's "software developers were given access credentials to test and explore NEXT's backend." *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 12 (Dckt. No. 383).

NEXT argues that CLEAResult added key functionalities of the NEXT Tool to its DSMTracker *after* CLEAResult had access to the NEXT System Back End. Specifically, NEXT points to 34 software "modules" that it now identifies as trade secrets, as well as five "combination modules." *See* Pl.'s Identification of Trade Secrets and Ex. A (Dckt. Nos. 307, 307-2). As NEXT sees it, CLEAResult assigned its staff "homework" to study the NEXT System Back End, and later turned in their assignments by detailing the NEXT trade secrets.[1] *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 8 (Dckt. No. 383). And NEXT provides evidence that the current version of the DSMTracker performs the same functions as NEXT's 34 modules. *See* Pl.'s Identification of Trade Secrets, Ex. A (Dckt. No. 307-2). But the parties dispute the existence (or absence) of those capabilities in the original version of the

---

[1] CLEAResult, for its part, disputes this allegation. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 8 (Dckt. No. 383).

DSMTracker – before CLEAResult had any chance to modify it.  *See* Pl.'s Resp. to Def.'s Statement of Facts Vol. II, at ¶¶ 17–18 (Dckt. No. 358).

CLEAResult eventually transitioned to DSMTracker, and informed NEXT that they had replaced the FAST Tool in its entirety.  *See* Mem. Opinion and Order dated 2/27/19, at 12–13 (Dckt. No. 285) (citing Peterson Dep., at 185–86 (Dckt. No. 198-1); also citing Mahler Nov. 1, 2017 Email (Dckt. No. 198-5)).

NEXT responded by suing CLEAResult, claiming misappropriation of trade secrets.  The Second Amended Complaint includes a claim under the Defend Trade Secrets Act, plus claims for breach of contract, unjust enrichment, and fraud.  *See* Second Am. Cplt. (Dckt. No.  171).

### Procedural History

CLEAResult now moves for partial summary judgment on NEXT's claim under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq*.  *See* Def.'s Mot. for Summ. J. (Dckt. No. 333).  Suffice it to say that, from a procedural standpoint, there is considerable water under the bridge.  The Honorable Rubén Castillo, this Court's predecessor on this case before reassignment, already ruled on a summary judgment motion on this very issue.

In its first summary judgment motion, CLEAResult argued that NEXT had failed to sufficiently identify its trade secrets or any other protected information that was misappropriated. *See* Def.'s Mem. in Support of Mot. for Summ. J., at 6–11 (Dckt. No. 191).  CLEAResult also argued that NEXT had publicly disclosed the features and functions of the FAST Tool on the internet, and had failed to protect the secrecy of its alleged trade secrets.  *Id.* at 12–13.  So CLEAResult argued that the information wasn't specific, and it wasn't secret, anyway.

In his ruling, Judge Castillo addressed whether NEXT "has provided enough evidence identifying a concrete trade secret to create a triable issue as to whether [CLEAResult]

6

misappropriated that trade secret." *See* Mem. Opinion and Order dated 2/27/19, at 49 (Dckt. No.
285). Judge Castillo noted that a broad, amorphous description of an avowed trade secret will
not do, as explained by the Seventh Circuit in *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581,
584 (7th Cir. 2002). *See* Mem. Opinion and Order dated 2/27/19, at 48–49. "[W]ithout enough
specificity of what information constitutes the claimed trade secret, the Court cannot properly
analyze the elements of a trade secret claim," such as whether a particular piece of information
was sufficiently secret to have value. *Id.* at 49.

The Court began its analysis by taking a close look at NEXT's descriptions of the
avowed trade secrets. *Id.* at 50–51. CLEAResult had served an interrogatory asking NEXT to
"[i]dentify with precision and specificity each alleged trade secret" that it allegedly
misappropriated. *See* Pl. NEXT's Verified Revised Confidential Answers to CLEAResult's
Second Set of Interrogatories (Dckt. No. 245-13, at 38–50 of 62). In response, NEXT offered
high-level descriptions of the trade secrets. *Id.*; *see also* Pl.'s Resp. to Def.'s Statement of Facts
Vol. I, at 20–21 of 51 (Dckt. No. 245-1).

NEXT claimed, for example, that one of its trade secrets was a "[c]ustomized workflow
for the utility industry to address a specific business need to perform home energy audit
scheduling/administration, appliance recycling." *See* Pl.'s Resp. to Def.'s Statement of Facts
Vol. I, at ¶ 34 (Dckt. No. 245-1). Another example was the "application architecture of the
FAST Systems with specific system behaviors, interactions, data exchange, functions, etc." *Id.*
NEXT gave other descriptions of its avowed trade secrets that began with all-encompassing
terms such as "user experience" and "algorithms and rules to automate certain tasks." *Id.*

Judge Castillo concluded that these alleged trade secrets were "too broad and
generalized." *See* Mem. Opinion and Order dated 2/27/19, at 51 (Dckt. No. 285). NEXT failed

7

to offer "evidence of a concrete secret or other information that would allow the Court or a fact finder to assess whether such information was kept secret or derives economic value." *Id.* Instead, NEXT offered a "broad description of business methods and software," which "does nothing to separate genuine trade secrets from generic features that are part of every software program such as '[a]lgorithms and rules to automate certain tasks.'" *Id.* (brackets in original) (quoting Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 34 (Dckt. No. 243-1)). NEXT's interrogatory answer was little more than "five pages of jargon." *Id.* at 51 n.15.

Judge Castillo also ruled that NEXT had "fail[ed] to come forward with any evidence showing that these broad categories of information are the information that [CLEAResult] allegedly misappropriated." *Id.* at 51–52. The Court ruled that NEXT had offered evidence that CLEAResult had access to the NEXT System Back End, but not evidence of misappropriation. *Id.*

In the end, the Court granted CLEAResult's motion for summary judgment "on any DTSA claim based on the broad categories of information referenced above that merely describe [NEXT]'s software in broad and generalized terms." *Id.* at 52.

But NEXT's trade secret claim survived summary judgment "to the extent it pertains to the features of the FAST Tool that were not part of DSMTracker before [CLEAResult] transitioned from the FAST Tool to DSMTracker." *Id.* Judge Castillo found that the features of the FAST Tool that DSMTracker did not have were "specific enough trade secrets to survive summary judgment." *Id.* at 53. The Court explained that a jury "would be able to analyze whether [CLEAResult] misappropriated specific features that were in the FAST Tool but missing

from DSMTracker and later added to DSMTracker after Defendant accessed the Next System Back End." *Id.*[2]

In sum, the Court granted the motion for summary judgment "as to all the information that Plaintiff claims is a trade secret except for those parts of the FAST Tool that were not present in DSMTracker before Defendant transitioned from the FAST Tool to DSMTracker." *Id.* at 50. So only part of the trade secret claim survived – the part about anything added after the transition to DSMTracker.

Along the way, Judge Castillo also rejected a number of other arguments advanced by CLEAResult, such as the notion that NEXT did not take reasonable steps to protect the secrecy of its information. The Court ruled that those issues raised questions of fact for the jury. *Id.* at 53–56.

The surviving claims are now at issue. After the summary judgment ruling, CLEAResult asked NEXT to amend its interrogatory response and identify the trade secrets that it intended to pursue at trial. *See* Def.'s Mot. to Compel (Dckt. No. 288). That is, CLEAResult requested more information about the alleged trade secrets that survived the Court's summary judgment ruling. CLEAResult wanted more specificity about the features of the FAST Tool that were *not*

---

[2] As explained in the next few paragraphs, Judge Castillo later concluded that NEXT's descriptions of its trade secrets were not specific enough, even though they involved the parts added after the transition to DSMTracker. *Compare* Mem. Opinion and Order dated 2/27/19, at 53 (Dckt. No. 285) ("The features of the FAST Tool that DSMTracker did not have . . . are specific enough trade secrets to survive summary judgment.") *with* 3/26/19 Hearing Tr., at 3 (Dckt. No. 297) ("I conclude that the plaintiff's current description of its trade secrets is too broad to support the plaintiff's position of proceeding to trial on a claim for misappropriation of trade secret."). Perhaps the best way to read the rulings in tandem is that the Court ruled, at the summary judgment stage, that claims about anything added to DSMTracker were potentially specific enough. That is, as a concept, it may be specific enough to point to parts added to DSMTracker after the transition from Fast Tool. But when CLEAResult attempted to get specific, it fell short.

part of DSMTracker originally, but were added after CLEAResult accessed the NEXT System Back End.

At the time, the request was time sensitive because trial was only two months away. NEXT apparently balked at supplementing its interrogatory response, so CLEAResult filed a motion to compel. *See id.* CLEAResult broke its request into five parts. CLEAResult wanted to know: "(1) the precise software feature(s) at issue, including what these features do, and where in the software they are located; (2) NEXT's basis for contending each such feature is a trade secret as defined by the DTSA, including what steps NEXT has taken to keep the feature confidential and why the feature was not readily ascertainable to CLEAResult before it transitioned from the FAST Tool to DSMTracker; (3) the point in time at which the FAST Tool had such features; (4) NEXT's basis for contending that the DSMT software lacked such features at the time CLEAResult acquired it; and (5) where in the DSMT software such features now appear or have appeared." *See* Pl.'s Resp. to Def.'s Statement of Facts Vol. II, at ¶ 10 (Dckt. No. 357); *see also* Def.'s Mem. in Supp. of Mot. to Compel, at 1–2 (Dckt. No. 289).

The day before the hearing, NEXT filed a supplemental interrogatory response. *See* Pl.'s Supplement to Verified Second Revised Confidential Answers to Def.'s Second Set of Interrogatories, Ex. 1 (Dckt. No. 299); *see also* Sealed Version of Ex. 1 filed 3/25/19 (Dckt. No. 239-1).

The supplement didn't help. At the hearing, Judge Castillo granted the motion to compel. Once again, the Court found that NEXT's descriptions of its trade secrets – meaning the trade secrets that had survived the initial challenge in the summary judgment decision – were inadequate. "I conclude that the plaintiff's current description of its trade secrets is too broad to support the plaintiff's position of proceeding to trial on a claim for misappropriation of trade

secret." *See* 3/26/19 Hearing Tr., at 3 (Dckt. No. 297); *see also id.* at 4 ("So we need to know exactly the trade secret that you're going to proceed to on trial.").

Judge Castillo continued to explain. "I understand I tried to clarify that. I think I said something like the specific features that were in the FAST Tool but were missing from DSMTracker and later added to the DSMTracker after defendant accessed the NEXT system Back End, but that's way too general for a jury to deal with." *Id.* at 4. The Court added: "[I]f we don't get a supplement that is what I think is triable, this could hold up the trial or else I'm going to ask you to give up this particular claim, and [your] other claims you can proceed to trial on. But we really need to flush this out and keep in mind a jury having to grapple with this." *Id.*

When NEXT's counsel defended the sufficiency of the descriptions, Judge Castillo responded: "I've looked at those. All I can tell you, Ms. Bogart, it's not sufficient for my purposes, and it's not going to be sufficient for a jury to decide this case. That's my conclusion." *Id.* at 5. Judge Castillo forewarned that if NEXT did not supplement its responses, it "could mean tubing this particular claim." *Id.* at 6.

One month later, NEXT responded by filing a document entitled "Identification of Trade Secrets for Trial." *See* Pl.'s Identification of Trade Secrets (Dckt. No. 307). The document was a 29-page brief, and it covered each of the five categories of information requested by CLEAResult (as identified above). *Id.* NEXT announced that its trade secrets are the "myriad features which made the FAST Tool a dynamic consumer friendly software scheduling tool." *Id.* at 2. They allowed CLEAResult to schedule appointments, track inventory, minimize expenses, and optimize routes to customers. *Id.*

NEXT attached a 13-page spreadsheet as Exhibit A, and it purported to summarize the trade secrets at issue. *See* Pl.'s Identification of Trade Secrets, Ex. A (Dckt. No. 307-2). The spreadsheet included the following column headings:

| Module Name | Description of Trade Secrets in Module and Features or in Combinations of Modules and Features | Location in DSMT (including exemplary evidence) | JIRA REN # (CCI description of FAST Tool) |
|---|---|---|---|

*Id.* So the four columns covered (1) the name of the trade secret; (2) a description; (3) the location of the trade secret in DSMTracker; and (4) documents from CLEAResult's JIRA project management tool that "describe[d] the trade secrets with comparable detail." [3] *Id.* at 2.

The spreadsheet identified 34 modules as the alleged trade secrets. Identifying modules as the trade secrets wasn't new. In fact, NEXT claimed that its trade secrets were modules in its supplemental interrogatory answers, meaning the responses that Judge Castillo found to be inadequate at the March 26, 2020 hearing. *See* Pl.'s Supplement to Verified Second Revised Confidential Answers to Def.'s Second Set of Interrogatories (Dckt. No. 299, at 3–4) ("NEXT's trade secrets included the FAST TOOL modules . . . ."). But this time, NEXT offered more words about the modules.

The modules had nondescript names, such as "Online Self Scheduling," "Dashboard Client," "Operational Dashboard," "Schedule Appointment," and "Email & Text Messaging," to name a few. [4] *See* Pl.'s Identification of Trade Secrets, at 11–13 of 29 (Dckt. No. 307); *see*

---

[3] NEXT explains that JIRA – the CLEAResult evidence provided in the fourth column – is a "project management tool used for software development projects." *See* Def.'s Resp. to Pl.'s Facts, at ¶ 1 (Dckt. No. 383).

[4] To the extent that this opinion cites anything under seal, the Court finds that it shouldn't be under seal. *See Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 547 (7th Cir. 2002). Judge Castillo did the same thing in his summary judgment decision. *See* Mem. Opinion and Order dated 2/27/19, at 2 n.1 (Dckt. No. 285) ("Where the Court cites or discusses portions of a document under seal, it is because the Court has determined that those portions of the document were improperly filed under seal."). The public needs transparency into the basis for the Court's decision.

*generally id.* at 9–20. After those generic names, NEXT offered a description of what the alleged trade secrets could do.

For example, for "Online Self Scheduling," NEXT explained that the system "manages the inventory of appointments" and "present[s] real-time appointment availability." *See* Pl.'s Identification of Trade Secrets, Ex. A, at 5 of 13 (Dckt. No. 307-2). As a second example, for "Schedule Appointment," NEXT stated that the system allows an administrator or dispatcher to "create open appointment slots, to update appointment availability." *Id.* at 6 of 13. For "Email & Text Messaging," NEXT claimed that the system "generates automated notifications, reminders, and alerts to utility customers." *Id.* at 7 of 13.

NEXT claimed that the spreadsheets satisfied the parameters set by Judge Castillo in the summary judgment ruling. That is, each of the 34 modules: (1) resided in the Back End of the NEXT System; (2) did not exist in the DSMTracker before CLEAResult accessed the NEXT Back End; and (3) are now part of the DSMTracker. *See* Pl.'s Identification of Trade Secrets, at 2 (Dckt. No. 307); *see also* Pl.'s Resp. to Def.'s Mot. for Summ. J., at 2 (Dckt. No. 356) ("For each software feature, NEXT's disclosure identifies 'specific features that were in the FAST Tool but missing from the DSMTracker and later added to DSMTracker after Defendant accessed the Next System Back End.'").

But there was more. NEXT didn't narrow the trade secrets for trial. Instead, it expanded them. In addition to the 34 modules, NEXT identified – for the first time – five "combinations" of modules and features as trade secrets. *See* Pl.'s Identification of Trade Secrets, at 9–11 (Dckt. No. 307); *see* Pl.'s Identification of Trade Secrets, Ex. A, at 1–4 of 13 (Dckt. No. 307-2). The five combinations had generic names: "Residential Appointment Management," "Appointment

Inventory Management," "Management and Tracking of Appliances," "Management of Field Services & Technicians," and "Management of Third-Party Contractors." *Id.*

NEXT's spreadsheet explained that the "combinations" were just that – combinations of many of the modules that NEXT also claimed were trade secrets. Consider, for example, the "Residential Appointment Management" combination. *See* Pl.'s Identification of Trade Secrets, Ex. A, at 1 of 13 (Dckt. No. 307-2). NEXT claimed that it was combination of modules 1, 2–5, 7, 9–13, 15, 16, 22–25, 27–29, and 31–34. *Id.* The idea seemed to be that NEXT could make more trade secrets by adding together trade secrets.

CLEAResult was non-plussed and filed a motion for sanctions. *See* Def.'s Mot. for Sanctions (Dckt. No. 309); Def.'s Mem. in Supp. of Sanctions (Dckt. No. 310). CLEAResult argued that NEXT had violated the Court's Order requiring more specificity about the trade secrets. And instead of narrowing the range, NEXT expanded the playing field. CLEAResult invoked the Court's statement that NEXT's "current description of its trade secrets is too broad to support the plaintiff's position of proceeding to trial on a claim for misappropriation of trade secret . . . ." *See* Def.'s Mem. in Supp. of Sanctions, at 1 (Dckt. No. 310) (quoting 3/26/19 Hearing Tr., at 3 (Dckt. No. 297)).

Judge Castillo denied CLEAResult's motion for sanctions, finding that NEXT did not violate its duty to supplement when it served a supplement. *See* Order dated 3/23/19 (Dckt. No. 323). But the ruling was narrow. The Court made clear that it did not reach the adequacy of the responses themselves. The specificity of the responses "goes to the merits and is an issue properly raised in a dispositive motion or at trial." *Id.* at 1.

Instead, the Court opened the door to a second summary judgment motion, a door that CLEAResult now attempts to pass through. Judge Castillo shared CLEAResult's "concern that

14

the parties are not prepared to try this complex case in light of [NEXT's] recently-filed document identifying 34 different software features as claimed trade secrets." *Id.* at 2. The Court granted CLEAResult leave to file a second summary judgment motion on the "narrow issue of whether Plaintiff has sufficiently identified any trade secrets." *Id.* at 3.

The Court also reopened expert discovery, allowing CLEAResult's expert to supplement his report. *Id.* at 2. CLEAResult later served a supplemental expert report that addressed NEXT's latest description of its trade secrets. CLEAResult's expert, Dr. Michael Shamos, opined that he still "cannot determine what NEXT's trade secrets are." *See* Pl.'s Resp. to Def.'s Statement of Facts Vol. II, at ¶ 23 (Dckt. No. 357).

After allowing CLEAResult to file a second summary judgment motion, Judge Castillo retired from the bench after decades of distinguished public service, and the case was reassigned. The Court now picks up where Judge Castillo left off: the adequacy of NEXT's descriptions of its alleged trade secrets.

## Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden to show that the evidence is insufficient to establish a material element of the non-moving party's case. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 322–23 (1986). A bare contention that an issue of fact exists is insufficient to create a factual dispute. *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000). The Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018). A genuine dispute of material fact

exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 610 (7th Cir. 2018) (quoting *Anderson*, 477 U.S. at 248).

Summary judgment is the time for a party to put its evidentiary cards on the table. Holding back is risky, because if the evidence that a party plays isn't enough, the claim may not survive. "Summary judgment is 'not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.'" *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005)); *see also Caisse Nationale de Credit v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) ("A party seeking to defeat a motion for summary judgment is required to 'wheel out all its artillery to defeat it.'") (citation omitted). NEXT has now played its best hand.

### Discussion

NEXT has attempted several times to identify alleged trade secrets with the requisite specificity. It answered written discovery, responded to a motion to compel, filed a document that purported to identify its trade secrets, and responded to two motions for summary judgment. *See* Pl.'s Resp. to Interrog. No. 21 (Dckt. No. 245-13, at 38–50 of 62); Pl.'s Resp. to Def.'s Mot. to Compel and Exs. (Dckt Nos. 293, 299); Identification of Trade Secrets (Dckt. No. 307); Pl.'s Resp. to Def.'s Mot. for Summ. J. (Dckt. No. 245); Pl.'s Resp. to Def.'s Mot. for Summ. J. (Dckt. No. 355). CLEAResult continues to object to the trade secrets as defined, and contends that NEXT has failed to identify the trade secrets with the specificity required by the Seventh Circuit. *See* Def.'s Mot. for Summ. J. (Dckt. No. 340).

## I.    NEXT's Descriptions of its Trade Secrets

After walking through the lengthy procedural history, it's important to summarize what is currently in play.  NEXT has had at least three opportunities to identify its trade secrets.  The latest offering is a 13-page document entitled Identification of Trade Secrets, with an accompanying brief.  *See* Pl.'s Identification of Trade Secrets and Ex. A. (Dckt. Nos. 307, 307-2).

The most detailed description of the trade secrets appears in the spreadsheet.  *See* Pl.'s Identification of Trade Secrets, Ex. A (Dckt. No. 307-2).  The spreadsheet describes 34 separate modules and five "combination" modules.  *Id.*  For each of the 34 modules, NEXT offers a "Description of Module," and then a "Description of Trade Secret."  *Id.*

Each "Description of Trade Secret" contains an explanation of the function of the module.  These descriptions bring the modules to life through a collection of active verbs, outlining what the module can do.

For example, the first module is titled "Online Self Scheduling."  *See id.* at 5.  NEXT describes the trade secret in the online self-scheduling module by identifying its abilities, using verbs like "manages," "applies rules," "tak[es] into account," and "provides for administrative audits."  *Id.*  NEXT points out that it "interfac[es] with modules 2, 3, 5, 7, 9, 10, 11, 12, 13, 15, 16, 22, 23, 24, 25, 27, 28, 29, 31, 32, 33, and 34 to present real-time appointment availability."  *Id.*

As another example, Module 2 – titled "Dashboard Client" – describes the trade secret, in part, as a module that "processes data collected from customers," which "prescribes and/or customizes reports."  *Id.* at 6.  NEXT similarly outlines the modules that interface with Module 2.  *Id.*

NEXT gives similar descriptions for the remaining 32 modules. *See id.* at 6–13 of 13. Each description contains similar elements: active, present-tense verbs explaining what the module accomplishes, and a list of the other modules with which the module interfaces. NEXT describes its modules' abilities with phrases like: "manages the inventory of appointments," "applies rules," "processes data," "creates reports," "permits editing appointments," "processes data entered by the utility customer," "generates automated notifications," and others. *See id.* at 5–7 of 13.

For each module, NEXT also provides citations to the location of that module in the DSMTracker, and to CLEAResult's software development documents that show CLEAResult describing the NEXT software function within the FAST Tool. *See id.* Notably, NEXT did not offer citations to the location of that software module in its *own* software. *Id.* It didn't cite its own documents, either. *Id.*

NEXT's descriptions of the five "combination" modules are even less specific. For starters, they don't separate the "description of module" from the "description of trade secret." *See id.* at 1–4. And they provide descriptions that cross-reference the more specific modules, explaining how they work together in these combination modules that seem to comprise a large swath of the software capability. *See id.*

For example, Combination Module A is a "FAST Tool Residential Appointment Management." *Id.* at 1. As its name suggests, it "permits consumers to schedule, cancel, or reschedule appointments online using a public-facing web page that required customers to enter information sufficient to automatically determine eligibility or potential eligibility for a program," among other functions. *Id.* As NEXT admits, it is "public-facing." That is, the

customers know that they're using the system to book an appointment – in fact, letting customers know that they can book an appointment is presumably the whole point.

## II.    NEXT's Claim under the Defend Trade Secrets Act

The Defend Trade Secrets Act creates a private cause of action in favor of the "owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." *See* 18 U.S.C. § 1836(b)(1); *Mission Measurement Corp. v. Blackbaud, Inc.*, 216 F. Supp. 3d 915, 919–20 (N.D. Ill. 2016). To prevail on a misappropriation claim, a plaintiff must show that (1) the information was a trade secret (*i.e.,* not generally known in the industry), (2) it was misappropriated (*i.e.,* stolen, rather than developed independently or obtained from a third party), and (3) it was used in the defendant's business.[5] *See Learning Curve Toys, Inc. v. Playwood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003) (citations omitted); *Composite Marine Propellers v. Van Der Woude*, 962 F.2d 1263, 1265 (7th Cir. 1992) (citations omitted). Here, the parties focus on whether the information qualifies as a trade secret at all – that is, whether it was something not generally known in the industry.

The Defend Trade Secrets Act defines a "trade secret" as information that the owner has taken "reasonable measures" to keep secret, and that derives value from the fact that it is not generally known and not readily ascertainable. *See* 18 U.S.C. § 1839(3). The definition expressly includes "programs," "methods," "processes," and the like. *Id.* The Act provides:

> The term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs,

---

[5] As the Court noted in its original summary judgment decision, the elements of a claim arising under the DTSA, the Illinois Trade Secrets Act, and other states' enacted versions of the Uniform Trade Secrets Act are the same, so the Court also relies on cases interpreting claims under the Illinois Trade Secrets Act and the Uniform Trade Secrets Act. *See* 2/27/19 Mem. Opinion and Order, at 48 n.13 (Dckt. No. 285); *see also Mickey's Linen v. Fischer*, 2017 WL 3970593, at *9 (N.D. Ill. 2017); *Inmar, Inc. v. Vargas*, 2018 WL 6716701, at *3 (N.D. Ill. 2019); *Kuryakyn Holdings, LLC v. Ciro, LLC*, 242 F. Supp. 3d 789, 797–98 (W.D. Wis. 2017).

prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

> (A) the owner thereof has taken reasonable measures to keep such information secret; and

> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

*Id.* So, to show that particular information was a trade secret, a plaintiff must demonstrate that the information is valuable, that it is "not known to others who might profit by its use," and that it "has been handled by means reasonably designed to maintain secrecy." *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002) (explaining the elements necessary to prove trade secrets under Wisconsin Uniform Trade Secrets Act, which defines "trade secret" using the same elements – and sometimes the same language – as the DTSA).

A plaintiff must identify the purported trade secret with an appropriate level of specificity. *See IDX Sys.*, 285 F.3d at 584 (finding that plaintiff, which argued that "all information in or about its software" is a trade secret, failed to identify its trade secrets). "A plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition." *Id.*; *see also Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992); *AMP Inc. v. Fleischhacker*, 823 F.2d 1199, 1203 (7th Cir. 1987).

The Seventh Circuit explained the need for specificity in *IDX Systems.* The case involved a trade secret claim about software used to manage the financial side of a medical practice. IDX argued that a "43-page description of the methods and processes underlying and the inter-relationships among various features making up IDX's software package" was "specific

enough." *IDX Sys.*, 285 F.3d at 583. The Seventh Circuit gave a straightforward answer: "No, it isn't." *Id.*

The Court found IDX's offering to be at once "too vague and too inclusive." *Id.* IDX argued that effectively "all information in or about its software is a trade secret." *Id.* Claiming that everything was a trade secret – without identifying anything with specificity – meant that nothing was protected. *Id.*

The Seventh Circuit held that the plaintiff had failed to separate the trade secrets from the other information that went into a software package. So it was impossible to determine which aspects were known to the trade, and which were not. *Id.* at 584. Even though some of the IDX software algorithms "may be genuine trade secrets," the Court faulted IDX for failing to "separate them from elements such as its input and output formats," which were readily ascertainable to the program users. *Id.* Indeed, IDX's tender of the "complete documentation for the software leaves mysterious exactly which pieces of information are the trade secrets." *Id.*

The failure to define the trade secrets with specificity, and the failure to separate the secrets from the non-secrets, meant that the claim could not survive. A party cannot bring a misappropriation claim without adequately describing what was stolen. And it was not the Court's job to parse out the trade secrets from the public-facing functions. *Id.* at 583; *see also Composite Marine Propellers*, 962 F.2d at 1266.

NEXT's long trade secret descriptions – which include public-facing functions and other general descriptions that are identifiable to an end-user – are similar to IDX's purported trade secrets. For that reason, the Court encouraged NEXT to narrow its alleged trade secrets and be more specific. Indeed, the Court gave NEXT more than ample opportunities to fix the problem.

The Court forewarned NEXT, no less than four times, that its purported trade secrets were too unwieldy for a jury. Specifically, Judge Castillo fired the following warning shots:

- "This description is too broad and generalized, and it is not evidence of a concrete secret or other information that would allow the Court or a fact finder to assess whether such information was kept secret or derives economic value. This broad description of business methods and software does nothing to separate genuine trade secrets from generic features that are part of every software program such as '[a]lgorithms and rules to automate certain tasks.'" *See* Mem. Opinion and Order dated 2/27/19, at 50–51 (Dckt. No. 285) (internal citations omitted) (referring to specific descriptions within the Interrogatory 21 response).

- "Consistent with the Court's summary judgment decision finding that Plaintiff's description of its trade secrets is too broad to support Plaintiff's claim for misappropriation of trade secrets, Plaintiff is ordered to supplement its response by 4/26/2019." *See* Order dated 3/26/19 (Dckt. No. 296).

- "So we need to know exactly the trade secret that you're going to proceed to on trial. I understand I tried to clarify that. I think I said something like the specific features that were in the FAST Tool but were missing from the DSMTracker and later added to the DSMTracker after defendant accessed the NEXT system back end, but that's way too general for a jury to deal with, and that's why I'm ordering the supplement within 30 days." *See* 3/26/19 Hearing Tr., at 4 (Dckt. No. 297).

- "[I]t's not sufficient for my purposes, and it's not going to be sufficient for a jury to decide this case. That's my conclusion . . . If you want to rest on that supplement, you're going to take a chance, that's all I'm going to ask. So you supplement as you see fit, and I will do what I think is appropriate, which could mean tubing this particular claim." *Id.* at 5–6 (referring to NEXT's supplemental interrogatory response).

- "The Court, however, shares Defendant's concern that the parties are not prepared to try this complex case in light of Plaintiff's recently-filed document identifying 34 different software features as claimed trade secrets." *See* Order dated 5/8/19, at 2 (Dckt. No. 323).

NEXT did not heed the warnings. Instead of fixing the problem, and getting down to brass tacks, NEXT *expanded* its alleged trade secrets. *See* Pl.'s Identification of Trade Secrets, at 9–20 (Dckt. No. 307). Indeed, after multiple attempts to define its trade secrets here, NEXT's most recent offering is a 13-page "Exhibit A," which lists five "combination modules" and 34 individual software modules. *See* Pl.'s Identification of Trade Secrets, Ex. A (Dckt. No. 307-2).

22

Within the 34 individual modules, NEXT identifies the alleged trade secrets, as well as the public-facing functionality. *See id.*

NEXT argues that distinct modules in its software system constitute trade secrets. Needless to say, computer software can qualify as a trade secret. *See Do It Best Corp. v. Passport Software, Inc.*, 2005 WL 743083, at *12 (N.D. Ill. 2005) (computer software "may constitute trade secrets and may be entitled to trade secret protection" where the owner has taken the right steps to protect its secrecy) (citations omitted). It also argues that combinations of those individual modules constitute trade secrets. *See* Pl.'s Identification of Trade Secrets, at 9–11 (Dckt. No. 307); *see also* Pl.'s Identification of Trade Secrets, Ex. A, at 1–4 of 13 (Dckt. No. 307-2). And to top it off, NEXT incorporates its current description "by reference" into the entirety of its former description, found in its response to Interrogatory 21, "as if fully set forth therein." *See* Pl.'s Identification of Trade Secrets (Dckt. No. 307).

Instead of narrowing its alleged trade secrets, NEXT simply dropped additional information about its trade secrets into the already existing quagmire of trade secrets and publicly available information. Instead of separating the trade secrets from the functionality that is readily ascertainable, NEXT's latest "trade secret identification" makes the distinction even murkier. Many of the items that appear in this description are "exceedingly hard to call trade secrets: things that any user or passer-by sees at a glance are 'readily ascertainable by proper means.'" *IDX Sys.*, 285 F.3d at 583 (quoting Wis. Stat. § 134.90(1)(c)).

As an example, consider Module 5, "Email & Text Messaging," which generates "automated notifications, reminders, and alerts to utility customer homeowners." *See* Pl.'s Identification of Trade Secrets, Ex. A, at 7 of 13 (Dckt. No. 307-2). As a second example, consider Module 15, "PDF Filler," which generates "a home energy audit in a Portable

Document Format (PDF) form with prefilled information collected during the scheduling process." *Id.* at 9 of 13. It is not obvious how it is a trade secret to send notifications to customers, or pre-fill a pdf. Anyone using the system would immediately ascertain that the software was sending them notifications and alerts, or providing them with prefilled PDF forms.

The combination modules are no better. If anything, they are more generalized, and are readily ascertainable to its software users. *See* Pl.'s Identification of Trade Secrets, Ex. A, at 1–4 of 13 (Dckt. No. 307-2).

NEXT's descriptions remain far too broad, especially when compared to trade secrets that passed muster in other cases. *See, e.g., Nilssen v. Motorola, Inc.*, 963 F. Supp. 664, 673–74 (N.D. Ill. 1997); *Do It Best v. Passport Software*, 2005 WL 743083, at *12 (N.D. Ill. 2005); *see also Act II Jewelry, LLC v. Wooten*, 318 F. Supp. 3d 1073, 1089 (N.D. Ill. 2018) (finding that plaintiff sufficiently identified its 74 alleged trade secrets, pointing to examples where plaintiff specifically identified "the name of each unreleased and modified carryover style for which it claims protection").

For example, in *Nilssen*, 963 F. Supp. at 673–74, the plaintiff provided the Court with amorphous descriptions of its alleged trade secrets throughout discovery. But at the summary judgment stage, the plaintiff gave a specific description. It identified four key elements that it disclosed to the defendant in confidence, including key technical elements of its circuits. *See Nilssen*, 963 F. Supp. at 673. Nilssen also narrowed the set of specific nontechnical items, and identified as a trade secret its detailed information about the reliability and cost of the technical design of the circuits. It supported that nontechnical information with documentary support. *See id.*

24

In *Do It Best*, the plaintiff claimed trade secret protection over 28 secrets. *See Do It Best*, 2005 WL 743083, at *12. In its trade secret identification, Do It Best included 831 pages of source code that it contended was protected material. *Id.* The court found that its 28 software features were sufficiently specific. And even then, the *Do It Best* court found that the trade secret submission came "dangerously close" to failing to identify its trade secrets with the requisite specificity. *Id.* at *14 (citing *IDX Sys.*, 285 F.3d at 584). But the submissions "identif[ied] certain lines of code and specific software features for which" plaintiff sought protection. *Id.*

Here, in sharp contrast, NEXT clings to generalities. It describes what its alleged trade secrets *do*, not what they *are*. NEXT took generalities and doused them with a heavy sprinkling of action verbs.

Module 1 "manages the inventory of appointments." *See* Pl.'s Identification of Trade Secrets, Ex. A, at 5 of 13 (Dckt. No. 307-2). Module 2 "processes data collected from consumers." *Id.* at 6. Module 3 "creates reports showing open appointment slots." *Id.* Module 4 "create[s] open appointment slots" and "processes data." *Id.* Module 5 "generates automated notifications." *Id.* at 7. Module 6 "enables and selecting of schedules of field technicians/contractors." *Id.* And so on. The remaining modules aren't any better. There are more words, but there isn't much more substance.

Just like in *IDX Systems*, NEXT comes to the summary judgment stage with an amorphous bog of alleged trade secrets. NEXT offers a broad description that leaves the audience wondering what, exactly, the supposed trade secrets are. Trying to pin down the trade secrets has the distinct feel of nailing jello to a wall.

25

Other District Courts have rejected such broad allegations at the summary judgment stage. *See, e.g., GlobalTap LLC v. Elkay Mfg. Co.*, 2015 WL 94235, at *6–7 (N.D. Ill. 2015) (granting summary judgment to defendant on trade secret misappropriation act claims for plaintiff's Business Plan and its list of partners, in part because much of the information in plaintiff's 101-page Business Plan "is not a GlobalTap trade secret," reasoning that while "[t]here may well be trade secrets" within the Plan, "it was Plaintiff's burden to identify those secrets and it has repeatedly failed to do so"); *see also Weather Shield Mfg. Inc. v. Drost*, 2018 WL 3824150, at *2 (W.D. Wis. 2018) (denying plaintiff Weather Shield's motion for summary judgment on trade secret misappropriation claim where Weather Shield argued that "all strategic plans, customer data, and pricing information constitute trade secrets as a matter of law," concluding that Weather Shield failed to "identify the specific information that it alleges contains trade secrets," and "[i]t is Weather Shield's responsibility, not the court's, to pin down the specific information that Weather Shield considers a trade secret").

In *IDX Systems*, the District Court found that IDX's silence on "any specific concepts, designs, methods, or processes underlying the functionalities" rendered IDX's identification of its software features insufficient. *See IDX Sys. Corp. v. Epic Sys. Corp.*, 165 F. Supp. 2d 812, 817–18 (W.D. Wis. 2001), *aff'd in relevant part*, 285 F.3d 581 (7th Cir. 2002). Here, just like in *IDX Systems,* NEXT didn't include its source code, nor did it identify any of the methods, designs, or processes underlying the system functionality. *See id.*; Pl.'s Identification of its Trade Secrets, Ex. A (Dckt. No. 307-2).

Unlike the plaintiff in *IDX Systems*, however, NEXT did try to parse out the trade secret from the public functionality (at least in its individual modules – it did not distinguish the public functions from the trade secrets within its combination modules). *IDX Sys.*, 285 F.3d at 584.

NEXT labeled its public-facing functions, and separated those public functions from the alleged trade secrets. *See* Pl.'s Identification of Trade Secrets, Ex. A (Dckt. No. 307-2). But these labels didn't save the content. Again, NEXT's module-specific descriptions, each labeled "Description of Trade Secret," provide a description of what each module *does*, not what it *is*. That is, the descriptions focus on the function of each module, not the underlying, secret methods of accomplishing those functions. And many of the functions on the "back end" are readily ascertainable to a customer who uses the software.

At bottom, NEXT has not identified the secrets that it seeks to protect with specificity. *See* Pl.'s Identification of Trade Secrets and Ex. A (Dckt. Nos. 307, 307-2); *see also IDX Sys.*, 285 F.3d at 684. And even then, the descriptions hardly seem like secrets. Module 1 "manages the inventory of appointments." *See* Pl.'s Identification of Trade Secrets, Ex. A, at 5 of 13 (Dckt. No. 307-2). Module 2 "processes data collected from customers" and "can compile data obtained from the residential utility customer." *Id.* at 6. Module 3 "creates reports showing open appointment slots from customer-provided data in the system" and "can update appointment availability under specific utility company eligibility rules." *Id.* And so on.

Those generic tasks aren't trade secrets. It's not a trade secret to manage inventory, process data, or create appointments. Maybe there is some secret, valuable software that NEXT uses to perform those functions. The code may be out there. Maybe there is some secret methodology or process, too. But if so, NEXT hasn't identified it, and the time to come forward with something has now passed. After all, summary judgment is the "put up or shut up" moment in a lawsuit. *Siegel v. Shell Oil Co.*, 612 F. 3d 932, 937 (7th Cir. 2010) (citation omitted). NEXT had repeated turns to speak, and didn't say what it needed to say. So its turn is now over.

Dr. Michael Shamos, Defendant's expert, described NEXT's trade secret filing with an apt analogy. *See* Supplemental Expert Rpt., at ¶ 13 (Dckt. No. 341). Describing the software functions without disclosing the underlying methods is like saying someone stole your top secret apple pie recipe, but never identifying the secret recipe itself. *See id.* Without the secret recipe, it is impossible to determine whether it was stolen, and whether it was copied. And the ultimate output – in the analogy, a delicious apple pie; in reality, the public-facing functions of the software – is certainly not a secret.

NEXT gambled that general descriptions would be good enough. By failing to identify any program, methodology, or process (and so on) with specificity, *see* 18 U.S.C. § 1839(3), NEXT has made it impossible to parse out the trade secrets. It is NEXT's job to identify them, not this Court's. *See IDX Sys.*, 285 F.3d at 584 ("[A] plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition."); *see also Composite Marine Propellers*, 962 F.2d at 1266 ("It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated. The plaintiff must show concrete secrets."). NEXT didn't match the level of specificity offered by the plaintiff in *Do It Best*, who provided hundreds of pages of its source code to support its trade secret claim. And the *Do It Best* plaintiff *still* came "dangerously close" to failing to identify the trade secrets with requisite specificity. *See Do It Best*, 2005 WL 743083, at *14.

The Court is fully mindful of the fact that the "existence of a trade secret ordinarily is a question of fact." *See Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003). All too often, "the existence of a trade secret is not obvious." *Id.* Still, a plaintiff must offer enough specificity to get to a jury in the first place. There is no question of fact for a

28

jury if the plaintiff has not offered enough specificity to support a verdict by a reasonable jury. And here, NEXT hasn't offered enough.

There is another problem with NEXT's identification of trade secrets. NEXT fails to come forward with any of its own documents to show that it maintains the software in question. *See* Pl.'s Resp. to Interrogatory 21 (Dckt. Nos. 243-9, 245-13); Def.'s Resp. to Pl.'s Mot. to Compel (Dckt. Nos. 293, 299); Pl.'s Identification of Trade Secrets, Ex. A (Dckt. No. 307-2). Instead, NEXT purports to identify its trade secrets by citing to *CLEAResult's* documents, ostensibly to show that it misappropriated the data, by including "Location in [DSMTracker]" and the "JIRA REN # (CCI description of FAST Tool)." *Id.* NEXT provides voluminous cites to the CLEAResult documents.

But offering that evidence, without more, skips a step. To prove its case, NEXT needed to offer evidence of its *own* software, too. NEXT doesn't offer "computer printouts, formulae, memoranda, or any other tangible technical data" *of its own*, identifying the trade secrets that NEXT itself developed. *See Lynchval Sys., Inc. v. Chicago Consulting Actuaries, Inc.*, 1998 WL 151814, at *5–6 (N.D. Ill. 1998) (finding interrogatory responses identifying trade secrets fail to establish that "the stolen objects in question . . . exist and therefore are capable of being stolen"). Assuredly, if such documentation exists for CLEAResult's software, there is corresponding documentation – just like the documentation it provides for CLEAResult's software – that relates to NEXT's software. While neither party disputes that the FAST Tool does what NEXT says it does, pointing the Court to NEXT's own software could have been helpful for the Court's understanding of NEXT's trade secrets. After all, NEXT is "supposed to produce evidence of its own . . . programs with which the trier of fact can compare to [the defendant's software] to

determine whether misappropriation has occurred." *Id.* at *5. Perhaps NEXT did so somewhere in the record, but it didn't include any citations in its recent filings.

By failing to present this information, NEXT asks the Court to skip a step, and look at CLEAResult's misappropriation of its technology, instead. But absent evidence of NEXT's technology, NEXT has not even shown the Court evidence that its own software "exists, and therefore [is] capable of being stolen." *See id.* at *5. NEXT must prove its own case. NEXT cannot ask this Court to trust that this software exists simply because NEXT says so.

It should come as no surprise to NEXT that the Court finds its current offering too expansive and overbroad to constitute a trade secret. It received ample opportunities to fix its filing and narrow its trade secrets. But, after all of these warnings, NEXT added to its trade secrets and refused to narrow anything. "Reluctance to be specific is understandable; the more precise the claim, the more a party does to tip off a business rival to where the real secrets lie and where the rival's own development efforts should be focused." *IDX Sys.*, 285 F.3d at 583. But "unless the plaintiff engages in a serious effort to pin down the secrets a court cannot do its job." *Id.*

NEXT has not engaged in this "serious effort" to pin down its secrets. *See id.* NEXT has had plenty of opportunities to do so. It will not get another one. CLEAResult's motion for partial summary judgment [333] is granted.

**Conclusion**

For the reasons stated above, CLEAResult's motion for partial summary judgment [333] is granted.

Date: May 31, 2020

_____

Steven C. Seeger
United States District Judge